# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK, COMMERCIAL DIVISION

——————————————————————————— x

FORT WORTH EMPLOYEES' RETIREMENT
FUND, On Behalf of Itself and All Others
Similarly Situated,

        Plaintiff,

    vs.

J.P. MORGAN CHASE & CO., J.P. MORGAN
ACQUISITION CORP., JP MORGAN
ACCEPTANCE, J.P. MORGAN SECURITIES,
INC., JP MORGAN MORTGAGE TRUST 2007-
S2, JP MORGAN MORTGAGE TRUST 2007-
S3, JP MORGAN MORTGAGE TRUST 2007-
A3, JP MORGAN MORTGAGE TRUST 2007-
A4, JP MORGAN ALTERNATIVE LOAN
TRUST 2007-S1, JP MORGAN ALTERNATIVE
LOAN TRUST 2007-A2, JP MORGAN
MORTGAGE ACQUISITION TRUST 2007-
CH4, JP MORGAN MORTGAGE
ACQUISITION TRUST 2007-CH5, JP
MORGAN MORTGAGE TRUST 2007-A5, JP
MORGAN MORTGAGE TRUST 2007-A6, JP
MORGAN MORTGAGE ACQUISITION
TRUST 2007-CH3, JP MORGAN MORTGAGE
ACQUISITION TRUST 2007-CH6, MOODY'S
INVESTOR SERVICES, INC., A DIVISION OF
MOODY'S CORP., MCGRAW-HILL
COMPANIES, INC., FITCH, INC., BRIAN
BERNARD, LOUIS SCHIOPPO JR.,
CHRISTINE E. COLE, DAVID M. DUZYK,
WILLIAM KING, and EDWIN F.
MCMICHAEL,

        Defendants.

——————————————————————————— x

*Date Filed:* **March 11, 2009**

Index No. 600767/2009

Plaintiff hereby designates
New York County as the place
for trial.

***SUMMONS WITH NOTICE***

*To the above-named Defendant(s):*

**YOU ARE HEREBY SUMMONED**, to serve a notice of appearance on the Plaintiff's Attorney within twenty (20) days after the service of this Summons, exclusive of the day of service (or within thirty (30) days after the service is complete if this Summons is not personally delivered to you within the State of New York); and in case of your failure to appear, judgment will be taken against you by default for the relief demanded in the notice set forth below.

Dated:      New York, New York
           March 11, 2009

Date Summons Filed: March 11, 2009

The basis of venue is:
  §22 of 1933 Act

JOSEPH P. GUGLIELMO
Attorney for Plaintiff
SCOTT + SCOTT, LLP
29 West 57th Street, 14th Floor
New York, NY 10019
(212) 223-6444

**NOTICE**: THE OBJECT OF THIS ACTION AND THE RELIEF SOUGHT BY THE PLAINTIFF HEREIN ARE AS FOLLOWS: (1) The principal claims in the case are shareholder class action claims and the sums at issue in this case (exclusive of punitive damages, interest, costs, disbursements, and counsel fees claimed) are in excess of $100,000, the monetary threshold of the Commercial Division in this County.
(2) This case falls within the standards set out in Subdivision (b) of the Section and does not come within the groups of cases set out in Subdivision (c) that will not be heard in the Division, in that the principal claims in the case are claims under Sections 11, 12 and 15 of the Securities Act.

AGENT FOR DEFENDANTS:
J.P. Morgan Chase & Co., J.P. Morgan Acquisition Corp., JP Morgan Acceptance, J.P. Morgan Securities, Inc., JP Morgan Mortgage Trust 2007-S2, JP Morgan Mortgage Trust 2007-S3, JP Morgan Mortgage Trust 2007-A3, JP Morgan Mortgage Trust 2007-A4, JP Morgan Alternative Loan Trust 2007-S1, JP Morgan Alternative Loan Trust 2007-A2, JP Morgan Mortgage Acquisition Trust 2007-Ch4, JP Morgan Mortgage Acquisition Trust 2007-Ch5, JP Morgan Mortgage Trust 2007-A5, JP Morgan Mortgage Trust 2007-A6, JP Morgan Mortgage Acquisition Trust 2007-Ch3, JP Morgan Mortgage Acquisition Trust 2007-Ch6, Brian Bernard, Louis Schioppio Jr., Christine E. Cole, David M. Duzyk, William King, And Edwin F. McMichael.
-And-
Moody's Investor Services, Inc.
IS LOCATED AT:
CT CORPORATION SYSTEM
111 Eighth Avenue
13th Floor
New York, NY 10011
Phone: 212-894-8940
Fax: 212-894-8581

NEW YORK
COUNTY CLERK'S OFFICE

MAR 1 2 2009

NOT COMPARED
WITH COPY FILED

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK, COMMERCIAL DIVISION

———————————————————————— x

FORT WORTH EMPLOYEES' RETIREMENT
FUND, On Behalf of Itself and All Others Similarly
Situated,

           Plaintiff,

    vs.

J.P. MORGAN CHASE & CO., J.P. MORGAN
ACQUISITION CORP., JP MORGAN
ACCEPTANCE, J.P. MORGAN SECURITIES, INC.,
JP MORGAN MORTGAGE TRUST 2007-S2, JP
MORGAN MORTGAGE TRUST 2007-S3, JP
MORGAN MORTGAGE TRUST 2007-A3, JP
MORGAN MORTGAGE TRUST 2007-A4, JP
MORGAN ALTERNATIVE LOAN TRUST 2007-S1,
JP MORGAN ALTERNATIVE LOAN TRUST 2007-
A2, JP MORGAN MORTGAGE ACQUISITION
TRUST 2007-CH4, JP MORGAN MORTGAGE
ACQUISITION TRUST 2007-CH5, JP MORGAN
MORTGAGE TRUST 2007-A5, JP MORGAN
MORTGAGE TRUST 2007-A6, JP MORGAN
MORTGAGE ACQUISITION TRUST 2007-CH3, JP
MORGAN MORTGAGE ACQUISITION TRUST
2007-CH6, MOODY'S INVESTOR SERVICES,
INC., A DIVISION OF MOODY'S CORP.,
MCGRAW-HILL COMPANIES, INC., FITCH, INC.,
BRIAN BERNARD, LOUIS SCHIOPPO JR.,
CHRISTINE E. COLE, DAVID M. DUZYK,
WILLIAM KING, and EDWIN F. MCMICHAEL,

           Defendants.

———————————————————————— x

Index No. 600767/2009

CLASS ACTION COMPLAINT

**JURY TRIAL DEMANDED**

## SUMMARY OF THE ACTION

1.      This is a securities class action on behalf of all persons who acquired the Mortgage Pass-Through Certificates ("Certificates") of JP Morgan Issuing Trusts (defined, *infra*) pursuant and/or traceable to the J.P. Morgan Acceptance Corporation I ("JP Morgan Acceptance") Registration Statement No. 333-141607 and accompanying Prospectus (collectively, the "Registration Statement") and Prospectus Supplements, and were damaged thereby. By this action, Plaintiff Fort Worth Employees Retirement Fund ("Plaintiff") asserts solely strict liability and negligence claims pursuant to the Securities Act of 1933 ("Securities Act") against defendants J.P. Morgan Chase & Co. ("JP Morgan"); J.P. Morgan Acquisition Corp ("JP Morgan Acquisition"); JP Morgan Acceptance; J.P. Morgan Securities, Inc. ("JP Morgan Securities"),[1] Moody's Investor Services, Inc. ("Moody's"), a division of Moody's Corp.; McGraw-Hill Companies, Inc. ("McGraw-Hill"); Fitch, Inc. ("Fitch"); Brian Bernard; Louis Schoppio, Jr.; Christine E. Cole; David M. Duzyk; William King; and Edwin F. McMichael.

2.      This action arises from defendants' sale of mortgage pass-through certificates (the "Certificates") based upon false and misleading offering documents. Mortgage pass-through certificates are securities entitling the holder to income payments from pools of loans and mortgage-backed securities aggregated and bundled for the purpose of selling certificates to institutional investors such as Plaintiff. Similar to other asset-backed securities, the value of pass-through certificates is dependent on the ability of the underlying borrowers to repay their loans (principal and interest) and the adequacy of collateral in the event that borrowers cannot do so.

---

[1]      Collectively, JP Morgan, JP Morgan Acquisition, JP Morgan Acceptance and JP Morgan Securities are sometimes referred to herein as the "JP Morgan Entities."

1

3.      On March 27, 2007, the JP Morgan Entities filed a Form S-3 Registration Statement No. 333-141607 ("Registration Statement")[2] and accompanying Prospectus with the Securities and Exchange Commission ("SEC") in connection with and for the purpose of issuing hundreds of millions of dollars of Certificates through JP Morgan Issuing Trusts (defined, *infra*). The JP Morgan Issuing Trusts issued the Certificates pursuant to the Registration Statement, which explained the structure of the Issuing Trusts and provided an overview of the Certificates. For example, the Registration Statement included information about the underwriting standards and the appraisals of the properties that were the subject of the underlying mortgage loans.

4.      The Certificates were then sold to investors by underwriters pursuant to a series of prospectus supplements that were also filed with the SEC and incorporated by reference into the Registration Statement ("Prospectus Supplements"). Each Prospectus Supplement included a detailed description of the particular JP Morgan Issuing Trust and the Certificates it would issue. For example, the Prospectus Supplements set forth data about the underlying loans, including the type and number of loans, the particular underwriting and appraisal standards employed by loan originators, mortgage rates, aggregated principal balance of the loans, the geographic concentration of the mortgaged properties and loan-to-value ratios.

5.      JP Morgan is one of the oldest financial services firms in the world. Since merging with Chase Manhattan Bank in 2000 to form JP Morgan Chase, JP Morgan has also acquired Bank One Corporation (2004), Bear Stearns (2008) and Washington Mutual (2008). As an integrated financial services firm, JP Morgan operates as an investment bank, asset manager and retail bank; JP Morgan also operates hedge funds and private equity investment vehicles.

---

[2]      On April 23, 2007, the JP Morgan Entities filed an Amended Registration Statement and Prospectus on Form S-3/A. References herein to the "Registration Statement" are to the April 23, 2007 Amended Registration Statement.

