UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————— x

FORT WORTH EMPLOYEES'                     :    Civil Action No. 1:09-cv-03701-JGK
RETIREMENT FUND, On Behalf of Itself and  :
All Others Similarly Situated,            :    CLASS ACTION
                                          :
                          Plaintiff,      :    AMENDED COMPLAINT FOR
                                          :    VIOLATION OF §§11, 12 AND 15 OF THE
         vs.                              :    SECURITIES ACT OF 1933
                                          :
J.P. MORGAN CHASE & CO., et al.,          :
                                          :
                          Defendants.     :
                                          :
—————————————————————— x    DEMAND FOR JURY TRIAL

514568_1

## INTRODUCTION

1.        This is a securities class action on behalf of all persons or entities who acquired the Mortgage Pass-Through Certificates (collectively, the "Certificates") of defendant J.P. Morgan Acceptance Corporation I ("JP Morgan Acceptance") pursuant and/or traceable to a false and misleading Registration Statement filed on March 27, 2007,[1] along with false and misleading Prospectus Supplements filed during February through April, 2007, each of which were expressly incorporated by reference into the Registration Statement (collectively, the "Offering Documents"). This action involves solely strict liability and negligence claims brought pursuant to the Securities Act of 1933 ("1933 Act").

2.        The Certificates were issued, underwritten and/or offered for sale by the defendants. The Certificates are securities backed by pools of residential real estate loans.  Defendants caused the Offering Documents to contain materially false and misleading statements and omissions concerning the Certificates, and the loans underlying them, in violation of the 1933 Act.

3.        In summary, defendants made the following false and misleading statements in the Offering Documents:

- Underwriting standards used to originate the loans supporting the Certificates evaluated a prospective borrower's ability to repay the loan;

- Property appraisers' compensation was not affected by whether or not a loan was approved; appraisals of the properties underlying the loans were based on recent sales of comparable properties; and the appraisals conformed to the Uniform Standards of Professional Appraisal Practice ("USPAP") standards;

- The loans underlying the Certificates had certain, specific, loan-to-value ("LTV") ratios; and

---

[1]        On April 23, 2007, defendants filed an Amended Registration Statement and Prospectus on Form S-3/A.  References herein to the "Registration Statement" are to the April 23, 2007 Amended Registration Statement.

- 1 -

- The Certificates had "investment grade" credit ratings.

4.    The true, material facts, which defendants omitted from the Offering Documents, were that:

- Borrowers were not evaluated on their ability to repay the loans; instead, loans were made regardless of a borrower's ability to repay; loan originators made as many loans as possible regardless of repayment ability since they were selling the loans to defendants at a profit; in addition, borrowers and loan originators were routinely inflating borrowers' incomes to falsely high levels to qualify borrowers for loans they could not afford to repay;

- Property appraisers' future compensation was contingent upon providing loan originators with predetermined, inflated property appraisals which allowed borrowers to qualify for loans; in addition, appraisals were not based on recent sales of comparable properties; and appraisals did not conform to USPAP standards;

- Documents submitted for loan underwriting contained untrue and false statements – potential borrowers and loan originators inflated borrowers' incomes and appraisers submitted falsely inflated property appraisals;

- Because the specified LTV ratios contained in the Offering Documents were based on inaccurate and inflated property appraisals, the LTV ratios specified in the Offering Documents were false, inaccurate and understated; and

- The credit ratings of the Certificates were inaccurate and understated the investment risk associated with the Certificates because the ratings agencies used outdated assumptions, overly relaxed rating criteria and inaccurate data in formulating the ratings.

5.    As a result, the Certificates sold to plaintiff and the Class had a much greater risk profile than represented in the Offering Documents.  Instead of being conservative "investment grade" products as defendants represented in the Offering Documents, the Certificates were extremely risky investments that should have actually been rated as "junk."

6.    The truth about the performance of the mortgage loans that secured the Certificates subsequently was revealed to the public, disclosing that the Certificates were much riskier than originally represented, and that holders would likely receive less absolute cash flow in the future and receive it, if at all, on an untimely basis.  The credit rating agencies also put negative watch labels on

the Certificates and downgraded previously assigned ratings. At present, each of the Certificates plaintiff bought have been downgraded from "AAA" investment grade at the time of purchase to "CCC" junk grade investments. As an additional result, the Certificates are no longer marketable in the secondary market at prices anywhere near the prices paid by plaintiff and the Class, and the holders of the Certificates are exposed to much more risk than the Offering Documents represented with respect to both the timing and absolutes cash flow to be received.

## JURISDICTION AND VENUE

7.     The claims alleged herein arise under §§11, 12(a)(2) and 15 of the 1933 Act, 15 U.S.C. §§77k, 77(1)(a)(2) and 77o. Jurisdiction is conferred by §22 of the 1933 Act, 15 U.S.C. §77v, and venue is proper pursuant to §22 of the 1933 Act.

8.     The violations of law complained of herein occurred in this District, including the dissemination of materially false and misleading statements complained of herein into this District. Defendants conduct business in this District.

## PARTIES

9.     Lead Plaintiff Employees' Retirement System of the Government of the Virgin Islands ("USVI GERS") acquired Certificates pursuant and traceable to the Registration Statement and Prospectus Supplements and has been damaged thereby. Specifically, on July 18, 2008, plaintiff purchased 3,540,508 JP Morgan Mortgage Trust 2007-S3 1A1 Mortgage Pass-Through Certificates ("2007-S3 1A1 Certificates") and has suffered significant losses as a result of its transactions in 2007-S3 1A1 Certificates.

10.     Defendant J.P. Morgan Chase & Co. ("JP Morgan") is a Delaware corporation with its principal executive office located at 270 Park Avenue, New York, New York 10017. As a financial institution with extensive investment banking operations, JP Morgan underwrites a wide range of securities and other financial instruments, including asset-backed and mortgage-related

- 3 -

securities.   JP Morgan owns and/or controls J.P. Morgan Acquisition Corp. ("JP Morgan Acquisition"), JP Morgan Acceptance and J.P. Morgan Securities, Inc. ("JP Morgan Securities"). JP Morgan acted as an underwriter in the sale of the Certificate offerings listed in ¶13 below. Defendant JP Morgan helped to draft and disseminate the Offering Documents.

11.     Defendant JP Morgan Securities is headquartered at 270 Park Avenue, New York, New York 10017.   JP Morgan Securities acted as an underwriter in the sale of the Certificate offerings listed in ¶13 below.  Defendant JP Morgan Securities helped to draft and disseminate the Offering Documents.

12.     Defendant JP Morgan Acquisition is a Delaware corporation with its principal place of business located at 270 Park Avenue, New York, New York 10017.   JP Morgan Acquisition purchased the mortgage loans that underlie the Certificates issued by the defendant JP Morgan Issuing Trusts from third-party loan originators.  JP Morgan Acquisition is the "sponsor" of the Certificate offerings at issue in this action and made certain representations concerning the loans within the Trusts at issue herein.

