UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                      :

FORT WORTH EMPLOYEES' RETIREMENT      :
FUND, On Behalf of Itself and All Others Similarly   :   09-cv-03701 (JGK) (JCF)
Situated,                                  :
                                      :
                    Plaintiff,        :
                                      :   ECF CASE
      vs.                                :
                                      :
J.P. MORGAN CHASE & CO., *et al.*,        :
                                      :
                   Defendants.      :
                                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE SECOND AMENDED COMPLAINT


SIDLEY AUSTIN LLP

ATTORNEYS FOR DEFENDANTS

787 SEVENTH AVENUE
NEW YORK, NEW YORK 10019
(212) 839-5300

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ........................................................................................1

FACTUAL BACKGROUND............................................................................................3

ARGUMENT....................................................................................................................9

I.   PLAINTIFF LACKS STANDING TO MAINTAIN THIS ACTION. ............................10

    A.   The Claims Relating To 10 Of The 11 Offerings At Issue Must Be Dismissed Because Plaintiff Lacks Standing. ........................................................................10

    B.   Plaintiff Lacks Standing Under Section 12(a)(2). ................................................12

II.   PLAINTIFF FAILS TO PLEAD ANY ACTIONABLE MISSTATEMENTS OR OMISSIONS...................................................................................................................13

    A.   Plaintiff Fails To Allege Any Actionable Misrepresentations Or Omissions Regarding Underwriting Guidelines For The Mortgage Loans............................14

    B.   Plaintiff Fails To Allege Any Actionable Misstatements Or Omissions Relating To Appraisal Standards And LTV Ratios.............................................................18

    C.   Plaintiff Fails To Allege Any Actionable Misstatements Or Omissions Relating To The Ratings Assigned To The Certificates. ......................................................20

    D.   Plaintiff's Allegations of Misstatements And Omissions Are Not Plausible........22

        1.   Plaintiff's CW Allegations Do Not Support A Reasonable Inference Of Misstatements Or Omissions. ...............................................................................22

            a.   The CWs are not alleged to have occupied positions such that they would possess the information alleged...........................................23

            b.   The CW allegations are generalizations. .......................................25

        2.   Plaintiff Offers No Factual Allegations Concerning The Majority Of The Originators' Underwriting And Appraisal Standards................................27

        3.   The Allegations Concerning Loans Backing JPMMT 2007-S3 Do Not Support A Plausible Inference of Misstatements Or Omissions. .............27

    E.   Plaintiff's Sole Remedy Is The Repurchase Of Non-Complying Loans.............29

    F.   Plaintiff Does Not Adequately Allege Materiality. ..............................................30

III.   PLAINTIFF FAILS TO PLEAD ANY COGNIZABLE ECONOMIC LOSS.................32

IV.     PLAINTIFF'S CLAIMS ARE TIME-BARRED. ...........................................................34

V.      PLAINTIFF'S SECTION 11 CLAIM AGAINST JPMC AND JPM ACQUISITION
        MUST BE DISMISSED.........................................................................................................36

VI.     PLAINTIFF'S SECTION 15 CLAIM MUST BE DISMISSED.......................................37

CONCLUSION ...........................................................................................................................39

## **TABLE OF AUTHORITIES**

**CASES**                                                                    **PAGE(S)**

*AIG Global Sec. Lending Corp. v. Banc of Am. Sec. LLC,*
   646 F. Supp. 2d 385 (S.D.N.Y. 2009) ................................................................32, 33

*Akerman v. Oryx Commc'ns, Inc.,*
   810 F.2d 336 (2d Cir. 1987) ................................................................................11

*Alaska Elec. Pension Fund v. Pharmacia Corp.,*
   554 F.3d 342 (3d Cir. 2009) ...............................................................................34

*Ashcroft v. Iqbal,*
   129 S. Ct. 1937 (2009)...................................................................................9, 22

*Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l, Ltd.,*
   968 F.2d 196 (2d Cir. 1992) .................................................................................9

*Barnes v. Osofsky,*
   373 F.2d 269 (2d Cir. 1967) ...............................................................................11

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) .....................................................................................9, 22

*Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.,*
   2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) ...........................................................14

*Caiafa v. Sea Containers Ltd.,*
   525 F. Supp. 2d 398 (S.D.N.Y. 2007) ..................................................................12

*Campo v. Sears Holdings Corp.,*
   2010 WL 1292329 (2d Cir. Apr. 6, 2010) .............................................................23

*Chamberlin v. Principi,*
   2005 WL 1963942 (S.D.N.Y. Aug. 16, 2005)........................................................29

*City of Ann Arbor Employees' Ret. Sys. v. Citigroup Mortgage Loan Trust Inc.,*
   2010 WL 1371417 (E.D.N.Y. Apr. 6, 2010) ...................................................*passim*

*DeMaria v. Andersen,*
   153 F. Supp. 2d 300 (S.D.N.Y. 2001) ..................................................................38

*Dodds v. Cigna Sec., Inc.,*
   12 F.3d 346 (2d Cir. 1993) ................................................................................34

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,*
   553 F.3d 187 (2d Cir. 2009) ...............................................................................31

*Ellison v. Am. Image Motor Co., Inc.,*
    36 F. Supp. 2d 628 (S.D.N.Y. 1999) ...................................................... 38

*First Nationwide Bank v. Gelt Funding Corp.,*
    27 F.3d 763 (2d Cir. 1994) ................................................................ 33

*Garber v. Legg Mason, Inc.,*
    537 F. Supp. 2d 597 (S.D.N.Y. 2008) .................................................. 32

*Gustafson v. Alloyd Co.,*
    513 U.S. 561 (1995) ........................................................................ 12

*Halperin v. eBankerUSA.com, Inc.,*
    295 F.3d 352 (2d Cir. 2002) .............................................................. 14

*Hoffman v. UBS-AG,*
    591 F. Supp. 2d 522 (S.D.N.Y. 2008) .................................................. 11

*I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc.,*
    936 F.2d 759 (2d Cir. 1991) .............................................................. 31

*In re Alstom SA Sec. Litig.,*
    406 F. Supp. 2d 402 (S.D.N.Y. 2005) ............................................. 34, 35

*In re Am. Bank Note Holographics, Inc. Sec. Litig.,*
    93 F. Supp. 2d 424 (S.D.N.Y. 2000) .................................................... 38

*In re Am. Express Co. Sec. Litig.,*
    2008 WL 4501928 (S.D.N.Y. Sept. 26, 2008) ....................................... 23

*In re AOL Time Warner, Inc. Sec. & ERISA Litig.,*
    381 F. Supp. 2d 192 (S.D.N.Y. 2004) .............................................. 10, 32

*In re Bausch & Lomb, Inc. Sec. Litig.,*
    592 F. Supp. 2d 323 (W.D.N.Y. 2008) ................................................. 23

*In re Britannia Bulk Holdings Inc. Sec. Litig.,*
    665 F. Supp. 2d 404 (S.D.N.Y. 2009) .................................................. 31

*In re Broderbund/Learning Co. Sec. Litig.,*
    294 F.3d 1201 (9th Cir. 2002) ........................................................... 32

*In re Cosi, Inc. Sec. Litig.,*
    379 F. Supp. 2d 580 (S.D.N.Y. 2005) .................................................. 12

*In re Deutsche Telekom AG Sec. Litig.,*
    2002 WL 244597 (S.D.N.Y. Feb. 20, 2002) .......................................... 37

*In re Elan Corp. Sec. Litig.,*
    543 F. Supp. 2d 187 (S.D.N.Y. 2008) .................................................. 25

iv

*In re First Union Corp. Sec. Litig.,*
    128 F. Supp. 2d 871 (W.D.N.C. 2001) ................................................................32

*In re IAC/Interactivecorp Sec. Litig.,*
    695 F. Supp. 2d 109 (S.D.N.Y. 2010) ..............................................22, 23, 25, 26

*In re IndyMac Mortgage-Backed Sec. Litig.,*
    2010 WL 2473243 (S.D.N.Y. June 21, 2010) ................................................*passim*

*In re Lehman Bros. Sec. & ERISA Litig.,*
    684 F. Supp. 2d 485 (S.D.N.Y. 2010) ...........................................10, 11, 18, 21

*In re Livent, Inc. Noteholders Sec. Litig.,*
    151 F. Supp. 2d 371 (S.D.N.Y. 2001) ..............................................................9, 38

*In re Loral Space & Commc'ns Ltd. Sec. Litig.,*
    2004 WL 376442 (S.D.N.Y. Feb. 27, 2004) .........................................10, 23, 25

*In re Merrill Lynch & Co. Research Reports Sec. Litig.,*
    272 F. Supp. 2d 243 (S.D.N.Y. 2003) ...........................................................13, 32

*In re Merrill Lynch & Co. Sec., Derivative & ERISA Litig.,*
    597 F. Supp. 2d 427 (S.D.N.Y. 2009) ..................................................................10

*In re Merrill Lynch,*
    273 F. Supp. 2d 351 (S.D.N.Y. 2003) ..................................................................35

*In re Morgan Stanley Info. Funds Sec. Litig.,*
    592 F.3d 347 (2d Cir. 2010) ..................................................................................13

*In re Openwave Sys. Sec. Litig.,*
    528 F. Supp. 2d 236 (S.D.N.Y. 2007) ...........................................................34, 35

*In re OPUS360 Corp. Sec. Litig.,*
    2002 WL 31190157 (S.D.N.Y. Oct. 2, 2002) .........................................14, 15, 32, 37

*In re Orion Sec. Litig.,*
    2009 WL 2601952 (S.D.N.Y. Aug. 20, 2009) .....................................................11

*In re SCOR Holding (Switzerland) AG Litig.,*
    537 F. Supp. 2d 556 (S.D.N.Y. 2008) ..................................................................34

*In re WorldCom, Inc.,*
    377 B.R. 77 (S.D.N.Y. 2007) ..................................................................................37

*In re WorldCom, Inc. Sec. Litig.,*
    2004 WL 1097786 (S.D.N.Y. May 18, 2004) .....................................................38

*In re WorldCom, Inc. Sec. Litig.,*
    308 F. Supp. 2d 338 (S.D.N.Y. 2004) ..................................................................37

*Konkol v. Diebold, Inc.*,
  590 F.3d 390 (6th Cir. 2009) .................................................................................23, 25

*Ladmen Partners, Inc. v. Globalstar, Inc.*,
  2008 WL 4449280 (S.D.N.Y. Sept. 30, 2008) ....................................................38

*Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*,
  594 F.3d 383 (5th Cir. 2010) ...............................................................................30

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ...............................................................................................11

*Luminent Mortgage Capital, Inc. v. Merrill Lynch & Co.*,
  652 F. Supp. 2d 576 (E.D. Pa. 2009)...................................................................33

*Makarova v. U.S.*,
  201 F.3d 110 (2d Cir. 2000) ...................................................................................9

*Malin v. XL Capital Ltd.*,
  499 F. Supp. 2d 117 (D. Conn. 2007)...................................................................25

*Mass. Bricklayers and Masons Funds v. Deutsche Alt-A Sec.*,
  2010 WL 1370962 (E.D.N.Y. Apr. 6, 2010) .........................................................30

*Merck & Co., Inc. v. Reynolds*,
  2010 WL 1655827 (U.S. Apr. 27, 2010) ...............................................................34

*N.J. Carpenters Health Fund v. DLJ Mortgage Capital, Inc.*,
  2010 WL 1473288 (S.D.N.Y. Mar. 29, 2010)..................................................*passim*

*N.J. Carpenters Health Fund v. Residential Capital, LLC*,
  2010 WL 1257528 (S.D.N.Y. Mar. 31, 2010).....................................10, 11, 21, 38

*N.J. Carpenters Vacation Fund v. The Royal Bank of Scotland Group, PLC*,
  2010 WL 1172694 (S.D.N.Y. Mar. 26, 2010)...........................................10, 11, 21

*NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co.*,
  No. 08 Civ. 10793 (S.D.N.Y. Jan. 28, 2010) (Ex. Q).......................................10, 34

*New York State Teachers' Ret. Sys. v. Fremont Gen. Corp.*,
  2010 WL 1473265 (C.D. Cal. Mar. 29, 2010)...................................................23, 25

*Olkey v. Hyperion 1999 Term Trust, Inc.*,
  98 F.3d 2 (2d Cir. 1996) .......................................................................................14

*Panther Partners, Inc. v. Ikanos Commc'ns., Inc.*,
  538 F. Supp. 2d 662 (S.D.N.Y. 2008) ...................................................................14

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*,
  658 F. Supp. 2d 299 (D. Mass. 2009)..............................................................*passim*

