**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**EMPLOYEES' RETIREMENT SYSTEM OF THE**
**GOVERNMENT OF THE VIRGIN ISLANDS, on**
**behalf of itself and all others**
**similarly situated,**

           **Plaintiff,**

     **- against -**

**J.P. MORGAN CHASE & CO., ET AL.,**

        **Defendants.**

---

      **09 Civ. 3701 (JGK)**

      <u>**OPINION AND ORDER**</u>

**JOHN G. KOELTL, District Judge:**

This is a securities action brought on behalf of a proposed class of purchasers of mortgage pass-through certificates issued by J.P Morgan Acceptance Corporation I ("JPM Acceptance"). The lead plaintiff, the Employees' Retirement System of the Government of the Virgin Islands (the "Retirement System"), alleges causes of action against J.P. Morgan Acceptance and three related entities, J.P. Morgan Chase & Co. ("JPMC"), J.P. Morgan Mortgage Acquisition Corp. ("JPM Acquisition"), and J.P. Morgan Securities Inc. ("JPM Securities") (collectively, the "Corporate Defendants"), along with six officers or directors of JPM Acceptance (collectively, the "Individual Defendants"), under sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77*l*(a)(2), & 77o. The defendants move to dismiss the Second Amended Complaint

pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

## I.

When presented with motions under both Federal Rule of Civil Procedure 12(b)(1) to dismiss for lack of subject matter jurisdiction and Rule 12(b)(6) to dismiss for failure to state a claim upon which relief can be granted, the Court must first analyze the Rule 12(b)(1) motion to determine whether the Court has the subject matter jurisdiction necessary to consider the merits of the action.  See Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n, 896 F.2d 674, 678 (2d Cir. 1990); see also S.E.C. v. Rorech, 673 F. Supp. 2d 217, 220 (S.D.N.Y. 2009).

In defending a motion to dismiss for lack of subject matter jurisdiction, the plaintiff bears the burden of proving the Court's jurisdiction by a preponderance of the evidence. Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). In considering such a motion, the Court generally must accept the material factual allegations in the complaint as true.  See J.S. ex rel. N.S. v. Attica Cent. Sch., 386 F.3d 107, 110 (2d Cir. 2004).  The Court does not, however, draw all reasonable inferences in the plaintiff's favor.  Id.; see also Graubart v. Jazz Images, Inc., No. 02 Civ. 4645, 2006 WL 1140724, at *2 (S.D.N.Y. Apr. 27, 2006).  Indeed, where jurisdictional facts

2

are disputed, the Court has the power and the obligation to consider matters outside the pleadings, such as affidavits, documents, and testimony, to determine whether jurisdiction exists. See Filetech S.A. v. France Telecom S.A., 157 F.3d 922, 932 (2d Cir. 1998); Kamen v. Am. Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir.1986).  In so doing, the Court is guided by that body of decisional law that has developed under Federal Rule of Civil Procedure 56.  Kamen, 791 F.2d at 1011; see also Rorech, 673 F. Supp. 2d at 220-21.

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007); Arista Records LLC v. Lime Group LLC, 532 F. Supp. 2d 556, 566 (S.D.N.Y. 2007).  The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient."  Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).  The Court should not dismiss the complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

3

misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). While the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions." Id.; see also Rorech, 673 F. Supp. 2d at 221-22.

When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); see also Taylor v. Vt. Dep't of Educ., 313 F.3d 768, 776 (2d Cir. 2002); Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47-48 (2d Cir. 1991); Kramer v. Time Warner, Inc., 937 F.2d 767, 773 (2d Cir. 1991); Rorech, 673 F. Supp. 2d at 221-22.

## II.

The following facts are undisputed, unless otherwise indicated.

**A.**

This case concerns eleven series of mortgage pass-through certificates (the "Certificates") issued by JPM Acceptance and eleven different common-law trusts (the "Trusts"), each of which corresponds to a different series of Certificates. (Second Am. Compl. ("SAC") ¶ 19.) A Certificate provides its holder with an ownership interest in the principal and/or interest payments from various pools of residential real estate loans contained within the corresponding Trust. (Id. ¶ 36.) On April 23, 2007, JPM Acceptance filed a single amended registration statement (the "Registration Statement") for the eleven series of Certificates, which expressly incorporated by reference eleven different prospectus supplements, one for each offering of a series of Certificates. (Id. ¶ 1.) Collectively, the Registration statement and the prospectus supplement for each series constitute the offering documents for that series.[1]

The loans underlying each series of Certificates were originated by entities not party to this lawsuit and purchased by JPM Acquisition for the Trusts. (Id. ¶¶ 18, 37.) The Second Amended Complaint alleges that JPM Acquisition was also "the 'sponsor' of the Certificate offerings . . . and made certain representations concerning the loans within the Trusts." (Id. ¶

---

[1] Because, as explained below, the plaintiff lacks standing to bring claims concerning the ten series of Certificates that it did not purchase, the terms "Prospectus Supplement" and "Offering Documents," when capitalized, will be used to refer specifically to the documents applicable to the 2007-S3 Trust.

18.)  The prospectus supplements identified JPM Acquisition as the "Sponsor and Seller" of the Certificates.  (E.g., Spenner Decl. Ex. B ("Prospectus Supplement") at i.)

The prospectus supplements identified JPM Securities as the "Underwriter" of the Certificates, and stated that the Certificates were "being offered" by JPM Securities.  (E.g., id. at i.)  The Second Amended Complaint alleges that JPM Securities also "acted as an underwriter in the sale of the Certificate offerings" and "helped to draft and disseminate the Offering Documents."  (SAC ¶ 16.)

