UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                :

FORT WORTH EMPLOYEES' RETIREMENT  :
FUND, et al.,                           :
                         Plaintiffs,  :            09 Civ. 3701 (JPO)
                                :
           -v-                   :           <u>MEMORANDUM</u>
                                :            <u>AND ORDER</u>
J.P. MORGAN CHASE & CO.,  et al.,    :
                                :
                     Defendants.  :
--------------------------------------------------------- X

J. PAUL OETKEN, District Judge:

      Currently before the Court in this mortgage-backed securities ("MBS") class action is a

motion by Lead Plaintiff Employees' Retirement System of the Government of the Virgin

Islands ("Virgin Islands") to withdraw as lead plaintiff, to appoint the Laborers Pension Trust

Fund for Northern California ("Laborers") as substitute lead plaintiff, and to approve Laborers'

selection of the law firm of Robbins Geller Rudman & Dowd LLP (the current lead counsel for

Virgin Islands) to serve as lead counsel.

      Defendants J.P. Morgan Securities Inc. (now known as J.P. Morgan Securities LLC), J.P.

Morgan Acceptance Corporation I, Brian Bernard, Louis Schioppo, Jr., Christine E. Cole, David

M. Duzyk, William King, and Edwin F. McMichael (collectively, the "Defendants") oppose the

motion on procedural grounds, and argue that, in any event, Laborers lacks standing to serve as

lead plaintiff in this case, and that any claims it may have had are time-barred.

      For the reasons discussed below, the Court grants Virgin Islands' motion to withdraw as

lead plaintiff, but denies the motion to substitute Laborers without prejudice to renewal of that

motion at the procedurally proper time.  In addition, the Court holds that Laborers, and other

purchasers of MBS certificates from the challenged offering, would have standing to serve as

1

lead plaintiff in this case, notwithstanding the fact that they purchased MBS certificates from different "tranches" within that offering.

## I.      Procedural History

Familiarity with the procedural and factual background of this case is presumed.[1]  The Court provides a summary of the procedural history only to the extent necessary to explain its ruling on this motion.

Fort Worth Employees' Retirement Fund ("Fort Worth") filed the complaint in this case in New York Supreme Court on March 11, 2009.  The case was removed to this Court on April 10, 2009.  (Dkt. No. 1.)  Under the lead plaintiff appointment process set forth by the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(a)(3)(B)(i) ("PSLRA"), notice of the pendency of the suit was issued on July 30, 2009.  (Dkt. No. 37, Ex. B.)   The suit was described as

> a securities class action on behalf of all persons who acquired the Certificates of JP Morgan Issuing Trusts . . . pursuant and/or traceable to the J.P. Morgan Acceptance Corporation I ("J.P. Morgan Acceptance") Registration Statement No. 333-141607 and accompanying Prospectus (collectively, the "Registration Statements") and Prospectus Supplements, for violations of the Securities Act of 1933.

(*Id.*)  The notice identified several J.P. Morgan Issuing Trusts "at issue in the action," including J.P. Morgan Mortgage Trust 2007-S3 ("2007-S3"), from which Fort Worth and Virgin Islands had purchased MBS certificates.

Both Fort Worth and Virgin Islands moved for appointment as lead plaintiff.  In light of Virgin Islands' showing that it possessed a larger financial interest in the case, thereby rendering it the presumptive lead plaintiff under the PSLRA, *see* 15 U.S.C. § 78u-4(3)(B)(iii)(I)(bb), Fort

---

[1] A fuller summary of the allegations of the Second Amended Complaint ("SAC") is contained in this Court's decision on the motion to dismiss.  *See Emp. Ret. Sys. of the Gov't of the Virgin Islands v. J.P. Morgan Chase & Co.*, 804 F. Supp. 2d 141, 150-51 (S.D.N.Y. 2011) ("*Virgin Islands*").

Worth filed a notice of support of Virgin Islands' appointment as lead plaintiff, but stated that Fort Worth "remains a plaintiff and class member in this action."  (Dkt. No. 43.)

On July 8, 2010, Virgin Islands filed a Second Amended Complaint ("SAC" or the "Complaint").  (Dkt. No. 85.)

On May 5, 2011, Judge Koeltl, to whom this action was previously assigned, granted in part and denied in part Defendants' motion to dismiss the SAC for lack of subject matter jurisdiction and for failure to state a claim.  In particular, the Court held that Virgin Islands had standing to bring claims only in connection with the offering in which it purchased securities— the 2007-S3 offering.  *See Virgin Islands*, 804 F. Supp. 2d at 150-51.  Claims on behalf of purchasers in all other offerings were dismissed.  The Court also dismissed the claims brought under Sections 12 and 15 of the Securities Act of 1933, leaving only the claims under Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k(a) ("Section 11").

On November 18, 2011, Virgin Islands filed the instant motion to withdraw as lead plaintiff and to appoint Laborers in its stead.  (Dkt. No. 151.)  Defendants have filed an opposition to this motion.  (Dkt. No. 158 ("Defs. Opp.").)  Defendants argue that it is procedurally improper under the PSLRA to allow the substitution of Laborers as lead plaintiff without re-opening the lead plaintiff appointment process as set forth in the PSLRA.  In addition, Defendants argue that Laborers should not be substituted as lead plaintiff because Laborers lacks standing to serve as a plaintiff in this action and because the claims that it would have standing to bring are time-barred under the applicable statutes of limitations and repose.

The Court heard oral argument that primarily focused on the standing issues on March 8, 2012.  On March 30, 2012, Virgin Islands filed a notice of recent authority to alert the Court to Judge Swain's decision dealing with issues similar to those raised on this motion in *In re Bear*

*Stearns Mortgage Pass-Through Certificates Litigation*, No. 08 Civ. 8093, 2012 WL 1076216

(S.D.N.Y. Mar. 30, 2012).  (Dkt. No. 168.)  Defendants filed a response on April 3, 2012.  (Dkt.

No. 169 ("Defs. Response").)

## II.    Discussion

### A.    Defendants' Standing to Challenge the Withdrawal and Substitution of Lead Plaintiff

As a threshold matter, given the current procedural posture, it is not entirely clear under

the statute whether Defendants have standing to oppose Virgin Islands' motion to withdraw as

lead plaintiff and to appoint Laborers as substitute lead plaintiff.  *See In re Initial Pub. Offering*

*Sec. Litig.*, 214 F.R.D. 117, 121-22 (S.D.N.Y. 2002) ("*IPO*") ("[D]efendants have *never* lodged

any objections to the 'adequacy' of the proposed substitute lead plaintiffs, nor is it even clear

whether defendants would be entitled to do so.").  Under the PSLRA, the presumptive lead

plaintiff is the one who meets particular criteria set forth in the statute, subject to rebuttal "by a

member of the purported plaintiff class."  15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).  The statute does

not provide for any involvement by a defendant in the initial selection of lead plaintiff.

However, courts have held that, "[g]iven the potential for prejudice to defendants when lead

plaintiffs are substituted after years of litigation," defendants in a putative class action may

challenge the replacement of a lead plaintiff at a later stage.  *In re Herley Indus., Inc.*, No. 06

Civ. 2569, 2010 WL 176869, at *2 (E.D. Pa. Jan. 15, 2010).

