UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
FORT WORTH EMPLOYEES' RETIREMENT   : 09 Civ. 3701 (JPO) (JCF)
FUND, et al.,                      :
                                   :          MEMORANDUM
                                   :          AND  ORDER
            Plaintiffs,            :
                                   :
     - against -                   :
                                   :
J.P. MORGAN CHASE & CO., et al.,   :
                                   :
            Defendants.            :
- - - - - - - - - - - - - - - - - - -:
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

     This is a securities action brought on behalf of a class of
purchasers of mortgage-backed securities issued by J.P. Morgan
Acceptance Corporation I.  The plaintiffs move to compel discovery
of various categories of documents and of electronically stored
information (ESI) under modified search parameters.  For the
reasons that follow, the plaintiffs' motion is granted in part and
denied in part.

Background

     The factual and procedural background of this action is set
forth in prior opinions.  See Fort Worth Employees' Retirement Fund
v. J.P. Morgan Chase & Co., 862 F. Supp. 2d 322 (S.D.N.Y. 2012);
Employees' Retirement System of the Government of the Virgin
Islands v. J.P. Morgan Chase & Co., 804 F. Supp. 2d 141 (S.D.N.Y.
2011), amended by Order dated Jan. 4, 2013.  I will address

1

additional relevant facts to the extent they are pertinent to the legal analysis.

Non-expert fact discovery is scheduled for completion by November 14, 2014. (Amended Scheduling Order dated June 21, 2013). Defendants J.P. Morgan Securities, Inc. and J.P. Morgan Acceptance Corporation I (collectively "J.P. Morgan")[1] have begun running searches for ESI and reviewing the output; they have turned over roughly 100,000 documents thus far and "anticipate producing millions of additional pages of responsive documents." (Letter of Dorothy J. Spenner dated Oct. 25, 2013 ("Spenner 10/25/13 Letter") at 3, 12). After discussions regarding the appropriate scope of this document discovery reached an impasse, the plaintiffs moved to compel expanded production from the defendants. (Letter of Susan G. Taylor dated Oct. 8, 2013 ("Taylor 10/8/13 Letter") at 3 & n.3; Spenner 10/25/13 Letter at 19). There are three overarching areas of dispute. First, the plaintiffs challenge the defendants' search parameters for discovery of ESI, alleging that the terms, custodians, and timeframe being used are too narrow and will not produce all relevant documents and communications. (Taylor 10/8/13

---

[1]   The defendants in this case now comprise these two J.P. Morgan Chase & Co. subsidiary entities and a handful of individually named defendant employees. J.P. Morgan Securities, Inc. is now known as J.P. Morgan Securities LLC. (Plaintiffs' Memorandum of Law in Support of Motion for Class Certification dated Sept. 27, 2013 ("Class Cert. Motion"), at 1 n.2).

Letter at 2-7; Letter of Darryl J. Alvarado dated Nov. 8, 2013 ("Alvarado 11/8/13 Letter") at 7 n.2). Second, the plaintiffs move to compel discovery of certain categories of documents that the defendants claim are not relevant or are unduly burdensome to produce, including documents that serve as a basis for J.P. Morgan's anticipated defenses; submissions and communications made during the course of government investigations; transcripts of testimony in prior civil and regulatory proceedings; and documents pertaining to warehouse financing, other loan disputes, and the defendants' shorting activities. (Taylor 10/8/13 Letter at 7-12; Spenner 10/25/13 Letter at 11-19). Finally, the plaintiffs request an interim discovery deadline of December 13, 2013 for the completion of document production, which the defendants argue is unreasonable. (Taylor 10/8/13 Letter at 12-13; Spenner 10/25/13 Letter at 19-20).

Standard

Parties are entitled to discovery of documents in the "possession, custody or control" of other parties, Fed. R. Civ. P. 34(a)(1), so long as they are "relevant to any party's claim or defense," Fed. R. Civ. P. 26(b)(1). "Although not unlimited, relevance, for purposes of discovery, is an extremely broad concept." Condit v. Dunne, 225 F.R.D. 100, 105 (S.D.N.Y. 2004); see also Nunez v. City of New York, No. 11 Civ. 5845, 2013 WL

2149869, at *2 (S.D.N.Y. May 17, 2013).  To be relevant, the requested documents must at least "appear[] reasonably calculated to lead to the discovery of admissible evidence."  Fed. R. Civ. P. 26(b)(1).  The burden of demonstrating relevance is on the party seeking discovery.  Trilegiant Corp. v. Sitel Corp., 272 F.R.D. 360, 363 (S.D.N.Y. 2010); Mandell v. Maxon Co., No. 06 Civ. 460, 2007 WL 3022552, at *1 (S.D.N.Y. Oct. 16, 2007).

"Once relevance has been shown, it is up to the responding party to justify curtailing discovery."  Fireman's Fund Insurance Co. v. Great American Insurance Co. of New York, 284 F.R.D. 132, 135 (S.D.N.Y. 2012) (internal quotation marks omitted).  Even if the sought-after documents are relevant, the court must limit discovery if the request is "unreasonably cumulative or duplicative," the requesting party has had "ample opportunity to obtain the information by discovery," or the "burden or expense of the proposed discovery outweighs its likely benefit" considering the needs of the case and importance of the documents.  Fed. R. Civ. P. 26(b)(2)(C). However, "[g]eneral and conclusory objections as to relevance, overbreadth, or burden are insufficient to exclude discovery of requested information."  Melendez v. Greiner, No. 01 Civ. 7888, 2003 WL 22434101, at *1 (S.D.N.Y. Oct. 23, 2003). Rather, "[a] party resisting discovery has the burden of showing 'specifically how, despite the broad and liberal construction

afforded the federal discovery rules, each interrogatory is not relevant or how each question is overly broad, burdensome or oppressive, . . . submitting affidavits or offering evidence revealing the nature of the burden.'" <u>Vidal v. Metro-North Commuter Railroad Co.</u>, No. 3:12 CV 248, 2013 WL 1310504, at *1 (D. Conn. March 28, 2013) (alteration in original) (quoting <u>Compagnie Francaise d'Assurance Pour le Commerce Exterieur v. Phillips Petroleum Co.</u>, 105 F.R.D. 16, 42 (S.D.N.Y. 1984)).

<u>Discussion</u>

The plaintiffs repeatedly assert that "documents do not need to be specifically related to the loans and offerings at issue in this case to be relevant," citing the Order of the Honorable John G. Koeltl, U.S.D.J., March 30, 2011 ("3/30/11 Order"). (Taylor 10/8/13 Letter at 3, 9, 10; Alvarado 11/8/13 Letter at 5, 6, 19, 21). The defendants invoke language from a recent ruling by the Honorable Sarah Netburn, U.S.M.J., that the plaintiffs in a securities case were "not entitled to everything that's ever been produced that has anything to do with residential mortgage backed securities." (Spenner 10/25/13 Letter at 2, 7, 12 (quoting Transcript of Civil Cause for Conference dated Aug. 12, 2013, <u>In re Morgan Stanley Mortgage Pass-Through Certificates Litigation</u>, No. 09 Civ. 2137 (S.D.N.Y.) ("Morgan Stanley Tr.") at 16)). The parties use these respective statements, each taken out of context,

to argue for extreme results; unsurprisingly, the appropriate discovery boundaries in this case lie somewhere in between.