6.      JP Morgan Acceptance is a subsidiary of JP Morgan involved in the real estate and mortgage market, including mortgage lending and real estate finance. JP Morgan established JP Morgan Acceptance for the purpose of creating entities to issue Certificates. JP Morgan Acquisition acquired pools of mortgage loans originated by third party mortgage originators and then transferred the loans to JP Morgan Acceptance for deposit into special purpose entities – the JP Morgan Issuing Trusts. The pools of mortgage loans were then securitized into asset-backed securities and sold by underwriters, including lead underwriter JP Morgan Securities, to investors as Certificates.

7.      The Certificates entitle investors to receive monthly distributions of interest and principal on cash flows paid by the borrowers on the mortgages held by the JP Morgan Issuing Trusts. As the underlying mortgage borrowers in each issuance pay their mortgages, distributions are made to the investors holding Certificates according to the terms of the particular Certificate as disclosed in the Prospectus Supplement disseminated with respect to that Certificate. If the underlying borrowers do not pay their mortgages, losses pass to investors based on the seniority of their Certificates. Consequently, the investment quality of the Certificates is inextricably connected to the quality of the mortgage loan pools held by each JP Morgan Issuing Trust.

8.      The asset-backed securities issued by the JP Morgan Issuing Trusts were divided into "tranches," each of which carried different priorities of seniority, payment, exposure to borrower defaults and interest payments. The tranches thus provided for higher yields on riskier Certificates, and the Certificates theoretically permitted investors to select between safer and more risky investments according to their own risk tolerances.

9.      Each tranche of mortgage-pass through certificates is typically rated by at least one of the three ratings agencies: Defendants Moody's Investor Service, Inc., a division of Moody's; Standard & Poor's, a division of McGraw-Hill, and Fitch Ratings, a division of Fitch. Moody's, Standard & Poor's and/or Fitch rated the tranches of Certificates issued by the JP Morgan Issuing

3

Trusts. The highest investment rating used by Moody's is AAA, and the highest rating used by Standard & Poor's and Fitch is AAA. The so-called "triple-A" or "AAA" ratings signal to investors that the subject investments are the highest investment-grade and carry the smallest degree of risk. Any security or investment instrument rated lower than BBB is considered below investment-grade, commonly referred to as "junk bonds." Those instruments that receive ratings BBB or better, but less than Triple-A are considered investment-grade.

10.     Defendants Moody's, Standard & Poor's and Fitch (collectively, the "Rating Agencies" or "Rating Agency Defendants") directly and indirectly participated in and took the actions necessary for the distribution of the JP Morgan Issuing Trust Certificates. The Rating Agencies directly participated in selection of the underlying mortgages to be securitized and issued by the JP Morgan Issuing Trusts. Far from rating each tranche once they were assembled, the Rating Agencies pre-determined the ratings that would be assigned, which they could do because they were involved in the formulation of the Certificates. The Rating Agencies each assigned investment-grade ratings to most of the tranches of Certificates offered to investors and the ratings were expressly included in each of the Prospectus Supplements. These ratings determined, in part, the price at which the Certificates were sold to Plaintiff and other investors.

11.     As explained above, the Registration Statement and Prospectus Supplements filed by the various JP Morgan Entities with the SEC in connection with the Certificates made representations about factors that investors use to determine whether the Certificates were good investments. As alleged herein, the Registration Statement, and Prospectus Supplements contained false and materially misleading information and omitted material information regarding the mortgage loans underlying the Certificates and the process by which JP Morgan Acquisition obtained the loans.

4

12.    Specifically, the JP Morgan Entities did not disclose in the documents, *inter alia*, that the loan originators that had originated the mortgages to borrowers had ignored and/or never intended to follow the stated underwriting and appraisal standards and guidelines, and that JP Morgan Acquisition ignored its loan purchasing guidelines. The underlying mortgages were also loans on properties for which the collateral appraisals materially overstated the value of the underlying properties. Thus, the Certificates that were sold to investors as investment-grade instruments were later revealed to be below investment-grade instruments. As underlying mortgage borrowers become delinquent, default and suffer foreclosures, the purportedly investment-grade Certificates have been downgraded, cash flows have suffered and the Certificates have lost value.

13.    As a direct and proximate result of defendants' false and materially misleading statements and material omissions alleged herein, Plaintiff suffered damages when the truth about the risk profile and value of the Certificates became known, causing the price to drop.

## JURISDICTION AND VENUE

14.    The claims asserted herein arise under §§11 and 15 of the 1933 Act, 15 U.S.C. §§77k and 77o. Jurisdiction is conferred by §22 of the 1933 Act and venue is proper pursuant to §22 of the 1933 Act. Section 22 of the 1933 Act states that "[e]xcept as provided in section 16(c), no case arising under this title and brought in any State court of competent jurisdiction shall be removed to any court in the United States." Section 16(c) refers to "covered class actions," which are defined as lawsuits brought as class actions or brought on behalf of more than 50 persons asserting claims under state or common law. This is an action asserting federal law claims. Thus, it does not fall within the definition of a "covered class action" under §16(b)-(c) and is therefore not removable to federal court under the Securities Litigation Uniform Standards Act of 1998.

5

15.     The violations of law complained of herein occurred in this County, including the dissemination of false and materially misleading statements complained of herein into this County. The JP Morgan Entities conduct business in this County.

## PARTIES

16.     Plaintiff Fort Worth Employees' Retirement Fund acquired Certificates pursuant to and traceable to Registration Statement No. 333-141607. Plaintiff has its principle offices at 4100 International Plaza, Suite 730, Ft. Worth, Texas 76109. Plaintiff provides disability, retirement and survivor benefits to current and former employees (and their beneficiaries) of the City of Fort Worth, Texas. Plaintiff purchased Certificates traceable to the Registration Statement and was damaged thereby.

17.     Defendant JP Morgan is a Delaware corporation with its principal executive office located at 270 Park Avenue, New York, New York 10017. As a financial institution with extensive investment banking operations, JP Morgan underwrites a wide range of securities and other financial instruments, including asset-backed and mortgage-related securities. JP Morgan owns and/or controls JP Morgan Acquisition, JP Morgan Acceptance and JP Morgan Securities. JP Morgan acted as an "Underwriter" of the Certificates within the meaning of the Securities Act, 15 U.S.C. §77(b)(a)(11). As an underwriter, JP Morgan participated in drafting and disseminating the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiff and other members of the Class.

18.     Defendant JP Morgan Acquisition is a Delaware corporation with its principal place of business located at 270 Park Avenue, New York, New York 10017. JP Morgan Acquisition purchased the mortgage loans that underlie the Certificates issued by the JP Morgan Issuing Trusts from third-party loan originators. JP Morgan Acquisition served as the "Sponsor/Seller" in the securitization of certain of the JP Morgan Issuing Trusts. JP Morgan Acquisition, in coordination

6

with other JP Morgan Entities, worked with the Rating Agencies to structure the securitization transactions related to the Certificates.

19.     Defendant JP Morgan Acceptance is a special purpose Delaware corporation headquartered at 270 Park Avenue, New York, New York 10017. JP Morgan Acceptance filed the March 27, 2007 Registration Statement and Prospectus, which also incorporated by reference the Prospectus Supplements issued by the JP Morgan Issuing Trusts. JP Morgan Acceptance served in the role as "Depositor" in the securitization of the JP Morgan Issuing Trusts and was an "Issuer" of the Certificates within the meaning of Section 15 of the 1933 Act, 15 U.S.C. §77(b)(a)(4).

20.     Defendant JP Morgan Securities is headquartered in New York, New York. JP Morgan Securities acted as an "Underwriter" of the Certificates within the meaning of the Securities Act, 15 U.S.C. §77(b)(a)(11). As an underwriter, JP Morgan Securities participated in drafting and disseminating the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiff and the other Class members.

21.     Defendant McGraw-Hill is a Delaware corporation with its principal place of business in New York, New York. Standard & Poor's is a division of McGraw-Hill that provides credit ratings, risk evaluation, investment research and data to investors. Standard & Poor's acted as an "Underwriter" of the Certificates within the meaning of the Securities Act, 15 U.S.C. §77b(a)(11). Standard & Poor's participated in drafting and disseminating the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiff and other Class members. Standard & Poor's also worked with the JP Morgan Entities in structuring the securitization transactions related to the Certificates and then provided the pre-determined credit ratings that it had agreed with the JP Morgan Entities to provide, as set forth in the Prospectus Supplements.

22.     Defendant Moody's is a division of Moody's Corp., a Delaware corporation with its principal place of business in New York, New York. Moody's provides credit ratings, risk

7

evaluation, investment research and data to investors. Moody's acted as an "Underwriter" of the Certificates within the meaning of the Securities Act, 15 U.S.C. §77b(a)(11). Moody's participated in drafting and disseminating the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiff and other Class members. Moody's also worked with the JP Morgan Entities in structuring the securitization transactions related to the Certificates and then provided the pre-determined credit ratings that it had agreed with the JP Morgan Entities to provide, as set forth in the Prospectus Supplements.

23.     Defendant Fitch is a Nationally Recognized Statistical Rating Organization with dual headquarters in New York, New York and London, England, and its principal place of operations at One State Street Plaza, New York, New York 10004. Fitch, through Fitch Ratings, is a leading global rating agency. Fitch acted as an "Underwriter" of the Certificates within the meaning of the Securities Act, 15 U.S.C. §77b(a)(11). Fitch participated in drafting and disseminating the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiff and other Class members. Fitch also worked with the JP Morgan Entities in structuring the securitization transactions related to the Certificates and then provided the pre-determined credit ratings that it had agreed with the JP Morgan Entities to provide, as set forth in the Prospectus Supplements.

24.     Defendants JP Morgan Issuing Trusts were created and structured by the JP Morgan Entities to issue the Certificates pursuant to the Registration Statement and the Prospectus Supplements. With respect to each offering of Certificates by the Issuing Trusts, JP Morgan Acquisition served as the "Sponsor/Seller," JP Morgan Acceptance served as the "Depositor," and JP Morgan Securities served as the designated "Underwriter." The Defendant JP Morgan Issuing Trusts are:

- JP Morgan Mortgage Trust 2007-S2
- JP Morgan Mortgage Trust 2007-S3
- JP Morgan Mortgage Trust 2007-A3

8

- JP Morgan Mortgage Trust 2007-A4
- JP Morgan Alternative Loan Trust 2007-S1
- JP Morgan Alternative Loan Trust 2007-A2
- JP Morgan Mortgage Acquisition Trust 2007-CH4
- JP Morgan Mortgage Acquisition Trust 2007-CH5
- JP Morgan Mortgage Trust 2007-A5
- JP Morgan Mortgage Trust 2007-A6
- JP Morgan Mortgage Acquisition Trust 2007-CH3

25.     Defendant Brian Bernard ("Bernard") was, at all relevant times, the President of JP Morgan Acceptance.  Bernard signed Registration Statement No. 333-141607.