13.     Defendant JP Morgan Acceptance is a special purpose Delaware corporation headquartered at 270 Park Avenue, New York, New York 10017.  JP Morgan Acceptance filed the Registration Statement and Prospectus, which also incorporated by reference the Prospectus Supplements issued by the defendant JP Morgan Issuing Trusts.  JP Morgan Acceptance was the "depositor" in the securitization of the JP Morgan Issuing Trusts.  JP Morgan Acceptance and the below-listed defendant common law trusts (the "Trusts") are also "issuers" of the Certificates:

> JP Morgan Mortgage Trust 2007-S2
> JP Morgan Mortgage Trust 2007-S3
> JP Morgan Mortgage Trust 2007-A3
> JP Morgan Mortgage Trust 2007-A4
> JP Morgan Alternative Loan Trust 2007-S1
> JP Morgan Alternative Loan Trust 2007-A2
> JP Morgan Mortgage Acquisition Trust 2007-CH4

- 4 -

> JP Morgan Mortgage Acquisition Trust 2007-CH5
> JP Morgan Mortgage Trust 2007-A5
> JP Morgan Mortgage Trust 2007-A6
> JP Morgan Mortgage Acquisition Trust 2007-CH3

14.    Defendant Brian Bernard ("Bernard") was the President of JP Morgan Acceptance during the relevant time period.  Bernard signed the April 23, 2007 Registration Statement.

15.    Defendant Louis Schoppio Jr. ("Schoppio") was Controller and Chief Financial Officer ("CFO") of JP Morgan Acceptance during the relevant time period.  Schoppio signed the April 23, 2007 Registration Statement.

16.    Defendant Christine E. Cole ("Cole") was a director of JP Morgan Acceptance during the relevant time period.  Cole signed the April 23, 2007 Registration Statement.

17.    Defendant David M. Duzyk ("Duzyk") was a director of JP Morgan Acceptance during the relevant time period.  Duzyk signed the April 23, 2007 Registration Statement.

18.    Defendant William King ("King") was a director of JP Morgan Acceptance during the relevant time period.  King signed the April 23, 2007 Registration Statement.

19.    Defendant Edwin F. McMichael ("McMichael") was a director of JP Morgan Acceptance during the relevant time period.  McMichael signed the April 23, 2007 Registration Statement.

20.    The defendants identified in ¶¶14-19 are referred to herein as the "Individual Defendants."

21.    These defendants aided and abetted, and/or participated with and/or conspired with the other named defendants in the wrongful acts and course of conduct or otherwise caused the damages and injuries claimed herein and are responsible in some manner for the acts, occurrences and events alleged in this Complaint.

## CLASS ACTION ALLEGATIONS

22.    Plaintiff brings this case as a class action pursuant to Rule 23 of the Federal Rules of

Civil Procedure, on behalf of a class consisting of all persons or entities who acquired the following

Certificates pursuant and/or traceable to the false and misleading Registration Statement

(Registration Statement No. 333-141607) and who were damaged thereby (the "Class"):

> Mortgage Pass-Through Certificates, Series 2007-S2
> Mortgage Pass-Through Certificates, Series 2007-S3
> Mortgage Pass-Through Certificates, Series 2007-A3
> Mortgage Pass-Through Certificates, Series 2007-A4
> Mortgage Pass-Through Certificates, Series 2007-S1
> Mortgage Pass-Through Certificates, Series 2007-A2
> Asset-Backed Pass-Through Certificates, Series 2007-CH4
> Asset-Backed Pass-Through Certificates, Series 2007-CH5
> Mortgage Pass-Through Certificates, Series 2007-A5
> Mortgage Pass-Through Certificates, Series 2007-A6
> Asset-Backed Pass-Through Certificates, Series 2007-CH3

23.    Excluded from the Class are defendants, the officers and directors of the defendants,

members of their immediate families and their legal representative, heirs, successors or assigns, and

any entity in which defendants have or had a controlling interest.

24.    The members of the Class are so numerous that joinder of all members is

impracticable.  While the exact number of Class members is unknown to plaintiff at this time and

can only be ascertained through appropriate discovery, plaintiff believes that there are, at least,

hundreds of members in the proposed Class.  Record owners and other members of the Class may be

identified from records maintained by defendants or their transfer agents and may be notified of the

pendency of this action by mail, using the form of notice similar to that customarily used in

securities class actions.  The Registration Statement issued billions of dollars worth of Certificates.

25.    Plaintiff's claims are typical of the claims of the members of the Class as all members

of the Class are similarly affected by defendants' wrongful conduct in violation of the federal

securities laws complained of herein.

26.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

27.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are: whether defendants violated the 1933 Act; whether the Registration Statement and Prospectus Supplements issued by defendants to the investing public negligently omitted and/or misrepresented material facts about the Certificates and the underlying mortgage loans comprising the pools; to what extent the members of the Class have sustained damages; and the proper measure of damages.

28.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## PLAINTIFF'S INVESTIGATION

29.    Plaintiff alleges the facts herein based upon the investigation of plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by defendants, as well as regulatory filings and reports, securities analysts reports and advisories about defendants and the Certificates, and media reports about the defendants, the Certificates and the loan originators alleged in this Complaint.  Plaintiff's counsel has also conducted interviews of former employees of at least one of the defendants, former employees of several of the loan originators alleged herein and others knowledgeable about the matters set forth herein.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

- 7 -

514568_1

**BACKGROUND**

30.     The Certificates provide the holders an ownership interest in principal and/or interest payments from various pools of residential real estate loans contained within the 11 Trusts.  The loans within the Trusts were purchased by defendant JP Morgan Acquisition from various loan originators and then bundled together, or securitized.  JP Morgan Acquisition, along with fellow defendant JP Morgan Acceptance, bundled the loans together into the Trusts and then offered the Certificates for sale to the public via the Offering Documents.

31.     Defendants created the Offering Documents in connection with the sale of the Certificates.  In the Registration Statement defendants disclosed that JP Morgan Acquisition acquired loans for the Trusts directly or indirectly from the loan originators.  In connection with the loans JP Morgan Acquisition purchased and which were put into the Trusts, defendants identified the underwriting guidelines purportedly used for the loans JP Morgan Acquisition purchased, and in some cases, identified specific loan originators they purchased loans from and described those originators' specific underwriting guidelines.  The Offering Documents also described the property appraisal practices used in connection with the loan originations.  In addition, the Offering Documents represented that loans within the Trusts had specific LTV ratios at origination.  The Offering Documents also stated that the Certificates had certain "investment grade" credit ratings from well-known (and then well-respected) rating agencies.  Defendants' representations about the loan underwriting standards, appraisal practices, loan origination documents, LTV ratios, and credit ratings were false and misleading, and omitted material information about these topics, as set forth in detail below.

**Residential Mortgage Loan Categories**

32.     Typically, borrowers who require funds to finance the purchase of a house, or to refinance an existing mortgage, apply for residential mortgage loans with a loan originator.  Loan

- 8 -

originators assess a borrower's ability to make payments on the mortgage loan based on, among other things, the borrower's Fair Isaac & Company ("FICO") credit score. Borrowers with higher FICO scores are able to receive loans with less documentation during the approval process, as well as higher LTV ratios. Using a person's FICO score, a loan originator assesses a borrower's risk profile to determine the interest rate of the loan to issue, the amount of the loan, the LTV ratio and the general structure of the loan.

33. A loan originator will issue a "prime" mortgage loan to a borrower who has a high credit score and who can supply the required documentation evidencing their income, assets, employment background, and other supporting documentation of their financial health. Borrowers who are issued "prime" mortgage loans are deemed to be the most credit-worthy and receive the best rates and structure on mortgage loans.

34. If a borrower has the required credit score for a "prime" mortgage loan, but is unable to supply supporting documentation of his or her financial health, then a loan originator will issue the borrower a loan referred to as a "low doc" or "Alt-A" loan, and the interest rate on that loan will be higher than that of a prime mortgage loan. In addition, the general structure of the loan will not be as favorable as it would be for a prime borrower. While borrowers of low doc or Alt-A loans typically have clean credit histories, the risk profile of the low doc or Alt-A loan increases because of, among other things, a higher LTV ratio, a higher debt-to-income ("DTI") ratio, or inadequate documentation of the borrower's income and assets/reserves.