*Police and Fire Ret. Sys. of the City of Detroit v. SafeNet, Inc.*,
  645 F. Supp. 2d 210 (S.D.N.Y. 2009) ............................................................. 38

*Public Employees' Ret. Sys. of Miss. v. Merrill Lynch & Co. Inc.*,
  2010 WL 2175875 (S.D.N.Y. June 1, 2010) ........................................... *passim*

*Pyramid Holdings, Inc. v. Inverness Med. Innovations, Inc.*,
  638 F. Supp. 2d 120 (D. Mass. 2009) .............................................. 22, 23, 25, 26

*Republic Bank & Trust Co. v. Bear, Stearns & Co., Inc.*,
  2010 WL 1489264 (W.D. Ky. Apr. 13, 2010) ..................................... 17, 22

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004) ........................................................... 14, 37

*Sloane Overseas Fund, Ltd. v. Sapiens Int'l Corp.*,
  941 F. Supp. 1369 (S.D.N.Y. 1996) ...................................................... 38

*Staehr v. Hartford Fin. Servs. Group, Inc.*,
  547 F.3d 406 (2d Cir. 2008) ................................................................. 35

*TSC Indus., Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976) ........................................................................... 30

*Tsereteli v. Residential Asset Securitization Trust 2006-A8*,
  692 F. Supp. 2d 387 (S.D.N.Y. 2010) .......................................... 19, 20, 21

*Yu v. State St. Corp.*,
  686 F. Supp. 2d 369 (S.D.N.Y. 2009) .................................................. 22

## STATUTES

15 U.S.C. § 77k(a) ......................................................................... 11, 13, 36

15 U.S.C. § 77l(a)(2) ...................................................................... 11, 12, 13

15 U.S.C. § 77m ........................................................................................ 34

15 U.S.C. § 77o ........................................................................................ 14

## OTHER AUTHORITIES

17 C.F.R. § 229.1101(l) ............................................................................ 37

17 C.F.R. § 229.1110(a) ............................................................................. 8

70 Fed. Reg. 1506 .................................................................................... 32

Fed. R. Civ. P. 8(a) ................................................................................... 24

Fed. R. Civ. P. 12(b)(1) ..................................................................................................9

Fed. R. Civ. P. 12(b)(6) ..................................................................................................9

Fed. R. Evid. 801(c)......................................................................................................29

Fed. R. Evid. 802 ..........................................................................................................29

Defendants JPMorgan Chase & Co. ("JPMC"), J.P. Morgan Securities Inc. ("JPMSI"), J.P. Morgan Mortgage Acquisition Corp. ("JPM Acquisition"), and J.P. Morgan Acceptance Corporation I ("JPM Acceptance"), and Brian Bernard, Louis Schioppo Jr., Christine E. Cole, David M. Duzyk, William King, and Edwin F. McMichael (the "Individual Defendants" and, collectively, the "Defendants")[1] respectfully submit this memorandum of law in support of their motion to dismiss the Second Amended Complaint (the "SAC") of Lead Plaintiff ("Plaintiff") pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

The past few years have seen a historic collapse of the U.S. economy. In 2006, home values began to crumble. In mid-2008, well after the downturn was evident, Plaintiff purchased mortgage pass-through certificates, securities that give holders a right to proceeds of payments made on mortgage loans in underlying loan pools. Plaintiff, a sophisticated investor, invested in the real estate market well after the housing bubble burst. Now, concerned that the collapse of real estate values *could* reduce the payments that it receives, Plaintiff seeks in this action to recover under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "1933 Act") based on sweeping and unsupported allegations that Defendants made misstatements in offering documents about the underwriting of, the appraisals for, and the loan-to-value ("LTV") ratios of the loans in the pools, and about the ratings assigned to the certificates.

The SAC suffers from the same fundamental flaws as its predecessor and must be dismissed for several reasons:

- ***First***, the claims relating to 10 of the 11 offerings must be dismissed because Plaintiff did not purchase certificates issued in those offerings and lacks standing. Plaintiff also lacks statutory standing to assert Section 12(a)(2) claims because it does not

---

[1] Plaintiff erroneously names "J.P. Morgan Chase & Co.," "J.P. Morgan Acquisition Corp.," and "J.P. Morgan Securities, Inc."

allege that it purchased any certificates in a public offering or directly from any of the Defendants.

- **_Second_**, Plaintiff fails to plead any actionable misstatements or omissions. The disclosures in the offering materials fully informed investors of the numerous factors, including a housing price collapse, that could have a negative impact on pass-through payments. In these circumstances, courts have recently dismissed the same claims asserted here relating to appraisals, LTV ratios, and ratings. In addition, Plaintiff's sole remedy for non-complying loans is repurchase and Plaintiff does not adequately allege that such repurchase was requested and denied.

- **_Third_**, Plaintiff fails to plead any cognizable economic loss. It does not allege that it has failed to receive any pass-through payments, and the risk that certificates will cease to perform in the future is not actionable.

- **_Fourth_**, Plaintiff's claims are time-barred because discovery of the facts alleged should have been made more than one year before this action was filed on March 11, 2009. Public information concerning underwriting standards and appraisals placed Plaintiff on inquiry notice of its claims before March 2008, and constructive discovery should have been made by that time.

- **_Fifth_**, Plaintiff's Section 11 claims against JPMC and JPM Acquisition must be dismissed because they are not issuers or underwriters subject to suit.

- **_Finally_**, Plaintiff's Section 15 "control person" claims must be dismissed. Plaintiff does not adequately plead any underlying violation of the 1933 Act and fails to adequately allege that JPMC controlled JPMSI or JPMorgan Acceptance or culpably participated in the alleged misstatements. Plaintiff also fails to adequately allege the Individual Defendants' control of JPMorgan Acceptance or culpable participation. In addition, Plaintiff's claims based on control of the trusts cannot stand because Plaintiff has voluntarily dismissed the trusts.

Plaintiff has no grounds for a lawsuit where it was fully informed of the risks of its investment but, in hindsight, would prefer not to have made the investment. Plaintiff's claims should, therefore, be dismissed with prejudice.[2]

---

[2] A chart summarizing the specific grounds for dismissal of Plaintiff's claims by each offering is included in Defendants' Notice of Motion.

## FACTUAL BACKGROUND

### Overview Of The Parties And Claims

Plaintiff is a sophisticated institutional investor.[3]  It purports to bring this action on behalf of a class consisting of all persons who purchased or acquired interests in the mortgage-backed certificates identified in the SAC (the "Certificates") issued pursuant and/or traceable to JPM Acceptance's March 27, 2007 Registration Statement, as amended, and the accompanying prospectuses and prospectus supplements ("Pro Supps") (collectively, the "Offering Documents").  (¶ 1.)[4]  Although this action purports to involve Certificates issued in connection with 11 public offerings (the "Offerings") conducted by 11 issuing trusts (the "Trusts") (¶¶ 19, 28), Plaintiff purchased Certificates in only 1 Offering.[5]

Plaintiff alleges that:  Defendants JPMC and JPMSI acted as underwriters of the Certificates and participated in the drafting and dissemination of the Offering Documents (¶¶ 16-17); Defendant JPM Acquisition acted as "Sponsor" of the Offerings and "made certain representations concerning the loans within" each Trust (¶ 18); Defendant JPM Acceptance served in the role of "Depositor" in the securitization of the issuing Trusts and, as such, was the "Issuer" of the Certificates (¶ 19); and each of the Individual Defendants signed the Registration Statement and was an officer or director of JPM Acceptance during the relevant time period.  (¶¶ 20-25.)

Plaintiff asserts its Section 11 claim against all Defendants, its Section 12(a)(2) claim against JPMC, JPMSI, and JPM Acceptance, and its Section 15 claim against JPMC, JPMSI,

---

[3] *See* Ex. A. Exhibit references are to exhibits to the Declaration of Dorothy J. Spenner, filed on August 9, 2010.
[4] Paragraph references are to the SAC.
[5] Ex. A. Plaintiff alleges that it purchased Class 1A1 Certificates in J.P. Morgan Mortgage Trust 2007-S3 ("JPMMT 2007-S3"), which was backed by mortgage loans originated by or acquired from different originators.  The other 10 Trusts are listed in footnote 29 below.

JPM Acceptance, and the Individual Defendants. (¶¶ 127, 140, 145.) The loans underlying the

Certificates were purchased from at least 9 non-defendant originators (the "Originators").[6]

**The Certificates**

The Certificates were created by "securitizing" pools of mortgage loans. For each

Offering, the "Sponsor" of the issuing Trust, JPM Acquisition, acquired a group of loans from

originators. The Sponsor sold the loans to the Depositor, JPM Acceptance, which established the

issuing Trust and placed the loans in the Trust in exchange for mortgage pass-through certificates

that give the holder a right to a portion of the loan proceeds. (*See* ¶¶ 49-51.) The value of each

Certificate is tied to payments made on the underlying loans. (*See* ¶¶ 10-11, 46, 51.)

The Certificates issued by each Trust were divided into separate classes or "tranches" that

are tiered such that losses (default, delinquency, or otherwise) are absorbed by bonds

sequentially in reverse order of their seniority. The senior tranches are often rated as the best

quality, and junior, lower-rated tranches are less insulated from risk. (¶¶ 46-48.)

Plaintiff alleges that the AAA-rated Certificates that it purchased have now been

downgraded to below investment-grade. (¶¶ 10, 124.) But Plaintiff does not allege that it has

failed to receive any payments on the Certificates. Rather, Plaintiff alleges "damages" based on

downgrades and a purported decrease of secondary market prices (¶¶ 10-12, 124-26), claiming

that the Certificateholders are "exposed to much more risk, with respect to both the timing and

absolute cash flow to be received, than the Offering Documents represented" (¶ 11.) However,

Plaintiff was advised by the Offering Documents that there might not be a liquid market for the

Certificates,[7] and that the purpose of the Certificates was to provide an income stream, not

---

[6] Exs. B at S-12; C at S-7; D at S-4; E at S-4; F at 18 of 226; G at S-7; H at S-4; I at S-4; J at S-3; K at S-5; L at 20 of 271.
[7] *See* Exs. K at S-15-16; L at 29 of 271; M at 1, 7.

secondary market value.[8]

## The Robust Disclosures In The Offering Documents

The Offering Documents detailed the nature and quality of the mortgage loans held by

each Trust, including type of loans, number of loans, and purported original LTV ratios.[9] The

Offering Documents made clear that:

- Originators' loan policies permitted "low-doc" or "no-doc" loans requiring little or no verification of a borrower's assets or income, which comprised a substantial number of the loans in each Trust;[10]
- Loans in the Trusts represented "exceptions" to even "low-doc" and "no-doc" guidelines;[11]
- Credit enhancements (*i.e.*, subordinated tranches designed to absorb initial losses) could prove inadequate to protect senior certificate holders from losses;[12]
- "[Credit] ratings are not recommendations to buy, sell or hold these certificates. A rating may be changed or withdrawn at any time by the assigning rating agency;"[13]
- The Certificates were potentially illiquid investments for which a secondary market might never exist;[14] and
- Recent developments in the mortgage market were resulting in increased delinquencies and losses, and numerous originators were experiencing financial difficulties or bankruptcies resulting in part from their inability to meet their repurchase obligations arising from "material breaches of representations and warranties . . . such as fraud claims."[15]

In fact, each Pro Supp disclosed that the loan pools were made up of many "low-doc" or

"no-doc" loans originated under programs such as "simply signature," "stated documentation,"

---

[8] *See* Exs. B at S-13-15; C at S-8-9; D at S-5-7; E at S-5-7; F at 19-20 of 226; G at S-8-10; H at S-5-7; I at S-5-7; J at S-4-6; K at S-6-8; L at 21-22 of 271.

[9] *See* Ex. B at A-1-25.

[10] *See* Exs. B at S-43-51, A-3; C at S-41-49, A-3; D at S-27-29; A-4; E at S-27-29, A-4; F at 33-35, 91 of 226; G at S-39-45, A-1-2; H at S-35, 67-90; I at S-35, 67- 90; J at S-33, 66-89; K at S-31-41, A-4; L at 42-53, 119-20 of 271.

[11] *See* Exs. B at S-43, 45-46, 50-51; C at S-42-43, 45, 49; D at S-27, 29; E at S-27, 29; F at 33, 35 of 226; G at S-40, 42, 43, 45; H at S-67, 73-74; I at S-68, 74; J at S-66, 72-73; K at S-32, 34, 37; L at  43, 46, 50, 53 of 271.