The Individual Defendants are Brian Bernard, the President of JPM Acceptance; Louis Schoppio Jr., the Controller and CFO of JPM Acceptance; and Christine E. Cole, David M. Duzyk, William King, and Edwin F. McMichael, all directors of JPM Acceptance.  (Id. ¶¶ 20-25.)  All of the Individual Defendants signed the Registration Statement.  (Id. ¶¶ 20-25.)


**B.**

On July 18, 2008, the Retirement System purchased 3,540,508 JP Morgan Mortgage Trust 2007-S3 Mortgage Pass-Through Certificates ("2007-S3 Certificates").  (Id. ¶ 15.)  The Retirement System did not purchase any of the other ten series of Certificates.

6

## C.

The Second Amended Complaint alleges false and misleading statements relating to four items: underwriting standards, appraisal standards, loan-to-value ("LTV") ratios, and investment ratings.

## 1.

The Offering Documents indicated that the underlying loans were acquired directly or indirectly by loan originators through the ordinary course of business and that mortgage loans were underwritten in accordance with specified underwriting criteria. (Id. ¶¶ 67-76.)  For example, the Prospectus Supplement stated:

> Underwriting standards are applied by or on behalf of a lender to evaluate a borrower's credit standing and repayment ability, and the value and adequacy of the related Mortgaged Property as collateral. In general, a prospective borrower applying for a loan is required to fill out a detailed application designed to provide to the underwriting officer pertinent credit information. As part of the description of the borrower's financial condition, the borrower generally is required to provide to the underwriting officer pertinent credit information. As part of the description of the borrower's financial condition, the borrower generally is required to provide a current list of assets and liabilities and a statement of income and expenses, as well as an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy. In most cases, an employment verification is obtained from an independent source . . . .

(Prospectus Supplement at S-42.)

The Offering Documents made clear, however, that this was only "generally" the case, and that loans had also been originated under "'alternative,' 'reduced documentation,' 'stated income/stated assets' or 'no income/no asset' programs" (Id. at S-43.)  The Offering Documents detailed the requirements of these programs, and stated that they were "generally limited to borrowers who have demonstrated an established ability and willingness to repay the mortgage loans in a timely fashion." (Id.)  They also stated:

> From time to time, exceptions to a lender's underwriting policies may be made. Such exceptions may be made on a loan by loan basis at the discretion of the lender's underwriter. Exceptions may be made after careful consideration of certain mitigating factors such as borrower liquidity, employment and residential stability and local economic conditions.

(Id.)  An Annex at the end of the Prospectus Supplement specified how many loans were issued under each program.  (Id. at A-1 to A-25.)

The Prospectus Supplement specifically described the underwriting guidelines for two loan originators, American Home Mortgage Corp. ("AHM") and JPMorgan Chase Bank, National Association ("Chase").  (Id. at S-44 to S-51.)  These two originators accounted for the majority of loans contained in the 2007-S3 Trust, with AHM originating 27% and Chase originating more than 58%.  (SAC ¶¶ 70, 72.)  In both cases, the Prospectus Supplement stated that each originator "generally" follows the

8

specified guidelines, although it indicated the alternative programs used in some cases.  (Prospectus Supplement at S-44 to S-51.)

The plaintiff alleges that these statements were false and misleading because "AHM was lending to anyone that it could regardless of a borrower's ability to repay the loan."  (SAC ¶ 78.)  The Second Amended Complaint alleges that AHM "was as a matter of course making loans even where 'compensating factors,' which would allow exceptions to the underwriting standards, did not exist" and that AHM "routinely fabricated 'compensating factors.'"  (Id. ¶ 79.)  Similarly, the Second Amended Complaint alleges that Chase's underwriting guidelines "were not applied to evaluate the prospective borrower's repayment ability" and that brokers "purposely originated loans for people they knew could not repay them."  (SAC ¶ 94.)  It alleges that an internal memo explained how to "cheat" or "trick" Chase's underwriting program to manipulate borrower approvals.  (SAC ¶ 95.)

### 2.

The Prospectus Supplement represented that every AHM loan had been "appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice" ("USPAP").  (Prospectus Supplement at S-46.)  It stated that appraisers "perform on-site inspections of the property and

report on the neighborhood and property condition in factual and specific terms," providing "an opinion of value that represents the appraiser's professional conclusion based on market data of sales of comparable properties and a logical analysis with adjustments for differences between the comparable sales and the subject property and the appraiser's judgment." (Id.)  It also stated that each appraisal was "reviewed for accuracy and consistency" by AHM, its vendor management company, or a mortgage insurance company contract underwriter.  (Id.)

The Prospectus Supplement also stated that the Chase loans were made pursuant to an "appraisal . . . by an independent fee appraiser who estimates the mortgaged property's market value" and "do[es] not receive any compensation dependent upon either the amount of the loan or its consummation."  (Id. at S-49.) However, "[a]n automated valuation model may be used instead of an independent fee appraiser."  (Id.)

The plaintiff alleges that these representations were false and misleading because "[a]ppraisers were ordered by loan originators to give predetermined, inflated appraisals that would result in approval of the loan," and that appraisers who refused "would be threatened with being black-balled within the industry."  (SAC ¶ 100.)  Such appraisals violated USPAP because "appraisers were ordered to come back with predetermined, preconceived, inflated and false appraisal values" that "were

not based upon the appraiser's professional conclusion based on market data of sales of comparable properties and a logical analysis and judgment." (Id. ¶¶ 103, 107.)  The Second Amended Complaint includes quotes from three anonymous appraisers and a former AHM vice president to support these allegations.  (Id. ¶¶ 107-10.)