Given that this case is now over three years old, and that many of the arguments raised by

Defendants affect their interests and will need to be addressed at some point in the litigation, the

Court has allowed Defendants to be heard on this motion.

### B.    PSLRA Procedure

Defendants argue that it is procedurally improper under the PSLRA to allow the substitution of Laborers as lead plaintiff without re-opening the lead plaintiff appointment process as set forth in the PSLRA.  Although there is limited guidance on the proper procedure for the replacement of a duly appointed lead plaintiff, the Court determines that a limited allowance of opportunity for other class members to move for appointment as lead plaintiff is appropriate under the circumstances.

Ordinarily, the PSLRA requires the plaintiff who files the complaint to publish a notice of the pendency of the action, thereby giving members of the class the opportunity to file a motion to be appointed as lead plaintiff.  *See* 15 U.S.C. § 78u-4(a)(3)(A)(i).  The statute then provides that the presumptive lead plaintiff is the one who (1) filed the complaint or made a motion in response to the notice; (2) "in the determination of the court, has the largest financial interest in the relief sought by the class"; and (3) "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure."  15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).  To satisfy the requirements of Rule 23, a plaintiff must show that

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  At this stage, the moving plaintiff need make "only . . . a preliminary showing that the adequacy and typicality requirements have been met."  *Janbay v. Canadian Solar, Inc.*, 272 F.R.D. 112, 120 (S.D.N.Y. 2010).

That presumption may be rebutted "only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff" (1) "will not fairly and adequately

protect the interest of the class;" or (2) "is subject to unique defenses that render such plaintiff incapable of adequately representing the class."  15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).  The policy behind this procedure is "to prevent lawyer-driven litigation, and to ensure that parties with significant financial interests in the litigation will participate in the litigation and exercise control over the selection and actions of plaintiffs['] counsel."  *In re NYSE Specialists Sec. Litig.*, 240 F.R.D. 128, 133 (S.D.N.Y. 2007) (citation and internal quotation marks omitted).

As several courts have recognized, although the PSLRA carefully sets forth the procedure for the initial appointment of a lead plaintiff, the statute is silent as to the procedure for substituting a lead plaintiff if the previously appointed lead plaintiff withdraws.  *See IPO*, 214 F.R.D. at 120.  Absent statutory guidance, courts are thus left to craft an order that best adheres to the policy behind the PSLRA.

On the one hand, "[i]t is certainly within the lead plaintiffs' discretion and, perhaps more importantly, part of a lead plaintiff's responsibility to propose their own withdrawal and substitution should it be discovered that they may no longer adequately represent the interests of the purported plaintiff class." *NYSE Specialists*, 240 F.R.D. at 134.  On the other hand, courts have held that in appointing a substitute lead plaintiff they should not "simply assume[] that [lead counsel's] choice of [substitute] lead plaintiff is the most adequate plaintiff."  *In re Neopharm, Inc. Securities Litigation*, No. 02 C 2976, 2004 WL 742084, at *3 (N.D. Ill. Apr. 7, 2004).

Courts have taken different approaches to the replacement of a duly appointed lead plaintiff.  Theoretically, a court could require a full re-opening of the lead plaintiff appointment process, essentially starting the process anew and following the PSLRA schedule accordingly, though Defendants do not point to any decision going that far.  Some courts have held that the

withdrawal of the lead plaintiff requires a limited re-opening of the PSLRA appointment process. For example, in *Neopharm*, 2004 WL 742084, the court denied the motion to substitute lead counsel's choice as the new lead plaintiff, but did not fully restart the lead plaintiff process and require published notice, as would be required for the initial appointment of a lead plaintiff under the PSLRA.  Instead, the court granted the motion for withdrawal and allowed an additional 21 days for any party to move for appointment as lead plaintiff.  *Id.* at *4.  Ultimately, the only motion that was filed with the court was that of the proposed substitute lead plaintiff from the original motion; the court granted that motion. [2]  *See* Order, No. 02 C 2976 (N.D. Ill. May 18, 2004); *see also* Order on Pending Motions, *In re HealthSouth Sec. Litig.*, CV-03-BE-1500-S (N.D. Ala. Dec. 1, 2004) (holding that withdrawal of lead plaintiff "necessitates the re-opening of the process for the appointment of lead plaintiff as mandated by the PSLRA," but not requiring issuance of new published notice, and allowing only 38 days for motions for appointment to be filed, rather than the full 60 days contemplated by the PSLRA).

    A court in this District held that "where a new lead plaintiff is willing to step forward, there is no need to start the process anew when all putative class members were given notice of the opportunity to move for appointment as lead plaintiff by means of the statutorily required published notice."  *IPO*, 214 F.R.D. at 120 n.5; *see also NYSE Specialists*, 240 F.R.D. at 143 (in slightly different context, holding that "since all putative class members were given notice of the opportunity to move for appointment as lead plaintiff by the original motion, there [was] no need

---

[2] The defendants in *Neopharm* objected to the substitution because the process was not fully re-opened through published notice as set forth in the PSLRA for the initial appointment of lead plaintiff.  The court noted that, "perhaps in hindsight it should have" restarted the process and required such notice, but held that because it was "no secret that [the previous lead plaintiff] sought leave to withdraw some time ago, and included on the service list in [the] case [were] law firms for other plaintiffs that had previously moved for appointment as lead plaintiff," the court was "satisfied that sufficient opportunity was present for another potential lead plaintiff to come forward."  *Id.*

for the Court to re-open the process by ordering a new notice and motion period").[3]  In *IPO*,

Judge Scheindlin held that she would "deem any movant timely" who either (a) filed the

complaint, (b) moved to be appointed lead plaintiff in response to the initial notice of pendency,

or (c) moved to be appointed lead plaintiff within 60 days of the withdrawal of the previous lead

plaintiff.  *Id.* at 120.

Here, the only other party to file for lead plaintiff status was Fort Worth, the entity that

filed the original complaint.  In light of what then appeared to be Virgin Islands' greater financial

interest, Fort Worth supported Virgin Islands' application but remained a plaintiff and class

member in the action.  (*See* Dkt. No. 43.)  Since Virgin Islands filed its motion to withdraw and

substitute Laborers as lead plaintiff, neither Fort Worth nor any other potential lead plaintiff has

sought appointment as lead plaintiff or otherwise intervened.

Under these circumstances, and in light of the authority discussed above and the limited

statutory guidance, the Court holds that the most appropriate approach in this case is a modified

version of the one used by Judge Scheindlin in *IPO*.  The court will deem timely any movant for

appointment as lead plaintiff who either (a) filed the complaint, (b) moved to be appointed lead

plaintiff in response to the initial notice of pendency, or (c) moved to be appointed lead plaintiff

within 30 days of the withdrawal of the previous lead plaintiff.

---

[3] As the District Court for the Northern District of California pointed out,

> It would turn securities litigation into a game of snakes and ladders to hold that
> any time a new plaintiff is added, the action must 'go back to square one' and
> recommence the PSLRA lead plaintiff selection process.  Relatedly, there is no
> indication that Congress intended such repetitive preliminaries to securities
> litigation.  The PSLRA's lead plaintiff provision is designed only to get cases
> off on the right foot.  (One may debate whether the PSLRA does so, but that is
> another matter.)