    A.   <u>ESI Document Search Protocol</u>

       1.   <u>Search Terms</u>

J.P. Morgan has already conducted a search for ESI that yielded some 875,000 document hits, which are currently being reviewed prior to production. (Spenner 10/25/13 Letter at 3). The defendants used roughly 80,000 search terms (Spenner 10/25/13 Letter at 1), consisting of the names of the 9 securities offerings at issue, CUSIP numbers for the 341 underlying certificates, names and dates of whole loan transactions, loan numbers for the approximately 35,000 loans that comprised the offerings, and names of the lead plaintiffs and their advisors (Spenner 10/25/13 Letter at 3; Declaration of David L. Breau dated Oct. 25, 2013 ("Breau Decl."), Exhs. A-E), as well as multiple variations on and abbreviations of each of these terms to ensure that the search captured all relevant files and e-mail communications where the actual terms may have been modified or truncated (Spenner 10/25/13 Letter at 3-4). Based on their knowledge of the "various naming conventions for files and folders in the relevant shared drives" and standard e-mail practices, the defendants argue that these search terms will yield the appropriate universe of relevant documents in this case. (Spenner 10/25/13 Letter at 4).

The plaintiffs believe that the search terms currently being used by J.P. Morgan are "woefully deficient." (Taylor 10/8/13 Letter at 2-3). First, they argue that the search framework currently being applied will not yield documents related to the disputed loans and offerings if they do not specifically mention the loan number or offering name. (Alvarado 11/8/13 Letter at 4-6). The defendants may be using 80,000 terms, but these consist largely of variations on names and numbers and encompass just a few specific, narrow categories of information. (Alvarado 11/8/13 Letter at 8). Searching only for documents containing these pieces of information would fail to capture informal e-mail communications that did not include such numbers or names (Taylor 10/8/13 Letter at 3; Alvarado 11/8/13 Letter at 4), and may exclude documents created before CUSIP numbers and offering names were assigned, which the plaintiffs allege occurs fairly late in the securitization process (Alvarado 11/8/13 Letter at 4; Declaration of Scott C. Calahan dated Nov. 8, 2013, attached to Alvarado 11/8/13 Letter, at 2). Second, the plaintiffs allege that limiting the search to these terms will leave out broad categories of documents that do not specifically reference "a particular loan, loan pool or securitization in the text of the document or e-mail" but instead address general practices or concerns, such as "widespread abandonment of underwriting guidelines," which they

argue are relevant and discoverable. (Taylor 10/8/13 Letter at 3-4; 3/30/11 Order at 21-22). Finally, the plaintiffs disagree with the defendants' characterization of their search results as substantial, arguing both that the quality of output is more important than the quantity, and that even the quantity -- as many as 875,000 responsive ESI documents -- is "actually minimal" for a case of this size. (Alvarado 11/8/13 Letter at 3, 10-11 (citing Assured Guaranty Municipal Corp. v. UBS Real Estate Securities Inc., No. 12 Civ. 1579, 2012 WL 5927379, at *2 (S.D.N.Y. Nov. 21, 2012)("[T]he total number of documents 'harvested' is not a particularly compelling statistic by itself, because it says nothing about the possible significance of the documents . . . .")))。

The plaintiffs propose another search protocol, to be run in addition to the one already conducted by the defendants, that includes assorted combinations of terms aimed at discovering relevant documents that are not loan specific. (Exh. 7 to Taylor 10/8/13 Letter ("Pl. Search Protocol"), "Search B"). These supplemental terms include the names of loan originators, due diligence firms, rating agencies, and "descriptors" (such as "awful" and "toxic"). (Pl. Search Protocol). Each of these groups of terms would be searched for within 20 or 35 words of what the plaintiffs designate as "Relevant Terms" specific to each group,

for example "delinquent" or "underperform." (Pl. Search Protocol). The plaintiffs believe that this proposal, modeled on the search framework agreed to by the parties in In re Morgan Stanley, would ensure the discovery of all documents and communications regarding the specific loans at issue here as well as those concerning "systemic non-compliance with underwriting guidelines" and other broader RMBS issues at J.P. Morgan. (Alvarado 11/8/13 Letter at 6-8, Exh. 1).

The defendants object to the plaintiffs' proposed search framework, challenging the use of weak connectors and generic words not tailored to the issues in this case and anticipating that it would "capture nothing less than each and every document concerning any RMBS." (Spenner 10/25/13 Letter at 6). They believe that the plaintiffs have an "overly broad view of relevance" and that any "documents that relate to offerings, securities, or loans that are not at issue in this case are irrelevant." (Spenner 10/25/13 Letter at 2). They also argue that adopting the plaintiffs' proposed 116,000 additional search term combinations would be unduly burdensome. (Spenner 10/25/13 Letter at 7; Breau Decl., Exh. G). After conducting a search on a small sample of the plaintiffs' proposed terms, the defendants estimate that the expanded search framework would yield an unreviewable pool of over 11 million additional documents. (Spenner 10/25/13 Letter at 7).

The plaintiffs dispute that their proposal would create an unreasonable burden and reject the defendants' attempt to sample and extrapolate the impact of the additional terms, arguing that overlap and de-duplication would eliminate a substantial number of the anticipated responsive documents. (Alvarado 11/8/13 Letter at 2-3, 9-10).

The plaintiffs incorrectly suggest that J.P. Morgan must "establish that plaintiffs' requested search protocol will yield irrelevant documents." (Alvarado 11/8/13 Letter at 3). The plaintiffs bear the burden of demonstrating relevance to justify expanding the discovery of ESI in this case, and the defendants must establish irrelevance, redundancy, or burden to justify limitations on otherwise permissible discovery. Here, to some extent, both parties have met their burdens. The plaintiffs have provided sufficient justification for expanding search terms beyond numbers and names to ensure that the ESI search captures all of the relevant documents pertaining to the loans and offerings at issue. They have also highlighted both general categories and concrete examples of documents concerning non-loan-specific practices and problems at J.P. Morgan that are relevant but would not be discovered by the current, loan-specific search. (Taylor 10/8/13 Letter at 4-5; Alvarado 11/8/13 Letter at 5-6). Despite J.P. Morgan's protests to the contrary, documents need not specifically

relate or refer to the loans or offerings at issue here to be discoverable.  That said, the defendants have substantiated their concerns that the plaintiffs' proposed search terms go too far in the other direction, requiring the defendants to sift through voluminous irrelevant documents added to the search results and thus creating an unreasonable burden of production.