26.     Defendant Louis Schoppio Jr. ("Schoppio") was, at all relevant times, the Controller and Chief Financial Officer of JP Morgan Acceptance.  Schoppio signed Registration Statement No. 333-141607.

27.     Defendant Christine E. Cole ("Cole") was a director of JP Morgan Acceptance during the relevant period.  Cole signed Registration Statement No. 333-141607.

28.     Defendant David M. Duzyk ("Duzyk") was a director of JP Morgan Acceptance during the relevant period.  Duzyk signed Registration Statement No. 333-141607.

29.     Defendant William King ("King") was a director of JP Morgan Acceptance during the relevant period.  King signed Registration Statement No. 333-141607.

30.     Defendant Edwin F. McMichael ("McMichael") was a director of JP Morgan Acceptance during the relevant period.  McMichael signed Registration Statement No. 333-141607.

31.     Defendants JP Morgan, JP Morgan Acceptance and the JP Morgan Issuing Trusts are collectively referred to herein as the "Issuing Defendants."

32.     Defendants JP Morgan, JP Morgan Securities and the Rating Agency Defendants are collectively referred to herein as the "Underwriter Defendants."

33.     Defendants Bernard, Schoppio, Cole, Duzyk, King and McMichael are collectively referred to herein as the "Individual Defendants."

9

## BACKGROUND

The Mortgage Industry, Secondary Mortgage Market and Mortgage Securitization

34.     Until relatively recently, consumers wishing to finance the purchase of a home or other piece of real property obtained 30-year or 15-year fixed rate mortgages or conventional adjustable rate mortgages ("ARMs") through a mortgage lender that profited by servicing the loans and collecting interest payments over the life of the mortgage until it reached maturity.  Thus, the mortgage industry was traditionally characterized by a lending institution (*i.e.*, a loan originator) that held a direct interest in the subject property as collateral in the event that the borrower defaulted on the loan.

35.     The United States chartered Government Sponsored Enterprises ("GSEs"), such as the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"), and empowered the institutions to buy mortgages from banks and other loan originators, thus creating a secondary market for mortgages.  Once acquired, the loans were typically pooled together and then securitized to enable sale to investors as "mortgage-backed securities," commonly referred to as "MBS."  The advent of a secondary market altered the traditional model of mortgage origination because loan originators began to sell mortgages to GSEs. By acquiring the loan, GSEs acquired both the right to interest payments and the risk of default by the borrower.  When mortgage companies originated loans and then sold the mortgage into the secondary market, the originator would receive upfront proceeds in the form of fees in connection with issuance of the mortgage and cash when it sold the loan into the secondary market. Upfront profits from fees and the immediate ability to sell mortgages into the secondary market fundamentally altered the incentives for loan originators because under such circumstances the entity making the loan could profit with almost no risk of loss.

10

36.     Investors who purchased MBS typically received monthly payments over the lifetime of the underlying loans in accordance with the borrowers' payments of principal and interest. However, GSEs were limited to purchasing loans that met particular underwriting standards. MBS purchased by GSEs were also discounted to account for an assumed rate or default on a certain percentage of loans. As real estate boomed, investment banks such as JP Morgan and others became active in and profited from the secondary market for mortgage loans. But unlike GSEs, investment banks were not constrained by the strict conditions and restrictions when purchasing loans from loan originators.

37.     The advent of unrestrained buying in the secondary mortgage market by non-GSE entities further separated loan originators from the risks inherent to loaning individuals money to buy property. The potential to sell most loans and thereby offload most risk turned mortgage lending into a volume business. To facilitate more loans – and with it more fees and sales revenue – originators offered increasingly aggressive and exotic loan products such as subprime mortgages to high credit risk borrowers, interest-only loans and negative-amortization "option ARM" loans.

38.     To further increase the number of loans written, originators simply abandoned or completely ignored stated underwriting standards. As a result, lenders not only issued loans based on little or no borrower documentation, but performed no additional due diligence or income verification, often approving loans within hours. Originators also made loans carrying low, "teaser" interest rates to borrowers who they knew would not have sufficient income to avoid default once the introductory rates expired and steered prime, qualified buyers to more expensive, exotic loans that created a serious risk of default that would not have existed had the borrower taken out a typical, fixed-interest rate mortgage. By using inflated appraisals that necessitated larger loans, originators also steered borrowers into larger loans that generated larger fees. The widespread use of "independent" originators and mortgage lenders who merely stood behind independent brokers

11

exacerbated these and other abusive practices because independent, non-employee brokers were inadequately supervised (if at all) and lending companies did little (if any) due diligence on the loans originated by such third parties.

39.      As the tendency for loan originators to push consumers to borrow more money than they could afford to repay turned into common industry practice, the market for non-prime loans issued to borrowers with poor credit histories and/or carrying exotic terms grew from less than $250 billion to almost $1 trillion by 2005.  By enabling consumers to borrow more, loan originators enabled consumers to spend more with the effect that housing prices rose – and kept rising.  Under conditions where housing prices perpetually increased, borrowers who had taken out loans that they could not afford were able to borrow against the increased equity in their property or sell their house at a price high enough to cover the loan (albeit to a buyer who was likely borrowing more than advisable in order to purchase the home).

40.      The merry-go-round was not sustainable and, eventually, loan originators' lending practices subsumed the housing market under a tidal wave of astronomical debt that was not affordable to those holding it.  When the merry-go-round finally stopped and housing prices leveled off and then declined, those who were in over their head had no equity to borrow against and no purchasers to sell their overpriced house to.  Without revenues from underlying borrowers who were now defaulting or adequate collateral to support MBS, the credit market began deteriorating and investors in MBS – directly or through derivative instruments such as mortgage pass-through certificates – experienced tremendous losses.

Mortgage Pass-Through Certificates

*Process of Creation*

41.      Initially, a "sponsor/seller" that either originated or acquired loans from other originators (typically the latter) sells an inventory of loans to a "depositor."  In this case, for

example, JP Morgan Acquisition acquired loans originated by various third parties and sold them to JP Morgan Acceptance. The loans in the inventory acquired by the "sponsor/seller" typically vary and may include conventional, fixed or adjustable rate mortgages secured by first and junior liens (or a combination thereof), with various maturities.

42.     Having acquired the loans, the "depositor" transfers (or "deposits") the acquired pool of loans to the issuing trust entity. Here, JP Morgan Acceptance transferred the pool of loans to the JP Morgan Issuing Trusts. The issuing trust securitizes the pool of loans such that the rights to the cash-flows from the underlying mortgages can be sold to investors as pass-through certificates. The securitization transactions are structured such that the risk of loss is divided among the different tranches, each of which carry different levels of risk and yield. Losses amongst the underlying loans (due to default, delinquency, etc.) are applied in reverse order of seniority – the most senior tranches of pass-through certificates are often rated as the best quality (*i.e.*, "AAA") while junior tranches usually carry lower ratings because they are less insulated from risk. Of course, the junior tranches also offer greater yields than the more senior, and less risky, tranches. By working with underwriters, the depositor and the ratings agencies, issuing trusts are able to ensure *ex ante* that particular tranches of mortgage pass-through certificates will receive certain ratings at the time of offering.

43.     Having securitized the underlying mortgage pool into various tranches of pass-through certificates, the issuing trust passes the certificates back to the depositor, which then passes the certificates to one or more designated underwriters which, in turn, offer the certificates to investors. Mortgage pass-through certificates must be offered to the public pursuant to a registration statement and prospectus in accordance with the 1933 Act.

44.     When investors purchase certificates they pay the underwriter who then pays the proceeds back to the depositor, minus fees. In this case, the JP Morgan Issuing Trusts passed the

13

Certificates back to JP Morgan Acceptance, which then sent the Certificates to JP Morgan Securities for sale to investors. JP Morgan Securities then took a fee from the proceeds and remitted the remainder to JP Morgan Acceptance. Once certificates are sold, a loan servicer collects the payments and distributes them, through the issuing trust, to investors according to the distribution schedule set forth in a prospectus supplement for the life of the loan.

*Analyzing Mortgage-Pass Thru Certificates as Investments*

45.     Investors acquire mortgage pass-thru certificates with the expectation of receiving monthly payments. Investors pay for the right to monthly payments of principal and/or interest from the mortgage pool, depending upon the class of certificate purchased (a minority of certificates are interest-only). Typically, if the investor holds the certificate to maturity, the investor will have received total payments providing a complete return of the principal invested, plus an additional amount, in the form of interest, representing the risk premium (*i.e.*, rate of return) generated by the investment in the certificate. Investors may sell certificates they hold, in which case the purchaser stands in the shoes of the original purchaser. Of course, if the certificate is not performing in the manner set forth in the registration statement and/or prospectus supplement, then the certificate will not be salable at the price paid by the original investor.

46.     Fundamentally, certificate value is based on the ability of the borrowers in the underlying mortgage pool to repay the principal and interest on the underlying loans and the adequacy of the collateral in the event that borrowers are delinquent or default. Loan underwriting and appraisal standards are therefore crucial to evaluating an investment in any mortgage pass-thru certificate – if underwriting or appraisals are faulty or standards are not adhered to, certificate owners suffer losses as the underlying loans do not generate sufficient income to make the monthly payments to investors.

14

47.     Investors frequently receive additional protection from loss through mechanisms known as "credit enhancements." Credit enhancements come in several forms, including overcollateralization, interest overage and insurance protection. "Overcollateralization" is the amount by which the total principal of the underlying loans exceeds the principal balance for the certificates and thereby serves as a cushion – if certain loans default and the investment vehicle cannot be made whole on those loans, the payments from the remaining loans are sufficient to cover the yield to investors without any losses. "Interest overage" is a similar mechanism – by structuring the certificates such that the weighted average interest rate of the mortgage loans is higher than the weighted average pass-through rate on the certificates (plus any fees), investors receive a cushion.

48.     A common way investors evaluate the adequacy of the real estate underlying the loan is to compare the appraised value of the real estate to the amount of the loan. This comparison, called the "loan-to-value ratio" or "LTV" is employed by investors to measure the risk that sale price of the underlying real estate in foreclose will satisfy the amount of the loan. A high LTV increases the risk to investors because it indicates that if the borrower defaults on the loan, the investor may not be able to be made whole by selling the underlying real estate.