35. A borrower will be classified as "sub-prime" if the borrower has a lower credit score and higher debt ratios. Borrowers who have low credit ratings are unable to obtain a conventional mortgage because they are considered to have a larger-than-average risk of defaulting on a loan. For this reason, lending institutions often charge interest on sub-prime mortgages at a rate that is higher than a conventional mortgage in order to compensate for assuming more risk.

- 9 -

**The Secondary Market**

36.     Traditionally, the model for a mortgage loan involved a lending institution (*i.e.*, the loan originator) extending a loan to a home buyer in exchange for a promissory note from the home buyer to repay the principal and interest on the loan. The loan originator also held a lien against the home as collateral in the event the home buyer defaulted on the obligation. Under this simple model, the loan originator held the promissory note until it matured and was exposed to the concomitant risk that the borrower may fail to repay the loan. As such, under the traditional model, the loan originator had a financial incentive to ensure that: (1) the borrower had the financial wherewithal and ability to repay the promissory note; and (2) the underlying property had sufficient value to enable the originator to recover its principal and interest in the event that the borrower defaulted on the promissory note and the property was foreclosed.

37.     Beginning in the 1990s, persistent low interest rates and low inflation led to a demand for mortgages. As a result, banks and other mortgage lending institutions took advantage of this opportunity, introducing financial innovations in the form of asset securitization to finance an expanding mortgage market. As discussed below, these innovations altered: (1) the foregoing traditional lending model, severing the traditional direct link between borrower and lender; and (2) the risks normally associated with mortgage loans.

38.     Unlike the traditional lending model, an asset securitization involves the sale and securitization of mortgages. Specifically, after a loan originator issues a mortgage to a borrower, the loan originator sells the mortgage in the financial markets to a third-party financial institution. By selling the mortgage, the loan originator obtains fees in connection with the issuance of the mortgage, receives upfront proceeds when it sells the mortgage into the financial markets, and thereby has new capital to issue more mortgages. The mortgages sold into the financial markets are typically pooled together and securitized into what are commonly referred to as "mortgage-backed

- 10 -

securities" or "MBS." In addition to receiving proceeds from the sale of the mortgage, the loan originator is no longer subject to the risk that the borrower may default; that risk is transferred with the mortgages to investors who purchase the MBS.

39.     As illustrated below, in a mortgage securitization, mortgage loans are acquired, pooled together or "securitized," and then sold to investors in the form of MBS, whereby the investors acquire rights in the income flowing from the mortgage pools:



(Source: *The Wall Street Journal*)

40.     When mortgage borrowers make interest and principal payments as required by the underlying mortgages, the cash flow is distributed to the holders of the MBS certificates in order of priority based on the specific tranche held by the MBS investors. The highest tranche (also referred to as the senior tranche) is first to receive its share of the mortgage proceeds and is also the last to absorb any losses should borrowers become delinquent or default on their mortgage. Of course, since the investment quality and risk of the higher tranches is affected by the cushion afforded by the lower tranches, diminished cash flow to the lower tranches results in impaired value of the higher tranches.

41.     In this MBS structure, the senior tranches received the highest investment rating by the rating agencies, usually AAA. After the senior tranche, the middle tranches (referred to as mezzanine tranches) next receive their share of the proceeds. In accordance with their order of priority, the mezzanine tranches were generally rated from AA to BBB by the rating agencies.

- 11 -

42.     The process of distributing the mortgage proceeds continues down the tranches through to the bottom tranches, referred to as equity tranches. This process is repeated each month and all investors receive the payments owed to them so long as the borrowers are current on their mortgages. The following diagram illustrates the concept of tranches within a MBS comprised of residential mortgages (sometimes referred to as a "residential mortgage-backed securities" or "RMBS"):



(Source: *The Wall Street Journal*)

43.     As illustrated below, in the typical securitization transaction, participants in the transaction are: (1) the servicer of the loans to be securitized, often called the "sponsor"; (2) the depositor of the loans in a trust or entity for securitization; (3) the underwriter of the MBS; (4) the entity or trust responsible for issuing the MBS, often called the "trust"; and (5) the investors in the MBS.

44.     The securitization process begins with the sale of mortgage loans by the sponsor – the original owner of the mortgages – to the depositor in return for cash. The depositor then sells those mortgage loans and related assets to the trust, in exchange for the trust issuing certificates to the depositor. The depositor then works with the underwriter of the trust to price and sell the certificates to investors:



45.     Thereafter, the mortgage loans held by the trusts are serviced, *i.e.*, principal and interest are collected from mortgagors by the servicer, which earns monthly servicing fees for collecting such principal and interest from mortgagors.  After subtracting a servicing fee, the servicer sends the remainder of the mortgage payments to a trustee for administration and distribution to the trust, and ultimately, to the purchasers of the MBS certificates.

**Sub-Prime and Low Documentation Alt-A Loans and the Secondary Market**

46.     Over the past 30 years, the sub-prime mortgage market has evolved from being just a small percentage of the overall U.S. home mortgage market to one that has originated hundreds of billions of dollars of sub-prime loans annually.  While several important legislative and regulatory changes have induced such growth, the sub-prime mortgage market would not have experienced such enormous growth without the development of a strong secondary market for home mortgage loans.

47.     During the 1980s, credit rating agencies began rating privately-issued MBS, which made them more suitable to a wider range of investors and expanded the market for MBS.  By 1988, 52% of outstanding residential mortgage loans had been securitized, up from 23% four years earlier.

48.     This rapid expansion of the secondary mortgage market significantly increased mortgage lenders' access to capital and dramatically reduced the need for loan originators to possess

- 13 -

a large deposit base in order to maintain their liquidity. As a result, non-depository mortgage lenders proliferated, comprising approximately 32% of lenders of home mortgage loans by 1989.

49.     During the early to mid-1990s, rising interest rates decreased the demand for prime mortgage loans. To spur continued sales of mortgages, lenders became amenable to originating sub-prime mortgages. This willingness, coupled with technological advances that helped credit rating companies accumulate credit information on a greater number of debtors, increased the market for sub-prime mortgage loans. By 1998, approximately $150 billion in sub-prime mortgage loans were originated, up from approximately $35 billion in 1994.

50.     The growth in the sub-prime mortgage loan market during the 1990s was also aided by mechanisms that allocated and/or moderated risk in sub-prime MBS. These mechanisms, called "credit enhancements," allowed issuers to obtain investment-grade ratings on all, or part of, their MBS, despite the higher risk on the sub-prime mortgages upon which the MBS were based.

51.     As a result of these credit enhancement mechanisms, MBS were deemed to be suitable to a wider market of investors, and the value of sub-prime MBS sold in the secondary mortgage market grew from $10 billion in 1991 to more than $60 billion in 1997. These sales of MBS provided lenders, including non-depository and mortgage-only companies who were responsible for much of the sub-prime mortgage lending, with ample liquidity to originate new sub-prime loans. By 2005, the amount of new sub-prime mortgage loans that were originated grew to over $620 billion.

52.     During the 1990s, a new category of mortgage loans emerged. These loans, which became very popular between 2004 through 2006, offered more lenient lending standards than "prime" loans, but were considered less risky than "sub-prime" loans. This loan category, which consisted primarily of Alt-A loans, was originally designed for self-employed borrowers who had high FICO scores and were able to document assets, but could not easily document their income.

- 14 -

The Alt-A loans enabled these borrowers to be approved for a mortgage without extensive supporting documentation of their financial history or income.