[12] *See* Exs. B at S-25-27; C at S-21-22; D at S-14-15; E at S-14-15; F at 26-27 of 226; G at S-22-23; H at S-15; I at S-15; J at S-13; K at S-17-18; L at 30-31 of 271.

[13] Ex. B at S-6 n.66, *see also* Exs. B at S-104-05; C at S-2 n.13, S-94; D at S-2 n.15, S-64; E at S-2 n.16, S-64-65; F at 16 n.6, 67 of 226; G at S-4 n.19, S-95-96; H at S-2 n.6, S-148-49; I at S-2 n.6, S-148-49; J at S-2 n.6, S-146-47; K at S-3 n.20, S-79-80; L at 17 n.39, 91- 92 of 271.

[14] *See* Exs. K at S-15-16; L at 29 of 271; M at 1, 7.

[15]  *See* Exs. B at S-21-22; C at S-16-17; D at S-12-13; E at S-12-13; F at 24 of 226; G at S-18-19; H at S-24-25; I at S-24-25; J at S-22-23; K at S-14-15; L at 28-29 of 271.

"stated income/stated asset," "no income verifier," "preferred," "no documentation," "no ratio,"
"alternative," "low," "streamlined," "limited," "no income/no assets verifier," and "reduced"
(collectively, "low- or no-doc loans").[16]   The Pro Supps disclosed exactly how many loans were
originated with less than full documentation of borrower income, as well as the range of LTV
ratios and FICO scores for the loans.[17]   The Offering Documents explained that such factors may
increase the risk of delinquencies.[18]

    The Pro Supps also disclosed the credit rating given to each tranche and contained
lengthy and detailed risk disclosures, which warned investors that a downturn in the housing
markets might interrupt payments, that higher risk loans were more likely to default, that there
were a number of different underwriting programs, and that exceptions would be made under
each.[19]   The Offering Documents further disclosed that the loan seller or originator would
repurchase any non-conforming loan or substitute a qualified loan.[20]   They stated that the "***sole
remedy*** available to holders of securities" for non-complying loans would be to request that the
seller or originator repurchase or substitute a similar loan.[21]

### Plaintiff's Allegations Of Misstatements And Omissions

    From 1997 through 2006, housing prices increased at an "unusually rapid rate," making it

---

[16] *See* Exs. B at A-3; C at A-3; D at A-4; E at A-4; F at 91 of 226; G at A-1-2, A-2-2; H at S-35; I at S-35; J at S-33; K at A-4; L at 119-20 of 271.

[17] *See* Exs. B at A-2-3 (roughly 65% of the loan balance was low-doc or no-doc); C at A-2-3 (roughly 52%); D at A-3-4 (roughly 47%); E at  A-3-4 (roughly 50%); F at 88-92 of 226 (roughly 75%); G at A-1-1-A-1-2, A-2-1-A-2-2 (roughly 81% in Pool 1 and 70% in Aggregate Pool A); H at S-32-35 (roughly 57%); I at S-32-35 (roughly 53%); J at S-30-33 (roughly 52%); K at A-2-4 (roughly 42%); L at 116-20 of 271 (roughly 45%).

[18] *See, e.g.,* Exs. H at S-13; I at S-13; J at S-11; M at 14-15.

[19] *See, e.g.,* Exs. B at S-1-6, S-21-22, S-24-25, S-42-51; C at S-1-2, S-16-17, S-40-49; D at S-1-3, S-12-13, S-26-30; E, at S-1-3, S-12-14, S-16, S-26-29; F at 15-16, 24-25, 32-35 of 226; G at S-1-4, S-18-19, S-21, S-38-45; H at S-1-3, S-18-20, S-66-90; I at S-1-2, S-13-15, S-18-20, S-67-91; J at S-1-3, S-11-13, S-16-17, S-65-89; K at S-1-3, S-14-19, S-30-41; L at 14-17, 28-30, 42-53 of 271.

[20] *See, e.g.,* Ex. M at 30-32, 64-65.

[21] *Id.* at 32 (emphasis added).

the "biggest national housing boom in U.S. history."[22]  The increase came to an abrupt end in

2006, when the largest decline in single-home values in U.S. history began, leading to a rise in

loan defaults.[23]  Plaintiff purchased its Certificates in mid-2008 and the change in economic

conditions was disclosed in the Offering Documents.

Plaintiff alleges that the Offering Documents contained untrue statements and omitted

material facts regarding:  (1) the underwriting standards used to originate loans (¶¶ 3, 61-96); (2)

the appraisal standards used to evaluate the properties and the accuracy of the LTVs (¶¶ 3, 97-

116); and (3) the accuracy of the credit ratings (¶¶ 3, 117-23).  Plaintiff alleges that the Offering

Documents failed to disclose that Originators made "exceptions" to stated underwriting

guidelines without sufficient compensating factors (¶ 64); that the Originators failed to "evaluate

the borrowers' ability to repay their loans" (¶ 65); and that "income inflation" by borrowers was

"systematic and commonplace" (¶ 65).  (See ¶¶ 4, 61-96.)  Plaintiff further alleges that the

Offering Documents were misleading because appraisals were inflated as a result of the

systematic coercion of appraisers.  (¶¶ 97-112.)  Plaintiff asserts that because appraisals were

inflated, the disclosed LTV ratios materially overstated borrowers' loan equity.  (¶ 115.)

Plaintiff also claims that the ratings assigned to the Certificates were unjustifiably high and did

not represent the true risk of the Certificates because they were based on inaccurate loan data and

outdated models.  (¶¶ 117-23.)

**Plaintiff's Allegations Based On Confidential Witnesses**

Plaintiff's allegations concerning underwriting practices, appraisals, and, by

incorporation, LTV ratios, are based predominately on purported information provided by

confidential witnesses (the "Confidential Witnesses" or "CWs"), who are described as either

---

[22] Exs. N at 6; O.
[23] See Ex. P.

former employees of a minority of the Originators or appraisers. Yet no CW provides a single example of an underwriting or appraisal determination that contradicts the Offering Documents, much less one relating to a loan underlying the Certificates. (*See, e.g.*, ¶¶ 81, 82, 96, 107, 109, 112.) The allegations include no facts supporting *any* deviation from guidelines, let alone any *systematic* deviation.

Moreover, the descriptions of the CWs do not support the inference that they would possess the generic information alleged, as their roles are not described apart from their titles. Additionally, Plaintiff fails to identify where geographically the vast majority of the CWs worked, and even where it does so, it is clear that most of the loans were originated in other geographic areas.

The CW allegations also do not offer any information about 5 of the at least 9 disclosed Originators.[24]  The CWs do not provide any significant information with respect to JPMMT 2007-A3 and JPMALT 2007-A2, because those Offerings included loans originated by a number of disclosed Originators for which there are no CW allegations.[25]  Such allegations do not support Plaintiff's sweeping claims.

## Plaintiff's Allegations Regarding Loans Backing Trust JPMMT 2007-S3

Plaintiff alleges that a "significant number of loans" backing the Certificates contained misrepresentations based on:  (a) a statistically insignificant number of loans backing one Trust,

---

[24] The CW allegations offer no information about Originators American Mortgage Network, GreenPoint Mortgage Funding, Inc., National City, PHH Mortgage, and Quicken. (*See* Exs. D at S-4; G at S-7; K at S-5; L at 20 of 271.) Under SEC Regulation AB, issuers are only required to disclose loan originators who originate 10% or more of the loans in an offering.  17 C.F.R. § 229.1110(a).

[25] With respect to JPMMT 2007-A3, Plaintiff offers no CW allegations with respect to 1 (PHH Mortgage) of the 3 alleged Originators of the underlying loans ("The Chase Originators," PHH Mortgage, and Wells Fargo Home Mortgage). (*See* Ex. D at S-4; ¶¶ 94, 96, 110.) As for JPMALT 2007-A2, Plaintiff offers CW allegations about only 3 (AHM, "The Chase Originators," and Countrywide) of the 6 primary Originators of the underlying loans (AHM, "The Chase Originators," American Mortgage Network, GreenPoint Mortgage Funding, Inc., and Quicken). (*See* Ex. G at S-7; ¶¶ 78, 80-82, 84, 86, 88, 89, 94, 96, 107-10.)

which Plaintiff contends were originated with "no apparent determination as to whether the borrower could afford to repay his or her loan" (¶¶ 5-8, 111, 116); and (b) bankruptcy filings for two of the borrowers (¶¶ 6-7), which are of no moment because, among other things, Plaintiff does not say what type of loan the borrowers obtained or what information they provided to the Originators. Accordingly, Plaintiff does not allege how the loans to these borrowers contradict the Offering Documents. Nor does Plaintiff allege any facts supporting that AHM or The Chase Originators failed to follow their respective guidelines as to these borrowers.

## ARGUMENT

Dismissal for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) is required where, as here, a plaintiff lacks standing and the district court thus "lacks the statutory or constitutional power to adjudicate." *Makarova v. U.S.*, 201 F.3d 110, 113 (2d Cir. 2000).

Dismissal is also required where, as here, a complaint fails to state a claim under Fed. R. Civ. P. 12(b)(6). *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). To survive this motion, the SAC "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The SAC's "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.*

Courts are not required to credit unsupported inferences, *Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l, Ltd.*, 968 F.2d 196, 198 (2d Cir. 1992), or factual allegations that are "contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice," *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405-06 (S.D.N.Y. 2001). "[T]he Court may

9

consider . . . documents that the plaintiffs relied on in bringing suit and that are either in the

plaintiffs' possession or the plaintiffs knew of when bringing suit, or matters of which judicial

notice may be taken." *In re Loral Space & Commc'ns Ltd. Sec. Litig.*, 2004 WL 376442, at *2

(S.D.N.Y. Feb. 27, 2004) (Koeltl, J.).

Under these standards, the SAC must be dismissed with prejudice.

**I.      PLAINTIFF LACKS STANDING TO MAINTAIN THIS ACTION.**

**A.      The Claims Relating To 10 Of The 11 Offerings At Issue Must Be Dismissed Because Plaintiff Lacks Standing.**

In a series of recent decisions, district courts in the Second Circuit have uniformly

dismissed Section 11 and 12(a)(2) claims relating to mortgage-backed securities for offerings in

which the plaintiff did not purchase certificates.[26] This Court should do the same here.

"'Standing is the key to the courthouse door.'" *In re Merrill Lynch & Co. Sec.,*

*Derivative & ERISA Litig.*, 597 F. Supp. 2d 427, 431 (S.D.N.Y. 2009). The standing inquiry "is

particularly important in securities litigation, where strict application of standing principles is

needed to avoid vexatious litigation and abusive discovery." *Nomura*, 658 F. Supp. 2d at 303.

"'The burden to establish standing rests on the party asserting its existence.'" *In re AOL Time*

*Warner, Inc. Sec. & ERISA Litig.*, 381 F. Supp. 2d 192, 245 (S.D.N.Y. 2004).  Accordingly, a

plaintiff must allege "'facts demonstrating that it is a proper party to invoke judicial resolution of

the dispute.'" *Id.*  Where a plaintiff cannot allege actual injury, traceable to the defendants'

---

[26] *See, e.g., In re IndyMac Mortgage-Backed Sec. Litig.*, 2010 WL 2473243, at *3 (S.D.N.Y. June 21, 2010) ("*IndyMac*"); *Public Employees' Ret. Sys. of Miss. v. Merrill Lynch & Co. Inc.*, 2010 WL 2175875, at *3 (S.D.N.Y. June 1, 2010) ("*Merrill Lynch*"); *N.J. Carpenters Health Fund v. Residential Capital*, LLC, 2010 WL 1257528, at *4 (S.D.N.Y. Mar. 31, 2010) ("*Residential*"); *N.J. Carpenters Health Fund v. DLJ Mortgage Capital, Inc.*, 2010 WL 1473288, at *3-4 (S.D.N.Y. Mar. 29, 2010) ("*DLJ*"); *N.J. Carpenters Vacation Fund v. The Royal Bank of Scotland Group*, PLC, 2010 WL 1172694, at *7-8 (S.D.N.Y. Mar. 26, 2010) ("*RBS*"); *In re Lehman Bros. Sec. & ERISA Litig.*, 684 F. Supp. 2d 485, 491 (S.D.N.Y. 2010) ("*Lehman*"); *NECA-IBEW Health & Welfare Fund v. Goldman, Sachs & Co.*, No. 08 Civ. 10793, Tr. at 2, 40 (S.D.N.Y. Jan. 28, 2010) ("*NECA*") (Ex. Q.); *City of Ann Arbor Employees' Ret. Sys. v. Citigroup Mortgage Loan Trust Inc.*, 2010 WL 1371417, at *7-8 (E.D.N.Y. Apr. 6, 2010) ("*Ann Arbor*"); *see also Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 658 F. Supp. 2d 299, 303 (D. Mass. 2009) ("*Nomura*").

conduct, it does not have standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) ("plaintiff must have suffered an 'injury in fact'"); *Lehman*, 684 F. Supp. 2d at 490 ("Standing . . . mandates an allegation of injury traceable to the conduct of which plaintiffs complain.").