**3.**

The Prospectus Supplement also included a series of charts detailing LTV ratios for the loans within the 2007-S3 Trust. The plaintiff alleges that these, too, were false and misleading, because they were based on the allegedly inflated appraisals described above.  (Id. ¶¶ 113-15.)  The Second Amended Complaint alleges that 24 out of 60 loans reviewed by the plaintiff overvalued the subject property by 9% or more. (Id. ¶ 116.)


**4.**

Finally, the Registration Statement represented that "[i]t is a condition to the issuance of the securities of each series . . . that they shall have been rated in one of the four highest rating categories by the nationally recognized statistical rating agency or agencies specified in the related prospectus supplement." (Spenner Decl. Ex. M ("Registration Statement") at

122.)  Accordingly, the 2007-S3 Trust was rated investment grade by Standard & Poor's Rating Services ("S&P") and Fitch Rating ("Fitch").  (SAC ¶ 117.)

The plaintiff alleges that these investment ratings were false and misleading "because they were based . . . on outdated assumptions, relaxed ratings criteria, and inaccurate loan information."  (Id. ¶ 119.)

## III.

The defendants move to dismiss the Second Amended Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  They argue that the plaintiff (a) lacks standing to bring claims concerning the ten series of Certificates that it did not purchase, (b) lacks standing to bring claims under Section 12(a)(2) because it did not purchase its Certificates from any defendant in a public offering, (c) did not plead any actionable misstatements or omissions, (d) did not plead any cognizable economic loss, (e) has not alleged facts bringing JPMC or JPM Acquisition under Section 11, and (f) has failed to state a claim under Section 15.[2]

---

[2] The defendants initially argued that the plaintiff was on inquiry notice of the alleged misrepresentations prior to March 11, 2008 and was thus barred by the Securities Act's one-year statute of limitations.  See 15 U.S.C. § 77m. At argument, the defendants withdrew this argument as to the Retirement System in light of City of Pontiac General Employees' Retirement System v. MBIA, Inc., --- F.3d ----, 2011 WL 677404 (2d Cir. 2011), although they

**A.**

The defendants first argue that the plaintiff lacks standing to bring any claims concerning the ten series of Certificates that it did not purchase.  Courts within the Second Circuit are divided as to whether a plaintiff bringing a putative class action has standing to bring claims under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. 78j(b), relating to securities that it did not purchase.  See La Pietra v. RREEF Am., L.L.C., 738 F. Supp. 2d 432, 439 n.1 (S.D.N.Y. 2010) (collecting cases).  However, courts have almost unanimously found that claims under Section 11 or Section 12 require plaintiffs to have purchased in each of the challenged offerings.  See, e.g., In re Lehman Bros. Sec. & ERISA Litig., 684 F. Supp. 2d 485, 490-91 (S.D.N.Y. 2010); Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co. ("PERS of Miss."), 714 F. Supp. 2d 475, 480 (S.D.N.Y. 2010); N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc., No. 08 Civ. 5653, 2010 WL 1473288, at *3-4 (S.D.N.Y. Mar. 29, 2010); N.J. Carpenters Vacation Fund v. Royal Bank of Scot. Group, PLC, 720 F. Supp. 2d 254, 264-66 (S.D.N.Y. 2010); City of Ann Arbor Emps.' Ret. Sys. v. Citigroup Mortg. Loan Trust Inc., 703 F. Supp. 2d 253, 260-61 (E.D.N.Y. 2010); but see In re CitiGroup

---

reserved limitations arguments as to any plaintiffs who may join the case in the future.

<u>Inc. Bond Litig.</u>, 723 F. Supp. 2d 568, 584-85 (S.D.N.Y. 2010)
("[W]here a plaintiff alleges untrue statements in the shelf
registration statement or the documents incorporated therein —
as opposed to an alleged untrue statement in a supplemental
prospectus unique to a specific offering — then that plaintiff
has standing to raise claims on behalf of all purchasers from
the shelf.").

   In Section 10(b) cases, this Court has held that such
questions generally go to "whether there is a proper class
action under Rule 23 and whether the named plaintiffs can fairly
and adequately protect the interests of the class," not to
standing.  <u>See</u> <u>In re Credit Suisse First Bos. Corp. Sec. Litig.</u>,
No. 97 Civ. 4760, 1998 WL 734365, at *11 (S.D.N.Y. Oct. 20,
1998); <u>see also</u> <u>La Pietra</u>, 738 F. Supp. 2d at 439 n.1.  Sections
11 and 12, however, differ from Section 10(b) in an important
regard.  Section 10(b) makes it unlawful "[t]o use or employ, in
connection with the purchase or sale of any security . . ., any
manipulative or deceptive device or contrivance."  15 U.S.C. §
78j(b).  The private right of action implied under Section 10(b)
thus allows a plaintiff to claim that it was harmed by
fraudulent representations that are "connected to" a security
that the plaintiff purchased or sold.  Where the same fraudulent
representations are "connected to" multiple securities, a
plaintiff need not have purchased or sold every security that

was affected by the alleged scheme to defraud to sue a defendant
for the alleged scheme to defraud and to seek to represent a
class of purchasers or sellers who similarly relied on the same
scheme to defraud, even if they purchased different securities.