*In re Impax Labs., Inc. Sec. Litig.*, No. C 04-04802 JW, 2008 WL 1766943, at *8 (N.D. Cal. Apr. 17, 2008)

Because the Court only now grants Virgin Islands' withdrawal, the time period in which another party may move begins as of the date of this order. Thus, the Court will not simply appoint Laborers now, even though it is "willing to step forward." *IPO*, 214 F.R.D. at 120 n.5. At the same time, the Court does not find that it is necessary or in the interests of the class to fully restart the PSLRA appointment process. This action—and indeed, this motion—have been pending for quite some time, and any other parties have had ample opportunity to seek to intervene. To ensure that such opportunity is not improperly denied, the Court is providing this additional thirty days during which any party meeting the test outlined above may file a motion to be appointed lead plaintiff.

After thirty days have elapsed, the Court will consider any motions to be appointed as lead plaintiff. Since Laborers has already so moved, the Court will deem Laborers' motion timely, and will not require an additional submission.

## C.    Proposed Lead Plaintiff's Standing

Defendants also argue that Laborers cannot meet the PSLRA requirements that it "has the largest financial interest" in the case and "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure," 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb)-(cc), because it lacks standing even to bring the claims asserted by Virgin Islands. Although the Court has decided to re-open the PSLRA lead plaintiff process, it is appropriate to address the standing issue at this point because its resolution will guide the parties in the lead plaintiff appointment process, in particular, by identifying who is eligible to vie for lead plaintiff status in this case.

Defendants' argument that Laborers lacks standing to assert these claims is based on the fact that, although Laborers purchased 2007-S3 certificates from the same offering as Virgin Islands, Laborers purchased certificates from different "tranches" than did Virgin Islands and

Fort Worth.  A "tranche" is a grouping of MBS certificates within a given offering.  According to the SAC, when mortgage loans are securitized,

> the cash flow [from the mortgage payments] is distributed to the holders of the MBS certificates in order of priority based on the specific tranche held by the MBS investors.  The highest tranche (also referred to as the senior tranche) is first to receive its share of the mortgage proceeds and is also the last to absorb any losses should borrowers become delinquent or default on their mortgage.  Of course, since the investment quality and risk of the higher tranches is affected by the cushion afforded by the lower tranches, diminished cash flow to the lower tranches results in impaired value of the higher tranches.

(SAC ¶ 46.)  Here, Laborers purchased certificates from tranches 1-A-96 and 1-A-97, while Virgin Islands (and Fort Worth) purchased certificates from tranche 1-A-1.

Defendants argue that in a class action under Section 11, as both a statutory and constitutional matter, a named plaintiff has standing to represent only a class of plaintiffs who have purchased the "same security" as the named plaintiff.  Defendants point out that each tranche is actually a different security, with its own distinct characteristics, that is traded independently from other tranches.  Each tranche has its own (1) Committee on Uniform Security Identification Procedures ("CUSIP") number; (2) original principal note balance; (3) interest rate; (4) payment rights; (5) credit rating; and (6) payment priority.  (*See* Defs. Opp. at 10 (citing *In re Wash. Mut. Mortgage-Backed Sec. Litig.*, 276 F.R.D. 658 (W.D. Wash. Oct. 21, 2011) ("*WaMu*")).)  Because the certificates in different tranches are different securities, Defendants argue, a named plaintiff who purchased one tranche would not have standing to assert claims on behalf of purchasers of other tranches. Thus, Virgin Islands would have standing to assert claims on behalf of purchasers of Tranche 1-A-1 certificates only, and Laborers would have standing to assert claims on behalf of purchasers of Tranches 1-A-96 and 1-A-97 only.

Laborers would not have standing to assert the claims brought thus far in the case, which, under Defendant's theory, were on behalf of purchasers of only Tranche 1-A-1 certificates.

Although this argument arises in the context of a motion to substitute the *lead* plaintiff, Defendants' arguments essentially go to whether Laborers could represent the class as a *named* plaintiff. As courts have made clear, and as discussed in more detail below, "in order for a claim to be asserted on behalf of a putative class, only the named plaintiffs—but not necessarily the lead plaintiff—must have standing." *IPO*, 214 F.R.D. at 122; *see also In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 422 (S.D.N.Y. 2003) ("Long before passage of the PSLRA, it was well established that named plaintiffs may jointly represent the class and it is their claims that determine whether there is standing to bring the claims alleged on behalf of the class."). Here, the lead plaintiff had been Virgin Islands, and it appears that Fort Worth remained a named plaintiff even though it was not appointed lead plaintiff. In arguing that Laborers cannot be appointed lead plaintiff of this putative class, Defendants are essentially arguing that Laborers is not part of the class represented by Virgin Islands and Fort Worth. As more fully discussed below, many of the decisions dealing with standing in the securities class action context start with a set of class representatives (lead and named plaintiffs) and examine the scope of the claims that those class representatives may assert. In other words, the courts are faced with motions by defendants to dismiss claims for which the class representatives lack standing to bring. *See, e.g.*, *Virgin Islands*, 804 F. Supp. 2d at 150-51 (holding that lead plaintiff had standing only to represent purchasers from same offering). This motion presents the inverse problem: Claims have already been asserted (by Fort Worth and Virgin Islands); the question is whether a particular plaintiff (Laborers) is part of the class of plaintiffs who had standing to assert those claims, such that that plaintiff could be installed as a representative of that class.

The Court recognizes that this decision is necessarily based on a limited record.  At this stage in the litigation (*i.e.*, before discovery), the Court must assess standing "on the basis of the pleadings" and will "'accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.'"  *New Jersey Carpenters Health Fund v. Residential Capital, LLC*, No. 08 Civ. 8781,  2010 WL 1257528, at \*3 (S.D.N.Y. 2010) ("*RALI I*") (quoting *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 106 (2d Cir. 2008)).  As the case progresses, evidence may shed further light on the issues addressed here, and it may be necessary to revisit some of the Court's conclusions.  But at this stage, the Court will determine whether Laborers would have standing to assert the claims asserted in the SAC.

### 1.      Previous Rulings

This Court previously held on the motion to dismiss by Defendants that the lead plaintiff (then Virgin Islands) had standing to represent only purchasers of certificates from the same offering.  *See Virgin Islands*, 804 F. Supp. 2d at 150-51.  That decision was in accord with the near-unanimous view of other courts in this District.  *See id.* at 150 (collecting cases).  The idea that a plaintiff was also limited to representing purchasers of the same tranche of certificates was neither raised nor decided, and indeed had not yet been addressed by any court prior to the last year.