Given the nature of this request and the complexities of crafting a search protocol, a court-ordered middle ground is impractical and inappropriate.  The resolution of the categorical document requests discussed below may alter the parties' positions on the scope of ESI discovery.  (See, e.g., Morgan Stanley Tr. at 17 ("if defense counsel is going to insist on exceedingly narrow terms for [ESI] production then [the] plaintiffs start to have a better argument" regarding production of transcripts and other document categories)).  I will also enter an order pursuant to Rule 502(d) of the Federal Rules of Evidence, as I have in previous cases with significant document discovery, in order to alleviate the defendants' burden concerns by "preclud[ing] the disclosure of privileged documents in this case from constituting a waiver of privilege or of work product protection." Fleisher v. Phoenix Life Insurance Co., No. 11 Civ. 8405, 2012 WL 6732905, at *4 (S.D.N.Y. Dec. 27, 2012).  With these considerations and the forgoing discussion in mind, I urge the parties to reexamine their positions

and work together in good faith to create a mutually acceptable ESI search regime.  If discussions between the parties do not yield a compromise by January 10, 2014, I will appoint a special master with expertise in the field of electronic discovery to review this order and the parties' positions and recommend a search protocol. The parties would share the cost of the special master.

### 2.  Custodians

The defendants are currently searching the documents and e-mails of 42 custodians "who were selected based on their roles with respect to securitization, their appearance on a significant number of working group lists for the offerings at issue," and the defendants' own assessment of who was most closely involved in the securities at issue.  (Spenner 10/25/13 Letter at 8).  The plaintiffs seek to expand that number by including an additional 30 individuals.[2]  (Alvarado 11/8/13 Letter at 12; Plaintiffs' Proposed Custodians Rejected by Defendants ("Pl. Custodian List"), attached as Exh. 2 to Alvarado 11/8/13 Letter).  The defendants have agreed to accept one additional custodian who was a due diligence manager

---

[2]  The plaintiffs' original request for 36 additional custodians (Taylor 10/8/13 Letter, Exh. 9) was reduced to 30 after the defendants pointed out that six of the proposed individuals -- Ish Masud, Thomas Scudese, Robert Shugrue, Frank Chiarulli, Robert LaBarbera, and Tatyana Berlyand -- were relevant only with respect to two offerings that the plaintiffs dropped from this case in their class certification motion (Spenner 10/25/13 Letter at 9 & n.23; Alvarado 11/8/13 Letter at 12 & n.3).

for loan transactions.[3]   (Spenner 10/25/13 Letter at 8; Pl. Custodian List).  But they object to the remaining 29, arguing that the plaintiffs added "each and every person listed on a working group list or mentioned in a document or deposition" regardless of their role in the disputed securities.  (Spenner 10/25/13 Letter at 8; Exh. R to Spenner 10/25/13 Letter ("Def. Custodian Response")).

Of these 29 proposed custodians, the defendants concede that 15 were members of working group lists associated with the relevant offerings[4] and are silent as to another three individuals identified by the plaintiffs as list members.[5]  (Spenner 10/25/13 Letter at 9-10 & n.22; Def. Custodian Response; Pl. Custodian List).  The defendants argue that the appearance of an individual's name on a working group list is insufficient to establish their relevance as a custodian, citing testimony demonstrating that the lists are "overbroad" and not "reflect[ive] [of] who actually worked on an offering."  (Spenner 10/25/13 Letter at 8-9; Def. Custodian Response).  They also claim that many of the proposed individuals who appear on the working group lists are duplicative of current custodians.  (Spenner 10/25/13 Letter at 9-10 & nn. 25-

---

[3] Pavit Randhawa.

[4] Poomarintr Sasinin, Abide Kakou, Cristina Rosales, Nandita Jhajharia, Gregory Boester, Ruslan L. Margolin, Osmin Rivera, Sean P. Reed, Haroon Jawadi, Melissa Traylor, Stanley Labanowski, Danielle Stiles, Jamie Gordon, Vicky Weaver, and Kenneth Robertson.

[5] Alissa Smith, Matt Cherwin, and Ralph A. Lenzi III.

30; Def. Custodian Response).

The defendants invoke In re Morgan Stanley to support their position that the plaintiffs have not demonstrated the necessity for the proposed custodians on the working lists who may be duplicative of existing custodians. (Spenner 10/25/13 Letter at 10 (citing In re Morgan Stanley, 2013 WL 4838796, at *2 (S.D.N.Y. Sept. 11, 2013) ("[T]he fact that a rejected custodian's role was immaterially different than a designated custodian's role is not a legitimate basis to justify expanding the list of custodians."))). But in that same case, Judge Netburn ruled that individuals who appeared on working group lists were properly considered custodians.   In re Morgan Stanley, 2013 WL 4838796, at *2 ("inclusion on the working group lists suggests [that a proposed custodian] does [have relevant information]").   Furthermore, J.P. Morgan itself relies on the working group lists as a basis for their determination of who should be considered a custodian, and as a reason to reject any proposed custodians who do not appear on the lists. (Spenner 10/25/13 Letter at 8; Def. Custodian Response).

The presence of these proposed custodians on the working group lists is sufficient to establish that their inclusion in ESI searches is reasonably calculated to lead to relevant evidence that might not be captured if they were excluded.   The defendants shall therefore add these additional 18 custodians to their search

14

regime.[6]   Because there is likely to be some overlap in the discoverable information possessed by the individuals on these lists, the defendants may continue to utilize procedures to eliminate duplicative search output from their production.

The remaining 11 proposed custodians do not appear to be on any working group lists for the offerings at issue here.[7]   (Pl. Custodian List; Spenner 10/25/13 Letter at 9 & n. 24; Def. Custodian Response).   Rather, the plaintiffs rely on the proposed individuals' titles or roles at J.P. Morgan and on references made during J.P. Morgan's Rule 30(b)(6) deposition testimony to support their inclusion as relevant custodians.   (Pl. Custodian List; Letter of Darryl J. Alvarado dated Nov. 27, 2013 ("Alvarado

---

[6]    Two of these individuals, Vicky Weaver and Kenneth Robertson, were employed not by the defendant entities, but by a related company, Chase Home Finance LLC (Spenner 10/25/13 Letter at 11; Pl. Custodian List).   But the defendants do not contend that they lack the practical ability to obtain documents from these persons.   See Motorola Credit Corp. v. Uzan, No. 02 Civ. 666, 2013 WL 6098388 (S.D.N.Y. Nov. 20, 2013) (obligation to produce documents turns on pragmatic understanding of "control"); Chevron Corp. v. Salazar, 275 F.R.D. 437, 450 (S.D.N.Y. 2011) (finding that whether corporate entity has possession, custody, or control of documents may depend on whether it has ability in ordinary course of business to obtain them from related entity); Bank of New York v. Meridien BIAO Bank Tanzania Ltd., 171 F.R.D. 135, 146 (S.D.N.Y. 1997) (control includes practical ability to obtain documents).   Nor have they argued that to do so would involve an undue burden.