49.     For example, an LTV of 60% means a $60,000 loan is secured by real estate determined by appraisal to have a fair market value of $100,000. An LTV of 110% means a $110,000 loan is secured by real estate with a fair market value of $100,000. From an investment perspective, an LTV of 110% is substantially riskier than an LTV of 60% because (absent intervening factors) there is a significantly greater risk that the sale proceeds from a loan with an LTV of 110% will not satisfy underlying debt and make the investor whole on the loan in the event of default. Additionally, a high LTV increases the likelihood that the borrower will "walk away from the property" in the event of financial difficulty – having paid less up front, the borrower has

15

less at risk in the property and therefore less incentive to protect his investment by making payments under the loan and avoiding default.

50.     Thus, an investor's analysis of a certificate builds from and is dependent upon the underwriting standards and appraisals because assumptions about the likelihood of defaults and value of the underlying assets are necessarily built in to LTV ratios and the extent of any credit enhancements. In sum, if the underwriting and appraisal standards are not followed, the certificate will suffer losses because it will have been valued inaccurately when originally structured and sold.

SUBSTANTIVE ALLEGATIONS

51.     The Registration Statement (including the Prospectus) filed by Defendants with the SEC provided general information about the Certificates that the JP Morgan Issuing Trust would issue. Subsequently, the respective Prospectus Supplement issued by each JP Morgan Issuing Trust in connection with particular issuances of Certificates provided the specific terms of that offering.

52.     The Registration Statement and each of the Prospectus Supplements identified JP Morgan Acceptance as the "Depositor"; JP Morgan Acquisition as the "Sponsor and Seller"; and JP Morgan Securities as the lead underwriter. According to the Registration Statement and Prospectus Supplements, the JP Morgan Acceptance acquired a pool of loans from JP Morgan Acquisition, which had purchased the loans or otherwise acquired the loans. JP Morgan Acceptance then worked with Underwriter Defendants (including Moody's and Standard & Poor's) and JP Morgan Acquisition to structure the securitization transactions and price the Certificates, which were then sold to investors by JP Morgan Securities. While each JP Morgan Entity acted in its stated capacity, the JP Morgan Entities were, individually and collectively, directed and controlled by JP Morgan.

False and Materially Misleading Representations and Material Omissions

53.     The Registration Statement and Prospectus Supplements contained false and materially misleading information, and omitted material information, regarding origination of the

16

underlying loans, underwriting standards adhered to by loan originators, loan quality control, the type and sufficiency of collateral, appraisal standards, loan-to-value averages and credit enhancements.

54. The following table sets forth the mortgage and lending companies that, according to the Prospectus Supplement for each respective Defendant JP Morgan Issuing Trust, originated at least 10% of the loans in the mortgage pool underlying the Certificates:

| JP Morgan Issuing Trust | Loan Originators (Percentage) |
|---|---|
| Mortgage Trust 2007-S2 | American Home Mortgage (37.05%)<br>Chase Originators (34.66%) |
| Mortgage Trust 2007-S3 | Chase Originators (58.50%)<br>American Home Mortgage (26.81%) |
| Mortgage Trust 2007-A3 | Chase Originators (62.84%)<br>PHH Mortgage (17.77%)<br>Wells Fargo Home Mortgage (11.87%) |
| Mortgage Trust 2007-A4 | Chase Home Finance LLC (67.62%) |
| Alternative Loan Trust 2007-S1 | Chase Originators (71.90%)<br>American Home Mortgage (15.93%) |
| Alternative Loan Trust 2007-A2 (Pool 1) | Chase Originators (57.87%)<br>American Home Mortgage (20.02%)<br>GreenPoint Mortgage Funding (11.75%) |
| Alternative Loan Trust 2007-A2 (Pool A) | Chase Originators (34.79%)<br>Quicken Loans (17.97%)<br>American Mortgage Network (17.83%)<br>Countrywide Home Loans (12.55%) |
| Mortgage Acquisition Trust 2007-CH4 | JP Morgan Chase Bank (100%) |
| Mortgage Acquisition Trust 2007-CH5 | JP Morgan Chase Bank (100%) |
| Mortgage Trust 2007-A5 | Chase Home Finance (47.10%)<br>PHH Mortgage (33.40%) |

| JP Morgan Issuing Trust | Loan Originators (Percentage) |
|---|---|
| Mortgage Trust 2007-A6 | National City Mortgage (31.23%)<br>PHH Mortgage (28.92%)<br>Chase Home Finance (24.18%) |
| Mortgage Acquisition Trust 2007-CH3 | JP Morgan Chase Bank (100%) |

55.    Defendants misrepresented the underwriting and lending standards employed by loan originators in connection with the loans underlying the Certificates in both the Registration Statement and Prospectus Supplements.

56.    Defendants stated in the Registration Statement that originators who made or first acquired the underlying loans to borrowers employed generally accepted underwriting standards, including complete evaluation of the ability of the borrower to repay the loan:

> Underwriting standards are applied by or on behalf of a lender to evaluate a borrower's credit standing and repayment ability, and the value and adequacy of the related mortgaged property as collateral. In general, a prospective borrower applying for a loan is required to fill out a detailed application designed to provide to the underwriting officer pertinent credit information. As part of the description of the borrower's financial condition, the borrower generally is required to provide a current list of assets and liabilities and a statement of income and expenses, as well as an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy. In most cases, an employment verification is obtained from an independent source (typically the borrower's employer), which verification reports, among other things, the length of employment with that organization, the current salary, and whether it is expected that the borrower will continue such employment in the future. If a prospective borrower is self-employed, the borrower may be required to submit copies of signed tax returns. The borrower may also be required to authorize verification of deposits at financial institutions where the borrower has demand or savings accounts . . . .

> A lender may also originate mortgage loans pursuant to alternative sets of underwriting criteria under reduced or limited documentation programs. These programs are designed to facilitate the loan approval process. Under these programs, certain documentation concerning income/employment and asset verification is reduced or excluded. Loans underwritten under these programs are generally limited to borrowers who have demonstrated an established ability and willingness to repay the mortgage loans in a timely fashion. Permitted maximum loan-to-value ratios

18

under these programs are generally more restrictive than those under the lender's standard underwriting criteria.

From time to time, exceptions to a lender's underwriting policies may be made. Such exceptions may be made on a loan-by-loan basis at the discretion of the lender's underwriter. Exceptions may be made after careful consideration of certain mitigating factors such as borrower liquidity, employment and residential stability and local economic conditions.

57.     Chase Home Finance LLC ("Chase Home Finance") and JP Morgan Chase Bank (sometimes acting together, referred to herein as "Chase Originators") was a major loan originator for the Defendant JP Morgan Issuing Trusts. For example, as set forth above, JP Morgan Chase Bank originated 100% of the loans in Defendant JP Morgan Mortgage Acquisition Trusts 2007-CH3, 2007-CH4 and 2007 CH-5. Chase Home Finance originated 67% of the loans in Defendant JP Mortgage Trust 2007-A4 and 62% of loans in Defendant JP Morgan Mortgage Trust 2007-A3. The Chase Originators also originated the majority of loans in Defendant JP Morgan Mortgage Trust 2007-S3 and were the largest underwriters by volume in Defendants JP Morgan Alternative Loan Trusts 2007-A2 and 2007-S1. The Defendant JP Morgan Mortgage Trust 2007-S3 and 2007-A3 Prospectus Supplements stated, in part:

> For "No Doc" program Chase Originator Mortgage Loans, no employment information, sources of income, income amount or assets are disclosed. Additionally, employment verification is not required. The underwriting for such mortgage loans are based primarily or entirely on a stronger credit profile (evidenced by a higher minimum FICO credit risk score), a lower maximum product limit and additional due diligence performed on the collateral.

> The "Stated Income Stated Asset" program (which is sometimes referred to as "Simply Signature") is a "reactive" program. While income and assets are not verified, eligibility and approval are determined by an automated underwriting system and are based on a stronger borrower credit history and profile . . . .

> The Chase Originators have represented to the Seller that, except for approximately 70.99% of these Chase Originator Mortgage Loans, such Chase Originator Mortgage Loans were originated generally in accordance with such policies. The Depositor believes that such Chase Originator Mortgage Loans subject to the exception in the previous sentence were originated generally in accordance with the underwriting guidelines set forth under the heading "The Originators—General Underwriting Guidelines" in this prospectus supplement.

19

58.     Certain JP Morgan Issuing Trust Prospectus Supplements, including the Defendant JP

Morgan Mortgage Trust 2007-S3 and 2007-A3 Prospectus Supplements stated, with respect to

"General Underwriting Guidelines":

> Underwriting standards are applied by or on behalf of a lender to evaluate a
> borrower's credit standing and repayment ability, and the value and adequacy of the
> related Mortgaged Property as collateral.  In general, a prospective borrower
> applying for a loan is required to fill out a detailed application designed to provide to
> the underwriting officer pertinent credit information.  As part of the description of
> the borrower's financial condition, the borrower generally is required to provide a
> current list of assets and liabilities and a statement of income and expenses, as well
> as an authorization to apply for a credit report which summarizes the borrower's
> credit history with local merchants and lenders and any record of bankruptcy.  In
> most cases, an employment verification is obtained from an independent source
> (typically the borrower's employer), which verification reports, among other things,
> the length of employment with that organization, the current salary, and whether it is
> expected that the borrower will continue such employment in the future.  If a
> prospective borrower is self employed, the borrower may be required to submit
> copies of signed tax returns . . . .

> The mortgagor may also have been required to authorize verifications of deposits at
> financial institutions where the mortgagor had demand or savings accounts.  In the
> case of investment properties and two to four unit dwellings, income derived from
> the mortgaged property may have been considered for underwriting purposes, in
> addition to the income of the mortgagor from other sources.  With respect to
> mortgaged property consisting of vacation or second homes, no income derived from
> the property generally will have been considered for underwriting purposes.  In the
> case of certain borrowers with acceptable payment histories, no income will be
> required to be stated (or verified) in connection with the loan application.

> Based on the data provided in the application and certain verification (if required), a
> determination is made by the original lender that the mortgagor's monthly income (if
> required to be stated) will be sufficient to enable the mortgagor to meet its monthly
> obligations on the mortgage loan and other expenses related to the property such as
> property taxes, utility costs, standard hazard insurance and other fixed obligations
> other than housing expenses.  Generally, scheduled payments on a mortgage loan
> during the first year of its term plus taxes and insurance and all scheduled payments
> on obligations that extend beyond ten months equal no more than a specified
> percentage of the prospective mortgagor's gross income.  The percentage applied
> varies on a case by case basis depending on a number of underwriting criteria,
> including the LTV ratio of the mortgage loan.  The originator may also consider the
> amount of liquid assets available to the mortgagor after origination.