53.    While Alt-A loans generally have hard-to-define characteristics, their most distinctive attribute is that borrowers are not required to provide supporting documentation with their applications.  For example, a borrower typically did not provide complete documentation of his or her assets or the amount or source of his or her income.  Other characteristics of Alt-A loans included: (i) LTV ratios in excess of 80% without primary mortgage insurance; (ii) borrowers who were temporary resident aliens; (iii) loans secured by non-owner occupied property; or (iv) a DTI ratio above normal limits.  MBS that are backed by Alt-A loans are appealing because Alt-A loans are perceived to offer temporary protection from prepayment risk, which is the risk that borrowers will pay off their loans immediately.  Mortgage loan securitizations were traditionally valued using prepayment speeds as an important component.  Alt-A loan borrowers exhibit greater resistance to prepayments during the first nine to twelve months following their origination.  Prime borrowers, by contrast, tend to be very sensitive to changing interest rates and they refinance or prepay their mortgage loans on a continual basis as interest rates decline.

54.    The market for Alt-A Loans had increased faster than that for sub-prime. Approximately $325 billion of Alt-A loans were originated during 2007 and accounted for approximately 13% of all mortgages originated in that year.  In 2006, a record $400 billion of Alt-A loans were originated and accounted for 13.4% of all mortgages originated that year.  In 2003, only 2.1% of loan originations were Alt-A.  However, the delinquency rate for Alt-A loans also increased. After 21 months, loans that were securitized in 2007 had a delinquency rate of more than 13% for fixed-rate loans and more than 26% for adjustable-rate loans.  For 2006 securitizations the delinquency rate exceeded 8% for fixed-rate loans and 18% for adjustable-rate loans.  This is compared to 2005 securitizations which only experienced a 2% delinquency rate for fixed-rate loans

- 15 -

and a 4% delinquency rate for adjustable-rate loans, and to 2004 securitizations which only experienced a 1.7% delinquency rate for fixed-rate loans and a 2.5% delinquency rate for adjustable-rate loans.

55.    Additionally, over the past several years, the quality of the borrowers of Alt-A-type mortgage loans weakened.  During this time, Alt-A-type loans were extended to borrowers who would otherwise have qualified only for: (i) sub-prime loans; (ii) much smaller dollar value loans at lower LTV ratios; or (iii) no mortgage loans at all.  These lower quality Alt-A-type loans were either "Alt-B" loans, sub-prime loans, or loans for completely unqualified borrowers and included increased risks such as a high LTV ratios and the lack of supporting financial documentation.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### Defendants Misrepresented that Borrowers Were Evaluated on Their Ability to Repay the Loans

56.    The April 23, 2007 Registration Statement indicated that the mortgage loans were acquired directly or indirectly by loan originators through the ordinary course of business and that that mortgage loans were underwritten in accordance with the related underwriting criteria specified.

57.    The Registration Statement stated that the "*[u]nderwriting standards are applied by or on behalf of a lender to evaluate a borrower's credit standing and repayment ability*" and that even with respect to "alternative" sets of underwriting criteria relating to reduced or limited documentation loan programs that the underwriting focuses on a demonstration of "*an established ability and willingness to repay the mortgage loans in a timely fashion*."

58.    The Prospectus Supplements for each of the Trusts alleged herein contained identical, or nearly identical, representations as set forth in ¶57 above.

59.    The Prospectus Supplement for the JP Morgan Mortgage Trust 2007-S3 also set forth the lending guidelines used by multiple originators of the loans in the Trust.  Loan originator

- 16 -

American Home Mortgage Corp.'s ("AHM") underwriting guidelines were described as follows: "*American Home underwrites a borrower's creditworthiness based solely on information that American Home believes is indicative of the applicant's willingness and ability to pay the debt they would be incurring*." AHM originated nearly 27% of the loans in the 2007-S3 Trust.

60.     The above representation regarding AHM's underwriting practices was repeated in the Prospectus Supplements for the JP Morgan Mortgage Trust 2007-S2. AHM was a major originator of loans in many of the Trusts, having originated over 37% of the loans in the JP Morgan Mortgage Trust 2007-S2, nearly 16% of the loans in the JP Morgan Alternative Loan Trust 2007-S1, and over 20% of the loans in Pool 1 and nearly 18% of the loans in Pool A of the JP Morgan Alternative Loan Trust 2007-A2 in addition to the loans in the 2007-S3 Trust alleged above.

61.     The Prospectus Supplement for the JP Morgan Mortgage Trust 2007-S3 also identified Chase Originators as loan originators and represented that "*a determination is made as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed loan and other expenses related to the residence (such as property taxes and insurance) as well as to meet other financial obligations and monthly living expenses*." Identical or nearly identical representations were made concerning the Chase Originators in the Prospectus Supplements for JP Morgan Mortgage Trust 2007-S2, JP Morgan Mortgage Trust 2007-A3, JP Morgan Mortgage Trust 2007-A4, JP Morgan Mortgage Trust 2007-A5, and JP Morgan Mortgage Trust 2007-A6. The Chase Originators were major originators of many of the loans in the Trusts, including having originated over 34% of the loans in JP Morgan Mortgage Trust 2007-S2, over 58% of the loans in JP Morgan Mortgage Trust 2007-S3, nearly 63% of the loans in JP Morgan Mortgage Trust 2007-A3, approximately 68% of the loans in JP Morgan Mortgage Trust 2007-A4, over 47% of the loans in JP Morgan Mortgage Trust 2007-A5, and over 24% of the loans in JP Morgan Mortgage Trust 2007-A6.

- 17 -

62.     The Prospectus Supplements for the JP Morgan Acquisition Trust 2007-CH3, JP Morgan Acquisition Trust 2007-CH4 and JP Morgan Acquisition Trust 2007-CH5 all identify JP Morgan Chase Bank as the loan originator for 100% of the loans in those Trusts and represented that the underwriters "*take into consideration the credit standing and repayment ability of the prospective borrower.*"

63.     The Prospectus Supplement for the JP Morgan Mortgage Trust 2007-A5 also set forth the underwriting guidelines for PHH Mortgage Corporation ("PHH") as follows: "*PHH Mortgage's underwriting guidelines are applied to evaluate an applicant's credit standing, financial condition, and repayment ability* . . . ."  PHH originated over 33% of the loans in the 2007-A5 Trust.

64.     The same standards were set forth in the Prospectus Supplement for the JP Morgan Mortgage Trust 2007-A6 with respect to the nearly 30% of loan originations PHH was responsible for in that Trust.

65.     The Prospectus Supplement for the JP Morgan Mortgage Trust 2007-A6 represented that another loan originator, National City Mortgage Co.'s ("National City"), "*underwriting standards are applied to evaluate the prospective borrower's credit standing and repayment ability.*"  National City originated approximately 31% of the loans in the 2007-A6 Trust.

66.     The foregoing statements alleged in ¶¶57-65, to the effect that loan originators evaluated a borrower's repayment ability or determined whether a borrower could afford to repay the loan, were false and misleading.  Loan originators did not make loans based on whether a borrower's monthly income was sufficient to repay the loan.  Rather, originators made as many loans as they possibly could regardless of the borrower's ability to repay the loan.  Indeed, in 2007 there were systematic problems in the residential lending industry wherein loans were made to numerous persons who could not afford them.  Loan originators knew that Wall Street firms such as defendants

- 18 -

were purchasing large quantities of home loans to be securitized and resold to the investing public without regard to whether borrowers could repay those loans. In order to meet that demand, and to profit by originating loans that could then be sold to defendants for a profit, loan originators began lending money to nearly anyone – even to people without the ability to repay the loans – ignoring their own stated lending underwriting guidelines.