Section 11 expressly limits recovery to "any person acquiring such security." 15 U.S.C. § 77k(a). The only persons capable of suffering actual injury traceable to defendants' alleged conduct are those who acquired the securities in question. *See Barnes v. Osofsky*, 373 F.2d 269, 273 (2d Cir. 1967).[27] Section 12(a)(2) also limits recovery to "the person purchasing such security." 15 U.S.C. § 77l(a)(2); *see Akerman v. Oryx Commc'ns, Inc.*, 810 F.2d 336, 344 (2d Cir. 1987); *In re Orion Sec. Litig.*, 2009 WL 2601952, at *2 (S.D.N.Y. Aug. 20, 2009). Thus, under both Sections 11 and 12(a)(2), "named plaintiffs are incompetent to allege an injury caused by the purchase of [securities] that they themselves never purchased." *Nomura*, 658 F. Supp. 2d at 303.[28]

Here, Plaintiff's SAC and sworn certification submitted in support of its lead plaintiff motion (the "Certification") make clear that Plaintiff acquired Certificates issued in only 1 of the 11 Offerings in question, JPMMT 2007-S3 (*see* ¶ 15; Ex. A) and did not acquire securities issued in the other 10 Offerings.[29] Because Plaintiff has not alleged that it purchased securities issued in any of those 10 Offerings, it cannot allege any injury arising from them. This Court should reach the same result as the other courts that have recently addressed this issue – it should dismiss, with prejudice, Plaintiff's claims related to the 10 Offerings from which it did not

---

[27] *See also IndyMac*, 2010 WL 2473243, at *3; *Merrill Lynch.*, 2010 WL 2175875, at *3; *RBS*, 2010 WL 1172694, at *8; *DLJ*, 2010 WL 1473288, at *4; *Residential*, 2010 WL 1257528, at *4; *Lehman*, 684 F. Supp. 2d at 491; *NECA*, Tr. at 6 (Ex. Q.); *Ann Arbor*, 2010 WL 1371417, at *7; *Nomura*, 658 F. Supp. 2d at 303; *Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 530-31 (S.D.N.Y. 2008).

[28] *See also Ann Arbor*, 2010 WL 1371417, at *7-8 (dismissing Section 11 and 12(a)(2) claims); *NECA*, Tr. at 6 (Ex. Q.) (same).

[29] Those 10 Offerings are: JPMMT 2007-S2; JPMMT 2007-A3; JPMMT 2007-A4; JPMALT 2007-S1; JPMALT 2007-A2; JPMMAT 2007-CH4; JPMMAT 2007-CH5; JPMMT 2007-A5; JPMMT 2007-A6; and JPMMAT 2007-CH3. (*See* ¶ 19 (listing 11 Trusts).)

purchase Certificates.

### B.  Plaintiff Lacks Standing Under Section 12(a)(2).

Plaintiff lacks standing to assert a claim under Section 12(a)(2) because it fails to allege

that it purchased any Certificates from any Defendant in a public offering.  *See* 15 U.S.C. §

77l(a)(2) (permitting causes of action against a person who "offers or sells a security . . . by

means of a prospectus"); *Gustafson v. Alloyd Co.*, 513 U.S. 561, 578 (1995) (limiting 12(a)(2)

claims to purchasers in initial public offering); *In re Cosi, Inc. Sec. Litig.*, 379 F. Supp. 2d 580,

589 (S.D.N.Y. 2005) (Koeltl, J.) (no 12(a)(2) standing for purchasers in secondary market).

First, Plaintiff's Certification makes clear that it did *not* purchase Certificates in a public

offering.  Certificates in JPMMT 2007-S3 were sold to the public pursuant to a Pro Supp dated

July 27, 2007.[30]  But Plaintiff purchased its Certificates in the secondary market more than one

year later, on July 18, 2008.[31]  Thus, it lacks standing to assert a Section 12(a)(2) claim.

In any event, Plaintiff's boilerplate allegations that it "acquired the Certificates pursuant

and/or traceable to the Registration Statement" (¶ 138) and that Defendants JPMC, JPMSI, and

JPM Acceptance "promoted and sold the Certificates to Lead Plaintiff and other members of the

Class" (¶ 141) are insufficient.  *See Merrill Lynch*, 2010 WL 2175875, at *6 (dismissing

12(a)(2) claim because allegations that plaintiffs purchased certificates pursuant and/or traceable

to defective prospectus supplements were insufficient); *DLJ*, 2010 WL 1473288, at *4 (same);

*Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 407-08 (S.D.N.Y. 2007) (dismissing

12(a)(2) claim because "plaintiffs fail[ed] to allege that they purchased the securities in a public

offering, as opposed to in the aftermarket"), *aff'd*, 331 Fed. Appx. 14 (2d Cir. May 19, 2009).

Plaintiff simply fails to plead that it purchased Certificates in a public offering.

---

[30] *See* Ex. B at i.
[31] *See* Ex. A at Schedule A.

Plaintiff's Section 12(a)(2) claim also fails because it does not allege that it purchased

Certificates from any Defendant.  Section 12(a)(2) contains an express privity requirement, such

that "'only a defendant from whom the plaintiff purchased securities may be liable.'"[32]  *In re*

*Merrill Lynch & Co. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 255 (S.D.N.Y. 2003).  A

plaintiff does not have standing to sue a defendant that was not its direct, "statutory seller."  *In re*

*Morgan Stanley Info. Funds Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010); *see Nomura*, 658 F.

Supp. 2d at 305.  Plaintiff's allegation that Defendants JPMC, JPMSI, and JPM Acceptance

"promoted and sold the Certificates to Lead Plaintiff and other members of the class" (¶ 141) is,

again, mere boilerplate that does not allege any direct sale to Plaintiff by any Defendant.  In fact,

neither JPMC nor JPM Acceptance sold Certificates directly to investors; rather, Depositor JPM

Acceptance sold them to JPMSI, as underwriter.[33]  The SAC fails to allege facts, as opposed to

conclusions, that show that either JPMC or JPM Acceptance was a statutory seller under Section

12(a)(2) and also fails to allege any direct purchase from any Defendant.  Particularly given

Plaintiff's aftermarket purchase, its failure to allege that it purchased directly from a Defendant

is fatal to its Section 12(a)(2) claim.  *See DLJ*, 2010 WL 1473288, at *4 (citing *Nomura*, 658 F.

Supp. 2d at 305).

## II.   PLAINTIFF FAILS TO PLEAD ANY ACTIONABLE MISSTATEMENTS OR OMISSIONS.

The SAC does not plead any actionable misrepresentations or omissions relating to the

loans underlying the Certificates.  *See* 15 U.S.C. § 77k(a) (Section 11 requires a material

misrepresentation or omission); 15 U.S.C. § 77l(a)(2) (Section 12(a)(2) requires a material

---

[32] "An individual is a 'statutory seller'. . . if he: (1) 'passed title, or other interest in the security, to the buyer for value,' or (2) 'successfully solicit[ed] the purchase [of a security], motivated at least in part by a desire to serve his own financial interests or those of the securities['] owner.'"  *In re Morgan Stanley Info. Funds Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010).
[33] *See* Ex. B at i.

13

misrepresentation or omission); 15 U.S.C. § 77o (Section 15 requires a primary violation).

A.   **Plaintiff Fails To Allege Any Actionable Misrepresentations
     Or Omissions Regarding Underwriting Guidelines For The Mortgage Loans.**

Plaintiff's claims relating to underwriting guidelines are not actionable in light of the

clear disclosures in the Offering Documents, which "must be read as a whole" to determine

whether they were false or misleading.  *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5

(2d Cir. 1996) (dismissing 1933 Act claims based on warnings in prospectus).  A plaintiff cannot

pursue claims based on events that it had been warned of in a prospectus:

> Not every bad investment is the product of misrepresentation.  The fact that
> interest rates did not rise, and that therefore the Trusts for a period decreased in
> value as the prospectuses indicated they might, only shows that the investment
> may have turned out to be a bad one.  To show misrepresentation, the complaint
> must offer more than allegations that the portfolios failed to perform as predicted.

*Id.* at 8; *see Panther Partners, Inc. v. Ikanos Commc'ns., Inc.*, 538 F. Supp. 2d 662, 664

(S.D.N.Y. 2008) ("[offering] documents are not guarantees of an offering's subsequent

success"); *Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.*, 2010 WL 148617, at *8

(S.D.N.Y. Jan. 14, 2010) ("The Prospectus's disclosure of information alleged . . . to have been

withheld . . . renders the Complaint insufficient as a matter of law.").

Plaintiff here ignores both that the Certificates were backed by loans originated under

low documentation programs and also the robust risk disclosures in the Offering Documents.

The Offering Documents warned Plaintiff of the very risks that have come to pass and "bespoke

caution," rendering Plaintiff's allegations not actionable.  *Rombach v. Chang*, 355 F.3d 164, 173

(2d Cir. 2004) ("'alleged misrepresentations . . . are immaterial . . . [if] it cannot be said that any

reasonable investor could consider them important in light of adequate cautionary language set

out in the same offering.'"); *Halperin v. eBankerUSA.com, Inc.*, 295 F.3d 352, 357 (2d Cir.

2002) (same); *In re OPUS360 Corp. Sec. Litig.*, 2002 WL 31190157, at *5-8 (S.D.N.Y. Oct. 2,

2002) (Koeltl, J.) (dismissing 1933 Act claims based on risk and other disclosures).

Plaintiff's claims here are belied by the warnings contained in the Offering Documents. The Offering Documents stated that market factors and loan characteristics could impact the receipt of pass-through payments.[34]  They also warned that deteriorating economic conditions in the real estate market could cause the Certificates to lose value.[35]  The Pro Supp for the Certificates that Plaintiff purchased stated:

> Recently, the residential mortgage market in the United States has experienced a variety of difficulties and changed economic conditions that may adversely affect the yield on your certificates.  Delinquencies and losses with respect to residential mortgage loans generally have increased in recent months, and may continue to increase, particularly in the subprime sector.  In addition, in recent months housing prices and appraisal values in many states have declined or stopped appreciating . . . A continued decline or an extended flattening of those values may result in additional increases in delinquencies and losses . . . A decline in housing prices may also leave borrowers with insufficient equity in their homes to permit them to refinance . . . .[36]

Plaintiff's claims are further belied by the disclosures relating to the underwriting programs used to originate the loans underlying the Certificates.  The Offering Documents clearly disclosed that "mortgage loans have been originated under . . . 'reduced documentation,' 'stated income/stated assets' or 'no income/no asset' programs."[37]  They further explained, among other things, that:

- "[U]nder a 'reduced documentation' program, either no verification of a mortgagor's stated income is undertaken by the originator or no verification of a mortgagor's assets is undertaken by the originator";
- "Under a 'stated income/stated assets' program, no verification of either a mortgagor's income or a mortgagor's assets is undertaken by the originator although . . . a 'reasonableness test' is applied"; and
- "Under a 'no income/no asset' program, the mortgagor is not required to state his or

---

[34] *See, e.g.,* Exs. K at S-14-15; L at 28-29 of 271; M at 6-14.
[35] *See, e.g., id.*
[36] Ex. B at S-21-22.
[37] Ex. B at S-43; *see also* Exs. C at S-41-42; D at S-27; E, at S-27; F at 34 of 226; G at S-39-40; H at S-68; I at S-69; J at S-67; K at S-31; L at 43 of 271.

her income or assets and therefore, no verification . . . is undertaken by the originator."[38]

And, the Offering Documents presented all relevant information about the types of loans originated, including the precise numbers of the many loans originated under reduced documentation programs.[39] The Pro Supp for JPMMT 2007-S3 disclosed that about *two-thirds of the loans had been originated as part of "low doc" or "no doc" programs that required no verification of income and/or assets*.[40] Thus, while Plaintiff asserts that "many stated income borrowers were actually wage earners who could have supplied Forms W-2 or other income-verifying documentation" (¶ 66), the Pro Supp for the Certificates that Plaintiff purchased stated that those borrowers did not and were not required to provide such information, and that the Originators were not verifying borrowers' income and/or assets.[41] Plaintiff knew that its Certificates were backed by such loans.