By contrast, Sections 11 and 12 define the causes of action
thereunder more narrowly.  Section 11 provides that if "any part
of [a] registration statement, when such part became effective,
contained an untrue statement of a material fact or omitted to
state a material fact required to be stated therein or necessary
to make the statements therein not misleading, any person
acquiring such security" may sue.  Id. § 77k(a).  Similarly,
Section 12 provides recourse against a person who "offers or
sells a security . . . by means of a prospectus or oral
communication, which includes an untrue statement of a material
fact or omits to state a material fact" for "the person
purchasing such security from him . . . to recover the
consideration paid for such security."  Id. § 77l(a).  The
actionable conduct under Section 11 is thus the specific
registration statement containing misrepresentations; under
Section 12, it is the specific prospectus or oral communication.
Unlike a Section 10(b) plaintiff, a Section 11 or 12(a)(2)
plaintiff is not suing over a broader course of conduct.  A
plaintiff who purchased a security issued pursuant to one
particular registration statement therefore has suffered harm,

15

and has standing to sue, only with respect to the specific
registration statement and prospectus that cover the specific
security that it purchased.  The plaintiff was not harmed, and
thus has no standing to sue, for alleged misrepresentations
concerned in other prospectuses or registration statements
covering other securities that it did not purchase.

This corresponds with the overwhelming majority of cases
considering standing in class action claims brought under
Sections 11 or 12.  The one case holding otherwise within the
Second Circuit that the plaintiff has identified, In re
CitiGroup, is readily distinguishable.  Like this case, In re
CitiGroup involved "shelf registration statements" that the
defendants used in combination with supplemental prospectuses to
make multiple offerings.  In re CitiGroup, 723 F. Supp. 2d at
584.  But in that case, the actionable misrepresentations were
alleged to be in the shelf registration statements, and were
thus "common to all purchasers from the same shelf."  Id.  Here,
by contrast, every cognizable alleged misrepresentation occurred
in the supplemental prospectuses.[3]  Accordingly, even if
misrepresentations within a shelf registration statement could

---

[3] The Second Amended Complaint alleges that two statements about underwriting
standards are in the Registration Statement, apparently referring to the
shelf registration statement.  (SAC ¶ 68.) These statements are actually
found in the Prospectus Supplement.  (Prospectus Supplement at S-42, S-43.)
Otherwise, the only alleged misrepresentation in the shelf registration
statement is the representation that each series would be rated highly by a
nationally recognized statistical rating agency.  (Registration Statement at
122-23.)  As discussed below, this statement does not constitute an
actionable falsehood or misrepresentation.

allow a plaintiff to bring claims concerning offerings in which it did not purchase, such a rule would not help the plaintiff here.[4]

Therefore, the plaintiff's claims are dismissed as to all ten offerings other than the 2007-S3 Certificates.

## B.

The defendants next move to dismiss the plaintiff's claims under Section 12(a)(2).  Claims under Section 12(a)(2) may only be brought against defendants who "(1) passed title, or other interest in the security, to the [plaintiff] for value, or (2) successfully solicited the purchase of a security, motivated at least in part by a desire to serve his own financial interests or those of the securities' owner."  In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 359 (2d Cir. 2010) (quoting Pinter v. Dahl, 486 U.S. 622, 647 (1988)) (internal quotation marks and brackets omitted); see also Gustafson v. Alloyd Co., 513 U.S. 561, 578 (1995) ("It is understandable that Congress would provide buyers with a right to rescind, without proof of fraud or reliance, as to misstatements contained in a document prepared with care, following well-established procedures

---

[4] Additionally, such a rule seems inconsistent with the SEC's interpretation of the Securities Act that "for the purpose of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein."  17 C.F.R. § 229.512(a)(2).

relating to investigations with due diligence and in the context of a public offering by an issuer or its controlling shareholders.  It is not plausible to infer that Congress created this extensive liability for every casual communication between buyer and seller in the secondary market."); In re Cosi, Inc. Sec. Litig., 379 F. Supp. 2d 580, 589 (S.D.N.Y. 2005) ("Well reasoned opinions in this Circuit after Gustafson have . . . interpreted Gustafson to preclude purchasers in private or secondary transactions from bringing actions pursuant to § 12(a)(2) based on those purchases.")

The plaintiff has not alleged that it purchased its Certificates in the initial public offering, and its certification makes clear that its first purchase came nearly a full year after the 2007-S3 Certificates were first offered on July 27, 2007.  (Spenner Decl. Ex. A at 2; Prospectus Supplement at i.)  Moreover, even if a purchaser in an aftermarket sale could have standing under Section 12(a)(2), the Second Amended Complaint only states that JPMC, JPM Securities, and JPM Acceptance "promoted and sold the Certificates to [the plaintiff]" and "solicited sales of the Certificates for financial gain."  (SAC ¶ 141.)  These are conclusory legal allegations unsupported by any factual allegations in the Second Amended Complaint.  In the sole case on which the plaintiff relies to support its Section 12(a)(2) claim, by contrast, the

18

plaintiffs alleged that they "purchased the Certificates 'pursuant to' the relevant Offering Documents" and some of the dates of purchase "corresponded to the initial offering dates." In re IndyMac Mortg.-Backed Sec. Litig., 718 F. Supp. 2d 495, 502 (S.D.N.Y. 2010).  The plaintiff makes no such allegations in this case.

Accordingly, the plaintiff's claims under Section 12(a)(2) are dismissed.

## C.

The defendants next argue that the plaintiffs have failed to allege any actionable misrepresentations or omissions in the Offering Documents that could support a claim under Section 11. According to the defendants, none of the four categories of alleged misrepresentations — statements concerning underwriting standards, appraisal standards, LTV ratios, and investment ratings — are plausibly supported by sufficient factual allegations.  Moreover, the defendants contend, any misrepresentations are immaterial.