Subsequent to (or in one case nearly simultaneously with) this Court's decision on the motion to dismiss, several courts directly addressed the tranche-based standing argument and have reached widely divergent results.  *Compare Plumbers' & Pipefitters' Local #562 Supp. Plan & Trust, et al v. JP Morgan Acceptance Corp I, et al*, No. 08 Civ. 1713, 2012 WL 601448 (E.D.N.Y. Feb. 23, 2012) ("*Plumbers*"); *WaMu*, 276 F.R.D. 658; *and Maine State Ret. Sys. v. Countrywide Fin. Corp.*, No. 10 Civ. 0302, 2011 WL 4389689 (C.D. Cal. May 5, 2011) (all

holding that lead plaintiff standing in MBS class actions is tranche-based); *with Bear Stearns*, 2012 WL 1076216, *and Genesee Cnty. Emps. Ret. Sys. v. Thornburg Mortg. Sec. Trust 2006-3*, 825 F. Supp. 2d 1082 (D.N.M. 2011) (holding that standing is not tranche-based). Other courts in this District have addressed—and rejected—the concept of tranche-based standing more indirectly, in the context of motions for class certification. *See Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 277 F.R.D. 97, 108-09 (S.D.N.Y. 2011) (rejecting argument as to standing in context of class certification); *N.J. Carpenters Health Fund v. DLJ Mortgage Capital*, No. 08 Civ. 5653, 2011 WL 3874821, at *3 (S.D.N.Y. Aug. 16, 2011) (rejecting argument that differences among tranches defeats typicality); *In re Dynex Capital, Inc. Sec. Litig.*, No. 05 Civ. 1897, 2011 WL 781215, at *2 (S.D.N.Y. Mar. 7, 2011) (rejecting argument that differences among tranches defeats adequacy); *N.J. Carpenters Health Fund v. Residential Capital, LLC*, 272 F.R.D. 160, 165-66 (S.D.N.Y. Jan. 18, 2011) ("*RALI II*") (rejecting argument that differences among tranches defeats typicality).

To resolve this question, it is necessary to review principles of standing in the class action context in general, as well as how those principles have been applied in the MBS context in particular.

### 2.      Constitutional Standing in Class Actions

In order to bring a suit in federal court, a plaintiff must demonstrate that he or she possesses standing to bring that suit.  Under well settled Supreme Court precedent, in order to demonstrate standing, a plaintiff must show three elements:  (1) an injury in fact (2) that is fairly traceable to the defendant's allegedly unlawful conduct, and (3) that is likely to be "redressed by a favorable decision."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  The "injury in fact" must be a "concrete and particularized" harm to a "legally protectable interest" that is

"actual or imminent, not conjectural or hypothetical." *Id.* at 560. A "particularized" injury is one that "affect[s] the plaintiff in a personal and individual way." *Id.* at 560 n.1; *see also Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166 (1972) (holding that a litigant "has standing to seek redress for injuries done to him, but may not seek redress for injuries done to others").

This requirement is drawn from the constitutional provision of jurisdiction to federal courts to hear "cases" or "controversies." U.S. Const. Art. III, § 2. *See Allen v. Wright*, 468 U.S. 737, 750-51 (1984). A plaintiff can demonstrate that there is an actual case or controversy that he or she possesses the requisite "personal stake" in resolving only if that plaintiff can meet the three standing requirements. *W.R. Huff Asset Mgmt. Co.*, 549 F.3d at 107 ("These requirements ensure that a plaintiff has a sufficiently personal stake in the outcome of the suit so that the parties are adverse."); *cf. O'Shea v. Littleton*, 414 U.S. 488, 493-94 (1974) ("There must be a 'personal stake in the outcome' such as to 'assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.'" (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).

It is also well settled that the requirement that a plaintiff have standing to sue is "no less true with respect to class actions than with respect to other suits." *Lewis v. Casey*, 518 U.S. 343, 357 (1996). A plaintiff in a class action cannot get around the standing requirement by asserting that other members of the class have standing. "It is not enough that the conduct of which the plaintiff complains will injure *someone*. The complaining party must also show that he is within the class of persons who will be concretely affected." *Blum v. Yaretsky*, 457 U.S. 991, 999 (1982). Thus, in order to maintain a class action, each member of the class must have standing to assert her own claims against the defendant, and the named plaintiffs "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified

members of the class to which they belong and which they purport to represent." *Lewis*, 518

U.S. at 357 (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 40 n.20 (1976)

(internal quotation marks omitted)).

      For each claim asserted in a class action, there must be at least one class representative (a

named plaintiff or a lead plaintiff) with standing to assert that claim. *See Cent. States Se. & Sw.*

*Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 241 (2d

Cir. 2007) ("To establish Article III standing in a class action, it is not required that each named

plaintiff must have a claim against each named defendant. Rather, for every named defendant

there must be at least one named plaintiff who can assert a claim directly against that defendant,

and at that point standing is satisfied . . . ." (quoting 1 Newberg on Class Actions § 2:6 n. 3 (4th

ed. 2002))). Other claims, for which the class representatives do not have standing, must be

dismissed. *See, e.g.*, *Public Employees' Retirement System of Mississippi v. Merrill Lynch & Co.*

*Inc.*, 714 F. Supp. 2d 475, 480-81 (S.D.N.Y. 2010) (dismissing claims for which no named

plaintiff possessed standing). This requirement ensures that the plaintiffs responsible for

prosecuting the case—the named plaintiffs, and, in the securities class action context, the lead

plaintiffs—have the requisite "personal stake" in prosecuting the claims in the case.

      At the same time, it is important to recognize that the entire concept of class actions is in

some degree of tension with the requirement of standing. In a class action, "the named plaintiffs

regularly litigate not only their own claims but also claims of other class members based on

transactions in which the named plaintiffs played no part." *Plumbers' Union Local No. 12*

*Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 769 (1st Cir. 2011). As Judge

Swain explained in a recent decision rejecting the same tranche-based standing argument at issue

here:

> the cancer-stricken lead plaintiff in an asbestos case brings claims
> based on *other people's* cancers; a lead plaintiff, paralyzed from
> the waist down due to a car brake malfunction, can bring product
> liability claims on behalf of other people who were paralyzed from
> the neck down due to the same faulty break design.

*Bear Stearns*, 2012 WL 1076216, at *24.[4]  Thus, when the Supreme Court says that a named

plaintiff must show that it was "personally . . . injured, not that injury has been suffered by

other, unidentified members of the class," *Lewis*, 518 U.S. at 357, the Court does not mean that

the named plaintiff must literally suffer the same actual injury that each class member suffered.

That would, of course, be impossible.  Rather, the named plaintiff must "show that he is within

the class of persons who [were] concretely affected" by "injurious conduct" by the defendant

such that that plaintiff has the "necessary stake in litigating" the case.  *Blum*, 457 U.S. at 999.  In

other words, the named plaintiff's case must "not implicate a significantly different set of

concerns" from the claims of the rest of the class.  *Gratz v. Bollinger*, 539 U.S. 244, 265 (2003)

(holding that plaintiff asserting claims regarding race-based preferences in admission of transfer

students had standing also to represent claims based on race-based preferences in admission of

freshmen); *see also Blum*, 457 U.S. at 999 (holding that plaintiff suffering "injurious conduct of

*one kind*," does not have "necessary stake in litigating conduct of *another kind*, although similar,

to which he has not been subject" (emphasis added)); *Nomura*, 632 F.3d at 769 (noting that the

Supreme Court has "used Article III concepts in refusing to permit class claims to extend to

those suffering injuries *materially different* than those suffered by the named plaintiffs"

(emphasis added)).

---

[4] Defendants contend that the *Bear Stearns* decision "confuses the issue of a named plaintiff's standing with the role of a lead plaintiff," and that it is thus not persuasive authority for this case.  (Defs. Response at 4.)  The Court disagrees with Defendants' argument, but notes that Judge Swain's use of the term "lead plaintiff" in this context obviously refers to the more generic "class representative," and not the PSLRA "lead plaintiff" process, which does not apply in the products liability context.