[7] Patrik Edsparr, Alison Malkin, Alayne Fleischmann, Tanya Dooley, Teresa Bowlin, Paul Hennessy, Kenneth Spindel, Jeanne Faye, Tom Tomeo, and Don Mayszak.   Daniel Lonski was listed as a member of working group lists for offerings that were eliminated in the motion for class certification.   (Alvarado 11/8/13 Letter at Exh. 2).

11/27/13 Letter")).  The defendants note that these individuals are absent from the working group lists, though this carries little weight considering they have already agreed to add one custodian, Pavit Randhawa, who does not appear to have been on any of the lists either.  (Spenner 10/25/13 Letter at 8; Pl. Custodian List).  They further state that some of these proposed custodians are duplicative of existing custodians, and others were culled from testimony or exhibits but have "no connection to the issues or allegations in this action." (Spenner 10/25/13 Letter at 10 & n.30; Def. Custodian Response).  These concerns must be weighed against the plaintiffs' interest in obtaining relevant, discoverable documents and the evidence they marshal in support of their request for each of the 11 individuals.

First, the plaintiffs highlight deposition testimony to the effect that proposed custodians Fleischmann, Dooley, and Bowlin served as "deal managers" within a subgroup of the "transaction management group." (Transcript of Videotaped Deposition of Seth M. Fenton dated Sept. 12, 2013 ("Fenton Dep."), attached as Exh. 13 to Alvarado 11/27/13 Letter, at 169-70).  The deal management subgroup is represented by two current custodians, the head of the subgroup and one other deal manager. (Fenton Dep. at 169-70; Spenner 10/25/13 Letter at 10 & n.27).  The plaintiffs do not attempt to distinguish these currently designated custodians from

their proposed custodians nor suggest what unique information the proposed custodians might possess.

As noted above, the requesting party generally bears the burden of showing the relevance of the documents sought, while the resisting party bears the burden of justifying limiting discovery of relevant documents. Here, the plaintiffs claim to have "provided extensive evidence demonstrating the relevance of each of the requested custodians," and charge the defendants with relying on "their own _ipse dixit_ assertions," having "give[n] no explanation" nor any evidentiary support for their position that the proposed custodians are duplicative. (Alvarado 11/8/13 Letter at 13). The plaintiffs state, without support, that "the fact that a custodian worked in the same business unit as certain of defendants' custodians does not demonstrate that the custodian would be duplicative." (Alvarado 11/8/13 Letter at 13). While this may be true, it misconstrues the nature of the plaintiffs' burden here -- as the defendants have already included custodians from certain business units in their ESI search protocol, the plaintiffs must demonstrate that the additional requested custodians would provide _unique_ relevant information not already obtained. They have failed to do so here, providing no evidence that there are unique responsive documents being missed in the current search scheme that would justify the inclusion of

additional custodians from this subgroup.  The request to add proposed custodians Fleischmann, Dooley, and Bowlin is denied.

Next, the plaintiffs cite deposition testimony that proposed custodians Faye, Tomeo, and Maysyak were key persons "in [the] securitized product sales force that had more interaction or responsibility as it related to [RMBS]," and also note that Ms. Faye appears on a J.P. Morgan organizational chart as selling whole loan acquisitions. (Pl. Custodian List; Securitized Products Group Organization Chart, attached as Exh. 8 to Alvarado 11/27/13 Letter; Fenton Dep. at 192).  The mere fact that these individuals were in charge of selling the securities at issue does not justify their inclusion as custodians in this dispute.  If documents produced during discovery indicate that they were in close communication with the current custodians about the offerings' alleged shortcomings, or were otherwise involved in any wrongdoing, they may be added at a later time.[8]

Proposed custodian Lonski was on working group lists for offerings JPMMT 2007-A5 and 2007-A6, which are no longer at issue in this case. (Pl. Custodian List; Class Cert. Taylor 10/8/13

---

[8] The defendants should note that if the plaintiffs are subsequently able to establish that any of the rejected individuals are in fact proper custodians, complaints regarding the burden of running new searches for ESI will fall on deaf ears.

Letter at 1 n.1).  The plaintiffs claim that he appears on a term sheet for one of the relevant offerings, but provide no documentation of this.  (Pl. Custodian List; Alvarado 11/27/13 Letter at 2).  He is also listed on an organizational chart as a member of the RMBS trading group, along with current custodians Boester, Horner, Margolin, Norquist, Simpson, Byrnes, and Panagis (Banking Professionals Dedicated to Mortgage ABS, attached as Exh. 10 to Alvarado 11/27/13 Letter), many of whom <u>are</u> included on the relevant working group lists (JPALT2007-A2 Working Party List, attached as Exh. 4 to Alvarado 11/27/13 Letter; Spenner 10/25/13 Letter at 10 n.26).  The plaintiffs have not established that Mr. Lonski would be a non-duplicative custodian, and the request to include him is therefore denied.

The evidence offered to support the addition of proposed custodians Edsparr, Hennessy, and Spindel is also unpersuasive.  To the extent that these individuals corresponded by e-mail regarding how to hedge J.P. Morgan's losses from its RMBS practice, this limited communication is more appropriately the target of a specific discovery request rather than as searchable ESI.  (Pl. Custodian List; Confidential Deposition of Robert Miller dated Feb. 1, 2013, in <u>Dexia v. Bear Stearns and Co.</u>, No. 12 Civ. 4761 (S.D.N.Y.), attached as Exh. 14 to Alvarado 11/27/13 Letter, at 215-229; E-mail of Paul Hennessy dated Oct. 13, 2006, attached as

Exh. 15 to Alvarado 11/27/13 Letter; E-mail of Paul Hennessy dated Dec. 11, 2006, attached as Exh. 16 to Alvarado 11/27/13 Letter). The only other evidence provided is testimony that Mr. Hennessy approved the due diligence processes established by William Buell; to the extent that sought-after relevant documents would not be produced as a result of Mr. Buell's current custodial status, this is again more appropriately dealt with through a limited discovery request rather than including Mr. Hennessy as a custodian. (Videotaped Deposition of William Buell dated Jan. 29, 2013, in Dexia v. Bear Stearns and Co., No. 12 Civ. 4761, attached as Exh. 21 to Alvarado 11/27/13 Letter, at 269-271).