> The mortgage loans have been originated under "full" or "alternative," "reduced
> documentation," "stated income/stated assets" or "no income/no asset" programs.
> The "alternative," "reduced," "stated income/stated assets" and "no income/no asset"

20

programs generally require either alternative or less documentation and verification than do full documentation programs which generally require standard Fannie Mae/Freddie Mac approved forms for verification of income/employment, assets and certain payment histories.  Generally, an "alternative" documentation program requires information regarding the mortgagor's income (*i.e.*, W-2 forms, tax returns and/or pay stubs) and assets (*i.e.*, bank statements) as does a "full doc" loan, however, alternative forms of standard verifications are used. Generally, under both "full" and "alternative" documentation programs at least one year of income documentation is provided.  Generally, under a "reduced documentation" program, either no verification of a mortgagor's stated income is undertaken by the originator or no verification of a mortgagor's assets is undertaken by the originator. Reduced doc loans may also include loans having only one year of income verification and loans to mortgagors with acceptable payment histories and credit scores but no information or verification of the mortgagor's income.   Under a "stated income/stated assets" program, no verification of either a mortgagor's income or a mortgagor's assets is undertaken by the originator although both income and assets are stated on the loan application and a "reasonableness test" is applied.  Generally, under a "no income/no asset" program, the mortgagor is not required to state his or her income or assets and therefore, no verification of such mortgagor's income or assets is undertaken by the originator.  The underwriting for such mortgage loans may be based primarily or entirely on the estimated value of the mortgaged property and the LTV ratio at origination as well as on the payment history and credit score.

These alternative sets of underwriting criteria are designed to facilitate the loan approval process. Loans underwritten under these programs are generally limited to borrowers who have demonstrated an established ability and willingness to repay the mortgage loans in a timely fashion.  Permitted maximum loan to value ratios under these programs are generally more restrictive than those under the lender's standard "full" documentation programs . . . .

From time to time, exceptions to a lender's underwriting policies may be made. Such exceptions may be made on a loan by loan basis at the discretion of the lender's underwriter.   Exceptions may be made after careful consideration of certain mitigating factors such as borrower liquidity, employment and residential stability and local economic conditions.

59.     The Prospectus Supplements issued in connection with Defendant JP Morgan Mortgage Trust 2007-A4 and JP Morgan Alternative Loan Trust 2007-S1 contained substantially similar representations concerning the underwriting practices of Chase Home Finance and the Chase Originators.

21

60.     Defendants JP Morgan Mortgage Acquisition Trusts 2007-CH3, 2007-CH-4 and 2007-CH5 Prospectus Supplements stated with respect to loans originated by the JP Morgan Chase Bank, in part:

*Underwriting Standards*

The CHM HLD Underwriting Guidelines consider the value and adequacy of the mortgaged property as collateral for the proposed mortgage loan, but also take into consideration the credit standing and repayment ability of the prospective borrower. On a case by case basis, CHM HLD underwriters may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting exception. Compensating factors may include, but are not limited to, relatively low loan-to-value ratio, relatively low debt-to-income ratio, stable employment and time in the same residence . . . .

*          *          *

The Chase Home Mortgage Wholesale/Retail Underwriting Guidelines consider the value and adequacy of the mortgaged property as collateral for the proposed mortgage loan, but also take into consideration the borrower's credit standing and repayment ability. On a case by case basis, Chase Home Mortgage may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting exception. Compensating factors may include, without limitation, relatively low loan-to-value ratio, relatively low debt-to-income ratio, stable employment and time in the same residence.

61.     PHH Mortgage Corporation ("PHH Mortgage") was a major loan originator for the Defendant JP Morgan Issuing Trusts. For example, as set forth above, PHH originated more than 33% of the loans in Defendant JP Morgan Mortgage Trust 2007-A5; more than 24% of the loans in Defendant JP Morgan Mortgage Trust 2007-A6; and more than 17% of the loans in Defendant JP Morgan Mortgage Trust 2007-A3. The Defendant JP Morgan Mortgage Trusts 2007-A5 and 2007-A6 Prospectus Supplements stated, in part:

PHH Mortgage's underwriting standards have been established based upon its knowledge of the primary and secondary residential mortgage markets. They are intended to originate investment-quality mortgage loans that are salable in the secondary mortgage market. They are applied in originating or purchasing loans for its own account, and in originating loans for, or purchasing loans from, other lenders under various **"private-label"** programs. The application of the underwriting

22

standards represent a balancing of several factors that may affect the ultimate recovery of the loan amount, including but not limited to, the applicant's credit standing and ability to repay the loan, as well as the value and adequacy of the mortgaged property as collateral.  PHH Mortgage may adapt its underwriting guidelines based upon the nature of a specific private-label relationship.

*General Underwriting Procedure*

The following describes the general underwriting procedures used for mortgage loans originated or purchased, and underwritten by PHH Mortgage.  From time to time, exceptions to PHH Mortgage's underwriting policies may be made.  Such exceptions are made on a loan-by-loan basis only at the discretion of PHH Mortgage's underwriters and may be made only after careful consideration of certain compensating factors such as borrower capacity, liquidity, equity, employment and residential stability.

PHH Mortgage's underwriting guidelines are applied to evaluate an applicant's credit standing, financial condition, and repayment ability, as well as the value and adequacy of the mortgaged property as collateral for any loan made.  As part of the loan application process, the applicant is required to provide information concerning his or her assets, liabilities, income and expenses (except as described below), along with an authorization to obtain any necessary third party verifications, including a credit report summarizing the applicant's credit history.   Unless prohibited by applicable state law, the applicant is typically required to pay an application fee if application is made directly to PHH Mortgage.

PHH Mortgage makes substantial use of automated underwriting systems and procedures in implementing its underwriting guidelines.  These systems are used in conjunction with PHH Mortgage's underwriting staff and control the loan approval process to ensure consistent loan decisioning and conditioning.

In evaluating the applicant's ability and willingness to repay the proposed loan, PHH Mortgage reviews the applicant's credit history and outstanding debts, as reported on the credit report.  If an existing mortgage or other significant debt listed on the loan application is not adequately reported on the credit report, PHH Mortgage may request a written or oral verification of the balance and payment history of such debt from the servicer of such debt.

Except as described below, PHH Mortgage verifies the applicant's liquid assets to ensure that the client has adequate liquid assets to apply toward any required down payment, closing costs, prepaid interest, and a specified amount of cash reserves after the closing of the related mortgage.  Additional liquid assets may not be verified.

62.     American Home Mortgage Corp. ("American Home Mortgage") was a major loan

originator for the Defendant JP Morgan Issuing Trusts.  For example, as set forth above, American

Home Mortgage originated more than 37% of the loans in Defendant JP Mortgage Trust 2007-S2;

23

more than 26% of the loans in Defendant JP Morgan Mortgage Trust 2007-S3; and 16-20% of the

loans in Defendants JP Morgan Mortgage Trust 2007-S1 and JP Morgan Alternative Loan Trust

2007-A2.  The Defendant JP Morgan Alternative Loan Trust 2007-A2 and JP Morgan Mortgage

Trust 2007-S2 Prospectus Supplements stated, in part:

> American Home's underwriting philosophy is to weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt. These standards are applied in accordance with applicable federal and state laws and regulations.  Exceptions to the underwriting standards may be permitted where compensating factors are present.  In the case of investment properties and two- to four-unit dwellings, income derived from the mortgage property may have been considered for underwriting purposes, in addition to the income of the mortgagor from other sources.  With respect to second homes and vacation properties, no income derived from the property will have been considered for underwriting purposes.  Because each loan is different, American Home expects and encourages underwriters to use professional judgment based on their experience in making a lending decision.

> American Home underwrites a borrower's creditworthiness based solely on information that American Home believes is indicative of the applicant's willingness and ability to pay the debt they would be incurring.

> Non-conforming loans are generally documented to the requirements of Fannie Mae and Freddie Mac, in that the borrower provides the same information on the loan application along with documentation to verify the accuracy of the information on the application such as income, assets, other liabilities, etc. Certain non-conforming stated income or stated asset products allow for less verification documentation than Fannie Mae or Freddie Mac require.  Certain non-conforming Alt-A products also allow for less verification documentation than Fannie Mae or Freddie Mac require. For these Alt-A products, the borrower may not be required to verify employment income, assets required to close or both.  For some other Alt-A products, the borrower is not required to provide any information regarding employment income, assets required to close or both. Alt-A products with less verification documentation generally have other compensating factors such as higher credit score or lower loan-to-value requirements.

> American Home obtains a credit report for each borrower that summarizes each borrower's credit history.  The credit report contains information from the three major credit repositories, Equifax, Experian and TransUnion. These companies have developed scoring models to identify the comparative risk of delinquency among applicants based on characteristics within the applicant's credit report. A borrower's credit score represents a comprehensive view of the borrower's credit history risk factors and is indicative of whether a borrower is likely to default on a loan. Some of the factors used to calculate credit scores are a borrower's incidents of previous

24

delinquency, the number of credit accounts a borrower has, the amount of available credit that a borrower has utilized, the source of a borrower's existing credit, and recent attempts by a borrower to obtain additional credit.  Applicants who have higher credit scores will, as a group, have fewer defaults than those who have lower credit scores.  The minimum credit score allowed by American Home non-conforming loan guidelines for these loans is 620 and the average is typically over 700.  For American Home Alt-A products, the minimum credit score is generally 580. If the borrowers do not have a credit score they must have an alternative credit history showing at least three trade lines with no payments over 60 days past due in the last twelve months.

In addition to reviewing the borrower's credit history and credit score, American Home underwriters closely review the borrower's housing payment history.  In general, for non-conforming loans the borrower should not have made any mortgage payments over 30 days after the due date for the most recent twelve months.  In general, for Alt-A loans, the borrower may have no more than one payment that was made over 30 days after the due date for the most recent twelve months.