67.    Contrary to the representations in the Registration Statement and Prospectus Supplements, neither defendants JP Morgan, JP Morgan Securities, JP Morgan Acquisition or JP Morgan Acceptance, nor the loan originators they used, determined whether borrowers' income was sufficient to meet the loan payments. Nor did they evaluate the borrowers' ability to repay their loans.

68.    Indeed, at the time the loans were originated and transferred to the Trusts, originators of mortgages throughout the home loan industry were not reviewing loan applications in order to determine whether borrowers had sufficient income to meet their monthly mortgage obligations. Rather, originators implemented policies designed to extend mortgages to borrowers regardless of whether they were able to meet their obligations under the mortgage. This conduct resulted in originators:

(a)    Coaching borrowers to falsely inflate their income on loan applications to appear to qualify for mortgage loans the borrowers could not afford to repay;

(b)    Falsely inflating a prospective borrower's income to qualify the borrower for a loan he or she could not afford to repay;

(c)    Steering borrowers to loans that exceeded their borrowing capacity;

(d)    Encouraging borrowers to borrow more than they could afford by suggesting "stated income" loans – loans on which the borrowers could simply make up, or "state," inflated incomes that would not be verified;

- 19 -

(e)     Approving borrowers based on "teaser rates" for loans despite knowing that the borrower would not be able to afford the payment when the loan rate adjusted; and

(f)     Allowing non-qualifying borrowers to be approved for loans they could not afford under exceptions to the underwriting standards based on so-called "compensating factors" when such "compensating factors" did not in fact exist or did not justify the loans.

69.     As a result, borrowers who were required to submit income information routinely included income levels which were falsely inflated to extreme levels relative to their stated job titles in order to get the mortgage loans approved and funded.  While they were successful in obtaining the loans by inflating their incomes, borrowers could not afford to actually repay the loans.  The false inflation of stated income was systematic and commonplace – a study cited by Mortgage Asset Research Institute found that almost all stated-income loans exaggerated the borrower's actual income by at least 5%, *and more than half increased the amount by more than 50%*.

70.     The originators' blatant disregard for their stated underwriting guidelines encouraged this type of income inflation.  For instance, many stated income borrowers were actually wage earners who could have supplied Forms W-2 or other income-verifying documentation, but did not and were not required to.  In addition, numerous mortgages transferred to the Trusts were issued without requiring the borrowers to execute a Form 4506 – which would have allowed the lender to access the borrower's tax returns from the Internal Revenue Service ("IRS") to verify income. Originators did not do this either.

71.     Similarly, with respect to AHM, the representation that it evaluated a "borrower's creditworthiness based solely on information that American Home believes is indicative of the applicant's willingness and ability to pay the debt they would be incurring" was false and misleading because AHM was lending to anyone that it could regardless of a borrower's ability to repay the loan.  According to a former District Manager, employees responsible for selling loans were told to

- 20 -

ignore the issues which should not be ignored, such as a borrower's ability to repay, and just sell the loan programs.

72.    Additionally, contrary to AHM's stated underwriting policy, AHM was not weighing all risk factors inherent in a loan file, nor did it encourage underwriters to use professional judgment based on their experience. Instead, according to a former Level 5 Underwriter, who worked AHM from 2004 until December 2006, the professional judgment of underwriters was often overridden by automated underwriting software that approved loans that made no financial sense and were therefore unlikely to be paid back. A former Level 3 Underwriter, employed by AHM from June 2004 to August 2007, confirmed that the automated underwriting software approved "awful loans" that would not have been approved under AHM's stated underwriting guidelines.

73.    Further, in order to achieve the volume of desired loan production, AHM was as a matter of course making loans even where "compensating factors," which would allow exceptions to the underwriting standards, did not exist. AHM routinely fabricated "compensating factors" purportedly justifying loans even when such factors were not present because AHM's business relied on making a large number of loans, earning fees for each loan when transferring them in the securitization process. A former AHM Wholesale Account Executive, who worked at AHM from January 2005 through July 2007, stated that anyone could buy a house with zero percent down and *no proof of ability to pay the loan back*.

74.    With respect to the Chase Originators, the representation that "*a determination is made as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed loan and other expenses related to the residence (such as property taxes and insurance) as well as to meet other financial obligations and monthly living expenses*" was false and misleading. The Chase Originators' underwriting guidelines – like most if not all of the loan originators – were not applied to evaluate the prospective borrower's

repayment ability.  Rather, according to a former Wholesale Account Executive with Chase Home Financial ("CHF"), from 2002 to 2008 the underwriting process was subject to abuse by brokers who purposely originated loans for people they knew could not repay them.  Additionally, CHF's proprietary automated underwriting system "Zippy" had extremely loose guidelines and was easily and often overridden.  The former Account Executive acknowledged that had Zippy's requirements not been so loose or if other measures had been taken in the underwriting process, the loans it approved would otherwise not have seen the light of day.

75.     The extent of "Zippy's" lax underwriting standard and the ease by which data could be manipulated to achieve the desired approval was documented in an internal memo explaining ways to "cheat" and "trick" Zippy.  For example, the memo instructs brokers to group tips, bonuses, and other amounts to make the base income appear larger or to simply inflate the stated income or assets by $500 increments to see if the broker could get the "desired findings."

76.     Additionally, a former Mortgage Loan Officer at JP Morgan Chase from 2003 through March 2007 confirmed that the directive for fulfilling the business model was to pursue "foot traffic" in the retail branch offices and to qualify applications even for obviously unqualified people with very poor credit and little ability to repay loans.  Another former Mortgage Loan Officer with JP Morgan Chase from 2005 through 2008 described his team as a bunch of cowboys working the phones to write "B" and "C" loans for customers they identified in internal databases as having trouble meeting their current Chase mortgage obligations.  He admitted their efforts left these individual borrowers "worse off" than before the refinance since they were not even able to repay the previously existing loan.  These loans were underwritten despite the fact that there was no evidence that the applicant's financial circumstances had improved.

77.     Concerning loan originator National City, the representation that its "***underwriting standards are applied to evaluate the prospective borrower's credit standing and repayment***

*ability*" were false and misleading because National City's underwriting standards were not applied to evaluate the prospective borrower's repayment ability. Instead, National City used guidelines supplied by Wall Street investors such as the defendants, which did not evaluate a borrower's ability to repay the loan but rather listed the minimum standards that Wall Street would accept for loans they would purchase and securitize. According to former underwriters for National City (who worked for the company during the 2006-2007 time period), this led to a situation where National City made as many loans as it could without regard to repayment ability because originators were focused only on meeting the more minimal Wall Street standards, thereby allowing National City to sell such troubled loans to defendants, and ultimately pass along to plaintiff and the Class, the risk that borrowers would not pay the loans off.

**Defendants Misrepresented that: (1) Appraisers'
Compensation Was Not Affected by Approval or
Disapproval of the Loans; (2) Appraisals Were
Performed in Conformity with USPAP;
(3) Appraisals Conformed to Fannie Mae or
Freddie Mac Standards; and/or (4) Appraisals
Were Based on Recent Sales of Comparable Properties**

78.     The Registration Statement and Prospectus Supplement for the JP Morgan Mortgage Trust 2007-S3 represented that "[a]ll appaisals conform to the [USPAP] adopted by the Appraisal Standards Board of the Appraisal Foundation" and that "[t]he appraisal generally will have been based upon a market data analysis of recent sales of comparable properties."

79.     Similarly, the Prospectus Supplement for the JP Morgan Mortgage Trust 2007-S3 stated specifically with respect to loan originator AHM that "*[a]ll appaisals conform to the [USPAP] adopted by the Appraisal Standards Board of the Appraisal Foundation*" and that "*[t]he appraisal generally will have been based upon a market data analysis of recent sales of comparable properties*." Additionally, with respect to the Chase Originators, the Prospectus Supplement stated that each "*appraisal is conducted by an independent fee appraiser*."