Plaintiff seeks to avoid dismissal of its claims by making conclusory assertions about a few Originators. Plaintiff's allegations are focused largely on AHM and The Chase Originators (*see* ¶¶ 70-72, 78-96), which are identified in the Offering Documents as Originators of loans underlying JPMMT 2007-S3. Those Offering Documents disclosed that, when originating loans under low- or no-doc loan programs, both AHM and The Chase Originators relied on a borrower's FICO credit score, which "represents a comprehensive view of the borrower's credit history risk factors and is indicative of whether a borrower is likely to default on a loan."[42] But the SAC does not allege that AHM or The Chase Originators failed to check borrowers' credit

---

[38] Ex. B at S-43; *see also* Exs. C at S-41-42; D at S-27; E, at S-27; F at 34 of 226; G at S-39-40; H at S-68; I at S-69; J at S-67; K at S-31; L at 43 of 271.
[39] *See, e.g.*, Exs. B at A-3; C at A-3; D at A-4; E, at A-4; F at 91 of 26; G at A-1-2, A-2-2; H at S-35; I at S-35; J at S-33; K at A-4; L at 119-20 of 271.
[40] *See* Ex. B at A-3. The Prospectus Supplement also disclosed that roughly 65% of the total loan balance was from low-doc or no-doc loans. *See id.*
[41] *See* Ex. B at S-42-51.
[42] Ex. B at S-45, 47-49.

scores. And, Plaintiff offers no information supporting its allegation that AHM "allowed credit scores to be manipulated by a borrower" (¶ 91) or that anyone at AHM knew that borrowers manipulated FICO scores. Nor does Plaintiff allege that The Chase Originators knew that borrowers manipulated FICO scores or allowed borrowers to do so.[43] In fact, borrowers' FICO scores, as provided by "the three major credit repositories, Equifax, Experian and TransUnion"[44] were not (and are not alleged to have been) within AHM's or The Chase Originators' control.[45]

In light all of the above disclosures, the allegation that the Offering Documents omitted information about "systematic and commonplace" departures from stated guidelines is not actionable. In fact, district courts have recently dismissed misrepresentation claims relating to mortgage-backed securities based on similar types of disclosures. *See Republic Bank & Trust Co. v. Bear, Stearns & Co., Inc.*, 2010 WL 1489264, at *6 (W.D. Ky. Apr. 13, 2010) (dismissing misrepresentation claims based on disclosures of originators' lax lending standards and exceptions from them); *Nomura*, 658 F. Supp. 2d at 307 (dismissing 1933 Act allegations based on the "fusillade of cautionary statements" regarding underwriting standards in the offering materials). This Court should do the same.

Plaintiff's allegations that Originators granted exceptions to stated underwriting guidelines without sufficient compensating factors (¶ 64) are insufficient because while the Offering Documents disclosed that exceptions would be based on compensating factors, the sufficiency of such factors in each instance constitutes a subjective, non-actionable opinion, and

---

[43] Plaintiff's assertions about Originators PHH and National City (¶¶ 74-76) are similarly unavailing. The Offering Documents disclosed that PHH and National City also relied on credit reports and Plaintiff does not allege that either PHH or National City knew that borrowers manipulated FICO scores or allowed borrowers to do so. (*See* Exs. K at S-37; L at 46 of 271, 51 of 271.)

[44] Ex. B at S-45.

[45] Plaintiff's additional allegation that AHM did not use common sense in granting mortgages "where a third of the mortgages were pay-option ARMS" (¶ 93) is conclusory and irrelevant in light of the Offering Documents. The Offering Documents for JPMMT 2007-S3, which issued the only Certificates that Plaintiff purchased, disclosed that *all* of the loans in the underlying pool were *fixed-rate*, not ARM, mortgages. (Ex. B at S-30.)

Plaintiff has failed to allege that the Originators did not truly hold the opinions at the time.[46]  For

example, Plaintiff focuses on AHM and The Chase Originators.  But, The Chase Originators

disclosed that they "*may* determine that, based on compensating factors," a prospective borrower

warrants an exception to stated guidelines (including those governing low- and no-doc loans),

and that the mix of compensating factors "*may* include, *without limitation, relatively* low loan-to-

value ratio, *relatively* low debt-to-income ratio, stable employment and time in the same

residence."[47]  Likewise, AHM explained that "each case is weighed individually on its own

merits and exceptions . . . are allowed if sufficient compensating factors exist to offset any

additional risk due to the exception."[48]  Thus, an Originator's determination as to what was a

compensating factor and whether such factors were sufficient to warrant an exception was within

its complete discretion and, at its core, was an opinion like an appraisal or a credit rating.  *See*

*Lehman*, 684 F. Supp. 2d at 495.  To be actionable, "the complaint must allege that the

[Originators] did not truly hold those opinions at the time."  *Id.*; *DLJ*, 2010 WL 11473288, at *6.

Plaintiff makes no such allegation.

### B.    Plaintiff Fails To Allege Any Actionable Misstatements Or Omissions Relating To Appraisal Standards And LTV Ratios.

District courts in the Second Circuit have recently addressed claims of misstatements

relating to appraisal standards and LTV ratios in the mortgage-backed securities context and

---

[46] Investors were explicitly told that Originators made a number of exceptions to their stated underwriting guidelines, including to those governing "low-doc" and "no-doc" loan programs.  (Exs. B at S-43, 45-46, 50-51; C at S-42-43, 45, 49; D at S-27, 29; E, at S-27, 29; F at 33, 35 of 226; G at S-40, 42, 43, 45; H at S-67, 73-74; I at S-68, 74; J at S-66, 72-73; K at S-32, 34, 37; L at  43, 46, 50, 53 of 271.)  The Chase Originators, for example, disclosed in connection with JPMMAT 2007-CH3 that "a significant number of the mortgage loans [were] underwritten in accordance with the Chase Home Mortgage Wholesale/Retail Underwriting Guidelines . . . with . . . underwriting exceptions based on compensating factors."  (Ex. H at S-73-74; *see also* Exs. H at S-67; B at S-43, 45-46, 50-51; C at S-42-43, 45, 49; D at S-27, 29; E, at S-27, 29; F at 33, 35 of 226; G at S-40, 42, 43, 45; I at S-68, 74; J at S-66, 73-74; K at S-32, 34, 37; L at  43, 46, 50, 53 of 271.)

[47] Ex. H at S-73 (emphasis added).

[48] Ex. B at S-46; *see also* Exs. C at S-43, 49; D at S-27, 29; E, at S-27, 29; F at 33, 35 of 226; G at S-40, 42, 43, 45; H at S-67, 73-74; I at S-68, 74; J at S-66; K at S-32, 34, 37; L at  43, 46, 50, 53 of 271.

have uniformly dismissed them. *See IndyMac*, 2010 WL 2473243, at *10-11; *DLJ*, 2010 WL

1473288, at *7-8; *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 692 F. Supp. 2d

387, 393 (S.D.N.Y. 2010). As Judge Kaplan explained:

> First, neither an appraisal nor a judgment that a property's value supports a
> particular loan amount is a statement of fact. Each is instead a subjective opinion
> based on the particular methods and assumptions the appraiser uses. A subjective
> opinion is actionable under the [1933] Act only if the amended complaint alleges
> that the speaker did not truly have the opinion at the time it was made public. The
> amended complaint is devoid of any such allegation.

*Id.* Judge Kaplan also rejected plaintiff's reliance on a report stating that IndyMac Bank's

appraisals were not in conformance with USPAP because it was conclusory and did not support

the allegation that the loans in the pool underlying the certificates were made based on

nonconforming appraisals. *Id.* And, he dismissed the claim relating to LTV ratios because it

was "completely derivative of the improper appraisal practices claim." *Id.* at 394. Judge Crotty

followed this holding in dismissing similar claims in *DLJ*, 2010 WL 1473288, at *7-8, and Judge

Kaplan reiterated this analysis in *IndyMac*, where he also rejected conclusory confidential

witness allegations about appraisals, *see IndyMac*, 2010 WL 2473243, at *10.

    As *Tsereteli* and *DLJ Mortgage* hold, appraisals are non-actionable where, as here, the

SAC alleges no facts supporting that the appraisers did not truly believe the appraisals.

Plaintiff's allegations concerning particular loans (¶¶ 8, 111, 116) do not state that appraisers did

not truly believe the appraisals for those loans, but rather conclusorily allege that less than 1% of

the loans backing JPMMT 2007-S3 overvalued property. And, Plaintiff's CW allegations are

similarly insufficient. Even where CWs claim that appraisals were inflated for certain

Originators (¶¶ 108-10), namely AHM, Countrywide, and Wells Fargo, there is no allegation that

those appraisals had anything to do with the loans at issue. In fact, neither Countrywide nor

Wells Fargo is identified as having originated loans underlying Plaintiff's Certificates.[49]

Indeed, Plaintiff's allegations are no different than the report and employee allegations rejected in *Tsereteli* and *IndyMac*. Plaintiff claims that appraisers experienced systemic problems of coercion to inflate appraisals and this pressure succeeded in generating artificially inflated appraisals. (¶ 105; *see* ¶¶ 97-112.) Plaintiff relies primarily on the accounts of 4 CWs and a 2007 survey of appraisers, which purportedly found that appraisers were pressured to raise property values. (¶¶ 106-12.) Despite making no allegation that either the CWs or the appraisers surveyed had anything to do with the loans underlying the Certificates, Plaintiff conclusorily asserts that appraisals were universally inflated, and therefore LTV ratios were false. (¶¶ 105, 108, 115.) Plaintiff's allegation that 24 of the loans backing JPMMT 2007-S3 Certificates overvalued property is also conclusory, as it is based solely on a review, using an undisclosed methodology, of unidentified "property information from 60 loans." (*See* ¶¶ 111, 116.)  In any event, this does not support any *systematic* problem, as it is based upon a *de minimis* percentage of the 3,476 loans backing JPMMT 2007-S3. Plaintiff's hindsight conclusion, based on the historic economic collapse, that properties were overvalued should be disregarded.

### C.     Plaintiff Fails To Allege Any Actionable Misstatements Or Omissions Relating To The Ratings Assigned To The Certificates.

District courts in this Circuit also have uniformly dismissed claims of misstatements and omissions relating to ratings for the following reasons:

- The offering documents bespoke caution in disclosing risks of relying on ratings;
- There were no allegations that the offerings did not receive the stated credit ratings or that the ratings were incorrect at the time offered;
- There were no factual allegations supporting a plausible inference that the ratings did not express each rating agency's judgment at the time they were issued.

---

[49] *See* Ex. B at S-12, S-42.

- Credit ratings are statements of opinion because they predict future value and reliability and are therefore not actionable unless it is alleged that the rating agencies did not truly hold those opinions;
- No affirmative legal obligation required disclosure of the particulars of the actual methodologies and models used by the rating agencies because the offering documents did not describe the rating agencies' processes or models;
- There was no duty to disclose conflicts of interest between rating agencies and underwriters because such conflicts were well-known, considered, and published in SEC reports; and
- The rating agencies' role in structuring mortgage-backed certificates is well-known and not material as a matter of law.

See *IndyMac*, 2010 WL 2473243, at *11-12; *RBS*, 2010 WL 1172694, at *14; *DLJ*, 2010 WL 1473288, at *7-8; *Residential*, 2010 WL 1257528, at *6-7; *Tsereteli*, 692 F. Supp. 2d 394-95; *Lehman*, 684 F. Supp. 2d 491-92.[50]

Plaintiff's allegations relating to the Certificates' ratings are no different from those found insufficient in the above cases. (*See* ¶¶ 117-23.) The Offering Documents disclosed all material risks associated with reliance on credit ratings, including the risk of downgrades:

- "There is no assurance that any rating will remain in effect for any given period of time or that it may not be lowered or withdrawn entirely by the rating agency in the future . . . ."[51]
- "The ratings are not recommendations to buy, sell or hold these certificates.  A rating may be changed or withdrawn at any time by the assigning rating agency."[52]
- "If the residential real estate markets should experience an overall decline in property values, the rates of delinquencies, foreclosures and losses could be higher than those now generally experienced," and the increased losses could be "borne, at least in part, by the holder of one or more classes of the securities."[53]

Plaintiff does not allege any facts indicating that any downgrade was the result of disclosure of information regarding improper loan underwriting or appraisals.  There is thus

---

[50] *See also Nomura*, 658 F. Supp. 2d at 309 (hindsight comments by rating agencies did not support inference of falsity).
[51] Ex. M at 123.
[52] Exs. B at S-6 n.66; C at S-2 n.13; D at S-2 n.15; E, at S-2 n.16; F at 16 of 226; G at S-4 n.19; H at S-2 n.6; I at S-2 n.6; J at S-2 n.6; K at S-3 n.20; L at 17 n.39, of 271.
[53] Ex. M at 123.

nothing that evidences any misrepresentation in the Offering Documents involving ratings.[54]

**D.      Plaintiff's Allegations of Misstatements And Omissions Are Not Plausible.**

Plaintiff's allegations do not contain sufficient facts to state a claim to relief that is plausible on its face, as required by *Iqbal* and *Twombly*.  Plaintiff's allegations are based solely on (1) generic and conclusory statements by CWs; and (2) equally conclusory and insignificant claims about less than 2% of the loans backing JPMMT 2007-S3.  Plaintiff thus fails to state a claim that is plausible, rather than conceivable.  *Cf. Republic Bank & Trust Co.*, 2010 WL 1489264, at *6 (dismissing misrepresentation claims as implausible).