To state a claim under Section 11, a plaintiff must allege that "(1) [it] purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3)

19

the registration statement 'contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."'  In re Morgan Stanley, 592 F.3d at 358-59 (quoting 15 U.S.C. § 77k(a)).  Only the third prong is at issue here.  As to that requirement, "[s]o long as a plaintiff establishes one of the three bases for liability under these provisions — (1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading — then, in a Section 11 case, the general rule is that an issuer's liability . . . is absolute."  Litwin v. Blackstone Group, L.P., --- F.3d ----, 2011 WL 447050, at *6 (2d Cir. 2011) (internal quotation marks, citation, and brackets omitted).

Unlike a claim under Section 10(b) of the Exchange Act, unless a plaintiff specifically pleads a claim of fraud, a claim under Section 11 of the Securities Act is "not subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b)."  Id.  Rather, it is subject to the "short and plain statement" requirements of Rule 8(a), id., and thus places "a relatively minimal burden on a plaintiff," Herman & MacLean v. Huddleston, 459 U.S. 375, 381-82 (1983).

**1.**

In the wake of the recent collapse of the housing market, courts within the Second Circuit have repeatedly dealt with suits brought under the Securities Act against issuers of mortgage-backed securities like the Certificates here.  These cases have generally agreed on several principles relevant to the four categories of alleged misrepresentations here.

a.  Underwriting Standards.  Allegations that loan originators "abandoned the underwriting standards that [they] professed to follow and ignored whether borrowers ever would be able to repay their loans" are actionable, notwithstanding the fact that Offering Documents may have disclosed that loans could be issued pursuant to low- or no-documentation programs or under exceptions to those guidelines.  Tsereteli v. Residential Asset Securitization Trust 2006-A8, 692 F. Supp. 2d 387, 392 (S.D.N.Y. 2010); see also In re IndyMac, 718 F. Supp. 2d at 509; DLJ Mortg., 2010 WL 1473288, at *6-7; In re Lehman Bros., 684 F. Supp. 2d at 493-94.  A plaintiff need not allege that any particular loan or loans were issued in deviation from the underwriting standards, so long as the complaint alleges "widespread abandonment of underwriting guidelines."  Tsereteli, 692 F. Supp. 2d at 392.

Here, the plaintiff has alleged, for example, that loan originators deviated from underwriting standards "as a matter of

course" or issued loans without evaluating "the prospective borrower's repayment ability," in violation of the underwriting standards specified in the Offering Documents.  (SAC ¶¶ 79, 94.)  These are factual allegations, not legal conclusions, and must be accepted as true for purposes of Rule 8(a).  See Iqbal, 129 S. Ct. at 1949.   While the Offering Documents did state that exceptions could and would be made to the underwriting standards, and that some low- or no-documentation loans would be issued, they repeatedly represented that loan originators would "generally" follow underwriting guidelines.  (Prospectus Supplement at S-42 to S-51.)  "[T]he alleged repeated deviation from established underwriting standards is enough to render misleading the assertion in the registration statements that underwriting guidelines were generally followed."  PERS of Miss., 714 F. Supp. 2d at 483.  Thus, the plaintiff's allegations regarding deviations from underwriting standards are sufficient to survive dismissal at this stage.

   b.  Appraisal Standards.  Allegations that loan underwriters failed to conduct appraisals in accordance with USPAP or other appraisal standards set out in offering documents have met with less success in many cases.  An appraisal is "a subjective opinion based on the particular methods and assumptions the appraiser uses" and thus "is actionable under the Securities Act only if the [complaint] alleges that the

22

speaker did not truly have the opinion at the time it was made public." Tsereteli, 692 F. Supp. 2d at 393; see also In re IndyMac, 718 F. Supp. 2d at 510-11; DLJ Mortg., 2010 WL 1473288, at *7-8.  A bare assertion that appraisals were not made in accordance with USPAP is "a legal conclusion not entitled to the assumption of truth unless supported by appropriate factual allegations." Tsereteli, 692 F. Supp. 2d at 393.  Thus, a complaint must typically allege either that appraisers did not in fact believe in the truth of their appraisals at the time they gave them, or that appraisers deviated from USPAP or other representations in concrete ways.

Here, unlike most previous cases, the plaintiff has made the requisite allegations.  The plaintiff alleges that appraisers were ordered to did produce "predetermined, preconceived, inflated and false appraisal values" and "frequently succumbed to brokers' demands to appraise at pre-determined inflated values," leading to "[a]ppraisals . . . not based upon the appraiser's professional conclusion based on market data of sales of comparable properties and a logical analysis and judgment." (SAC ¶¶ 103, 107.)  The plaintiff further bolsters these assertions by describing the experiences of appraisers who allegedly worked for AHM and were told by mortgage brokers what home values to provide and did, in fact, provide inflated appraisals. (SAC ¶¶ 108-10.)  Thus, the Second

23

Amended Complaint includes specific, concrete factual allegations that (a) appraisers did not believe the appraisals when they made them and (b) that appraisers accepted assignments that were contingent on predetermined results, which would be a violation of USPAP.  These allegations are sufficient to survive a motion to dismiss.

c.  LTV Ratios.  The LTV ratios provided in the Offering Documents incorporate appraisals of property values, and are thus also statements of opinions.  Tsereteli, 692 F. Supp. 2d at 394.  Therefore, complaints that lack allegations that appraisals were not subjectively believed at the time they were given cannot sustain a claim that LTV ratios were false and misleading.  Id. at 394-95.