In short, the named plaintiff must be part of the same "case or controversy" against the defendant as the members of the class.  *See O'Shea*, 414 U.S. at 494 (holding that "if none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class"); *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 216 (1974) (noting that a class representative "must be a part of that class, that is, he must possess the same interest and suffer the same injury shared by all members of the class he represents"); *cf. Nomura*, 632 F.3d at 770 (limiting standing of named plaintiffs in MBS case to representing purchasers from same offering, but reserving judgment on cases "where the claims of the named plaintiffs necessarily give them—not just their lawyers—essentially the same incentive to litigate the counterpart claims of the class members because the establishment of the named plaintiffs' claims necessarily establishes those of other class members").

It is also important not to collapse the standing inquiry into the class certification inquiry. Courts in this District have long made clear that "the Article III standing determination should precede that of class certification."  *In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579, 605 (S.D.N.Y. 2006).  This is because "it is black letter law that a rule of procedure"—such as Rule 23, governing class actions—"cannot create standing."  *Merrill Lynch*, 714 F. Supp. 2d at 480 (citing 28 U.S.C. § 2072(b) (providing that procedural rules "shall not abridge, enlarge or modify any substantive right")).  But in requiring a named plaintiff to have "standing vis-à-vis the defendant" by "demonstrat[ing] injury by that defendant so as to have a sufficiently direct and substantial interest" in the case, *Salomon Smith Barney*, 441 F. Supp. 2d at 579, a court should not base its determination of that question on whether the named plaintiff (and the class) has also met the requirements of Rule 23.  A named plaintiff must show that it is a

"part of th[e] class" by showing that it has the same interest in redressing the same injurious conduct by the same defendant. *Schlesinger*, 418 U.S. at 216. But once it has established that, questions of adequacy, typicality and the like should be resolved at the class certification stage. *See Salomon Smith Barney*, 441 F. Supp. 2d at 605 ("Care must be taken, when dealing with apparently standing-related concepts in a class action context, to analyze individual standing requirements separately and apart from Rule 23 class prerequisites. Though the concepts appear related, in that they both seek to measure whether the proper party is before the court to tender the issues for litigation, they are in fact independent criteria. They spring from different sources and serve different functions. Often satisfaction of one set of criteria can exist without the other." (quoting 1 Newberg on Class Actions § 2:9, at 109 (4th ed. 2002))).

### 3.     Tranche-Based Standing for Securities Act Claims

Turning to the application of standing principles to the specific context of tranches under the Securities Act, the Court begins with constitutional standing, and then addresses statutory standing.

### a.     Constitutional Standing

Although the Court previously has held that the lead plaintiff was limited to representing purchasers of securities from the same offering, it does not follow from the reasoning of that decision that named plaintiff's standing is further limited to purchasers of the same tranche of certificates.

The plaintiffs in this case allege a violation of Section 11 of the Securities Act of 1933, which provides that if "any part of [a] registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring

such security" may sue. 15 U.S.C. § 77k(a).[5] As the Court previously explained in this case, in deciding that Virgin Islands had standing to represent only purchasers in the 2007-S3 offering,

> [t]he actionable conduct under Section 11 is . . . the specific registration statement containing misrepresentations . . . . A plaintiff who purchased a security issued pursuant to one particular registration statement therefore has suffered harm, and has standing to sue, only with respect to the specific registration statement and prospectus that cover the specific security that it purchased. The plaintiff was not harmed by, and thus has no standing to sue for, alleged misrepresentations contained in other prospectuses or registration statements offering other securities that it did not purchase.

804 F. Supp. 2d at 150-51.[6]

Defendants would focus on the "specific security that it purchased" language, arguing that a named plaintiff must have purchased the same "specific security" as each of the class members in order to have suffered the same harm. But the reason that purchasers of securities from different offerings lack standing to represent each other's claims is because each offering represented a separate act of alleged misconduct by the Defendants, causing separate harm.

Each offering was issued pursuant to a different set of offering documents, each of which contained the alleged misstatements that could give rise to a claim. Most of the material misstatements at issue were contained in the prospectus supplements, which were unique to each offering. The statements in one set of offering documents did not apply to certificates issued in other offerings. Thus, a plaintiff harmed by an alleged misstatement in one set of offering documents is not harmed by alleged misstatements in a wholly different set of offering

---

[5] As more fully discussed in the section below regarding statutory standing issues, the phrase "such security" does not have a grammatical referent in the statute.

[6] The plaintiffs also brought claims under Sections 12 and 15, but those claims were dismissed. *See Virgin Islands*, 804 F. Supp. 2d at 151, 158. As explained in the decision on the motion to dismiss, the remaining claim, under Section 11, is based upon alleged misstatements contained in the prospectus supplement pertaining to the 2007-S3 offering, as incorporated by reference into the registration statement for the offerings. In this opinion the capitalized term "Offering Documents" refers to the specific prospectus supplement and registration statement pertaining to the 2007-S3 offering.

documents that it never received.  In standing terms, the "injury in fact" that a plaintiff suffers

when it purchases securities based on a particular misstatement of a defendant is not "fairly

traceable" to other, unrelated alleged misstatements by the same defendant.  *Lujan*, 504 U.S. at

560.  A plaintiff who purchased securities pursuant to one set of offering documents has no

"personal stake" in establishing that an unrelated set of offering documents contains

misstatements.  *O'Shea*, 414 U.S. at 493.  But this logic does not mandate further that each

different security issued pursuant to the same registration statement (and subject to the exact

same misrepresentations) yields a separate "case or controversy."

        The fact that other offerings are issued pursuant to separate offering documents,

representing separate acts of alleged misconduct by the defendant, underlies each of the

decisions from this District holding that standing is offering-based.  *See, e.g.*, *In re Lehman Bros.

Securities and ERISA Litigation*, 684 F. Supp. 2d 485, 491 (S.D.N.Y. 2010) (holding that named

plaintiff lacked standing to sue on behalf of purchasers in other offerings because "plaintiffs have

not alleged any injury traceable to the Certificates in those offerings"); *N.J. Carpenters Vacation

Fund v. Royal Bank of Scotland Grp., PLC*, 720 F. Supp. 2d 254, 265 (S.D.N.Y. 2010) ("Most of

Plaintiffs' factual allegations focus on the underlying details contained in the . . .  prospectus

supplements and are unique to each of the offerings . . . . [T]he harm Plaintiffs may have suffered

based on misstatements in the Offering Documents for the Certificates they purchased has no

bearing on any harm suffered by other investors based on alleged misstatements in other offering

documents with details about other offerings that Plaintiffs did not purchase."); *New Jersey

Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, No. 08 Civ. 5653, 2010 WL 1473288, at *3

(S.D.N.Y. Mar. 29, 2010) ("The Certificates in each of the four Offerings were based upon a

distinct pool of mortgages, originated largely by different mortgage lenders, and *governed by a*

*different prospectus supplement with different underwriting requirements and disclosures*."

(emphasis added)); *RALI I*, 2010 WL 1257528, at *4 ("Plaintiffs' allegations are largely related

to the details contained in the distinct prospectus supplements for each of the offerings: the

description of the particular underwriting guidelines, the delinquency rates, the credit

enhancements, and the loan-to-value ratios all differed based on the particular offering. . . . As

such, the harm claimed by Plaintiffs due to the alleged misstatements in the Offering Documents

for the RALI Certificates that they purchased has little bearing on any potential harm suffered by

an unnamed party from misstatements in the Offering Documents from Certificates that they did

not purchase.").