The plaintiffs offer stronger support for proposed custodian Alison Malkin, who was the head of the risk management subgroup within the transaction management team. (Pl. Custodian List; Fenton Dep. at 174). They point out that the defendants are "already [] searching the shared drives used by Alison Malkin's group." (Alvarado 11/8/13 Letter at 14 (quoting Spenner 10/25/13 Letter at 17)). They also cite deposition testimony that Ms. Malkin was responsible for "looking for breaches of reps and warranties and potential fraud in the loans." (Videotaped Deposition of Arpanraj M. Kothari dated June 4, 2013, in Federal Housing Finance Agency v. J.P. Morgan Chase & Co., No. 11 Civ. 6188 (S.D.N.Y.), attached as Exh. 4 to Alvarado 11/8/13 Letter, at 159).

20

This evidence overcomes the defendants' objection that Ms. Malkin is duplicative of other current custodians in her subgroup or lacks connection to the disputed offerings. (Spenner 10/25/13 Letter at 10 & nn.27, 30; Def. Custodian Response). The defendants shall add Ms. Malkin as a custodian.

>       3.   Temporal Scope

In a battle of footnotes, the parties dispute the appropriate temporal scope of the ESI discovery. (Spenner 10/25/13 Letter at 3 n.4, 6 n.16; Alvarado 11/8/13 Letter at 7 n.2). The plaintiffs' proposal calls for an ESI search based on the defendants' terms from July 29, 2004 through December 31, 2010, and for their own search terms to be run for the period from July 29, 2004 through September 30, 2009. (Pl. Search Protocol). The defendants are currently searching a more limited timeframe, examining shared drives for the three-year period from July 29, 2004 through August 26, 2007, which is "60 days before the earliest relevant whole loan purchase transaction through 30 days after the latest closing date of the remaining offerings." (E-mail of David Breau dated Oct. 4, 2013 ("Breau E-mail"), attached as Exh. X to Breau Decl.; Spenner 10/25/13 Letter at 3 n.4). As to the e-mails and files of particular custodians, the search periods are based on the roles and involvement of each individual and are limited to shorter timeframes within that three-year span. (Breau E-mail). The

defendants reject a date range that extends significantly past the date of the offerings or the date of the proposed class period. (Spenner 10/25/13 Letter at 6 n.16).

Given the possibility that post-closing and post-class period documents and communications might provide retrospective insight into the performance of the offerings at issue here, they may be relevant at the discovery stage. See, e.g., Assured Guaranty Municipal Corp., 2012 WL 5927379, at *2 ("Documents that post-date the transactions may nevertheless relate back to the state of affairs as it existed at the crucial time."); see also In re Weatherford International Securities Litigation, No. 11 Civ. 1646, 2013 WL 5788687, at *2-3 (S.D.N.Y. Oct. 28, 2013) (holding that documents related to events occurring after the class period has closed may be relevant for discovery purposes); In re Morgan Stanley, 2013 WL 4838796, at *3 ("Like other courts, I conclude that the post-closing period can prove to be fertile ground for relevant discovery."). But without greater explanation from the parties as to why the search periods they propose should be implemented, I do not have a sufficient basis for selecting one over the other. The parties agree as to the start date of the search period, and I am inclined to believe that a middle ground is appropriate as to the end date -- more than 30 days after closing, but not a full three years later. See, e.g., In re Morgan Stanley,

2013 WL 4838796, at *3 (extending the search period for eighteen months after closing and noting that a longer post-closing period is less likely to produce false hits where most of the search terms focus on specific loans or offerings).  I urge the parties to reach such a compromise as they discuss additional search terms; if they remain at an impasse, this issue will also be submitted to the special master for determination.

    B.   <u>Specific Document Requests</u>

        1.   <u>Documents Relating to the Defendants' Contentions and Defenses</u>

    The plaintiffs have requested production of documents "concerning [the] defendants' contentions or defenses." (Taylor 10/8/13 Letter at 7; Lead Plaintiffs' Second Request for Production of Documents to All Defendants ("Second Request"), attached as Exh. 5 to Taylor 10/8/13 Letter, at 9).  In their answer to the Second Amended Complaint, the defendants raised forty-one affirmative defenses, arguing among other things that they had no duty to verify or review the offering documents' content, that they "acted with reasonable care and due diligence" regarding statements made in the offerings, that they reasonably relied in good faith on "the opinions of professionals and experts" and other third parties in making the statements contained in the offerings, that they "did not know, and in reasonable diligence could not have known, that the Offering Documents contained material representations or

omissions," and that the claims are barred because of certain provisions in the offering documents. (Defendants' Answer to the Second Amended Complaint at 28-31).

The defendants "do not dispute" the relevance and discoverability of documents related to their defenses. (Spenner 10/25/13 Letter at 11). However, they do not believe that they are required to search specifically for such documents, and argue that the request is duplicative because they anticipate turning them over in response to the plaintiffs' other discovery requests. (Spenner 10/25/13 Letter at 12). The defendants also believe that this request is "premature" and that contentions and defenses need not be disclosed until the end of the discovery period. (Spenner 10/25/13 Letter at 11).

Plaintiffs are generally not in a position to know what information the opposing party might rely on to meet its burden of proof for affirmative defenses. Rule 26(a) of the Federal Rules of Civil Procedure addresses this problem by providing that even absent a discovery request, any party must produce documents that it "may use to support its claims or defenses . . . ." Fed. R. Civ. P. 26(a)(1)(A)(ii) (emphasis added). That obligation is ongoing, and "a party must supplement its initial disclosures when additional information supporting its claims or defenses comes to its attention." Pentair Water Treatment (OH) Co. v. Continental

Insurance Co., No. 08 Civ. 304, 2009 WL 3817600, at *2 (S.D.N.Y. Nov. 16, 2009).  The defendants are clearly obligated to turn over documents supporting their defenses; the questions are when and how such documents should be searched for and disclosed.

If J.P. Morgan is confident that its current search efforts will yield all the documents it requires to support affirmative defenses, it need not search for them specifically.  The defendants should keep in mind, of course, that failure to turn over any of these documents at the appropriate time during discovery may preclude their introduction at trial or result in sanctions.  See Fed. R. Civ. P. 37(c)(1); see also Schiller v. City of New York, Nos. 04 Civ. 7922, 04 Civ. 7921, 2008 WL 4525341, at *3-4 (S.D.N.Y. Oct. 9, 2008).