In order to determine if a borrower qualifies for a non-conforming loan, the loans have been either approved by Fannie Mae's Desktop Underwriter, Freddie Mac's Loan Prospector automated underwriting systems, a customized form of Fannie Mae's Desktop Underwriter called Custom Desktop Underwriter, or they have been manually underwritten by American Home's underwriters. American Home's Alt-A loan products generally have been approved manually by contract underwriters provided by certain mortgage insurance companies or by American Home's senior underwriters. American Home Solutions products must receive an approval from the Assetwise automated underwriting system.  For manually underwritten loans, the underwriter must ensure that the borrower's income will support the total housing expense on an ongoing basis.  Underwriters may give consideration to borrowers who have demonstrated an ability to carry a similar or greater housing expense for an extended period.  In addition to the monthly housing expense, the underwriter must evaluate the borrower's ability to manage all recurring payments on all debts, including the monthly housing expense.  When evaluating the ratio of all monthly debt payments to the borrower's monthly income (debt-to-income ratio), the underwriter should be aware of the degree and frequency of credit usage and its impact on the borrower's ability to repay the loan.  For example, borrowers who lower their total obligations should receive favorable consideration and borrowers with a history of heavy usage and a pattern of slow or late payments should receive less flexibility. . . .

American Home realizes that there may be some acceptable quality loans that fall outside published guidelines and encourages "common sense" underwriting. Because a multitude of factors are involved in a loan transaction, no set of guidelines can contemplate every potential situation.  Therefore, each case is weighed individually on its own merits and exceptions to American Home's underwriting guidelines are allowed if sufficient compensating factors exist to offset any additional risk due to the exception.

63.    · The adequacy of the mortgaged properties as security for repayment of the underlying loans is generally determined by appraisals, conducted in accordance with pre-established guidelines set forth in the JP Morgan Issuing Trust Prospectus Supplements.  Certain of the Defendant JP Morgan Issuing Trusts represented that appraisals were conducted in conformity with the Uniform Standards of Professional Appraisal Practice ("USPAP"), as adopted by the Appraisal Standards Board of the Appraisal Foundation.  For example, the "General Underwriting Guidelines" of JP Morgan Mortgage Trust 2007-S3 Prospectus Supplement stated:

> The adequacy of the mortgaged property as security for repayment of the related mortgage loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator.  *All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac.*  Appraisers may be staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established appraisal procedure guidelines established by the originator.·  The appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed.  The appraisal generally will have been based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property.   Under some reduced documentation programs, the originator may rely on the original appraised value of the mortgaged property in connection with a refinance by an existing mortgagor.

The Defendant JP Morgan Mortgage Trusts 2007-A3, 2007-A4, 2007-A5, 2007-S1 and 2007-S2; and JP Morgan Alternative Loan Trusts 2007-A2 and 2007-S1 Prospectus Supplements contained substantially-similar or identical language regarding appraisals.  USPAP requires, with respect to real estate appraisals, *inter alia*:

> An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests.

> In appraisal practice, an appraiser must not perform as an advocate for any party or issue. ·

26

An appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions.

\*       \*       \*

It is unethical for an appraiser to accept an assignment, or to have a compensation arrangement for an assignment, that is contingent on the following:

1.  the reporting of a predetermined result (*e.g.*, opinion of value);

2.  a direction in assignment results that favor the cause of the client;

3.  the amount of a value opinion;

4.  the attainment of a stipulated result; or

5.  the occurrence of a subsequent event directly related to the appraiser's opinions and specific to the assignment's purpose.

64.    The foregoing statements set forth in ¶¶56-63 were materially false and misleading because they affirmatively misrepresented and/or failed to disclose that:

(a)    loan originators ignored and abandoned stated underwriting standards during the period that the JP Morgan Entities were acquiring and securitizing mortgages and structuring and marketing the Certificates;

(b)    the JP Morgan Issuing Trusts did not acquire loans originated in conformity with the underwriting guidelines set forth in the Registration Statement and each respective Prospectus Supplement;

(c)    JP Morgan Acquisition had not adhered to its loan purchasing guidelines;

(d)    underwriting standards employed by loan originators did not properly analyze borrowers' credit standing and ability to repay the underlying loans;

(e)    loan originators made exceptions to underwriting standards despite the absence of stated compensating factors;

(f)      third-party brokers were unsupervised by loan originators who performed inadequate due diligence on the loans written by such brokers, including in contravention of stated standards; and

(g)      appraisals were inflated and not conducted in accordance with loan originators' stated standards and/or USPAP standards.

65.     As set forth above (¶¶9-10), the Rating Agency Defendants directly participated in structuring the securitization transactions and, as a condition to the issuance of the Certificates, provided pre-determined ratings which were investment-grade for virtually all tranches. The ratings provided by the Rating Agency Defendants did not represent the true risk of the Certificates because they were based on insufficient information and erroneous assumptions about the likelihood of default by borrowers in the underlying loan pools. Moreover, the Rating Agency Defendants were hopelessly conflicted – the JP Morgan Entities would be unlikely to retain them for subsequent, highly-lucrative structured product offerings if they did not provide the ratings sought for the Certificates.

66.     Defendants pre-determined that the Certificates the JP Morgan Issuing Trusts issued would be investment grade. Defendants stated in the Registration Statement that:

> As to each series of securities, only those classes rated in an investment grade rating category by any rating agency will be offered by this prospectus and the related prospectus supplement . . . .

> It is a condition to the issuance of the securities of each series offered by this prospectus that they shall have been rated in one of the four highest rating categories by the nationally recognized statistical rating agency or agencies specified in the related prospectus supplement.

67.     Because the JP Morgan Entities worked with the Rating Agency Defendants to structure the Certificates, the initial ratings for each tranche of Certificates issued by each JP Morgan Issuing Trust were investment grade and most tranches (also referred to as "Classes") were rated "AAA." For example, the JP Morgan Mortgage Trust 2007-S3 Prospectus Supplement indicated

that 120 of 124 offered classes of Certificates were rated "AAA" by both Fitch and Standard & Poor's.

68.     The foregoing statements in the Registration Statement and Prospectus Supplements regarding "investment grade" and "AAA" ratings as set forth and referenced in ¶¶66-67 were false and misleading when made because Defendants misrepresented that:

(a)     the ratings reflected the actual credit quality of the loans;

(b)     the ratings considered the extent to which the payment stream on the loans was adequate to make the payments set forth in the Prospectus Supplements; and

(c)     misrepresented that certain Certificates were investment grade when such Certificates should have been classified as below investment grade under the Rating Agency Defendant's pre-established rating guidelines.

## CLASS ACTION ALLEGATIONS

69.     Plaintiff bring this action as a class action pursuant to CPLR 901, *et seq.*, on behalf of all person or entities who acquired certificates pursuant and/or traceable to Registration Statement No. 333-141607, from the effective date of the Registration Statement, March 27, 2007, through the date of the filing of this action, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

70.     The members of the Class are sufficiently numerous that joinder of all members is impracticable. While the precise number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members of the proposed Class, and that the members of the Class may be identified from records maintained by Defendants and/or notified of this action using the form of notice customarily employed in securities

29

class actions. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

71.     Plaintiff's claims are typical of the claims of the Class. Plaintiff and all members of the Class sustained damages as a result of Defendants' misconduct alleged herein. Plaintiff will fairly and adequately protect the interests of the Class and has retained competent counsel with significant experience in class action litigation and litigation involving alleged violations of the federal securities laws. Plaintiff has no interests that are contrary to, or in conflict with, those of the Class that Plaintiff seeks to represent in this Action.

72.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, including because joinder of all members of the Class is impracticable and damages suffered by individual Class members may be relatively small whereas the expense and burden of individual litigation make it virtually impossible for the members of the Class to individually redress the wrongs done to them by Defendants. There will be no difficulty in the management of this Action as a class action.

73.     There is a well-defined community of interest in the questions of law and fact involved in this Action. The questions of law and fact common to the members of the Class which predominate over questions that may affect individual Class members are:

(a)     whether Defendants violated the 1933 Act;

(b)     whether statements made by Defendants to the investing public in the Registration Statement and Prospectus Supplements both omitted and misrepresented material facts about the mortgages underlying the JP Morgan Issuing Trusts; and

(c)     the extent and proper measure of damages sustained by the members of the Class.

## FIRST CAUSE OF ACTION
### Violation of Section 11 of the 1933 Act
### (Against the Individual Defendants, Issuing Defendants
### and Underwriter Defendants)

74.     Plaintiff repeats and realleges each and every allegation above as it set forth in full herein, to the extent that such allegations do not sound in fraud.

75.     This First Cause of Action is brought pursuant to Section 11 of the 1933 Act, on behalf of Plaintiff and the Class, against the Individual Defendants, the Issuing Defendants and the Underwriter Defendants.  This Cause of Action is predicated upon Defendants' strict liability for making false and misleading statements in the Registration Statement, Prospectus and Prospectus Supplements.

76.     The Registration Statement for the Certificates was materially misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

77.     The Individual Defendants, the Issuing Defendants and the Underwriter Defendants are strictly liable to Plaintiff and the Class for making the misstatements and omissions in issuing the Certificates.

78.     The Individual Defendants each signed the Registration Statement.

79.     The Underwriter Defendants each acted as an underwriter in the sale of Certificates issued by the JP Morgan Issuing Trusts, directly and indirectly participated in the distribution of the Certificates, and directly and indirectly participated in drafting and disseminating the Registration Statement, Prospectus and Prospectus Supplements for the Certificates. The Underwriter Defendants were underwriters for the respective JP Morgan Issuing Trusts.

80.     The Individual Defendants, Issuing Defendants and Underwriter Defendants owed to the Plaintiff and other Class members the duty to make a reasonable and diligent investigation of the

31

statements contained in the Registration Statement, Prospectus and Prospectus Supplements at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

81.     The Individual Defendants, Issuing Defendants and Underwriter Defendants knew, or in the exercise of reasonable care should have known, of the material misstatements and omissions contained in or omitted from the Registration Statement, Prospectus and Prospectus Supplements as set forth herein.

82.     Each of the Individual Defendants, Issuing Defendants and Underwriter Defendants failed to possess a reasonable basis for believing, and failed to make a reasonable investigation to ensure, that statements contained in the Registration Statement, Prospectus and Prospectus Supplements were true and/or that there was no omission of material facts necessary to make the statements contained therein not misleading.

83.     The Individual Defendants, Issuing Defendants and Underwriter Defendants issued and disseminated, caused to be issued or disseminated, and participated in the issuance and dissemination of material statements to the investing public which were contained in the Prospectus, which made false and misleading statements and/or misrepresented or failed to disclose material facts, as set forth above.

84.     By reason of the conduct alleged herein, each of the Individual Defendants, Issuing Defendants and Underwriter Defendants violated Section 11 of the Securities Act, and is liable to Plaintiff and the Class.