- 23 -

80.     Identical language appeared in the Prospectus Supplements for JP Morgan Mortgage Trust 2007-S2, JP Morgan Mortgage Trust 2007-A3, JP Morgan Mortgage Trust 2007-A4, JP Morgan Mortgage Trust 2007-A5, JP Morgan Mortgage Trust 2007-A6, and JP Morgan Alternative Loan Trust 2007-A2.

81.     The foregoing representation in ¶79, that appraisals were done by qualified and "*independent*" appraisers was false and misleading. Appraisers were ordered by loan originators to give predetermined, inflated appraisals that would result in approval of the loan; if the appraiser objected to the inflated appraisal number, they would be threatened with being black-balled within the industry. Appraisers were frequently threatened by being told to provide a predetermined appraisal value justifying a loan or face never doing business again. Thus, appraisers' compensation was in fact affected by whether or not a loan was approved.

82.     Second, the representations in ¶¶78-79 that "*[a]ll appraisals conform to the [USPAP] adopted by the Appraisal Standards Board of the Appraisal Foundation*" were false and misleading because the appraisals did not conform to the USPAP standards.

83.     The USPAP provides that:

(a)     An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests;

(b)     In appraisal practice, an appraiser must not perform as an advocate for any party or issue;

(c)     An appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions; and

(d)     It is unethical for an appraiser to accept an assignment, or to have a compensation arrangement for an assignment, that is contingent on any of the following:

(i)     The reporting of a predetermined result (*e.g.*, opinion of value);

- 24 -

(ii)        A direction in assignment results that favors the cause of the client;

(iii)       The amount of a value opinion;

(iv)       The attainment of a stipulated result; or

(v)        The occurrence of a subsequent event directly related to the appraiser's opinions and specific to the assignment's purpose.

84.    The representations that appraisals conformed to the USPAP, or Fannie Mae or Freddie Mac standards, were materially false and misleading in that they omitted to state that the appraisals were inaccurate because, contrary to the USPAP or Fannie Mae and/or Freddie Mac standards, appraisers were ordered to come back with predetermined, preconceived, inflated and false appraisal values.

85.    Most lenders allowed the sales personnel or account executives to order and control the appraisals.  These sales personnel were typically on a commission-only pay structure and were therefore motivated to close as many loans as possible at the highest possible loan amounts.  These sales personnel and account executives would pressure appraisers to appraise properties at pre-set, artificially high levels to justify the loans they wanted to make, or they would not be hired again.

86.    This dynamic caused appraisers to experience systemic problems of coercion, as many were ordered to doctor their reports or face never seeing work from lenders again, as they were threatened with being put on exclusionary "do-not-use" lists.  This pressure succeeded in generating artificially inflated appraisals.

87.    A 2007 survey of 1,200 appraisers conducted by October Research Corp. – a firm in Richfield, Ohio that publishes *Valuation Review* – found that 90% of appraisers reported that mortgage brokers and others pressured them to raise property valuations to enable deals to go through.  The study also found that 75% of appraisers reported "negative ramifications" if they did not cooperate, alter their appraisal, and provide a higher valuation.

- 25 -

88.     Numerous appraisers have confirmed that the inflation of appraisals was systemic and commonplace.  For example, a former AHM Vice President from March 2003 through May 2007, described that appraisal fraud was a common problem.  AHM appraisers succumbed to brokers' demands to appraise at predetermined inflated values.  Loan officers pressured appraisers to come up with the "right number," *i.e.*, the inflated number the loan officers wanted to justify a loan (or a larger loan).  Additionally, the owner of a small Midwest residential real estate appraisal firm in Illinois – who was approved and/or utilized by originators of loans in many of the Trusts, including Countrywide and Wells Fargo in approximately 200 transactions – stated that mortgage brokers frequently threatened him with "either give us this home value or you will never do business for us again."

89.     A real estate appraiser in Las Vegas stated that when the Vegas market had peaked, Countrywide and Wells Fargo were requiring appraisers to come up with real estate appraisals reflecting escalating values or they would black ball them.  This appraiser conducted over 300 inflated appraisals for Countrywide, Wells Fargo and other originators.  According to this appraiser, typically the appraisals demanded by these lenders were 15% to 25% over the actual market values.

90.     The representations in ¶¶78-79 that "*[t]he appraisal[s] generally will have been based upon a market data analysis of recent sales of comparable properties*" was false and misleading.  In many cases the appraisals were based on purportedly "comparable properties" which really were not comparable.  As an independent appraiser in Florida related, in order to stay in business, she gave inflated appraisals even if it required driving 20 miles away for "comparable" sales that really were not comparable.  During the relevant period, this appraiser completed 100+ appraisals for Countrywide and other originators that were overinflated and based on sales that were not "comparable."  Appraisers routinely used more expensive properties with larger lots or square

- 26 -

footages, or which had other amenities the appraised property did not have, in order to inflate the value of the appraised property.

**The LTV Ratios Stated in the Offering Documents Were False**

91.    Each Prospectus Supplement for each Trust contained information concerning the LTV ratios at origination of the loans within the Trust.  Specifically, "Annex A" of the Prospectus Supplement for the JP Morgan Mortgage Trust 2007-S3 contained detailed information on the LTV ratios for the loans within the Trust.  An example of the LTV ratio information contained within the above Prospectus Supplement is set forth below in an excerpt from page A-4 of Annex A:

Original Loan-To-Value Ratios - Pool 1

| Range of Original Loan-To-Value Ratios (%) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding | Percent of Aggregate Principal Balance Outstanding |
|---|---|---|---|
| 0.01 - 10.00………...…………. | 1 | $1,098,005.78 | 0.07% |
| 10.01 - 20.00…… ………… ……… | 10 | $5,943,899.56 | 0.37% |
| 20.01 - 30.00…… ………… ……… | 22 | $7,602,545.67 | 0.47% |
| 30.01 - 40.00…… ………… ……… | 41 | $19,683,265.57 | 1.22% |
| 40.01 - 50.00…… ………… ……… | 150 | $78,650,132.16 | 4.87% |
| 50.01 - 60.00…… ………… ……… | 247 | $137,035,191.61 | 8.49% |
| 60.01 - 70.00…… ………… ……… | 459 | $277,543,748.64 | 17.20% |
| 70.01 - 75.00…… ………… ……… | 401 | $250,213,511.77 | 15.50% |
| 75.01 - 80.00…… ………… ……… | 1,534 | $782,537,276.16 | 48.48% |
| 80.01 - 85.00…… ………… ……… | 17 | $6,864,195.61 | 0.43% |
| 85.01 - 90.00…… ………… ……… | 87 | $28,539,057.59 | 1.77% |
| 90.01 - 95.00…… ………… ……… | 27 | $8,652,283.97 | 0.54% |
| 95.01 - 100.00………… ………… . | 30 | $9,629,065.73 | 0.60% |
| Total… ………… ………… …. | 3,026 | $1,613,992,179.82 | 100.00% |

As of the Cut-off Date, the weighted average Original Loan-to-Value Ratio of the Mortgage Loans in Pool 1 is expected to be approximately 72.02%

92.    Each of the Prospectus Supplements at issue herein contained similar information about the LTV ratios of the loans within the Trusts.