**1.      Plaintiff's CW Allegations Do Not Support A Reasonable Inference Of Misstatements Or Omissions.**

Plaintiff's CW allegations do not relate to loans underlying the Certificates that Plaintiff purchased,[55] have nothing to do with the majority of the Originators, and do not support a reasonable inference that any Originator systematically deviated from guidelines.  They cannot serve as the basis for the SAC's sweeping claims of misstatements and omissions.  *See, e.g., In re IAC/Interactivecorp Sec. Litig.*, 695 F. Supp. 2d 109, 119 (S.D.N.Y. 2010) (uncorroborated and sketchy witness statements insufficient); *Pyramid Holdings, Inc. v. Inverness Med. Innovations, Inc.*, 638 F. Supp. 2d 120, 127-28 (D. Mass. 2009) (witness allegations failed to provide a meaningful degree of specificity or contextualizing information).  Witness statements "without any 'facts that might corroborate [them]'" are "[s]ketchy at best [and] do not provide enough detail to nudge plaintiffs' claims across the line from conceivable to plausible." *In re*

---

[54] *See Yu v. State St. Corp.*, 686 F. Supp. 2d 369, 376-77 (S.D.N.Y. 2009) (rejecting "[a] backward-looking assessment of the infirmities of mortgage-related securities"), *vacated in part on other grounds*, 2010 WL 2816259 (S.D.N.Y. July 14, 2010).
[55] *See Ann Arbor*, 2010 WL 1371417, at *10 (plaintiffs must "plead how [the alleged] [mis]statements and/or omissions are tied to the loans in which they invested").

*IAC*, 695 F. Supp. 2d at 119 (dismissing §§ 11 and 15 claims).[56]  In *Pyramid Holdings*, 638 F.

Supp. 2d at 126, the court dismissed 1933 Act claims because confidential witnesses' accounts

did not support allegations of misstatements or omissions.  The court held that plaintiff's

subjective and generalized allegations were insufficient, that the witness allegations failed to

provide a meaningful degree of specificity and/or lacked contextualizing information, and that

while some of the allegations offered a modicum of quantitative information, that information

was insufficient to draw any meaningful conclusions.  *Id.* at 127-28.  As in *In re IAC* and

*Pyramid*, the CW allegations here are insufficient to draw any plausible conclusions about the

Offering Documents.

> a.  The CWs are not alleged to have occupied positions such that they
>     would possess the information alleged.

Plaintiff's description of the CWs does not specify their duties and functions, and

therefore does not support any conclusion that the CWs occupied positions that would provide

them with knowledge about the Originators' systematic practices or information that contradicts

the disclosures in the Offering Documents.  This Court, among others, has discounted

confidential witness allegations in the securities fraud context where the witnesses were not

"described . . . with sufficient particularity to support the probability that a person in the position

occupied by the source would possess the information alleged."  *In re Loral Space*, 2004 WL

376442, at *11 (Koeltl, J.).[57]  Although the SAC does not allege fraud, Rule 8 demands that the

Court discount allegations that, as here, do not support meaningful conclusions about the alleged

---

[56] The Second Circuit recently expressed reservations about such allegations on motions to dismiss.  *See Campo v. Sears Holdings Corp.*, 2010 WL 1292329, at *3 n.4 (2d Cir. Apr. 6, 2010) (affirming dismissal of securities fraud claims after court-ordered depositions of confidential witnesses).

[57] *See Konkol v. Diebold, Inc.*, 590 F.3d 390, 399 (6th Cir. 2009) (discounting allegations where complaint did not allege dates of employment, job description, employment location/sector, or interaction with defendants); *In re Am. Express Co. Sec. Litig.*, 2008 WL 4501928, at *7 (S.D.N.Y. Sept. 26, 2008); *In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F. Supp. 2d 323, 342 (W.D.N.Y. 2008); *New York State Teachers' Ret. Sys. v. Fremont Gen. Corp.*, 2010 WL 1473265, at *2 (C.D. Cal. Mar. 29, 2010).

conduct. Fed. R. Civ. P. 8(a).

Here, it is not plausible that employees who appear to rank far below management and whose duties and functions are not specified would have knowledge of company-wide underwriting practices. For instance, no credible basis exists to infer that CW9, who is described solely as "a former Wholesale Account Executive with Chase Home Financial," would know that "from 2002 to 2008 the underwriting process was subject to abuse by brokers who purposely originated loans for people they knew could not repay them" (¶ 94); or that CW10, a "former Mortgage Loan Officer at JP Morgan Chase," would know that "the directive for fulfilling the business model was . . . to qualify applications even for obviously unqualified people" (¶ 96); or that CW7, a "former AHM employee," would know that "even loan pools that were ultimately rated AAA were made up of 'nothing but junk'" (¶ 88).

Moreover, Plaintiff fails to identify where geographically the vast majority of the CWs worked. Even where Plaintiff does so, the Offering Documents make clear that most of the loans were originated in other locations. For instance, while CW13 is alleged to have been the owner of a small Illinois residential real estate appraisal firm (¶ 108), the aggregate loan pool data for the 11 Offerings reveals that less than 7%, and as little as 0.45%, of the outstanding loan balances were originated in Illinois.[58] Likewise, although CW14 is purportedly an independent appraiser in Florida (¶¶ 109, 112), the data for the Offerings makes clear that only 4.56% to 20.65% of the outstanding loan balances were originated in Florida.[59] Again, these CWs do not support the core allegation that the loans systematically deviated from the stated standards.

---

[58] See Exs. B at A-2; C at A-3; D at A-3; E, at A-3; F at 91 of 226; G at A-1-2, A-2-3; H at S-38; I at S-38; J at S-36; K at A-3; L at 117-18 of 271.

[59] See id. Notably, Plaintiff omitted from the SAC its prior allegations based on a Las Vegas real estate appraiser (see Am. Comp. ¶ 89), presumably because the JPMorgan Defendants' motion to dismiss the first amended complaint argued that only between 0.5% and 2.87% of the outstanding loan balances were originated in Nevada.

b. The CW allegations are generalizations.

The courts in *In re IAC* and *Pyramid* found that confidential witness allegations did not support 1933 Act claims because they were subjective generalizations that failed to provide a meaningful degree of specificity and/or lacked contextualizing information. *In re IAC*, 695 F. Supp. 2d at 119; *Pyramid*, 638 F. Supp. 2d at 127-28. Courts have likewise rejected such allegations in the securities fraud context as vague and conclusory. *See, e.g., In re Loral Space*, 2004 WL 376442, at *11 (Koeltl, J.); *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 220-21 (S.D.N.Y. 2008).[60] The Court should reject the CW allegations here for the same reason.

The CWs' allegations concerning underwriting standards are generic and vague, and do not provide sufficient detail or context to support Plaintiff's sweeping claim that *any*, much less *all*, of the Originators *systematically* disregarded their stated standards. (*See, e.g.,* ¶¶ 72, 96.) First, no CW allegation contains any information concerning the specific loans underlying any of the Certificates, let alone those Plaintiff purchased. And, the allegations have nothing to do with the majority of the Originators. Moreover, they are completely generic as to the Originators' determinations of whether deviations from guidelines were warranted. Nowhere does any CW provide a single example of an underwriting determination that contradicts the Offering Documents. The CW allegations are devoid of any *facts* supporting that exceptions were made for borrowers who did not meet the criteria disclosed in the Offering Documents. They lack any context as to how many exceptions were made, where they were made, or the circumstances under which they were made, including profiles of the borrowers who received exceptions. They do not support *any* deviation from guidelines, let alone any *systematic* deviation.

The CWs' statements that "underwriting practices became increasingly lax," that

---

[60] *See also Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 140 (D. Conn. 2007); *Konkol*, 590 F.3d at 400-01; *New York State Teachers' Ret. Sys.*, 2010 WL 1473265, at *3.

"anybody could buy a house," and that "awful" loans that "made no financial sense" were approved are the same types of subjective generalizations that were held to be insufficient in *In re IAC* and *Pyramid*. And although some of the CW allegations offer some modicum of information about underwriting systems, even that information does not support the allegation of *systematic* deviation from underwriting standards.[61]

Plaintiff's CW allegations concerning appraisal standards likewise have nothing to do with specific loans or appraisals or with the vast majority of the Originators. (*See, e.g.*, ¶¶ 107-10, 112.) Moreover, they do not concern the appraisers' actual determinations of value. None of the CWs provide a single example of an appraisal determination that contradicts the Offering Documents. Even where CWs 13, 14, and 15 suggest that they provided inflated appraisals for Countrywide, Wells Fargo, AHM, and/or other originators, or that these originators would request inflated appraisals, there is no allegation that these CWs provided inflated appraisals in every instance, or that any inflated appraisal had anything to do with the loans underlying the Certificates. (*See* ¶¶ 107-10, 112.) In fact, neither Countrywide nor Wells Fargo are identified in the Offering Documents as having originated loans underlying the Certificates that Plaintiff purchased.[62] The CWs' appraisal allegations are mere generalizations. *Cf. IndyMac*, 2010 WL 2473243, at *10 ("that one . . . employee believed that appraisals were 'shoddy' says nothing at all about whether the appraisals were made in accordance with USPAP"). They include no facts supporting *any* deviation from guidelines, let alone any *systematic* deviation. The allegations that the LTV ratios in the Offering Documents were inaccurate should also be disregarded because they are based solely on the appraisal allegations. (¶ 115.)

---

[61] Plaintiff's generalized allegations about "[Chase Home Finance's] automated underwriting system 'Zippy'" (¶¶ 94-95) do not support any systematic deviation from standards, let alone deviation as to the loans at issue.
[62] *See* Ex. B at S-12, S-42.

### 2. Plaintiff Offers No Factual Allegations Concerning The Majority Of The Originators' Underwriting And Appraisal Standards.

The CW allegations also do not support that *all* Originators *systematically* disregarded their standards because they do not provide any information about 5 of at least 9 Originators of loans underlying the Certificates. *See supra* at 8. Further, for at least 2 Offerings, JPMMT 2007-A3 and JPMALT 2007-A2, the CWs do not provide any significant information, because those Offerings included loans originated by a number of disclosed Originators for which there are no CW allegations. *Id.* And, the allegations about appraisals are based on only 4 CWs, none of whom address any particular loans. Such allegations do not provide plausible factual support for the sweeping allegation that *each* Originator *systematically* disregarded its policies.

### 3. The Allegations Concerning Loans Backing JPMMT 2007-S3 Do Not Support A Plausible Inference of Misstatements Or Omissions.

Plaintiff's allegations concerning particular loans are vague and conclusory, and do not support a reasonable inference of misstatements or omissions. The SAC is devoid of allegations about any particular loans backing Certificates from 10 of the 11 Offerings. Instead, Plaintiff makes the sweeping allegation that "a significant number of loans backing the Certificates" issued by *all 11 Trusts* "contained misrepresentations regarding the borrowers' ability to repay the mortgage and/or the properties' appraised value" based on a statistically insignificant "review of documentation for 60 loans backing Trust 2007-S3" (¶ 5), which alone contained 3,476 loans.[63] Plaintiff cannot, based on this self-selected sample of 1.7% of the loans underlying JPMMT 2007-S3, assert any meaningful allegations about systematic origination or appraisal practices with respect to loans in *any* Trust, much less all 11 Trusts, which included loans originated by a number of Originators not involved in JPMMT 2007-S3.

---

[63] *See* Ex. B at S-17.