As already stated, the Second Amended Complaint sufficiently alleges that the appraisals supporting the underlying loans were not believed when made.  Accordingly, the claims regarding LTV ratios are also sufficient: if the appraisals were not believed to be accurate, then the LTV ratios could not be believed to be accurate.  See In re Wells Fargo Mortg.-Backed Certificates Litig., 712 F. Supp. 2d 958, 972 (N.D. Cal. 2010).

d.  Investment Ratings.  Like appraisals, investment ratings are statements of opinion and do not give rise to a Section 11 claim unless they are disbelieved when given.

24

Tsereteli, 692 F. Supp. 2d at 395; see also In re IndyMac, 718 F. Supp. 2d at 511-12; DLJ Mortg., 2010 WL 1473288, at *7-8.

Unlike the plaintiff's other allegations, the allegations regarding credit ratings are insufficient to support a claim. The plaintiff alleges that ratings agencies "repeatedly eased their ratings standards in order to capture more market share," "us[ed] flawed information and models to generate their ratings," and failed to "engage[] in any due diligence or otherwise . . . verify the accuracy or quality of the loan data underlying the loan pools they rated." (SAC ¶¶ 121-23.) The plaintiff does not, however, allege that the ratings agencies believed their standards to be too lax or their ratings to be inaccurate, or that they knew that loan data was flawed. Nor did the Offering Documents make any representations as to how ratings would be assigned; rather, they represented only that the Certificates would be and were "rated in one of the four highest categories" by a ratings agency. (Registration Statement at 122-23; Prospectus Supplement at S-1 to S-3.)

Accordingly, the plaintiff's allegations regarding investment ratings must be dismissed.

## 2.

The defendants further contend that any misrepresentations are immaterial. They argue that the allegations relate to a

small fraction of the loans at issue and therefore cannot be material to the investment as a whole.  Additionally, they argue that any misrepresentations were immaterial in light of investors' understanding that repurchase or substitution would be the sole remedy for non-complying loans.

Neither theory of immateriality is persuasive.  First, as the Court of Appeals for the Second Circuit has recently repeated, claims under Section 11 may not be dismissed for immateriality "unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  Litwin, 2011 WL 447050, at *7 (internal quotation marks omitted).  Materiality is an "inherently fact-specific finding."  Id. (quoting Basic Inc. v. Levinson, 485 U.S. 224, 236 (1988)).

Allegations of widespread abandonment of underwriting and appraisal guidelines can hardly be held immaterial as a matter of law.  See Tsereteli, 692 F. Supp. 2d at 392-93.  The Second Amended Complaint alleges that this was the case at the two loan originators that together accounted for more than 85% of the loans contained in the 2007-S3 Trust.  (SAC ¶¶ 70, 72.)  The facts that the plaintiff has only identified a small number of particular loans that it claims were wrongly made, and that each confidential witness has knowledge of only a limited range of loans, are not dispositive.  See Litwin, 2011 WL 447050, at *8

26

("[A] court must consider both quantitative and qualitative factors in assessing an item's materiality . . . ." (quoting SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45, 151 (1999)) (internal quotation marks omitted)).

The defendants urge that the plaintiff's "sole remedy" under the Offering Documents is to have the seller or originator repurchase or replace specific loans that did not comply with representations in the Offering Documents. (Registration Statement at 30-32, 65.) The defendants urge the Court to follow the decision of the Court of Appeals for the Fifth Circuit in Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC, 594 F.3d 383 (5th Cir. 2010). Lone Star held that a clause stating that the sole remedy for delinquent loans would be repurchase or substitution by the issuer "change[d] the nature of [the] representation" that loans were not delinquent, so that the issuer's obligations were fulfilled when it repurchased or substituted delinquent mortgages and the existence of a small number of delinquent loans was immaterial. Id. at 389-90.

As a preliminary matter, Lone Star is distinguishable from this case. In Lone Star, the plaintiffs "pointed to a limited number of loans that failed to conform to the representation regarding their default status"; here, by contrast the plaintiffs claim "widespread misrepresentations regarding the nature of the underwriting [and appraisal] practices described

27

in the offering documents." <u>City of Ann Arbor Emps.' Ret. Sys.</u> <u>v. Citigroup Mortg. Loan Trust Inc.</u>, No. CV 08-1418, 2010 U.S. Dist. LEXIS 137290, at *18 (E.D.N.Y. Dec. 23, 2010).

Moreover, <u>Lone Star</u> is in significant tension with the well-established rule that "individual security holders may not be forced to forego their rights under the federal securities laws due to a contract provision." <u>McMahan & Co. v. Wherehouse</u> <u>Entmt., Inc.</u>, 65 F.3d 1044, 1051 (2d Cir. 1995); <u>see also</u> 15 U.S.C. § 77n ("Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this subchapter or of the rules and regulations of the Commission shall be void."). Although offering documents are "complex contractual documents that must be read in their entirety to be given effect," <u>Lone Star</u>, 594 F.3d at 388, enforcing a "sole remedy" clause would vitiate the obligations imposed by Section 11 and be contrary to the anti-waiver provision of Section 14. <u>See</u> <u>City of Ann Arbor</u>, 2010 U.S. Dist. LEXIS 137290, at *18. It is also difficult to square with the strict liability nature of a Section 11 claim and the absence of any requirement that a plaintiff show reliance. <u>See</u> <u>In re</u> <u>Morgan Stanley</u>, 592 F.3d at 359.