      The cases in this District holding that a named plaintiff can represent purchasers in other

MBS offerings have so held when the plaintiffs "do not rely on the information furnished in the

prospectus and pricing supplements unique to each of the . . . offerings but rather on the alleged

material misstatements and omissions located in the common elements of the  . . . different

registration statements . . . ."  *In re Am. Int'l Grp., Inc.*, 741 F. Supp. 2d 511, 538 (S.D.N.Y.

2010).  Thus, those plaintiffs could "trace the injury of the purchasers in each of the . . . offerings

to the same underlying conduct on the part of the defendants."  *Id.*; *see also In re Citigroup Bond

Litig.*, 723 F. Supp. 2d 568, 584-85 (S.D.N.Y. 2010) (holding that "where a plaintiff alleges

untrue statements in the shelf registration statement or the documents incorporated therein—as

opposed to an alleged untrue statement in a supplemental prospectus unique to a specific

offering—then that plaintiff has standing to raise claims on behalf of all purchasers from the

shelf").  Because purchasers of different tranches within the same offering can also trace their

injuries to the same offering documents—in other words, the "same underlying conduct on the

part of the defendants," *Am. Int'l Grp.*, 741 F. Supp. 2d at 538—those purchasers are part of the

same "case or controversy."

Defendants attempt to distinguish the holding in *Bear Stearns*, in which Judge Swain held

that standing was not tranche-based, because in that case, the court found that "the tranches in

each offering were constituted from a single pool of mortgages" and there were "no substantive

differences among the tranches." *Bear Stearns*, 2012 WL 1076216, at *23, *24 (quotation marks

omitted). Defendants state that, in this case, the different tranches are not merely different

securities, but are also backed by different sets of loans and are therefore substantively different.

The Court is not persuaded that these differences change the standing analysis.

As Defendants explain, the 2007-S3 offering was composed of certificates backed by two

"pools" of loans. Those pools were subdivided into subgroups. The different tranches were

backed by different subgroups of loans. Tranche 1-A-1 was tied to Subgroup 1-1 while Tranches

1-A-96 and 1-A-97 were tied to Subgroup 1-2. (*See* J.P. Morgan Mortgage Trust 2007-S3

Prospectus Supplement (July 27, 2007), Declaration of Dorothy J. Spenner in Support of

Defendants' Motion to Dismiss the Second Amended Complaint, Ex. B, Dkt. No. 91 ("Prosp.

Supp."), at S-10.) The loans within each "subgroup" had certain specific ranges of "net

mortgage rate[s]." (*Id.*)[7] Defendants also point out that the different sub-groups had, *inter alia*,

different ranges of loan-to-value ("LTV") ratios, different weighted average credit scores, and

different percentages of "interest-only loans." (Defs. Response at 2 n. 2 (citing Prosp. Supp. at

S-17).)

---

[7] Subgroup 1-1 is composed of "100% of the principal balance of each pool 1 mortgage loan with a net mortgage rate less than 5.50% per annum" and "a portion of each pool 1 mortgage loan with a net mortgage rate greater than or equal to 5.50% per annum and less than 6.00% per annum, equal to" a specified equation. (Prosp. Supp. at S-10). Subgroup 1-2 is composed of "a portion of each pool 1 mortgage loan with a net mortgage rate greater than or equal to 5.50% per annum and less than 6.00% per annum, equal to" the same equation, and a portion of each pool 1 mortgage loan with a net mortgage rate "(i) greater than or equal to 6.00% per annum, or  (ii) greater than equal to 6.75% per annum and less than 7.00% per annum equal to" a different equation. (*Id.*)

Some courts have held that these differences among loan groups create a separate "case or controversy" for the holders of each tranche. This view was explained by the District Court for the Central District of California:

> Because the loan groups backing the Certificates differed from tranche to tranche, the statements regarding underwriting and credit characteristics found in the prospectus supplements for those MBS deals were essentially different statements for each tranche, given that the point of reference for those statements—the loan groups—differed at the tranche level. In other words, an alleged misstatement as to the origination practices with respect to one loan group backing a particular tranche would not necessarily constitute a misstatement as to a different loan group backing a different tranche.

*Maine State*, 2011 WL 4389689, at *7.

The Court is not persuaded that this analysis applies in this case, or that these factors ought to affect the constitutional standing inquiry. The SAC in this case alleges misstatements in the Offering Documents pertaining to the 2007-S3 offering in which Plaintiff purchased securities. Those alleged misstatements are not tranche-specific, but rather are based on the entire pool of loans backing the certificates in the offering. Indeed, although the characteristics of the different tranches and sub-groups are listed in the Offering Documents, the alleged misstatements do not concern these particular characteristics, which are primarily focused on the interest rates of the loans.[8]

---

[8] If this were a lawsuit about misstated interest rates for the different loans, then it is possible that a named plaintiff purchasing loans with one set of interest rates could not represent a class of plaintiffs purchasing loans with a different set of interest rates. But even then, if the complaint alleged simply that "the offering documents misstated the interest rates of the loans," then each plaintiff would presumably have the same "personal stake" in establishing that fact, even if the evidence later revealed that the different rates were misstated to different degrees. Similarly, of course, the different payout rates of the different tranches will affect damages for the individual class members, but it is well settled that "so long as a formula for calculating damages is proposed, the fact that damages must be calculated on an individual basis is no impediment to class certification." *Fogarazzo v. Lehman Bros., Inc.*, 263 F.R.D. 90, 109 (S.D.N.Y. 2009) (citation and quotation marks omitted). *A fortiori*, differences in damages would also not undermine constitutional standing.

Here, the SAC alleges that the Offering Documents contained material misstatements regarding the underwriting standards, the appraisal standards, and the LTV ratios of the underlying loans.[9]  *See Virgin Islands*, 804 F. Supp. 2d at 147-49.  For example, the SAC alleges that "loan originators deviated from underwriting standards 'as a matter of course' or issued loans without evaluating 'the prospective borrower's repayment ability,' in violation of the underwriting standards specified in the Offering Documents."  *Id.* at 152-53 (quoting SAC ¶¶ 79, 94).  The SAC also alleges that "appraisers were ordered to [and] did produce 'predetermined, preconceived, inflated and false appraisal values' and 'frequently succumbed to brokers' demands to appraise at predetermined inflated values,' leading to '[a]ppraisals . . . not based upon the appraiser's professional conclusion based on market data of sales of comparable properties and a logical analysis and judgment.'"  *Id.* at 153 (quoting SAC ¶¶ 103, 107).  The SAC further alleges that because the LTV ratios contained in the Offering Documents based the "value" calculation on the allegedly improper appraisals, then Defendants knew those ratios were false.  *Id.* at 153-54.

These allegations are not specific to any one pool or subgroup of loans.  Rather, the allegations address the general practices pertaining to the entire body of loans backing the 2007-S3 offering and how those practices are characterized in the Offering Documents.  Though the truth or falsity of the statements will depend in part on practices by specific loan originators, the SAC does not make allegations as to each loan, or a particular set of loans.  For example, the SAC alleges that loan originators deviated from underwriting standards "as a matter of course."  It is of course possible that certain individual loans were issued in compliance with the requisite underwriting standards.  That would not necessarily render the allegation untrue, if many more

---

[9] The SAC also alleged misstatements regarding investment ratings, but those claims were dismissed by this Court for failure to state a claim.  804 F. Supp. 2d at 154.

loans were issued in violation of those standards and guidelines.  There is no suggestion that these allegedly industry-wide practices would have affected only particular tranches.  The fact that one tranche is backed by one sub-group of loans with particular interest rates, while another tranche is backed by another sub-group of loans with other interest rates, does not affect whether a plaintiff has the requisite "personal stake" in establishing that particular underwriting practices pervaded the entire industry, and that descriptions of those underwriting practices in the Offering Documents were false and misleading.