Under Rule 26(b)(2)(C)(iii) of the Federal Rules of Civil Procedure, J.P. Morgan need not turn over any documents in response to this request that are duplicative of those produced in response to other requests.  The plaintiffs are concerned that these documents will end up buried among the millions that the parties anticipate being produced.  (Spenner 10/25/13 Letter at 12; Alvarado 11/8/13 Letter at 16).  However, the defendants are required to produce documents either "as they are kept in the usual course of business" or "organize[d] and label[ed] [] to correspond to the categories in the request."  Fed. R. Civ. P. 34(b)(2)(E)(i);

see also <u>SEC v. Collins & Aikman Corp.</u>, 256 F.R.D. 403, 409-10 (S.D.N.Y. 2009).  If J.P. Morgan produces documents organized by request, it must either turn over duplicate copies or make note of which already-produced documents are responsive to this request. If instead the defendants wish to turn over documents as kept in the ordinary course of business, they must provide sufficient context to enable the plaintiffs to efficiently locate the specific information related to their requests.  See <u>Schrom v. Guardian Life Insurance Co. of America</u>, No. 11 Civ. 1680, 2012 WL 28138, at *6 (S.D.N.Y. Jan. 5, 2012) ("Where massive numbers of documents are involved, it may be necessary for the producing party to provide a complete explanation of its information management structure if it wishes to produce these documents in the manner that they are ordinarily stored.").

As for timing, the defendants must provide these documents now, not at the end of discovery.  It is true that under Local Rule 33.3(c), contention interrogatories "should generally not be served during the early stages of discovery and . . . [need] not be answered until other discovery is substantially completed." (Spenner 10/25/13 Letter at 11 (quoting <u>Tribune Co. v. Purcigliotti</u>, No. 93 Civ. 7222, 1997 WL 540810 (S.D.N.Y. Sept. 3, 1997))); <u>see</u> Local Rule 33.3(c) ("At the conclusion of other discovery, and at least 30 days prior to the discovery cut-off

date, interrogatories seeking the claims and contentions of the opposing party may be served unless the Court has ordered otherwise."). Such contention interrogatories help the parties focus their arguments after discovery is complete and trial is near by asking them to identify each claim or defense clearly and point to the facts, witnesses, or documents that support them. <u>See, e.g.</u>, <u>Kyoei Fire & Marine Insurance Co. v. M/V Maritime Antalya</u>, 248 F.R.D. 126, 142-43 (S.D.N.Y. 2007). But the plaintiffs' request is not a contention interrogatory. They are merely asking for what Rule 26 requires: that the defendants meet their ongoing obligation to produce documents that serve as a basis for the defenses they have asserted in their Answer to the Second Amended Complaint. Contention interrogatories may prove helpful near the end of discovery in this case, but their availability does not obviate the clear command of Rule 26 that documents supporting claims and defenses be disclosed, even absent a request or interrogatory. The defendants must produce such documents forthwith.

    2.  <u>Documents Relating to Government Investigations</u>

    The plaintiffs next request "any communication with or documents provided to any government body or agency in connection with an investigation" of J.P. Morgan's RMBS business, underwriting of the certificates and offerings at issue, and any of the

originators from whom the loans were purchased.  (Taylor 10/8/13
Letter at 8; Second Request at 9).  They argue such documents are
relevant even if not connected to the loans or offerings in this
case, as they address the same "processes and procedures . . .
common across securitizations" and the same culpable conduct of the
defendants during these similar transactions.  (Taylor 10/8/13
Letter at 8-9).  Indeed, they fear that "restrictive, offering-
specific search terms" are failing to yield such broadly relevant
documents.  (Taylor 10/8/13 Letter at 8).  J.P. Morgan responds
that the request is an overly broad and burdensome "fishing
expedition" not relevant to the offerings at issue, and the
defendant cites a number of cases rejecting attempts to "piggyback"
discovery on government investigations.  (Spenner 10/25/13 Letter
at 12-13).

The plaintiffs claim to have "limited their request only to
documents related to mortgage-backed securities offered by J.P.
Morgan," though it is harder to imagine a more expansive request
within the boundaries of this case.  (Taylor 10/8/13 Letter at 9).
They are not entitled to all documents relating to RMBS that the
defendants have turned over to "any government body or agency"
pursuant to subpoena.  While the scope of discoverable material may
extend beyond the particular transactions in this case, that fact
in and of itself does not mean that every document produced in

response to any government subpoena related to RMBS is relevant.

Instead, the plaintiffs should be provided with copies of those responses that are relevant to this case and which conform to the limits of Rule 26(b). See In re Weatherford, 2013 WL 5788687, at *2. Of course, this includes any investigations involving the specific transactions and offerings at issue in this case. But it also encompasses investigations of broader practices or issues that are not explicitly tied to loans in this case but are nevertheless pertinent. For example, discoverable documents include those turned over to the government in an investigation of J.P. Morgan's assessment of the underwriting practices of a loan originator involved in the loans at issue here, even if that investigation focused entirely on other loans, provided that such documents apply equally to both those loans and the loans here. Documents regarding common due diligence procedures that J.P. Morgan applies to all RMBS offerings are also discoverable, regardless of whether those documents are specifically tied to one of the loans or offerings in question, as they are relevant to how those procedures were or should have been applied in this case. These two categories of documents are reasonably calculated to lead to admissible evidence, and such responses to government investigations should therefore be produced.

Additionally, to help guide this disclosure, J.P. Morgan shall

provide the plaintiffs with copies of any government subpoenas that it has received relating to RMBS for the period from July 29, 2004 to present.  If the plaintiffs identify government requests for documents that are not covered by the two categories above, they may make additional requests.

So far the discussion has been limited to government subpoenas and J.P. Morgan responses, but the plaintiffs also request "communications with" any government body or agency regarding formal or informal RMBS investigations.  (Taylor 10/8/13 Letter at 8; Second Request at 9).  "That the subject matter of [government] subpoenas is relevant may explain why documents <u>produced</u> to [any agency] are discoverable, but not why disclosure of . . . communications . . . related to those subpoenas is warranted."  <u>In re Weatherford</u>, 2013 WL 5788687, at *3.  The plaintiffs have not shown that communications beyond the government requests and J.P. Morgan's answers are relevant, and this order is thus limited to the government's subpoenas and any of the defendants' relevant responses.[9]

---

[9] Responses to this request may overlap with other discovery requests, as such attempts to "piggyback" on government investigations can lead to "plainly cumulative and unnecessarily burdensome" discovery.  <u>In re Weatherford</u>, 2013 WL 5788687, at *4. J.P. Morgan need not turn over any responsive documents that are duplicative of material it has already produced to the plaintiffs.

### 3.  Transcripts of Testimony or Interviews

In addition to documents produced pursuant to government subpoenas, the plaintiffs also seek "transcripts of interviews or depositions provided in other civil litigation, government investigation or regulatory proceedings" concerning the RMBS business generally and the certificates, offerings, and loan originators at issue here. (Taylor 10/8/13 Letter at 9; Second Request at 9). They again argue that this information is helpful to establishing "basic guidelines and procedures" and "widespread practices." (Taylor 10/8/13 Letter at 9-10). The defendants believe that this discovery should be limited only to testimony in prior civil actions that was given by one of the custodians in this case and related to one of the offerings at issue in this case. (Spenner 10/25/13 Letter at 14). The defendants also contend that they have already provided transcripts and deposition witnesses relating to the broader "basic guidelines and procedures" evidence the plaintiffs seek through this request. (Spenner 10/25/13 Letter at 15; Taylor 10/8/13 Letter at 9).