85.     Plaintiff and other Class members acquired Certificates pursuant and/or traceable to the Registration Statement.  At the time Plaintiff and Class members obtained their Certificates, they did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

86.     Plaintiff and other Class members have sustained damages as a result of the wrongful conduct alleged and the violations of the Individual Defendants, Issuing Defendants and Underwriter Defendants.

87.     By virtue of the foregoing, Plaintiff and other Class members are entitled to damages, jointly and severally from each of the Individual Defendants, Issuing Defendants and Underwriter Defendants, as set forth in Section 11 of the 1933 Act.

88.     This action is brought within one year after the discovery of the untrue statements and omissions contained in the Offering Documents and within three years of the Certificates being offered to the public.  Despite the exercise of reasonable diligence, Plaintiff could not have reasonably discovered the untrue statements and omissions in the Registration Statement, Prospectus and Prospectus Supplements at an earlier time.

### SECOND CAUSE OF ACTION
### For Violation of Section 12(a)(2) of the 1933 Act
### (Against the Issuing Defendants and Underwriter Defendants)

89.     Plaintiff repeats and realleges each and every allegation above as if set forth in full herein, to the extent that such allegations do not sound in fraud.

90.     This Cause of Action is brought pursuant to Section 12(a)(2) of the 1933 Act, on behalf of Plaintiff and the Class, against the Issuing Defendants and Underwriter Defendants.

91.     The Issuing Defendants and Underwriter Defendants promoted and sold Certificates pursuant to the defective Prospectus for their own financial gain.  The Prospectus contained untrue statements of material fact, omitted to state facts necessary to make statements not misleading, and concealed and failed to disclose material facts.

92.     The Issuing Defendants and Underwriter Defendants owed to Plaintiff and the other Class members who purchased Certificates pursuant to the Prospectus a duty to make a reasonable and diligent investigation of the statements contained in the Prospectus, to ensure that such

statements were true and that there was no omission of material fact necessary to make the statements contained therein not misleading. The Issuing Defendants and Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the Prospectus, as set forth herein.

93.     Plaintiff and other Class members purchased or otherwise acquired Certificates pursuant and/or traceable to the defective Prospectus. Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, of the misrepresentations and omissions contained in the Prospectus.

94.     By reason of the conduct alleged herein, the Issuing Defendants and Underwriter Defendants violated Section 12(a)(2) of the 1933 Act, and are liable to Plaintiff and other Class members who purchased Certificates pursuant and/or traceable to the Prospectus.

95.     Plaintiff and the Class members were damaged by the Issuing Defendants' and Underwriter Defendants' wrongful conduct.  Those Class members who have retained their Certificates have the right to rescind and recover the consideration paid for their Certificates, as set forth in Section 12(a)(2) of the 1933 Act.  Those Class members who have sold their Certificates are entitled to rescission, as set forth in Section 12(a)(2) of the 1933 Act.  These plaintiffs hereby tender their Certificates, or proceeds from the sale thereof, to defendants named in this Cause of Action in exchange for the value of the consideration paid for such Certificates, plus interest.  In the alternative, these plaintiffs seek recovery of damages in an amount to be proven at trial.

96.     This action is brought within one year after the discovery of the untrue statements and omissions contained in the Prospectus and within three years of when the Certificates were sold to the public.  Despite the exercise of reasonable diligence, Plaintiff could not have reasonably discovered the untrue statements and omissions in the Offering Documents at an earlier time.

### THIRD CAUSE OF ACTION
### For Violation of Section 15 of the 1933 Act
### (Against JP Morgan, JP Morgan Acquisition, JP Morgan Acceptance
### and JP Morgan Securities)

97.     Plaintiff repeats and realleges each and every allegation above as if set forth in full herein, to the extent that such allegations do not sound in fraud.

98.     This Cause of Action is brought against defendants JP Morgan, JP Morgan Acquisition, JP Morgan Acceptance and JP Morgan Securities as controlling persons, pursuant to Section 15 of the 1933 Act. Each of JP Morgan, JP Morgan Acquisition, JP Morgan Acceptance and JP Morgan Securities by virtue of its control, ownership, offices, directorship, and specific acts, was at the time of the wrongs alleged herein a controlling person of the Issuing Defendants within the meaning of Section 15 of the 1933 Act. Each of JP Morgan, JP Morgan Acquisition, JP Morgan Acceptance and JP Morgan Securities had the power and influence, and exercised that power and influence, to cause the Issuing Defendants to engage in violations of the 1933 Act, as described herein.

99.     JP Morgan, JP Morgan Acquisition, JP Morgan Acceptance and JP Morgan Securities, individually, possessed control, ownership and had positions making each them privy to, and provided each of them with actual knowledge of, the material facts concealed from Plaintiff and other Class members.

100.    By virtue of the wrongful conduct alleged herein, JP Morgan, JP Morgan Acquisition, JP Morgan Acceptance and JP Morgan Securities are liable to Plaintiff and other Class members for their sustained damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action and certifying plaintiff as Class representative;

35

B.     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.     Awarding rescission or a rescissory measure of damages; and

E.     Such equitable/injunctive or other relief as deemed appropriate by the Court.

## DEMAND FOR JURY

Plaintiff hereby demands a trial by jury.


DATED: March 11, 2009

Respectfully submitted,
SCOTT+SCOTT LLP

JOSEPH P. GUGLIELMO
29 West 57th Street, 14th Floor
New York, NY 10019
Telephone: (212) 223-6444
Fax: (212) 223-6334
Email: jguglielmo@scott-scott.com

DAVID R. SCOTT
108 Norwich Avenue
P.O. Box 192
Colchester, CT 06415
Telephone (860) 537-5537
Fax: (860) 537-4432
Email: drscott@scott-scott.com

UCS-840(REV 1/2000)

## REQUEST FOR JUDICIAL INTERVENTION

| | | | | |
|---|---|---|---|---|
| NY State Supreme | New York | 600767/09 | 3-11-09 | |
| COURT | COUNTY | INDEX NO. | DATE PURCHASED | For Clerk Only |

PLAINTIFF(S)
Fort Worth Employees' Retirement Fund, on Behalf of Itself and All Others Similarly Situated

v.

DEFENDANT(S): J.P. Morgan Chase & Co., JPMorgan Acquisition Corporation, JPMorgan Acceptance JPMorgan Securities, Inc., JPMorgan Mortgage Trust 2007-S2, JPMorgan Mortgage Trust 2007-S3, JPMorgan Mortgage Trust 2007-A3, JPMorgan Mortgage Trust 2007-A4, JPMorgan Mortgage Alternative Loan Trust 2007-S1, JPMorgan Mortgage Alternative Loan Trust 2007-A2, JPMorgan Mortgage Acquisition Trust 2007-CH5, JPMorgan Mortgage Acquisition Trust 2007-CH4, JPMorgan Mortgage Acquisition Trust 2007-A4, JPMorgan Mortgage Trust 2007-A5, JPMorgan Mortgage Trust 2007-A6, JPMorgan Mortgage Acquisition Trust 2007-CH3, JPMorgan Mortgage Acquisition Trust 2007-CH6, Moody's Investor Services, Inc., a Division of Acquisition Trust CH6, Moody's Investor Services, Inc., a Division of Moody's Corp., McGraw-Hill Companies, Inc., Fifth, Inc., Brian Bernard Louis Schiappacio Jr., Christine E. Cole, David M. Duzyk, William King, and Edwin F. McMichael

Date issue joined: _____  Bill of particulars served (Y/N):  [ ] Yes   [X] No

------------------------------------------------------------------------

NATURE OF JUDICIAL INTERVENTION (check ONE box only AND enter information)

[X] Request for preliminary conference

[ ] Note of issue and/or certificate of readiness

[ ] Notice of motion (return date:_____)
    Relief sought _____

[ ] Order to show cause
    (clerk enter return date:_____)
    Relief sought_____

[ ] Other ex parte application (specify:

    _____)

[ ] Notice of petition (return date:_____)
    Relief sought

[ ] Notice of medical or dental malpractice action (specify:_____)

[ ] Statement of net worth

[ ] Writ of habeas corpus

[ ] Other (specify: _____

**RECEIVED**
MAR 11 2008
NEW YORK
COUNTY CLERK'S OFFICE

NATURE OF ACTION OR PROCEEDING (Check ONE box only)

MATRIMONIAL
[ ] Contested             -CM
[ ] Uncontested           -UM

COMMERCIAL
[ ] Contract              -CONT
[ ] Corporate             -CORP
[ ] Insurance (where insurer is a
    party, except arbitration) -INS
[ ] UCC (including sales, negotiable
    instruments)          -UCC
[X] *Other Commercial     -OC

REAL PROPERTY
[ ] Tax Certiorari        -TAX
[ ] Foreclosure           -FOR
[ ] Condemnation          -COND
[ ] Landlord/Tenant       -LT
[ ] *Other Real Property  -ORP

OTHER MATTERS
[ ] _____                 -OTH

TORTS

Malpractice
[ ] Medical/Podiatric     -MM
[ ] Dental                -DM
[ ] *Other Professional   -OPM

[ ] Motor Vehicle         -MV
[ ] *Products Liability   -PL

[ ] Environmental         -EN
[ ] Asbestos              -ASB
[ ] Breast Implant        -BI
[ ] *Other Negligence     -OTN

[ ] *Other Tort (including
    intentional)          -OT

SPECIAL PROCEEDINGS
[ ] Art. 75 (Arbitration) -ART75
[ ] Art. 77 (Trusts)      -ART77
[ ] Art. 78               -ART78
[ ] Election Law          -ELEC
[ ] Guardianship (MHL Art. 81) -GUARD81
[ ] *Other Mental Hygiene -MHYG
[ ] *Other Special Proceeding -OSP

Check "YES" or "NO" for each of the following questions:

Is this action/proceeding against a

YES  NO                                          YES  NO
[ ]  [X]  Municipality:                          [ ]  [X]  Public Authority:
          (Specify_____)                    (Specify_____)

YES  NO
[X]  [ ]  Does this action/proceeding seek equitable relief?
[ ]  [X]  Does this action/proceeding seek recovery for personal injury?
[ ]  [X]  Does this action/proceeding seek recovery for property damage?