- 27 -

93.     The foregoing LTV ratios in the Offering Documents were inaccurate, false and misleading because they were calculated using the false and inflated property appraisals alleged herein.  Incorporating an inflated appraisal into the LTV calculation will result in a lower LTV ratio.  For example, if a borrower seeks to borrow $90,000 to purchase a house worth $100,000, the LTV ratio is $90,000/$100,000 or 90%.  If, however, the appraised value of the house is artificially increased to $120,000, the LTV ratio drops to just 75% ($90,000/$120,000).  Because the LTV ratio can only be calculated by using the appraisal value of the property, and because the property values in the appraisals were inflated, this resulted in false, lower LTV ratios for the loans in the Trusts.  This made it appear that the Certificates were safer and less risky than they actually were since a lower LTV ratio indicated there was more equity in the property, thereby protecting the loan holder in the event of a default or foreclosure.

**The Credit Ratings Assigned to the Certificates**
**Falsely Portrayed the Certificates as Much Safer**
**Investments than They Really Were**

94.     The April 23, 2007 Registration Statement represented that "[i]t is a condition to the issuance of the securities of each series offered by this prospectus that they shall have been rated in one of the four highest rating categories by the nationally recognized statistical rating agency or agencies specified in the related prospectus supplement."  Eventually, all of the Certificates in all of the Trusts were given investment grade ratings.  For example, the Certificates for the JP Morgan Mortgage  Trust 2007 S-3 were all rated at investment grade, that is AAA to BBB, by Standard & Poors Rating Services ("S&P") and Fitch Rating ("Fitch").

95.     The Certificates for all of the other Trusts contained the same or similar investment grade ratings from S&P, Fitch or Moody's Investor Services, Inc. ("Moody's").

96.     The ratings stated in the Registration Statement and Prospectus Supplements were inaccurate, false and misleading because they were based, as alleged below, on outdated

- 28 -

assumptions, relaxed ratings criteria, and inaccurate loan information. These flaws produced artificially high credit ratings for the Certificates, making them appear safer and less risky than they really were.

97. The ratings agencies used models to produce the ratings for the Certificates. The models were based upon loan performance *prior* to the year 2000. However, an unprecedented decline and deterioration in mortgage lending standards occurred *after* 2000 which the models did not account for. This decline in lending standards and an increase in riskier exotic mortgage products during the 2001 through 2005 time period rendered the ratings agencies' pre-2000 loan performance data obsolete. Thus, by the time the agencies provided "investment grade" ratings to the Certificates, their historical data no longer reflected the reality that mortgage credit quality was rapidly deteriorating.

98. In addition to using flawed models to generate ratings, the Ratings Agencies repeatedly eased their ratings standards in order to capture more market share of the ratings business. This easing of ratings standards was due in large part to the fact that these rating agencies were compensated by the very entities, *i.e.*, the defendants, that they provided ratings to, and the fact that those entities were free to shop around for the rating agency that would provide them with the highest ratings.

99. In addition to the eroding rating standards and the flawed rating models alleged above, the ratings agencies' ratings were also based on inaccurate information. The rating agencies rated the Certificates based in large part on data about each of the mortgage loans that defendants provided to them – including borrowers' incomes, property appraisal values and LTV ratios. As alleged above, much of this data was inaccurate due to the inflated appraisal values, inaccurate LTV ratios, borrower income inflation and falsification, and the other facets of defective underwriting alleged herein. None of the ratings agencies engaged in any due diligence or otherwise sought to

- 29 -

verify the accuracy or quality of the loan data underlying the loan pools they rated. Nor did they seek representations from defendants that due diligence was performed.

100. Because the ratings agencies were using flawed information and models to generate their ratings, the ratings assigned to the Certificates did not accurately reflect their risk. Certificates were given "investment grade" ratings when in reality they were not of investment grade quality. As such, the statements regarding the ratings of the Certificates were false and misleading.

## DISCLOSURES EMERGE ABOUT PROBLEMS WITH LOANS UNDERLYING THE CERTIFICATES

101. After the Certificates were issued, the ratings on Certificates within each of the Trusts were downgraded. In some instances, Certificates that received the highest rating of AAA at issuance have fallen many notches and are now rated CC – a rating many levels below the threshold for "junk status."

102. These downgrades have occurred because the original ratings did not accurately reflect the risk associated with the assets underlying the Certificates. Further, the delinquency rates on the underlying mortgage loans have skyrocketed. All of the Trusts have experienced the 60+ day delinquency rate in excess of 12% and in more than a third of the Trusts, the 60+ day delinquency rate is in excess of 42%. The "60+ day delinquency rate" includes loans that are foreclosures, loans that are 60 days or more delinquent, and loans in which the real estate collateral was retaken by the lender. In many of the Trusts, at least one of every four loans has experienced foreclosure. The massive foreclosure rates and extraordinary delinquencies have further confirmed defendants' misrepresentations concerning the lending practices detailed above.

103. Because of the downgrades, as well as other information that was unknown to investors at the time the Certificates were issued, the value of the Certificates has diminished greatly

since their original offering, as has the price at which members of the Class could dispose of them. These diminutions in value and price have caused damages to the plaintiff and the Class.

## COUNT I

### Violations of §11 of the 1933 Act
### Against All Defendants

104.    Plaintiff repeats and re-alleges the allegations set forth above as if set forth fully herein. For purposes of this Count, plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the 1933 Act.

105.    This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of plaintiff and the Class, against all defendants.

106.    The Registration Statement for the Certificate offerings was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

107.    Defendant JP Morgan Acceptance, as Issuer of the Certificates, is strictly liable to plaintiff and the Class for the misstatements and omissions complained of herein, even if such misstatements and omissions were innocent.

108.    Defendant JP Morgan was an underwriter for each of the offerings specified in ¶114 below and failed to perform adequate due diligence, thereby permitting the false and misleading statements and omissions included in the Registration Statement to be disseminated.

109.    Defendant JP Morgan Securities was an underwriter for each of the offerings specified in ¶114 below and failed to perform adequate due diligence, thereby permitting the false and misleading statements and omissions included in the Registration Statement to be disseminated.

- 31 -

110.    Defendant JP Morgan Acquisition was the sponsor of the Certificate offerings.

111.    The Individual Defendants signed the Registration Statement, which was false due to the misstatements and omissions described above.

112.    None of these defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were not false and misleading or did not omit material facts that rendered statements made therein not false and misleading.

113.    By reason of the conduct herein alleged, each defendant named herein violated, and/or controlled a person who violated, §11 of the 1933 Act.

114.    Defendants JP Morgan and JP Morgan Securities were underwriters for the following issuances:

> Mortgage Pass-Through Certificates, Series 2007-S2
> Mortgage Pass-Through Certificates, Series 2007-S3
> Mortgage Pass-Through Certificates, Series 2007-A3
> Mortgage Pass-Through Certificates, Series 2007-A4
> Mortgage Pass-Through Certificates, Series 2007-S1
> Mortgage Pass-Through Certificates, Series 2007-A2
> Asset-Backed Pass-Through Certificates, Series 2007-CH4
> Asset-Backed Pass-Through Certificates, Series 2007-CH5
> Mortgage Pass-Through Certificates, Series 2007-A5
> Mortgage Pass-Through Certificates, Series 2007-A6
> Asset-Backed Pass-Through Certificates, Series 2007-CH3

115.    Plaintiff acquired the Certificates pursuant and/or traceable to the Registration Statement.  Plaintiff and the Class have sustained damages as the value of the Certificates has declined substantially subsequent to the disclosures of defendants' misconduct.

116.    At the time of their purchases of the Certificates, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the middle of 2008.  Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon

- 32 -

which this Complaint is based to the time that the initial complaint in this matter was filed. Less than three years has elapsed between the time that the securities upon which this claim is brought were offered to the public and the time the initial complaint was filed.