Indeed, Plaintiff baldly alleges that 43 of 60 underlying loans were originated with "no apparent determination as to whether the borrower could afford to repay his or her loan[s]" and that 24 of 60 underlying loans overvalued applicable property by 9% or more (¶¶ 5, 8, 111, 116), but does not provide sufficient facts about the loans or borrowers. The SAC fails to allege any facts suggesting that any borrower obtained a loan requiring verification of income and/or assets or lacked an adequate FICO score. Nor does the SAC allege any facts supporting its conclusion that 24 of 60 underlying loans overvalued applicable property. Absent these essential facts, Plaintiff's allegations concerning specific loans are merely speculation and conjecture, and thus do not support any misrepresentations or omissions relating to underwriting guidelines or appraisals.

Plaintiff's purported "examples" of 2 borrowers are unavailing. Plaintiff contends that a review of sworn bankruptcy filings related to 2 borrowers reflects that those borrowers reported no or little income and assets and, in one case, was required to make a monthly car payment in addition to the payment on the mortgage loan. (*See* ¶¶ 6-7.) First, Plaintiff does not allege which underwriting programs were used for these loans, let alone how these loans contradict the underwriting guidelines disclosed in the Offering Documents. Plaintiff baldly asserts that these loans would not have been approved if AHM's or The Chase Originators' underwriting standards were actually designed to determine borrowers' ability to repay debt. (*See* ¶¶ 6-7.) This is an unsupported inference, however, and cannot be credited. *See supra* at 9. As discussed above, the Offering Documents for JPMMT 2007-S3 disclosed that two-thirds of the underlying loans were originated with *no verification* of borrowers' stated income and/or assets.[64] Plaintiff notably fails to allege whether the loans it selected for review were low- or no-doc loans or

---

[64] Ex. B at A-3.

received discretionary exceptions to stated underwriting guidelines.  In addition, Plaintiff

provides no other information about these borrowers, and no allegations of what information

these borrowers provided to Originators when they applied for their loans.  Plaintiff fails to

allege what these borrowers' FICO credit scores were, despite that, as noted above, the Offering

Documents made clear that AHM and The Chase Originators relied on those scores.  Further,

Plaintiff's hindsight reliance on 2008 income, which could not possibly have been known in

2007, when the Trust was created, is irrelevant.[65]

In sum, Plaintiff does not allege any facts supporting that AHM or The Chase Originators

failed to follow their guidelines as to these borrowers.  Plaintiff claims that the income of 2

borrowers "is indicative of the 43 faulty loans" (¶ 7) it allegedly identified.  Not only is this

another unsupported inference, but even accepting it as true, it does not support that any loan was

originated in a manner inconsistent with the disclosures for JPMMT 2007-S3.  And, it certainly

does not support Plaintiff's core, sweeping allegation of *systematic* departure from guidelines

with respect to 11 Offerings by at least 9 Originators, most of which are not disclosed as having

originated any loans backing JPMMT 2007-S3.  At the end of the day, even Plaintiff's

allegations about particular loans do not support any reasonable inference of misstatements or

omissions.

**E.      Plaintiff's Sole Remedy Is The Repurchase Of Non-Complying Loans.**

In any event, the sole remedy for the breach of any representation regarding a loan is for

the seller or originator to repurchase or replace that specific loan.  The Offering Documents

disclose a "repurchase or substitute" provision, under which the seller of the loans to the

---

[65] In any event, a borrower's sworn financial statement or affidavit filed in an unrelated bankruptcy proceedings is ultimately inadmissible to prove the truth of the matter asserted – *i.e.*, the truth of the borrower's purported income, assets, or payments. *See* Fed. R. Evid. 801(c); Fed. R. Evid. 802; *see Chamberlin v. Principi*, 2005 WL 1963942, at *10 (S.D.N.Y. Aug. 16, 2005) (sworn affidavit from earlier proceeding was inadmissible hearsay).

Depositor, or the Originator, must repurchase any non-complying loans or substitute a qualified loan.[66] The Offering Documents advise investors that this provision constitutes the "sole remedy available" to certificate holders for non-complying loans.[67] This "sole remedy" renders the alleged misrepresentations non-actionable, as the Fifth Circuit recently held. *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 389 (5th Cir. 2010).

In *Lone Star*, the Fifth Circuit held that an identical "sole remedy" provision appearing in a prospectus precluded the 1933 Act claims because it "change[s] the nature of [the issuer's] representation." *Id.* at 390. The court reasoned that the issuer had represented that "the mortgages *should* be non-delinquent, but if some mortgages were delinquent then [defendants] would either repurchase them or substitute performing mortgages into the trusts." *Id.* at 389. The court affirmed the dismissal of plaintiffs' 1933 Act claims because, as sophisticated investors, plaintiffs had "no basis to ignore these provisions or their consequences." *Id.*

This reasoning applies equally to the Certificates. The Offering Documents for the Certificates set forth Plaintiff's "sole remedy" for any breach of a representation regarding a loan. Thus, there is no actionable misrepresentation. *Id.* at 389-90.[68]

**F.      Plaintiff Does Not Adequately Allege Materiality.**

The SAC also does not allege materiality, which requires "a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable [investor]." *TSC Indus., Inc. v. Northway,*

---

[66] *See, e.g.*, Ex. M at 30-32, 64-65.
[67] *Id.* at 32.
[68] *See Ann Arbor*, 2010 WL 1372417, at *10 (indicating that "repurchase or substitute" provisions are relevant in 1933 Act cases concerning mortgage-backed securities); *Mass. Bricklayers and Masons Funds v. Deutsche Alt-A Sec.*, 2010 WL 1370962, at *1 (E.D.N.Y. Apr. 6, 2010) (same).

*Inc.*, 426 U.S. 438, 449 (1976).[69]  The inquiry is "whether defendants' representations, taken together and in context, would have [misled] a reasonable investor about the nature of the investment." *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc.*, 936 F.2d 759, 761 (2d Cir. 1991).

    *Britannia Bulk Holdings* is instructive.  There, plaintiff alleged that offering documents were misleading because they failed to disclose that the use of forward freight agreements. *In re Britannia Bulk Holdings Inc. Sec. Litig.*, 665 F. Supp. 2d 404, 406 (S.D.N.Y. 2009).  The court dismissed the Section 11 and 12(a)(2) claims because "the Complaint specifies only one FFA [of 37] as being inconsistent with . . . Britannia's disclosures." *Id.* at 416.

    Here, as to 10 of the 11 Offerings, Plaintiff does not identify even one loan that did not comply with the characteristics disclosed in the Offering Documents, let alone any rough number of non-complying loans.[70]  Even if some non-complying loans were included in the pools, Plaintiff does not allege that the number of such loans reached material levels.[71]  Nor do the allegations about loans backing JPMMT 2007-S3 adequately plead materiality.  As discussed above, there were a total of 3,476 loans backing Trust JPMMT 2007-S3.  Thus, Plaintiff's purported sample of 60 loans represents only 1.7% of the loan pools, and Plaintiff alleges that only 1.2 % of the loans were originated outside of disclosed guidelines and that only 0.69% of the loans overvalued property by 9% or more.  These allegations do not support that there was a material number of non-complying loans backing JPMMT 2007-S3.

---

[69] *See ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009).

[70] *See Ann Arbor*, 2010 WL 1371417, at *10 (plaintiffs must "plead how [the alleged] [mis]statements and/or omissions are tied to the loans").

[71] Although Plaintiff has alleged that a percentage of loans are foreclosed, delinquent, and/or loans in which collateral was retaken by the lender (¶ 125), this does not allege materiality, especially in light of the overall real estate market collapse.  Rather, Plaintiff must allege facts showing that a material number of loans did not comply with the disclosures.

Moreover, the Certificates Plaintiff purchased, as senior certificates, were protected against losses by various forms of credit enhancement, [72] and will not experience an interruption of payments unless a *substantial* number of loans in the underlying pools have defaulted, *and* the defaults are not cured. A small number of non-complying loans could not, therefore, have a material effect on the Certificates. Plaintiff cannot state a claim because it does not, and cannot, allege that a sufficient number of non-complying loans were included to overcome the Certificates' credit enhancement.[73]

## III.   PLAINTIFF FAILS TO PLEAD ANY COGNIZABLE ECONOMIC LOSS.

The SAC also should be dismissed because Plaintiff does not plead a legally cognizable economic loss. *See In re Broderbund/Learning Co. Sec. Litig.*, 294 F.3d 1201, 1203-05 (9th Cir. 2002) (dismissing §§ 11 and 12(a)(2) claims); *In re AOL Time Warner,* 381 F. Supp. 2d at 245-46 (dismissing § 11 claim); *See In re Merrill Lynch & Co.*, 272 F. Supp. 2d at 253 (dismissal is proper "where it is apparent . . . the plaintiff cannot recover her alleged losses").

Unlike stock in which "shares are purchased for the purpose of investment and their true value to the investor is the price at which they may later be sold," asset-backed securities are securitized contract rights that provide investors "with the expectation that they would receive a stream of . . . payments for the life of the securitization." *AIG Global Sec. Lending Corp. v. Banc of Am. Sec. LLC*, 646 F. Supp. 2d 385, 403 (S.D.N.Y. 2009) (Koeltl, J.).[74] Plaintiff thus

---

[72] *See* Exs. B at i; C at i; D at i; E at i; F at 1 of 226; G at i; H at cover; I at cover; J at cover; K at i; L at 1 of 271.
[73] *See Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 613 (S.D.N.Y. 2008) (dismissing claims based on failure to disclose increased expenses because plaintiff failed to "describe in any way the magnitude of the increase"); *In re OPUS360 Corp.*, 2002 WL 31190157, at *6 (Koeltl, J.) (finding that absence of actual insolvency rendered any possible misrepresentations about cash flow immaterial).
[74] *See In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 894 n.22 (W.D.N.C. 2001) ("Valuation of mortgage-backed securities . . . is an exercise in estimating expected future cash flows.") The SEC has similarly noted that "[a]sset-backed securities . . . differ from corporate securities" in that " investors are generally interested in . . . the timing and receipt of cash flows from those assets and the structure for distribution of those cash flows." *Asset-Backed Securities*, Securities Act Release No. 33-8518, 70 Fed. Reg. 1506, 1508-11 (Jan. 7, 2005).

suffers actionable damages only if there is a failure to distribute the pass-through payments, not if there is some alleged decline in the market or resale value of the Certificates. *AIG Global*, 646 F. Supp. 2d at 403 (plaintiffs suffered losses "not [because of] a decrease in market price, but [because of] a decrease in the amount of money returned to them").

Plaintiff concedes that "[t]he Certificates provide the holders an ownership interest in principal and/or interest payments from various pools of . . . loans" (¶ 36) and that their "value" is thus solely a function of such pass-through payments (¶¶ 10, 46). And the Offering Documents warned: "[Y]ou may not be able to sell your certificates readily or at prices that will enable you to realize your desired yield."[75] "The market values of the certificates are likely to fluctuate; these fluctuations may be significant and could result in significant losses to you."[76]

Plaintiff does not dispute that it has received all required "pass-through" payments, but merely alleges an increase in the risk that the Certificates will not perform in the future. (¶¶ 10-12, 24-26.) That kind of speculative injury is not actionable. *See First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768 (2d Cir. 1994) ("[W]e reject [plaintiff's] novel theory that it was damaged simply by being undersecured when, with respect to those loans not yet foreclosed, the actual damages it will suffer, if any, are yet to be determined.").[77]

Plaintiff's allegation that "the Certificates are no longer marketable at prices anywhere near the prices paid by plaintiff and the Class" does not state an actionable loss. (¶ 11.) And Plaintiff's claim that there is a secondary market for the purchase and sale of the Certificates (¶ 12) is conclusory and beside the point. As Judge Cedarbaum stated:

---

[75] Exs. K at S-15; L at 29 of 271.
[76] Ex. M at 7; *see e.g.*, Exs. K at S-15; L at 29 of 271.
[77] *See Luminent Mortgage Capital, Inc. v. Merrill Lynch & Co.*, 652 F. Supp. 576, 590-92 (E.D. Pa. 2009) (dismissing securities fraud claim where mortgage-backed certificateholder did not allege diminished payments).

> [P]laintiff alleges that 'the certificates are no longer marketable at prices
> anywhere near the prices paid by plaintiff.' . . . It is unclear that that allegation in
> the face of a specific warning in the offering documents about the possibility in
> any event that the certificates may not be resalable raises question about whether
> the plaintiff has suffered any injury. Plaintiff alleges that it is 'exposed to much
> more risk with respect to both the timing and absolute cash flow paid under the
> certificates that it purchased.' But perhaps this establishes a risk, but a risk is not
> itself injury. The current complaint does not appear to allege facts permitting an
> inference that the plaintiff suffered a cognizable loss.