Furthermore, it is by no means clear at this stage that the repurchase or substitution provision included in the Offering Documents sufficiently changed the nature of the representations

so as to render the alleged falsehoods immaterial.  The
defendants concede that the Retirement System could not <u>itself</u>
take advantage of the provision, arguing instead that the
Retirement System could have combined with other investors to
exercise the option.  A reasonable investor might be able to
conclude that this procedure would be sufficiently difficult
that it should assume repurchase or substitution would not be
available to it, and that the investment therefore made sense
only if the issuers' representations were truthful.  The "sole
remedy" provision does not undercut the plaintiff's showing that
the alleged misrepresentations discussed above were material.


**D.**

The defendants next argue that the plaintiff did not plead
any cognizable economic loss.  "Although a plaintiff has no
obligation to plead damages under Section 11 of the Securities
Act, the plaintiff must nevertheless satisfy the court that [it]
has suffered a cognizable injury under the statute."  <u>In re AOL
Time Warner, Inc. Sec. & "ERISA" Litig.</u>, 381 F. Supp. 2d 192,
246 (S.D.N.Y. 2004) (citation omitted).  The defendants argue
that the only cognizable loss that can be suffered by an
investor in an asset-backed security is a failure to receive the
pass-through payments guaranteed to holders, which the plaintiff
does not allege.  Because there is no guarantee that a market

for the securities will exist or that resale prices will remain
stable, the defendants argue, a drop in market value is
insufficient.

This is incorrect, for the reasons stated in <u>DLJ Mortgage</u>:

> Many fixed-income debt securities . . . do not trade
> on national exchanges and yet institutional investors
> routinely purchase corporate bonds hoping to realize a
> profit through resale. Plaintiff may have purchased
> the Certificates expecting to resell them, making
> market value the critical valuation marker for
> Plaintiff. This is a securities claim, not a breach of
> contract case. Mortgage-backed Certificates are a type
> of security, which is why, in fact, the SEC has
> adopted a regulatory scheme relating to pooled asset-
> backed securities . . . .

2010 WL 1473288, at *5.

The defendants rely principally on this Court's decision in
<u>AIG Global Sec. Lending Corp. v. Banc of Am. Sec. LLC</u>, 646 F.
Supp. 2d 385 (S.D.N.Y. 2009), <u>aff'd</u>, 386 Fed. App'x 5 (2d Cir.
2010). In <u>AIG</u>, however, the plaintiffs only alleged that the
issuing trust had failed to make payments required by the
certificates; the plaintiffs "[did] not allege that they
suffered losses from selling the Certificates at some reduced
price after the fraud was uncovered." <u>Id.</u> at 403. <u>AIG</u> did not
set out a rule that lost payments were the only form of loss
that a purchaser of an asset-backed security could claim.
Rather, it merely analyzed the one theory of loss asserted by
the plaintiffs in that case.

30

Here, the plaintiff alleges that their investment has declined in value.  This is a cognizable loss for the purposes of Section 11.

### E.

The defendants next argue that JPMC and JPM Acquisition cannot be sued under Section 11 because they are not within the categories of defendants enumerated therein.  See 15 U.S.C. § 77k(a).[5]  The plaintiff responds that JPMC and JPM Acquisition are underwriters for the purposes of Section 11(a)(5).

The Securities Act defines "underwriter" as " any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking."  Id. § 77b(a)(11).  Both the SEC and courts within the Second Circuit have interpreted this provision to limit the definition of underwriter to "participation in the 'undertaking' . . . of purchasing securities from an issuer with a view to their resale — that is, the underwriting of a securities offering as commonly understood."  In re Refco, Inc. Sec.

---

[5] The defendants do not argue that JPM Acceptance or JPM Securities are not proper defendants under Section 11.

Litig., No. 05 Civ. 8626, 2008 WL 3843343, at *4 (S.D.N.Y. Aug.
14, 2008); accord PERS of Miss., 714 F. Supp. 2d at 482; In re
Lehman Bros. Sec. & ERISA Litig., 681 F. Supp. 2d 495, 499
(S.D.N.Y. 2010); see also 17 C.F.R. § 230.144 ("The
interpretation of this definition traditionally has focused on
the words 'with a view to' in the phrase 'purchased from an
issuer with a view to . . . distribution.'").

The plaintiff has alleged no facts that could render either
JPMC or JPM Acquisition an underwriter under this definition.
Although the Second Amended Complaint asserts that both
defendants are underwriters, this is a conclusion of law that is
not supported by any factual allegations.  The other allegations
to which the plaintiff points — that JPMC and JPM Acquisition
participated in drafting and disseminating the Offering
Documents, that JPM Acquisition sponsored the Certificate
offerings, and that JPMC is the parent company JPM Acceptance
and JPM Securities — are statutorily irrelevant.  See PERS of
Miss., 714 F. Supp. 2d at 482-83 (rejecting Section 11 liability
on the basis of sponsor status, unspecified participation in
drafting and disseminating prospectus supplements, and parent-
subsidiary relationships).

Accordingly, the Section 11 claim is dismissed as to JPMC
and JPM Acquisition.

**F.**

Finally, the defendants argue that the plaintiff has not stated a claim of control person liability under Section 15.