In addition, the SAC alleges that 27% of the loans in the 2007-S3 Trust were originated by American Home Mortgage Corp. ("AHM") and that "Chase Originators" originated 58% of the loans.  (SAC ¶¶ 70, 72.)  Neither the SAC nor the record is clear as to precisely which subgroups were backed by which loans, but it is clearly alleged that approximately 85% of the loans were originated by one of these two entities.  Defendants have not pointed to anything in the record establishing that some tranches were composed entirely of loans originated by one entity or the other.  On the contrary, the division of the sub-groups appears to be based on the mortgage rates of the underlying mortgage loans, not on which entity originated them.  Thus, it would appear that allegations about the general practices of these two loan originators apply at least to some extent to all of the sub-groups of loans backing the 2007-S3 offering.

In any event, this line of analysis is not necessary to the core standing inquiry.  A lead plaintiff who has purchased from one tranche has the same "personal stake" in proving the allegations of this Complaint as a purchaser of any other tranche where (as here) the tranches are tied to the same alleged misrepresentations.  As the court in the *RALI* litigation held, in the context of class certification,

> [t]he heart of Plaintiffs' claims under sections 11 and 12 of the
> Securities Act is that the offering documents were materially

> misleading as to whether the underlying loans were originated in compliance with underwriting guidelines. Plaintiffs show that the four loan groups comprising the relevant securities were originated under identical loan underwriting guidelines, and by the same four principal loan originators. The alleged disregard for those guidelines thus impacted all proposed class members in the same manner, irrespective of which tranche they purchased.

*RALI II*, 272 F.R.D. at 165-66. Judge Swain explained the idea in more explicit standing terms:

> [N]amed Plaintiffs and the members of the class have suffered an identical form of injury (a decline in their Certificates' value) traceable to a single, allegedly unlawful act by Defendants (disseminating Offering Documents with misrepresentations and omissions). As such, named Plaintiffs have clearly established that they, and the purchasers of all other tranches within the offerings, are part of the same case and controversy with Defendants.

*Bear Stearns*, 2012 WL 1076216, at *23. *See also Merrill Lynch*, 277 F.R.D. at 108 ("Moreover, the representations in each Offering apply equally to all tranches within that Offering."); *Thornburg*, 825 F. Supp. 2d at 1152 (finding that "the same misrepresentations flow to all of the tranches"); *cf. In re Dynex*, 2011 WL 781215, at *2 ("While investors' repayment rights may vary slightly based on the seniority of the tranches they purchased, this does not present a 'fundamental' conflict within the class.").

Finally, although the record is not yet clear on this point, as alleged in the SAC, even if misrepresentations in the Offering Documents pertained only to loans backing particular tranches, based on the payment structure of the offering, a drop in value of one tranche affected the value of all of the tranches. (*See* SAC ¶ 46 ("[S]ince the investment quality and risk of the higher tranches is affected by the cushion afforded by the lower tranches, diminished cash flow to the lower tranches results in impaired value of the higher tranches.").) Thus, a purchaser of one tranche is allegedly in fact injured by misstatements that pertain only to another tranche. *See Bear Stearns*, 2012 WL 1076216, at *24 n.36 ("If this is correct, purchasers of senior tranches

are not merely part of the same case and controversy as purchasers of junior tranches—the former can also trace personal injury to declines in securities they did not hold.  However, because the Court finds that there is a common case and controversy, it need not rely on this underdeveloped aspect of the record to find that named Plaintiffs have constitutional standing.”); *Merrill Lynch*, 277 F.R.D. at 109 (“Indeed, because of the ‘waterfall’ method of repaying investors in order of the quality of security purchased, false statements in Offering Documents affect all Certificates in the Offering.”).

In sum, the Court concludes that, as a constitutional matter, Laborers would have standing to assert the claims brought in the SAC.  Although the differences among the tranches may affect the class certification inquiry down the line, those differences do not take away Laborers’ standing to assert claims on behalf of all purchasers of certificates in the same offering, pursuant to the exact same alleged misrepresentations.

### b.      Statutory Standing

Defendants also argue that the statute giving rise to the cause of action limits the lead plaintiff’s standing to representing only purchasers of the same security.

As noted above, Section 11 of the Securities Act provides that “[i]n case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security” may bring suit against specified defendants.  15 U.S.C. § 77k(a).  Defendants argue that the fact that the potential plaintiff under this statute is “any person acquiring such security” means that “a plaintiff lacks standing under . . . Section 11 . . . to bring claims based on securities that it did not purchase.” (Defs. Opp. at 11.)

27

This is certainly true in a limited sense.  The statute clearly provides that not just anyone may sue for misstatements in a registration statement; only someone purchasing "such security" may do so.  The statute does not explain precisely what "such security" refers to—as Judge Swain pointed out, the phrase has no grammatical referent in the statute, *Bear Stearns*, 2012 WL 1076216, at *25—but based on the context, it is clear that a prerequisite to bringing suit based on misstatements in a registration statement is the purchase of a security covered by that registration statement.  *See Barnes v. Osofsky*, 373 F.2d 269, 273 (2d Cir. 1967) ("[A]n action under § 11 may be maintained only by one who comes within a narrow class of persons, i.e. those who purchase securities that are the direct subject of the prospectus and registration statement." (citation and quotation marks omitted)); *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 491 (S.D.N.Y. 2006) ("The pleading requirement for Section 11 standing is satisfied by general allegations that plaintiff purchased pursuant to or traceable to a false registration statement."  (citing *In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 208 (S.D.N.Y. 2003) (internal quotation marks and brackets omitted))).

But this does not resolve the issue before the Court.  When a plaintiff purchases a particular security pursuant to a particular registration statement, that plaintiff has standing to sue under Section 11.  When a different plaintiff purchases a different security pursuant to that same registration statement, that plaintiff also has standing to sue under Section 11.  The question is not whether either plaintiff has standing to sue under Section 11, but whether they each would have the requisite "personal stake" to represent the other's claims as part of one class action.  This is, in essence, the constitutional standing inquiry, already discussed above (if not the Rule 23 class certification inquiry).

Defendants would read the statute to provide a cause of action to "any person acquiring such security" pursuant to a registration statement containing misstatements, and then to add the further qualification that "each different security issued under a single registration statement containing misstatements yields a separate case or controversy for standing purposes." The plain language of Section 11 contains no such qualification.

The statute does not contain any requirement as to who can and cannot represent a class of plaintiffs when all members of the class have standing under the statute to sue the same defendant for the same misstatements in the same registration statement. In other words, the fact that the statute requires a plaintiff to have purchased "such security"—*i.e.*, a security that is traceable to an alleged misstatement—does not resolve the distinct question whether one such purchaser may represent another such purchaser in a single class action. As this Court has already held, "[t]he actionable conduct under Section 11 is . . . the specific registration statement containing misrepresentations." *Virgin Islands*, 804 F. Supp. 2d at 150. One plaintiff with standing to bring suit for that "actionable conduct" thus may have standing to represent the claims of another plaintiff who also has standing to bring suit for the exact same "actionable conduct." The statute does not provide otherwise.