The same reasoning that guided discovery of subpoena responses applies here as well. The plaintiffs are entitled to transcripts from other cases dealing with some or all of the "offering platforms, loans, and certificates" at issue here. (Alvarado 11/8/13 Letter at 19; see also Morgan Stanley Tr. at 64 ("the

defendants [shall] produce the transcripts . . . [in] all civil litigation and government investigations that concern the relevant offerings, mortgage loans, certificates, et. cetera")). Additionally, any transcripts containing information on broader underlying issues such as the "basic guidelines and procedures for acquiring, securitizing or selling residential mortgage loans, which apply across the business and are not limited to the securities in this case," shall also be disclosed, provided they are not duplicative of other discovery production. (Taylor 10/8/13 Letter at 9). Finally, the defendants shall disclose transcripts of depositions in other RMBS cases where the deposed individual is a custodian in this case. To the extent that the defendants withhold transcripts they consider to be duplicative or non-responsive, they shall provide the plaintiffs with a list of such transcripts. (Alvarado 11/8/13 Letter at 20; Morgan Stanley Tr. at 64-65).

4.   Documents Relating to Warehouse Financing

Next, the plaintiffs request "communication with, or documents received from, originators concerning warehouse financing that [the] defendants provided to originators." (Taylor 10/8/13 Letter at 10; Second Request at 11). They believe that J.P. Morgan may

have provided warehouse financing[10] for some loans in the relevant offerings and seek information about the due diligence that was conducted during that process. (Taylor 10/8/13 Letter at 10-11). The defendants suggest that warehouse financing may not have been used in any of the loans at issue here. (Spenner 10/25/13 Letter at 15 (neither admitting nor denying that such financing took place)). If it was in fact used, they nevertheless object to disclosure on relevance grounds, arguing that any due diligence conducted by warehouse financing teams was not done with securitization in mind. (Spenner 10/25/13 Letter at 15-16). In reply, the plaintiffs argue that J.P. Morgan's warehouse financing team was "extensively involved" in scrutinizing the loan originators of loans eventually purchased by the defendant entities. (Alvarado 11/8/13 Letter at 20). They also allege that the interplay between the provision of warehouse financing and

---

[10] "Warehouse financing" describes the process by which a financial institution such as J.P. Morgan provides a short-term line of credit to a mortgage loan originator so that the originator can pursue a property buyer's application for a mortgage loan. After the loan closes, it is typically sold to a permanent investor, and the proceeds of that sale are used to repay the warehouse lender. See, e.g., HSA Residential Mortgage Services of Texas v. Casuccio, 350 F. Supp. 2d 352, 355 (E.D.N.Y. 2003); In re AppOnline.com, Inc., 315 B.R. 259, 268 (Bankr. E.D.N.Y. 2004). The ultimate purchaser of the mortgage loan may be the warehouse lender or one of its sister or subsidiary entities, or be an unrelated investor. See, e.g., Indymac Mortgage Holdings, Inc. v. Reyad, 167 F. Supp. 2d 222, 229 (D. Conn. 2001).

33

securitization -- whether J.P. Morgan decided to buy the loans, and whether it purchased them itself or merely packaged and sold them to others -- is indicative of the defendants' conscious choice to pass what they viewed as unreasonably risky sub-standard loans onto third parties via securitization. (Alvarado 11/8/13 Letter at 20).

Whether or not the plaintiffs' suspicions ultimately bear fruit, they have sufficiently articulated how these documents are reasonably calculated to lead to the discovery of admissible evidence. If any loans acquired by J.P. Morgan from the originators at issue in this case were in fact subject to warehouse financing, the defendants must provide any documents related to due diligence and review of the originators when those loans were vetted, as well as any documents relating to the defendants' consideration of whether to provide warehouse financing and whether to ultimately designate the financed loans for purchase or securitization. Documents that are merely transactional or otherwise unrelated to J.P. Morgan's assessment of the relevant loans or originators need not be disclosed. As with the previous categories, disclosure shall include warehouse financing documents related to the loans at issue in this case, as well as documents pertaining to the originators generally that apply to one of the loans in this matter, even though the documents discuss other loans or, indeed, no specific loan.

34

5.   Disputes Concerning the Subject Loans, Offerings, or Originators

The plaintiffs seek "documents and communications concerning any dispute relating to the offerings, the certificates, the subject loans, the originators or any of the allegations in the complaint." (Taylor 10/8/13 Letter at 11; Second Request at 12). The target of this request appears to be threatened or actual litigation regarding the underlying loans, including, for example, early payment default claims. (Taylor 10/8/13 Letter at 11). The defendants object that the scope of this request is overbroad, particularly as to disputes involving originators that are unrelated to the loans involved in this case. (Spenner 10/25/13 Letter at 16). They also complain that it would be unreasonably burdensome to produce such material because there is "no obvious way" to search for it. (Spenner 10/25/13 Letter at 16).

The plaintiffs are entitled to documents and communications regarding disputes, threatened litigation, and actual litigation over RMBS loans. Once again, this discovery is limited to the loans contained in the offerings at issue in this case or any disputes about broader matters that relate to, but do not specifically identify, the loans at issue here. The plaintiffs have not shown that disputes arising from other loans provided by the originators would be relevant; absent the presence of an issue that applies both to loans inside and outside the scope of this

litigation, such external disputes are not discoverable.

      6.  <u>Defendants' Shorting Activities</u>

The final disputed request seeks documents pertaining to the defendants' shorting positions and trading history for both the certificates, offerings, or loans at issue here as well as the RMBS market generally. (Taylor 10/8/13 Letter at 11; Second Request at 13). The plaintiffs claim that such information is indicative of J.P. Morgan's knowledge that its offerings were below the represented standard and that it had failed to conduct adequate due diligence as alleged in its answer. (Taylor 10/8/13 Letter at 11-12; Alvarado 11/8/13 Letter at 23; Answer to Second Amended Complaint at 28-29 ("[J.P. Morgan] did not know, and in the exercise of reasonable diligence could not have known, that the Offering Documents contained material misrepresentations or omissions.")). The defendants contend that decisions to short RMBS offerings are based on a variety of market factors and are not necessarily indicative of the quality of the offerings or their underlying documents nor of any concerns by J.P. Morgan about due diligence or misstatements. (Spenner 10/25/13 Letter at 18). In support of this position they cite Judge Netburn's recent rejection of a similar request for shorting documents. (Spenner 10/25/13 Letter at 18 (citing <u>In re Morgan Stanley</u>, 2013 WL 4838796, at *4 ("A trader's decision whether to short an offering might depend on

market factors entirely unrelated to the accuracy of material included in the offering document . . . .")")).