Pre-Note Time Frames:
(This applies to all cases except contested matrimonials and tax certiorari cases)

Estimated time period for case to be ready for trial (from filing of RJI to filing of Note of Issue):

☐ Expedited: 0-8 months      ☐ Standard: 9-12 months      [X] Complex: 13-15 months

Contested Matrimonial Cases Only: (Check and give date)

    Has summons been served?          ☐ No      ☐ Yes, Date_____
    Was a Notice of No Necessity filed?  ☐ No      ☐ Yes, Date_____

ATTORNEY(S) FOR PLAINTIFF(S):

| Self Rep.* | Name | Address | Phone # |
|------------|------|---------|---------|
| ☐ | | | |
| ☐ | | | |

ATTORNEY(S) FOR DEFENDANT(S):

| Self Rep.* | Name | Address | Phone # |
|------------|------|---------|---------|
| ☐ | | | |
| | | | |

*Self Represented: parties representing themselves, without an attorney, should check the "Self Rep." box and enter their name, address, and phone # in the space provided above for attorneys.

INSURANCE CARRIERS:



RELATED CASES: (IF NONE, write "NONE" below)
Title                Index #              Court                Nature of Relationship


        I AFFIRM UNDER PENALTY OF PERJURY THAT, TO MY KNOWLEDGE, OTHER THAN AS NOTED ABOVE, THERE ARE AND HAVE
BEEN NO RELATED ACTIONS OR PROCEEDINGS, NOR HAS A REQUEST FOR JUDICIAL INTERVENTION PREVIOUSLY BEEN FILED IN
THIS ACTION OR PROCEEDING.

Dated:
                                    _____
                                    (SIGNATURE)
                                    Joseph Guglielmo
                                    (PRINT OR TYPE NAME)
                                    Plaintiff
                                    ATTORNEY FOR

        ATTACH RIDER SHEET IF NECESSARY TO PROVIDE REQUIRED INFORMATION

\forms\rji2000.wpd

# EXHIBIT B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

FORT WORTH EMPLOYEES' RETIREMENT FUND,
On Behalf of Itself and All Others Similarly Situated,

                       Plaintiff,

v.

J.P. MORGAN CHASE & CO., J.P. MORGAN
ACQUISITION CORP., JP MORGAN ACCEPTANCE,
J.P. MORGAN SECURITIES, INC., JP MORGAN
MORTGAGE TRUST 2007-S2, JP MORGAN
MORTGAGE TRUST 2007-S3, JP MORGAN
MORTGAGE TRUST 2007-A3, JP MORGAN
MORTGAGE TRUST 2007-A4, JP MORGAN
ALTERNATIVE LOAN TRUST 2007-S1, JP
MORGAN ALTERNATIVE LOAN TRUST 2007-A2,
JP MORGAN MORTGAGE ACQUISITION TRUST
2007-CH4, JP MORGAN MORTGAGE ACQUISITION
TRUST 2007-CH5, JP MORGAN MORTGAGE TRUST
2007-A5, JP MORGAN MORTGAGE TRUST 2007-A6,
JP MORGAN MORTGAGE ACQUISITION TRUST
2007-CH3, JP MORGAN MORTGAGE ACQUISITION
TRUST 2007-CH6, MOODY'S INVESTOR
SERVICES, INC., A DIVISION OF MOODY'S CORP.,
MCGRAW-HILL COMPANIES, INC., FITCH, INC.,
BRIAN BERNARD, LOUIS SCHIOPPO JR.,
CHRISTINE E. COLE, DAVID M. DUZYK, WILLIAM
KING, and EDWIN F. MCMICHAEL,

                       Defendants.

---

Index No. 09/600767

**STIPULATION**

NEW YORK
COUNTY CLERK'S OFFICE

APR 0 6 2009

NOT COMPARED
WITH COPY FILED

---

      **IT IS HEREBY STIPULATED AND AGREED** by and between Plaintiff Fort

Worth Employees' Retirement Fund ("Plaintiff") and Defendants JPMorgan Chase & Co., J.P.

Morgan Securities Inc., J.P. Morgan Mortgage Acquisition Corp., and J.P. Morgan Acceptance

Corporation I,[1] The McGraw-Hill Companies, Inc., and Fitch, Inc. (collectively, the "Stipulating

Defendants"), through their undersigned counsel, that Stipulating Defendants shall have until

---

[1] Plaintiff erroneously names "J.P. Morgan Chase & Co.," "J.P. Morgan Acquisition Corp.," and "JP
Morgan Acceptance" as defendants in this action.

May 15, 2009 to move, answer or otherwise respond to the Class Action Complaint filed in this action.

Dated:  New York, York
         April ___, 2009

SCOTT+SCOTT LLP

By: _____
       Joseph P. Guglielmo
29 West 57th Street, 14th Floor
New York, NY 10019
Telephone: (212) 223-6444
Fax:  (212) 223-6334

*Counsel for Plaintiff*

SIDLEY AUSTIN LLP

By: _____
       Dorothy J. Spenner
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 839-7375
Fax: (212) 839-5599

*Counsel for Defendants JPMorgan Chase &
Co., J.P. Morgan Securities Inc., J.P. Mor-
gan Mortgage Acquisition Corp., and J.P.
Morgan Acceptance Corporation*

CAHILL GORDON & REINDEL LLP

By: _____
       Floyd Abrams
       Penny Windle
       Tammy L. Roy
80 Pine Street
New York, NY 10005
Telephone: (212) 701-3000
Fax:  (212) 269-5420

*Counsel for Defendant The McGraw-Hill
Companies, Inc.*

-2-

May 15, 2009 to move, answer or otherwise respond to the Class Action Complaint filed in this action.

Dated:  New York, York
        April ___, 2009                          SCOTT+SCOTT LLP


                                                 By:_____
                                                     Joseph P. Guglielmo
                                                 29 West 57th Street, 14th Floor
                                                 New York, NY 10019
                                                 Telephone: (212) 223-6444
                                                 Fax:  (212) 223-6334

                                                 *Counsel for Plaintiff*


                                                 SIDLEY AUSTIN LLP


                                                 By:_____
                                                     Dorothy J. Spenner
                                                 787 Seventh Avenue
                                                 New York, NY 10019
                                                 Telephone: (212) 839-7375
                                                 Fax: (212) 839-5599

                                                 *Counsel for Defendants JP Morgan Chase &*
                                                 *Co., J.P. Morgan Securities Inc., J.P. Mor-*
                                                 *gan Mortgage Acquisition Corp., and J.P.*
                                                 *Morgan Acceptance Corporation*


                                                 CAHILL GORDON & REINDEL LLP

                                                 By:_____
                                                     Floyd Abrams
                                                     Penny Windle
                                                     Tammy L. Roy
                                                 80 Pine Street
                                                 New York, NY 10005
                                                 Telephone: (212) 701-3000
                                                 Fax:  (212) 269-5420

                                                 *Counsel for Defendant The McGraw-Hill*
                                                 *Companies, Inc.*

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: _____
        Martin Flumenbaum
        Andrew J. Ehrlich
        Jason D. Williamson
1285 Avenue of the Americas
New York, New York 10019
Telephone:  (212) 373-3166
Fax: (212) 492-0166

*Counsel for Defendant Fitch, Inc.*

# EXHIBIT C

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
COMMERCIAL DIVISION
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
FORT WORTH EMPLOYEES' RETIREMENT
FUND, On Behalf of Itself and All Others
Similarly Situated,

                      Plaintiff,

             vs.

J.P. MORGAN CHASE & CO., J.P. MORGAN
ACQUISITION CORP., JP MORGAN
ACCEPTANCE, J.P. MORGAN SECURITIES INC.,
JP MORGAN MORTGAGE TRUST 2007-S2, JP
MORGAN MORTGAGE TRUST 2007-S3, JP
MORGAN MORTGAGE TRUST 2007-A3, JP
MORGAN MORTGAGE TRUST 2007-A4, JP
MORGAN ALTERNATIVE LOAN TRUST 2007-S1,
JP MORGAN ALTERNATIVE LOAN TRUST 2007-
A2, JP MORGAN MORTGAGE ACQUISITION
TRUST 2007-CH4, JP MORGAN MORTGAGE
ACQUISITION TRUST 2007-CH5, JP MORGAN
MORTGAGE TRUST 2007-A5, JP MORGAN
MORTGAGE TRUST 2007-A6, JP MORGAN
MORTGAGE ACQUISITION TRUST 2007-CH3, JP
MORGAN MORTGAGE ACQUISITION TRUST
2007-CH6, MOODY'S INVESTOR SERVICES,
INC., A DIVISION OF MOODY'S CORP.,
MCGRAW-HILL COMPANIES, INC., FITCH, INC.,
BRIAN BERNARD, LOUIS SCHIOPPO JR.,
CHRISTINE E. COLE, DAVID M. DUZYK,
WILLIAM KING, and EDWIN F. MCMICHAEL,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Index No. 600767/2009

**NOTICE OF FILING OF
NOTICE OF REMOVAL**

     PLEASE TAKE NOTICE that on April 10, 2009, this action was removed from the

Supreme Court of the State of New York, New York County, Commercial Division, to the

United States District Court for the Southern District of New York.  Pursuant to 28 U.S.C.

§ 1446(d), this Court shall effect the removal of this action to that court and shall proceed no

further unless and until the case is remanded to this Court.  A copy of the Notice of Removal

filed with the United States District Court for the Southern District of New York is attached

hereto.

Dated: New York, New York
      April 10, 2009

SIDLEY AUSTIN LLP

By: _____
    A. Robert Pietrzak
    Dorothy J. Spenner
    787 Seventh Avenue
    New York, New York 10019
    Telephone: (212) 839-5300
    Facsimile: (212) 839-5599

*Attorneys for Defendants JPMorgan Chase*
*& Co., J.P. Morgan Mortgage Acquisition*
*Corp., J.P. Morgan Acceptance*
*Corporation I, J.P. Morgan Securities Inc.,*
*Louis Schioppo, Jr., Christine E. Cole,*
*David M. Duzyk and Edwin F. McMichael*

## CERTIFICATE OF SERVICE

I, Tor B. Ekeland, hereby certify that on April 10, 2009 I had served a true and correct copy of the foregoing Notice of Removal by the method indicated below upon:

SCOTT+SCOTT LLP                                      (By Hand Delivery)
Joseph P. Guglielmo
29 West 57th Street, 14th Floor
New York, NY 10019
Telephone: (212) 223-6444
Fax:  (212) 223-6334
*Counsel for Plaintiff*

SCOTT + SCOTT LLP                                    (By Priority Mail)
David R. Scott
P.O. Box 192
Colchester, CT 06415
*Counsel for Plaintiff*

Tor B. Ekeland
Tor B. Ekeland