## COUNT II

### Violations of §12(a)(2) of the 1933 Act
### Against Defendants JP Morgan, JP Morgan Securities
### and JP Morgan Acceptance

117.    Plaintiff repeats and re-alleges the allegations above as if set forth fully herein. For purposes of this Count, plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the 1933 Act.

118.    By means of the defective Offering Documents, defendants JP Morgan, JP Morgan Securities and JP Morgan Acceptance promoted and sold the Certificates to plaintiff and other members of the Class. Defendants JP Morgan, JP Morgan Securities and JP Morgan Acceptance solicited sales of the Certificates for financial gain, as they benefitted financially from the sale of the Certificates.

119.    The Offering Documents contained untrue statements of material fact, and concealed and failed to disclose material facts, as alleged above. JP Morgan, JP Morgan Securities and JP Morgan Acceptance owed plaintiff and the other members of the Class who purchased the Certificates pursuant to the Offering Documents the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. JP Morgan, JP Morgan Securities and JP Morgan Acceptance, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Offering Documents, as set forth above.

514568_1

120.     Plaintiff did not know, nor in the exercise of reasonable diligence could it have known, of the untruths and omissions contained in the Offering Documents at the time it acquired the Certificates.

121.     By reason of the conduct alleged herein, JP Morgan, JP Morgan Securities and JP Morgan Acceptance violated §12(a)(2) of the 1933 Act.  As a direct and proximate result of such violations, plaintiff and the other members of the Class who purchased the Certificates pursuant to the Offering Documents sustained substantial damages in connection with their purchases of the Certificates.  Accordingly, plaintiff and the other members of the Class who hold the Certificates issued pursuant to the Offering Documents have the right to rescind and recover the consideration paid for their shares, and hereby tender their Certificates to JP Morgan, JP Morgan Securities and JP Morgan Acceptance.  Class members who have sold their Certificates seek damages to the extent permitted by law.

### COUNT III

**Violations of §15 of the 1933 Act**
**Against Defendant JP Morgan, Defendant JP Morgan Acceptance,**
**the Individual Defendants and Defendant JP Morgan Securities**

122.     Plaintiff repeats and re-alleges the allegations above as if set forth fully herein.  For purposes of this Count, plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the 1933 Act.

123.     This Count is brought pursuant to §15 of the 1933 Act against defendant JP Morgan, defendant JP Morgan Acceptance, the Individual Defendants and defendant JP Morgan Securities.

124.     JP Morgan owns JP Morgan Acceptance, the issuer, and JP Morgan Securities, an underwriter in the sale of the Certificates.  By virtue of the complete ownership of JP Morgan

Acceptance and JP Morgan Securities, defendant JP Morgan had the power to, and did, direct JP Morgan Acceptance and JP Morgan Securities, and was a control person over those entities.

125.    Each of the Individual Defendants was a control person of JP Morgan Acceptance and of the Trusts by virtue of his/her position as a director and/or senior officer of JP Morgan Acceptance. The Individual Defendants were responsible for the preparation of the contents of the Registration Statement which incorporated by reference the statements in the Prospectus Supplements.

126.    JP Morgan Acceptance was the depositor and an issuer for the offerings. JP Morgan Securities was an underwriter for the offerings. The defendants named herein were responsible for overseeing the formation of the Trusts as well as the operation of the Trusts, including routing payments from the borrowers to investors.

127.    The defendants named in this Count prepared, reviewed and/or caused the Registration Statement and Prospectus Supplements to be filed and disseminated.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying plaintiff as Class representative;

B.    Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding rescission or a rescissory measure of damages; and awarding such additional equitable/injunctive or other relief as deemed appropriate by the Court.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

DATED:  April 9, 2010                    ROBBINS GELLER RUDMAN
                                              & DOWD LLP
                                         SAMUEL H. RUDMAN
                                         DAVID A. ROSENFELD
                                         CAROLINA C. TORRES
                                         JARRETT S. CHARO


                              _____
                                         DAVID A. ROSENFELD

                              58 South Service Road, Suite 200
                              Melville, NY  11747
                              Telephone:  631/367-7100
                              631/367-1173 (fax)

                              ROBBINS GELLER RUDMAN
                                 & DOWD LLP
                              ARTHUR C. LEAHY
                              THOMAS E. EGLER
                              SUSAN G. TAYLOR
                              SCOTT H. SAHAM
                              NATHAN R. LINDELL
                              MATTHEW I. ALPERT
                              655 West Broadway, Suite 1900
                              San Diego, CA  92101
                              Telephone:  619/231-1058
                              619/231-7423 (fax)

                              Lead Counsel for Plaintiff

## DECLARATION OF SERVICE BY MAIL

I, the undersigned, declare:

1.      That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of Suffolk, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 58 South Service Road, Suite 200, Melville, NY  11747.

2.      That on April 9, 2010, declarant served the **AMENDED COMPLAINT FOR VIOLATION OF §§11, 12 AND 15 OF THE SECURITIES ACT OF 1933** by depositing a true copy thereof in a United States mailbox at San Diego, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

3.      That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on April 9, 2010, at Melville, New York.

_____
KELLY STADELMANN

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: April 9, 2010

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
CAROLINA C. TORRES
JARRETT S. CHARO


_____
DAVID A. ROSENFELD

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
ARTHUR C. LEAHY
THOMAS E. EGLER
SUSAN G. TAYLOR
SCOTT H. SAHAM
NATHAN R. LINDELL
MATTHEW I. ALPERT
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiff

- 36 -

## DECLARATION OF SERVICE BY MAIL

I, the undersigned, declare:

1.    That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of Suffolk, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 58 South Service Road, Suite 200, Melville, NY 11747.

2.    That on April 9, 2010, declarant served the **AMENDED COMPLAINT FOR VIOLATION OF §§11, 12 AND 15 OF THE SECURITIES ACT OF 1933** by depositing a true copy thereof in a United States mailbox at San Diego, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

3.    That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on April 9, 2010, at Melville, New York.

_____
KELLY STADELMANN

514568_1

JPMORGAN ACCEPTANCE 2
Service List - 4/8/2010    (09-0239)
Page 1 of 1

**Counsel For Defendant(s)**

Adam  Zurofsky
Floyd  Abrams
S. Penny Windle
Cahill Gordon & Reindel LLP
80 Pine Street
New York, NY  10005-1702
   212/701-3000
   212/269-5420(Fax)

Andrew J. Ehrlich
Roberta A. Kaplan
Martin  Flumenbaum
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY  10019-6064
   212/373-3000
   212/757-3990(Fax)

James J. Coster
Joshua M. Rubins
Justin E. Klein
Satterlee Stephens Burke & Burke LLP
230 Park Avenue, 11th Floor
New York, NY  10169
   212/818-9200
   212/818-9606(Fax)

A. Robert Pietrzak
Dorothy J. Spenner
Owen H. Smith
Sidley Austin LLP
787 7th Avenue, 22nd Floor
New York, NY  10019
   212/839-5300
   212/839-5599(Fax)

**Counsel For Plaintiff(s)**

Samuel H. Rudman
David A. Rosenfeld
Mario  Alba Jr.
Robbins Geller Rudman & Dowd LLP
58 South Service Road, Suite 200
Melville, NY  11747
   631/367-7100
   631/367-1173(Fax)

Arthur C. Leahy
Thomas E. Egler
Susan G. Taylor
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
   619/231-1058
   619/231-7423(Fax)

Joseph P. Guglielmo
Geoffrey M. Johnson
Thomas L. Laughlin IV
Scott + Scott, LLP
500 Fifth Avenue, 40th Floor
New York, NY  10110
   212/223-6444
   212/223-6334(Fax)