*NECA*, Tr. at 42 (Ex. Q.) This Court should reach the same conclusion.

## IV.   PLAINTIFF'S CLAIMS ARE TIME-BARRED.

Section 11, 12(a)(2), and 15 claims must be brought "within one year after the discovery

of the untrue statement or the omission, or after such discovery should have been made by

exercise of reasonable diligence." 15 U.S.C. § 77m. Thus, both actual and constructive

discovery trigger the 1-year statute of limitations. *See Merck & Co., Inc. v. Reynolds*, 2010 WL

1655827, at *17 (U.S. Apr. 27, 2010) (Scalia, J., concurring) (interpreting § 77m).[78] In assessing

constructive discovery, a duty of inquiry arises when the available facts would lead a reasonably

diligent plaintiff to investigate a potential cause of action. *Dodds v. Cigna Sec., Inc.*, 12 F.3d

346, 350 (2d Cir. 1993).[79] Constructive discovery is easier to establish for 1933 Act claims

because scienter is not an element and thus discovery turns on the misstatements alone. *See, e.g.*,

*In re SCOR Holding (Switzerland) AG Litig.*, 537 F. Supp. 2d 556, 580 (S.D.N.Y. 2008); *Alaska*

*Elec. Pension Fund v. Pharmacia Corp.*, 554 F.3d 342, 348 n.4 (3d Cir. 2009).

Plaintiff commenced this action on March 11, 2009.[80] But it is clear from the SAC and

---

[78] *See also Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 350 (2d Cir. 1993). In *Merck*, 2010 WL 1655827, at *14, the Supreme Court clarified that constructive discovery triggers the statute of limitations for Securities Exchange Act §10(b) claims, which lapses two years after a *reasonably diligent plaintiff* would have discovered the necessary facts, whether or not s/he investigated.

[79] *See In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 245 (S.D.N.Y. 2007); *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 402, 421 (S.D.N.Y. 2005) (information that may be held to constitute inquiry notice/storm warnings includes financial, legal, or other data, such as public disclosures and similar lawsuits).

[80] Plaintiff filed a Summons with Notice on March 11, 2009 and filed its original complaint on March 12, 2009.

public documents that Plaintiff had notice of storm warnings alerting it to its claims well before March 11, 2008. Indeed, Plaintiff cannot simultaneously rely upon unspecific allegations to state a claim *and* ignore that public information regarding industry deviation from underwriting guidelines placed it on inquiry notice of its claims. A reasonably diligent plaintiff would have investigated, sought out and spoken to confidential witnesses, and constructively discovered the alleged facts supporting Plaintiff's claims by March 11, 2008. Thus, Plaintiff's 1933 Act claims should be dismissed.[81]

The crisis in the mortgage-backed securities market was widely known and reported long before March 11, 2008. In a December 2007 article in the Wall Street Journal, former Federal Reserve Chairman Alan Greenspan looked back to "August 9, 2007, and the days immediately following," when "markets in much of the world seized up . . . triggered by the mispricing of securitized subprime mortgages." (*See* Ex. R at 8.) Myriad press reports preceding March 2008 revealed that dozens of loan originators were declaring bankruptcy or closing their doors, that the largest financial institutions were taking multi-billion dollar write-downs on mortgage-backed securities, and that rating agencies were downgrading ratings assigned to billions of dollars of such securities. (*Id.* at 11-16, 19-21.)

These prominent reports and other publicly available information predating March 11, 2008 placed Plaintiff on notice of the precise appraisal practices, ratings downgrades, and originator lending practices upon which it bases its claims. (*See id.*) Plaintiff's allegations concerning appraisal practices are based largely on a survey of appraisers that was published in

---

[81] *See In re Merrill Lynch*, 273 F. Supp. 2d 351, 378-79 (S.D.N.Y. 2003) (courts routinely dismiss claims where the facts necessary to trigger inquiry notice are apparent on the face of the complaint and other public documents); *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d at 245-48 (dismissing 1933 Act claims); *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d at 432 (S.D.N.Y. 2005) (same). The Court may "take judicial notice of the *fact* that press coverage, prior lawsuits, or regulatory filings contained certain information . . . in deciding whether so-called 'storm warnings' were adequate to trigger inquiry notice as well as other matters." *Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 425 (2d Cir. 2008).

2007, well more than a year before this suit.  (¶ 106.)  Plaintiff relies on ratings downgrades, but Fitch publicly reported ratings downgrades of Certificates of several Trusts on March 4, 2008. (Ex. R at 21.)  Plaintiff also acknowledges that AHM "originated nearly 27% of the loans in the 2007-S3 Trust" (¶ 70), the *only* Trust in which Plaintiff invested.  But Plaintiff omits that AHM filed for bankruptcy on August 6, 2007, which news reports indicated had resulted from a high number of defaults on loans, forcing AHM to repurchase such loans at "huge losses."  (Ex. R at 11-13).  Numerous lawsuits against AHM and a criminal investigation followed soon thereafter. (*Id.* at 13-14.)  And, what happened with AHM was not atypical.  The Prospectus Supplement for JPMMT 2007-S3, filed with the SEC on July 31, 2007, stated that many "originators . . . have recently experienced serious financial difficulties and, in some cases, bankruptcy . . . result[ing] in part from declining markets for mortgage loans as well as from claims for repurchases of mortgage loans previously sold."[82]

These are but a few examples from the surfeit of public information about appraisal standards, ratings, and originators' supposed deviations from underwriting standards, which are Plaintiff's core allegations.  (Ex. R (summarizing relevant public information).)  Based on these unmistakable storm warnings, a plaintiff exercising reasonable diligence would have constructively discovered the alleged misrepresentations by March 11, 2008.

## V.    PLAINTIFF'S SECTION 11 CLAIM AGAINST JPMC AND JPM ACQUISITION MUST BE DISMISSED.

Plaintiff has alleged no basis for a Section 11 claim against JPMC or JPM Acquisition. Section 11 enumerates five categories of possible defendants.  15 U.S.C. § 77k(a).  But the SAC fails to allege facts showing that either JPMC or JPM Acquisition was an issuer, underwriter, or otherwise a proper defendant under any of the categories listed in Section 11.  Plaintiff's

---

[82] Ex. B at S-22.

conclusory allegation that JPMC "acted as an underwriter in the sale of the Certificate offerings"

(¶ 16) is unsupported by any facts, and is directly contradicted by the Offering Documents,

which identify JPMSI as the *only* underwriter.[83]  *See Merrill Lynch*, 2010 WL 2175875, at *5

(dismissing § 11 claims against parent company); *In re WorldCom, Inc. Sec. Litig.*, 308 F. Supp.

2d 338, 344 (S.D.N.Y. 2004) ("There is no basis . . . for finding that a parent of an underwriter is

a participant . . . in an underwriting."). Plaintiff's allegation that JPM Acquisition was the

"sponsor of the Certificate offerings" (¶ 18) is also plainly insufficient.  A sponsor is not

involved in the distribution of certificates to the public, and therefore could not be an

underwriter. *See Merrill Lynch*, 2010 WL 2175875, at *5 (dismissing § 11 claims against

sponsors).[84]  Thus, the Section 11 claim against JPMC and JPM Acquisition must be dismissed.

## VI.    PLAINTIFF'S SECTION 15 CLAIM MUST BE DISMISSED.

Plaintiff's Section 15 "control person" claim must be dismissed because the SAC fails to

state a requisite underlying violation by any Defendant. *Rombach*, 355 F.3d at 177-78; *In re*

*OPUS360 Corp.*, 2002 WL 31190157, at *13 (Koeltl, J.).[85]  In addition, Plaintiff's conclusory

allegations do not meet the standard for pleading control person liability.  Although some courts

have concluded that culpable participation is not an element,[86] others have come to the more

well-reasoned conclusion that culpable participation is required.  These courts have held that "a

plaintiff must [not only] adequately allege '(1) a primary violation by a controlled person; (2)

control of the primary violator by the defendant; [but also] (3) that the controlling person was in

---

[83] *See, e.g.*, Exs. B at i; C at i; D at i; E, at i; F at 1-2 of 226; G at i; H at cover; I at cover; J at cover; K at i; L at 1 of 271.

[84] *See also* Regulation AB, 17 C.F.R. § 229.1101(l) ("Sponsor means the person who organizes and initiates an asset-backed securities transaction by selling or transferring assets . . . to the issuing entity."); *Asset-Backed Securities*, 70 Fed. Reg. 1506, 1534 (Jan. 7, 2005) (describing "sponsor" as a party that makes an intermediate transfer of assets); Ex. B at S-12.

[85] *See also Nomura*, 658 F. Supp. 2d at 310.

[86] *See In re WorldCom, Inc.*, 377 B.R. 77, 102-03 (S.D.N.Y. 2007); *In re Deutsche Telekom AG Sec. Litig.*, 2002 WL 244597, at *5-6 (S.D.N.Y. Feb. 20, 2002).

some meaningful sense a culpable participant in the primary violation.'" *Ladmen Partners, Inc. v. Globalstar, Inc.*, 2008 WL 4449280, at *10 (S.D.N.Y. Sept. 30, 2008).[87]  "[A] plaintiff may not allege 'controlling person' status merely by reciting a corporate officer's title without alleging actual control and the nature of the controlling person's 'culpable participation' in the [controlled person's conduct]." *Ellison v. Am. Image Motor Co., Inc.*, 36 F. Supp. 2d 628, 642 (S.D.N.Y. 1999); *see Merrill Lynch*, 2010 WL 2175875, at *8 (plaintiff must allege meaningful culpable conduct beyond mere status as a director or officer).

Plaintiff's allegations fail this standard.  Plaintiff alleges that JPMC had "complete ownership" of JPMSI and JPM Acceptance.  But alleging a parent/subsidiary relationship, without more, is not a sufficient basis to infer control. *See In re WorldCom, Inc. Sec. Litig.*, 2004 WL 1097786, at *3 (S.D.N.Y. May 18, 2004).  The SAC provides no factual basis for ignoring the distinction between separate corporate entities.  Plaintiff also fails to allege that any Individual Defendant controlled JPM Acceptance, let alone was a culpable participant in the alleged conduct.  Plaintiff claims that the Individual Defendants were either officers or directors of JPM Acceptance and that they signed the shelf Registration Statement, and conclusorily asserts that each of them "was a control person of JP Morgan Acceptance and of the Trusts." (¶¶ 20-25, 148.)[88]  Titles and signatures, however, are not a sufficient basis from which to infer either control or culpable participation.[89]  Indeed, Judge Rakoff recently dismissed similar Section 15 claims after engaging in a lengthy analysis. *See Merrill Lynch*, 2010 WL 2175875, at

---

[87] *See also DeMaria v. Andersen*, 153 F. Supp. 2d 300, 314 (S.D.N.Y. 2001) (same), *aff'd*, 318 F.3d 170 (2d Cir. 2003); *In re Livent Noteholders Sec. Litig.*, 151 F. Supp. 2d at 441-42.  Courts have this as necessitating particularized facts of culpable participation in the violation. *See, e.g., DeMaria*, 153 F. Supp. 2d at 314 (citing cases); *In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 93 F. Supp. 2d 424, 441 (S.D.N.Y. 2000).
[88] The SAC added no allegations about JPMC or the Individual Defendants, demonstrating that no such facts exist.
[89] *See Police and Fire Ret. Sys. of the City of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 242 (S.D.N.Y. 2009); *Sloane Overseas Fund, Ltd. v. Sapiens Int'l Corp.*, 941 F. Supp. 1369, 1378 (S.D.N.Y. 1996); *Residential*, 2010 WL 1257528, at *7.

*8 (dismissing allegations against entities and individuals).  This Court should reach the same

conclusion here.[90]

## CONCLUSION

For all of the foregoing reasons, the SAC should be dismissed with prejudice.

Dated:  New York, New York
      August 9, 2010

SIDLEY AUSTIN LLP

By: _____

A. Robert Pietrzak (rpietrzak@sidley.com)
Dorothy J. Spenner (dspenner@sidley.com)
Owen H. Smith (osmith@sidley.com)
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
*Attorneys for Defendants*

---

[90] Plaintiff's claim that JPMC, JPM Acceptance, JPMSI, and the Individual Defendants "controlled" the Trusts (¶¶ 148-49) must also be dismissed because Plaintiff has voluntarily dismissed the Trusts with prejudice, thereby removing the requisite underlying violation by them.  *See* Joint Notice of Dismissal entered by the Court on May 7, 2010.