To make out a claim under Section 15, a plaintiff must allege "(1) a primary violation; and (2) control over the primary violator."  In re CIT Group Inc. Sec. Litig., No. 08 Civ. 6613, 2010 WL 2365846, at *8 (S.D.N.Y. June 10, 2010); see 15 U.S.C. § 77o.  In light of the foregoing discussion, the plaintiff has successfully pleaded a primary violation of Section 11, and the defendants do not contend that JPM Acceptance, JPM Securities, or the Individual Defendants are not proper defendants with respect to that claim.  The only question, then, is whether the plaintiff has sufficiently pleaded "control" by JPMC or the Individual Defendants.[6]

The Second Amended Complaint does not state a claim against JPMC.  Allegations that an entity was the parent corporation of a primary violator, standing alone, do not make out a claim of control.  See Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 93, 102 (2d Cir. 2001) (affirming the dismissal of a complaint against a parent company of a primary violator); see also PERS of Miss., 714 F. Supp. 2d at 485.  Nor

---

[6] The Second Amended Complaint does not allege that JPM Acquisition is liable under Section 15.  Although the Second Amended Complaint did allege that JPM Acceptance and JPM Securities were liable as control persons, the plaintiff withdrew those allegations after argument.  (Mar. 28, 2011 Ltr. of Thomas E. Egler.)

is the fact that the J.P Morgan name appeared prominently on the
Prospectus Supplement, lending the investment the imprimatur of
the larger corporation, enough to establish control person
liability.  The Second Amended Complaint's further allegation
that JPMC "had the power to, and did, direct [JPM Acceptance]"
is too conclusory to warrant an inference in the plaintiff's
favor.  (SAC ¶ 147.)

However, the plaintiff has pleaded a Section 15 claim
against the Individual Defendants.  As discussed above, the
plaintiff has successfully pleaded a primary violation by JPM
Acceptance, consisting of the Offering Documents that went out
over the Individual Defendants' signatures.  The plaintiff has
alleged not only that the Individual Directors were officers or
directors of JPM Acceptance, but also that they directly
participated in the alleged primary violation: their signatures
enabled JPM Acceptance's participation in the allegedly unlawful
conduct.  This is sufficient to sustain a control person claim
at the motion to dismiss stage.  See In re Global Crossing Sec.
Litig., No. 02 Civ. 910, 2005 WL 1907005, at *12 (S.D.N.Y. Aug.
8, 2005) ("[P]laintiffs must show both that the defendant
possessed the power to direct or cause the direction of the
management and policies of a person, whether through the
ownership of voting securities, by contract, or otherwise, and
that defendant had actual control over the transaction in

34

question." (internal quotation marks and citations omitted));
cf. PERS of Miss., 714 F. Supp. 2d at 485 (holding that a
Section 15 claim was not pleaded where a complaint only alleged
that individual defendants were officers or directors of a
primary violator).[7]  It may be that the Individual Defendants'
primary liability, if proven, will be found incompatible with
control person liability, see Kalnit v. Eichler, 85 F. Supp. 2d
232, 246 (S.D.N.Y. 1999), aff'd on other grounds, 264 F.3d 131
("Under plaintiff's theory . . . the Directors would be primary
violators rather than control persons . . . ."), but this cannot
be determined on the face of the complaint in this case, see In
re Van der Moolen Holding N.V. Sec. Litig., 405 F. Supp. 2d 388,
412-13 (S.D.N.Y. 2005) ("[I]t is conceivable that one defendant
ultimately might be found to be a primary violator while another
defendant might be found to be a control person under Section
20(a).  As the Federal Rules of Civil Procedure permit the
pleading of claims in the alternative, Plaintiffs are not

---

[7] Some courts have held that a plaintiff must allege "culpable participation"
to plead a Section 15 claim in the same way that culpable participation must
be pleaded under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  See,
e.g., PERS of Miss., 714 F. Supp. 2d at 485; In re Prestige Brands Holdings,
Inc. Sec. Litig., No. 05 Civ. 6924, 2006 U.S. Dist. LEXIS 81980, at *6-7
(S.D.N.Y. Nov. 9, 2006) (quoting Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d
Cir. 1998)).  Others have held that the culpable participation requirement
applies only under Section 20(a).  See generally In re WorldCom, Inc., 377
B.R. 77, 103-04 (Bankr. S.D.N.Y. 2007) (collecting cases). This split does
not affect the resolution of this case, because the "culpable participation"
cases should not impose the scienter requirement from Section 20 or otherwise
impose any conduct or state of mind standard that is more stringent than the
standards of Section 11 itself. See id.

35

precluded from pleading that the Defendants are both primary violators and control persons." (citation omitted)).

Accordingly, the plaintiff's Section 15 claims are dismissed against JPMC, withdrawn against JPM Acceptance and JPM Securities, and survive solely against the Individual Defendants.

## IV.

The plaintiff requests leave to amend its complaint to remedy any deficiencies therein.  However, the Court previously gave the plaintiff the opportunity to amend its amended complaint in respond to the defendants' first motion to dismiss, and plainly stated that any dismissal would be with prejudice. (Doc. No. 54.)  See, e.g., Abu Dhabi Commercial Bank v. Morgan Stanley & Co., No. 08 Civ. 7508, 2009 WL 3346674, at *2 ("[A] dismissal with prejudice is generally appropriate where a court puts a plaintiff on notice of a complaint's deficiencies and the plaintiff fails to correct those deficiencies after amendment."); id. at *2 n.14 (collecting cases).  Accordingly, the plaintiff's request is denied.

## CONCLUSION

For the reasons stated above, the defendants' motion is **granted in part and denied in part**. The Clerk is directed to close Docket Nos. 81 and 88.

**SO ORDERED.**

Dated:     New York, New York
           March 29, 2011

                                    John G. Koeltl
                                    United States District Judge

37