The Court acknowledges that other district courts, including courts within this District, have recently read the statute differently, *see Maine State*, 2011 WL 4389689, at *4; *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 369-70 (S.D.N.Y. 2011), but historically, "[c]ourts have allowed those with valid securities claims to represent the interests of the purchasers of other types of securities in class action suits." *In re Mobilemedia Sec. Litig.*, 28 F. Supp. 2d 901, 911 n.7 (D.N.J. 1998) (citing cases and stating that "[g]iven Plaintiffs have sufficiently alleged individual cognizable injuries pursuant to Section 11 and Section 12(a)(2),

Plaintiffs have standing to bring these claims.  Concerns over whether stock purchasers should represent notes purchasers are better addressed at the time of class certification.").  Judge Swain's recent decision rejecting the same statutory standing argument identified several decisions holding that a named plaintiff can represent purchasers of other securities pursuant to the same registration statement.  *See Bear Stearns*, 2012 WL 1076216, at *25 (citing, *inter alia*, *In re Worldcom, Inc. Sec. Litig.*, Nos. 02 Civ. 3288, *et al*., 2004 WL 540450, at *6-7 (S.D.N.Y. Mar. 19, 2004) (holding that purchasers of one type of debt security had standing to bring claims on behalf of purchasers of a different debt security when both were issued in the same offering pursuant to the same offering documents); *In re Fleming Cos. Sec. & Derivative Litig.*, No. 5-03-MD-1530, 2004 WL 5278716, at *59 (E.D. Tex. June 10, 2004) ("[T]he case law holds that purchasers of one type of security have standing to sue on behalf of purchasers of other types of security issued pursuant to a single registration statement.")).  Other courts have taken an even broader view, holding that with Section 11 or 12 claims, whether or not the securities were purchased pursuant to the same registration statement, "class representatives need not have invested in each security so long as the plaintiffs have alleged a single course of wrongful conduct with regard to each security."  *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98 Civ. 4318, 2000 WL 1357509, at *3 (S.D.N.Y. Sept. 20, 2000).

Defendants argue that these decisions "did not analyze the 'such security' language at all."  (Defs. Response at 3.)  But that does not mean those decisions were incorrect; it just means that (presumably) the parties' submissions in those cases did not call upon the courts to address that particular statutory argument.  In any event, notwithstanding the recent decisions that have read an additional standing requirement into the statute, the plain language of the statute simply does not contain any such requirement.

To be sure, the older, broader decisions, such as *Dreyfus*, 2000 WL 1357509, are arguably inconsistent with the more recent decisions in this District holding that named plaintiffs in MBS suits have standing only to represent purchasers of securities from the same offering. But those more recent decisions were not based upon reading an additional requirement into the statute. As discussed above, the reasoning behind those decisions was not the technical, formal fact that purchasers of other offerings acquired different securities, but rather that, as a matter of constitutional standing, purchasers in other offerings suffered a discrete and unrelated harm.

The Court recognizes the theoretical simplicity of requiring that a securities class action involve a class of only purchasers of exactly the same security, but neither the Constitution nor the statute mandates this result. Moreover, as a practical matter, Defendants' arguments, taken to their logical conclusion, would severely undermine the efficiency concerns underlying class actions in general. In the 2007-S3 offering alone there were over 100 tranches. Under Defendants' view of the law, there would necessarily be up to 100 named plaintiffs (or 100 separate lawsuits), all raising nearly identical allegations. This in itself is impractical.

To the extent that there are material differences among the different classes of purchasers of 2007-S3 certificates, those differences may be addressed at the class certification stage. As the First Circuit has noted, "Rule 23 criteria can still be used as a required tool for shaping the scope of a class action without abandoning the notion that Article III creates some outer limit based on the incentives of the named plaintiffs to adequately litigate issues of importance to them." *Nomura*, 632 F.3d at 770 (citation omitted). The Supreme Court has also pointed out that it is the Rule 23 requirements that "effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982) (citation and quotation marks omitted); *cf. Gratz*, 539 U.S. at 263 n.15 (acknowledging "tension"

in cases regarding whether differences between claims of class representative and class members are "appropriately addressed under the rubric of standing or [Rule 23] adequacy"); 1 Newberg on Class Actions § 2:6 (5th ed. 2011) (discussing division in case law over whether to address potential disjuncture between claims of class representative and class members as a standing issue or a Rule 23 class certification issue, and concluding that the class certification approach is "preferable").

The Court's ruling today does not alter the Rule 23 inquiry that it will have to undertake before any class can be certified in this case. And Laborers is not hereby installed as lead plaintiff. Instead, the Court holds only that as a standing matter, Laborers, along with the purchasers of any tranche of certificates within the 2007-S3 offering, is eligible to be a part of the class and to vie for lead plaintiff status. It is not prevented from doing so because it bought securities from a different tranche within the 2007-S3 offering than did the original lead plaintiffs.

### D. Statutes of Limitations and Repose

Defendants also argue that, to the extent that Laborers is allowed to assert claims on behalf of purchasers of Tranches 1-A-96 and 1-A-97, those claims are barred by the applicable statutes of limitations and repose because those claims are being newly asserted now. However, because the Court holds that Laborers has standing to assert the claims already brought in this case (which include claims on behalf of purchasers of all tranches within the 2007-S3 offering), the time-bar analysis is irrelevant. It is not necessary to inquire whether the statutes of limitations and repose were tolled for these claims, because they are not new claims at all. If Laborers is ultimately selected as lead plaintiff, it would be representing a class asserting the same claims as have been asserted all along.

**III.     Conclusion**

For the foregoing reasons, Virgin Islands' motion to withdraw and substitute Laborers as lead plaintiff, and appoint Robbins Geller Rudman & Dowd LLP as lead counsel is GRANTED in part and DENIED in part.  Virgin Islands' motion is GRANTED insofar as Virgin Islands is permitted to withdraw as lead plaintiff.  Virgin Islands' motion is DENIED without prejudice insofar as it seeks to substitute Laborers as lead plaintiff before other class members have the opportunity to seek appointment as lead plaintiff in place of Virgin Islands.

Any party wishing to serve as lead plaintiff may file a motion with this Court on or before June 15, 2012.  Selection of the lead plaintiff will be based upon the standards set forth by the PSLRA, 15 U.S.C. § 78u-4(a)(3)(B).  Laborers need not file a new motion for appointment; the current motion will suffice as Laborers' motion.

The Court also holds that Laborers does not lack standing to seek appointment as lead plaintiff by virtue of the fact that it purchased securities from a different tranche within the 2007-S3 offering.  Any class member who purchased certificates in the 2007-S3 offering may move to be appointed lead plaintiff, regardless of which tranche within that offering that class member purchased.

Any responses to any new applications for appointment as lead plaintiff shall be filed by June 29, 2012.

The Clerk of Court is directed to terminate the motion at Docket Number 151.

SO ORDERED.

Dated: New York, New York
       May 15, 2012

J. PAUL OETKEN
United States District Judge