However, Judge Netburn distinguished the dispute before her from a hypothetical case where "one of the custodians involved in the Offerings at issue was in contact with [the defendants'] traders regarding the nature or adequacy of the due diligence process." In re Morgan Stanley, 2013 WL 4838796, at *4; (Alvarado 11/8/13 Letter at 23-24). In the latter situation, there would be a sufficient connection between the shorting of RMBS and knowledge of their inferior quality to warrant discovery. And that is apparently the case here, where the plaintiffs allege that "individuals at J.P. Morgan [who] shorted RMBS had access to non-public information" relating to the underlying loans. (Alvarado 11/8/13 Letter at 23). Specifically, the plaintiffs note that at least one custodian in this case, Robert Miller, was involved in the due diligence done at the creation of the offerings and later worked on the trading desk, where he executed short positions on the offerings. (Alvarado 11/8/13 Letter at 24; Deposition of Robert Miller dated Feb. 1, 2013, attached as Exh. 6 to Alvarado 11/8/13 Letter, at 202).

The plaintiffs' request for documents relating to shorting positions for "the U.S. residential housing market" is too broad; production shall instead be limited to the certificates or

offerings at issue in this case.  If traders making shorting decisions had access to information from the due diligence process during the creation of the offerings, either through communication or because they were involved at both stages, then there is a reasonable possibility that shorting decisions reflected insider knowledge of the deficient quality of the securities, undermining J.P. Morgan's affirmative due diligence defense.  The plaintiffs are entitled to documents and communications regarding shorting positions in which Mr. Miller was involved.  The defendants shall also turn over any documents pertaining to shorting activities of other individuals who were either involved in both the creation of the offerings and the decision to short the offerings or the execution thereof, or who worked on the offerings and communicated with someone in the trading teams regarding shorting decisions and the due diligence process.

As to the scope of this production, the defendants claim that they did not short RMBS at a certificate or offering level, but rather at a portfolio level.  (Spenner 10/25/13 Letter at 18).  If that is the case, J.P. Morgan must turn over any documents relating to the shorting of portfolios in which the loans and offerings in dispute were a component, subject to the limitations described above.

The plaintiffs also seek to compel disclosure of "[the]

38

defendants' net aggregate proprietary positions for the U.S. housing market" on a monthly basis and the annual salaries for persons working in the RMBS business for 2005-2007. (Taylor 10/8/13 Letter at 11-12; Second Request at 13). But they offer no argument as to how this information is relevant, focusing only on the short positions. (Alvarado 11/8/13 Letter at 24 ("Thus, [the] plaintiffs are entitled to shorting evidence.")). As is the case with shorting, there may be any number of reasons why J.P. Morgan's proprietary trading of RMBS or its employees' compensation levels would fluctuate over a given period, and the plaintiffs have not made any effort to tie those actions with the wrongdoing alleged here. These requests are therefore denied.

    C.   <u>Production Schedule</u>

    The plaintiffs are concerned that J.P. Morgan has not been producing documents at a fast enough pace. They ask that an interim deadline be imposed for completion of document discovery well in advance of the close of fact discovery on November 14, 2014, so that they have ample time to review the documents that are produced prior to conducting depositions. (Taylor 10/8/13 Letter at 12-13; Amended Scheduling Order dated June 21, 2013 (Docket No. 210)). The defendants reject the plaintiffs' proposed interim deadline of December 13, 2013, and point to the numerous responsive documents they have produced thus far as evidence of reasonable

39

efforts.  (Spenner 10/25/13 Letter 19-20).

An interim deadline for the document and electronic discovery discussed above is appropriate, and will help ensure that the plaintiffs have adequate time to make additional requests and conduct depositions with a solid factual basis.  See Arkwright Mutual Insurance Co. v. National Union Fire Insurance Co. of Pittsburgh, No. 90 Civ. 7811, 1995 WL 66405, at *1 (S.D.N.Y. Feb. 15, 1995) (noting the value of interim deadlines in structured discovery).  Such a deadline is also consistent with the current scheduling order guiding discovery in this case.  (Amended Scheduling Order).  The parties shall continue to turn over responsive materials as they become available and complete their document production by May 14, 2014.

Conclusion

For the reasons discussed, the plaintiffs' motion is granted in part and denied in part as set forth above.

SO ORDERED.

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
       December 16, 2013

40

Copies mailed this date to:

Arthur C. Leahy, Esq.
Jonah H. Goldstein, Esq.
Matthew I. Alpert, Esq.
Nathan R. Lindell, Esq.
Scott H. Saham, Esq.
Susan G. Taylor, Esq.
Thomas E. Egler, Esq.
Angel P. Lau, Esq.
L. Dana Martindale, Esq.
Ashley M. Robinson, Esq.
Caroline M. Robert, Esq.
Daniel S. Drosman, Esq.
Darryl J. Alvarado, Esq.
Hillary B. Stakem, Esq.
Robbins Geller Rudman & Dowd LLP
655 West Broadway
Suite 1900
San Diego, CA 92101

Luke O. Brooks, Esq.
Robbins Geller Rudman & Dowd LLP
One Montgomery Street, Suite 1800
San Francisco, CA 94104

Carolina C. Torres, Esq.
David A. Rosenfeld, Esq.
Samuel H. Rudman, Esq.
Robbins Geller Rudman & Dowd LLP
58 South Service Rd.
Suite 200
Melville, NY 11747

Joseph P. Guglielmo, Esq.
Thomas L. Laughlin, IV, Esq.
Scott + Scott, L.L.P.
405 Lexington Ave.
40th Floor
New York, NY 10174

Geoffrey M. Johnson, Esq.
Scott + Scott, L.L.P.
12434 Cedar Rd., Suite 12
Cleveland Heights, OH 44106

Alfred R. Pietrzak, Esq.
Dorothy J. Spenner, Esq.
Owen H. Smith, Esq.
David L. Breau, Esq.
Daniel A. McLaughlin, Esq.
Danny C. Moxley, Esq.
Sidley Austin LLP
787 Seventh Ave.
New York, NY 10019

Alison L. MacGregor, Esq.
Kelley Drye & Warren, LLP
101 Park Ave.
New York, NY 10178

Darrell S. Cafasso, Esq.
Sullivan & Cromwell, LLP
125 Broad St.
New York, NY 10004

Robert A. Sacks. Esq.
Sullivan & Cromwell, LLP
1888 Century Park East, Suite 2100
Los Angeles, CA 90067

Richard F. Lubarsky, Esq.
Levi Lubarsky & Feigenbaum LLP
1185 Avenue of the Americas, 17th Floor
New York, NY 10036

Rebecca L. Butcher
Landis Rath & Cobb LLP
919 Market Street, Suite 1800
Wilmington, DE 19801