UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

FORT WORTH EMPLOYEES' RETIREMENT
FUND, On Behalf of Itself and All Others Similarly
Situated,

                         Plaintiff,

                vs.

J.P. MORGAN CHASE & CO., *et al.*,

                     Defendants.

-------------------------------------------------------------X

: No. 1:09-cv-03701 (JPO) (JCF)
: ECF CASE
:
: **ORAL ARGUMENT REQUESTED**

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
LEAD PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................ 1

THE PLAINTIFFS AND THEIR INVESTMENTS ................................................. 3

ARGUMENT ............................................................................................................ 5

I.     COMMON ISSUES DO NOT PREDOMINATE ........................................... 6

     A.     *NECA* Does Not Support Certification of the Proposed Class Because Each Offering Presents Individual and Unique Liability Issues ........................... 7

     B.     The Veracity of the Statements at Issue Cannot Be Determined on a Common Basis ........................................................................... 11

           1.     Statements About Underwriting Guidelines ............................. 12

           2.     Statements About Appraisals ..................................................... 14

II.     THE PROPOSED CLASS IS NOT ASCERTAINABLE OR MANAGEABLE ........... 15

     A.     The Class Is Not Ascertainable or Manageable Because Loss Causation and Damages Can Only Be Determined on an Individual Basis ....................................................................... 15

           1.     Plaintiffs Have Not Met Their Burden To Produce a Damages Model ................................................................... 16

           2.     No Damages Model Could Eliminate the Individual Issues, Which Are Intertwined with Both Liability and the Class Definition ................. 18

     B.     The Knowledge of RMBS Purchasers Varied Widely Across the Class and Over the Class Period, Raising Additional Individualized Issues and Rendering the Claims of NorCal and SoCal Atypical ................................... 23

           1.     Differences in Knowledge and Materiality Over Time And Between Initial and Secondary Market Purchasers ................................... 24

           2.     Differences in Knowledge and Materiality Among Purchasers in Prime, Alt-A, and Suprime Offerings ......................................... 26

           3.     Differences in Knowledge Based on Purchaser Sophistication and Access to Information .......................................................... 28

III.     NEITHER LEAD PLAINTIFFS NOR LEAD COUNSEL CAN ADEQUATELY REPRESENT THE PROPOSED CLASS .................................................... 29

## TABLE OF CONTENTS

Page

A.   NorCal and SoCal Are Not Members Of The Proposed Class Because They Suffered No Damages.................................................................................. 30

B.   NorCal's and SoCal's Claims Are Time-Barred ................................................. 33

C.   Lead Plaintiffs' and Lead Counsel's Conflicts and Prior Conduct Raise Grave Questions About Their Ability To Represent The Class ........................... 37

IV.   LEAD PLAINTIFFS HAVE NOT SHOWN THAT A CLASS ACTION IS A SUPERIOR VEHICLE TO RESOLVE THIS CASE.................................................... 39

CONCLUSION.......................................................................................................................... 40

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Abrams v. Interco Inc.*,
719 F.2d 2 (2d Cir. 1983) ..................................................................20

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) .........................................................................5

*Applestein v. Medivation, Inc.*,
861 F. Supp. 2d 1030 (N.D. Cal. 2012) .................................................38

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
222 F.3d 52 (2d Cir. 2000) ................................................................29

*Banca Cremi, S.A. v. Alex, Brown & Sons, Inc.*,
132 F.3d 1017 (4th Cir. 1997) ............................................................24

*Beck v. Status Game Corp.*,
1995 WL 422067 (S.D.N.Y. Jul. 13, 1995) .............................................30

*Belmont Holdings Corp. v. SunTrust Banks, Inc.*,
2012 WL 4096146 (N.D. Ga. Aug. 8, 2012) ............................................38

*Blyden v. Mancusi*,
186 F.3d 252 (2d Cir. 1999) ...............................................................22

*Bruce v. Teleflora, LLC*,
2013 WL 6709939 (C.D. Cal. Dec. 18, 2013) ..........................................19

*Burley v. The City of New York*,
2005 WL 668789 (S.D.N.Y. Mar. 23, 2005) ........................................18, 19

*Campo v. Sears Holdings Corp.*,
371 Fed. Appx. 212 (2d Cir. 2010) .......................................................38

*Castano v. Am. Tobacco Co.*,
84 F.3d 734 (5th Cir. 1996) ...............................................................22

*City of Livonia Employees' Ret. Sys. v. The Boeing Co.*,
711 F.3d 754 (7th Cir. 2013) ..............................................................38

*Comcast Corp. v. Behrend*,
133 S. Ct. 1426 (2013) .....................................................2, 5, 6, 16, 17

*Eisen v. Carlisle & Jacquelin*,
417 U.S. 156 (1974) .....................................................................12, 15

## TABLE OF AUTHORITIES

Page(s)

*Fogarazzo v. Lehman Bros.,*
    232 F.R.D. 176 (S.D.N.Y. 2005) ............................................................30

*Folger Adam Co. v. PMI Industries, Inc.,*
    938 F.2d 1529 (2d Cir. 1991) ...............................................................24

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
    903 F.2d 176 (2d Cir. 1990) .................................................................30

*Gasoline Prods. Co. v. Champlin Ref. Co.,*
    283 U.S. 494 (1931) .............................................................................22

*Glover v. Standard Fed. Bank,*
    283 F.3d 953 (8th Cir. 2002) ...............................................................15

*Heimmermann v. First Union Mortgage Corp.,*
    305 F.3d 1257 (11th Cir. 2002) ...........................................................15

*In re AOL Time Warner, Inc. Sec. & ERISA Litig.,*
    381 F. Supp. 2d 192 (S.D.N.Y. 2004) .................................................30

*In re Barclays Bank PLC Sec. Litig.,*
    2011 WL 31548 (S.D.N.Y. Jan. 5, 2011) .....................................33, 36

*In re BP p.l.c. Sec. Litig.,*
    2013 WL 6388408 (S.D. Tex. Dec. 6, 2013) ................................16, 17

*In re Broderbund/Learning Co. Sec. Litig.,*
    294 F.3d 1201 (9th Cir. 2002) .............................................................32

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.,*
    934 F. Supp. 2d 1219 (C.D. Cal. 2013) ...............................................34

*In re Dynex Cap., Inc. Sec. Litig.,*
    2011 WL 781215 (S.D.N.Y. Mar. 7, 2011) ...........................................9

*In re Fed. Nat'l Mortg. Ass'n Sec., Derivatives & "ERISA" Litig.,*
    247 F.R.D. 32 (D.D.C. 2008) ...............................................................24

*In re Frito-Lay N. Am., Inc. All-Natural Litig.,*
    2013 WL 4647512 (E.D.N.Y. Aug. 29, 2013) .......................................8

*In re IndyMac Mortg.-Backed Sec. Litig.,*
    No. 1:09-CV-04583-LAK (S.D.N.Y. Jul. 23, 2013) ...........................7, 8

# TABLE OF AUTHORITIES

Page(s)

*In re IndyMac Mortg.-Backed Sec. Litig.,*
  286 F.R.D. 226 (S.D.N.Y. 2012) ..................................................................................9

*In re IndyMac Mtge.-Backed Sec. Litig.,*
  718 F.Supp.2d 495 (S.D.N.Y. 2010) .........................................................................34

*In re Initial Pub. Offerings Sec. Litig.,*
  471 F.3d 24 (2d Cir. 2006)................................................................................5, 6, 28

*In re Openwave Sys. Sec. Litig.,*
  528 F. Supp. 2d 236 (S.D.N.Y. 2007).....................................................................35, 36

*In re Rail Freight Fuel Surcharge Antitrust Litig.,*
  725 F.3d 244 (D.C. Cir. 2013).............................................................................17, 19

*In re Rhone-Poulenc Rorer, Inc.,*
  51 F.3d 1293 (7th Cir. 1995) .....................................................................................22

*In re SCOR Holding (Switzerland) AG Litig.,*
  537 F. Sup. 2d 556 .......................................................................................................36

*Jacob v. Duane Reade, Inc.,*
  2013 WL 4028147 (S.D.N.Y. Aug. 8, 2013) .......................................................17, 22

*LC Capital Partners, LP v. Frontier Ins. Group, Inc.,*
  318 F.3d 148 (2d Cir.2003).........................................................................................35

*Marcus v. BMW of N. Am. LLC,*
  687 F.3d 583 (3d Cir. 2012).................................................................................18, 19

*Mata v. Citimortgage, Inc.,*
  2012 WL 7985175 (C.D. Cal. July 20, 2012) ...........................................................14

*McGonigle v .Combs,*
  968 F.2d 810 (9th Cir. 1992) .....................................................................................24

*Me. State Ret. Sys. v. Countrywide Fin. Corp.,*
  722 F.Supp.2d 1157 (C.D. Cal. 2010) .......................................................................34

*Merck & Co. v. Reynolds,*
  130 S. Ct. 1784 (2010)................................................................................................33

*Myers v. Hertz Corp.,*
  624 F.3d 537 (2d Cir. 2010)..........................................................................................6

# TABLE OF AUTHORITIES

Page(s)

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.,*
  693 F.3d 145 (2d Cir. 2012)...........................................................7, 8, 32

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
  259 F.3d 154 (3d Cir. 2001).................................................................15

*N.J. Carpenters Health Fund v. DLJ Mortgage Capital, Inc.,*
  2011 WL 3874821 (S.D.N.Y. Aug. 16, 2011).............................................9

*N.J. Carpenters Health Fund v. DLJ Mortgage Capital, Inc.,*
  2012 WL 4865174 (S.D.N.Y. Oct. 15, 2012)..................................9, 26, 29

*N.J. Carpenters Health Fund v. DLJ Mortgage Capital, Inc.,*
  2013 WL 55854 (S.D.N.Y. Jan. 8, 2013) ....................................9, 26

*N.J. Carpenters Health Fund v. Residential Capital, LLC,*
  2013 WL 1809767 (S.D.N.Y. Apr. 30, 2013)............................................10

*N.J. Carpenters Health Fund v. Residential Capital, LLC,*
  2013 WL 6669966 (S.D.N.Y. Dec. 18, 2013) ..........................................10

*N.J. Carpenters Health Fund v. Residential Capital, LLC,*
  Nos. 08 CV 8781 (HB) & 08 CV 5093 (HB) (S.D.N.Y. Dec. 27, 2013) ................10

*Public Employees Ret. Sys. of Miss. v. Goldman Sachs Group, Inc.,*
  280 F.R.D. 130 (S.D.N.Y. 2012) ("Goldman")..........................................9

*Public Employees Ret. Sys. of Miss. v. Merrill Lynch & Co.,*
  277 F.R.D. 97 (S.D.N.Y. 2011) ("Merrill Lynch").................................9, 25

*Rapcinsky v. Skinnygirl Cocktails, L.L.C.,*
  2013 WL 93636 (S.D.N.Y. Jan. 9, 2013) ..................................5, 29

*Rios v. Marshall,*
  100 F.R.D. 395 (S.D.N.Y. 1983) ..........................................................18

*Schuetz v. Banc One Mortgage Corp.,*
  292 F.3d 1004 (9th Cir. 2002) ............................................................15

*SEC v. Happ,*
  392 F.3d 12 (1st Cir. 2004).................................................................24

*Shah v. Meeker,*
  435 F.3d 244 (2d Cir. 2006)................................................................24

## TABLE OF AUTHORITIES

Page(s)

*Staehr v. Hartford Fin. Servs. Grp., Inc.,*
   547 F.3d 406, 427 (2d Cir. 2008)............................................................35

*Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.,*
   802 F. Supp.2d 1125 (C.D. Cal. 2011) ....................................................34

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.,*
   546 F.3d 196 (2d Cir. 2008).......................................................................5

*Thorn v. Jefferson-Pilot Life Ins. Co.,*
   445 F.3d 311 (4th Cir. 2006) ....................................................................23

*TSC Indus., Inc. v. Northway, Inc.,*
   426 U.S. 438 (1976)...................................................................................24

*Tsereteli v. Residential Asset Securitization Trust 2006-A8,*
   283 F.R.D. 199 (S.D.N.Y. 2012) ...........................................................9, 25

*USVI GERS v. J.P. Morgan Chase & Co.,*
   804 F. Supp. 2d 141 (S.D.N.Y. 2011)...............................................*passim*

*Wal-Mart Stores, Inc. v. Dukes,*
   131 S. Ct. 2541 (2011).......................................................................*passim*

*Wilson v. Toussie,*
   2008 WL 905903 (E.D.N.Y. Mar. 31, 2008).........................................19

*Woori Bank v. Merrill Lynch,*
   923 F. Supp. 2d 491 (S.D.N.Y. 2013).....................................................35

### CONSTITUTION

U.S. CONST. amend. VII...............................................................................22

### STATUTES AND RULES

FEDERAL RULES OF CIVIL PROCEDURE
   Rule 8 ........................................................................................................12
   Rule 23 ................................................................................................*passim*

Home Mortgage Disclosure Act of 1975, 12 U.S.C. § 2801 *et seq.* ............12

Private Securities Litigation Reform Act,
   Pub. L. No. 104-67, 109 Stat. 737 ....................................................4, 5, 39

## TABLE OF AUTHORITIES

Page(s)

Securities Act of 1933, 15 U.S.C.
    § 77k............................................................................................................*passim*
    § 77m .............................................................................................................33

28 U. S. C. § 1658(b) ........................................................................................33

## OTHER AUTHORITIES

RESTATEMENT (SECOND) OF TORTS § 283 ...............................................................24

## TABLE OF ABBREVIATIONS AND DEFINED TERMS

| | |
|---|---|
| 1933 Act | Securities Act of 1933 |
| A2 Offering | The JPALT 2007-A2 Offering |
| AHM | American Home Mortgage |
| ARM | Adjustable rate mortgages |
| Certificates | The certificates issued in the Offerings |
| CH5 Offering | The JPMAC 2007-CH5 Offering |
| CHF | Chase Home Finance |
| Complaint or SAC | The Second Amended Complaint [Dkt. 85] |
| D. Ex. | Exhibits to Declaration of Daniel A. McLaughlin in Support of Defendants' Opposition to the Motion |
| Ft. Worth | Fort Worth Employees' Retirement Fund |
| Individual Defendants | Defendants Brian Bernard, Christine E. Cole, David M. Duzyk, William King, Edwin F. McMichael, and Louis Schioppo Jr. |
| JPMAC | Defendant J.P. Morgan Acceptance Corporation I |
| JPMS | Defendant J.P. Morgan Securities Inc. (now known as J.P. Morgan Securities LLC) |
| JR | Report of Prof. Christopher M. James [D. Ex. A] |
| Lead Plaintiffs | Collectively, NorCal and SoCal |
| MBS | Mortgage-backed securities |
| McMorgan | McMorgan & Company |
| MetWest | Metropolitan West Asset Management |
| Motion or P. Br. | Plaintiffs' Memorandum of Law In Support of Motion for Class Certification [Dkt. 223] |
| Non-S3 Offerings | The eight Offerings other than the S3 Offering |
| NorCal | Lead Plaintiff Laborers Pension Trust Fund for Northern California |
| Offerings | The RMBS offerings at issue in this case |
| P. Ex. | Exhibits to Declaration of Daniel S. Drosman in Support of Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel [Dkt. 224] |
| Proposed Class | The class defined in Lead Plaintiffs' Motion |
| Proposed Class Period | The time period of purchases by members of the Proposed Class |
| PSLRA | Private Securities Litigation Reform Act of 1995 |
| RMBS | Residential mortgage-backed securities |
| Robbins Geller or Lead Counsel | Robbins Geller Rudman & Dowd LLP |
| S3 Offering | The JPMMT 2007-S3 Offering |
| SoCal | Lead Plaintiff Construction Laborers Pension Trust for Southern California |
| SR | Expert Declaration of Frank Sillman in Support of Defendants' Opposition to the Motion for Class Certification [D. Ex. B] |
| USVI GERS | Employees' Retirement System of the Government of the Virgin Islands |

Defendants respectfully submit this memorandum of law in opposition to Lead Plaintiffs' motion for class certification.

## PRELIMINARY STATEMENT

Plaintiffs ask this Court to certify a class that is unlike any class certified in any prior class securities case and would be inconsistent with the governing standards, with the Federal Rules and with Second Circuit precedent. Lead Plaintiffs seek to represent all purchasers of 308 different RMBS Certificates from nine different securities Offerings over a nearly two-year period, despite seeking damages as to only one Offering. These Offerings involve more than 35,000 loans, made pursuant to more than 8,000 different underwriting guidelines applied by more than 40 different originators and involving the subjective appraisals of thousands of appraisers. An undertaking of this magnitude would require the treatment and resolution of a vast array of individualized issues that are unmanageable and not capable of classwide resolution.

Plaintiffs' failure to meet their Rule 23 burden is comprehensive. First, Plaintiffs have not shown, nor could they show, that common issues would predominate. As the Supreme Court recently has emphasized, the hallmark of a proper class action is a "common contention" that can "resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). But the core liability question in this case—whether the offering materials for each of the securities at issue in nine separate trusts contained material misstatements or omissions—can be resolved only through individualized inquiry involving determinations about compliance with thousands of loan underwriting guidelines and the subjective beliefs of thousands of individual appraisers. These determinations simply cannot be made on a classwide basis. *See* Point I.

1

Second, Plaintiffs have failed to demonstrate that the Proposed Class would be manageable.  In addition to the practical obstacles posed by the individualized issues discussed above, ignoring the Supreme Court's dictate in *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013), Plaintiffs have presented no damages model, which alone is sufficient to deny certification.  But given the scope and nature of the Proposed Class, no damages model that Plaintiffs could have presented would have eliminated the need to analyze individual issues to calculate loss causation and damages.  Indeed, the parties and the Court must conduct individual inquiries even to ascertain who is and who is not a member of the Proposed Class.  The lack of a uniform injury caused to the Proposed Class is illustrated by the fact that Lead Plaintiffs themselves are not part of the Proposed Class, *because they made money on every investment in these Certificates*—and so did each of the prior lead and named plaintiffs.  Further, differences in knowledge and sophistication across the Proposed Class and the class period make litigation of those key issues on a classwide basis impossible.  Because Plaintiffs have not articulated any means of actually litigating the merits of their case on a classwide basis, certification should be denied.  *See* Point II.

Third, even if class treatment were otherwise appropriate, neither Lead Plaintiffs nor Lead Counsel can adequately represent the class.  Most fundamentally, although the Proposed Class would include investors who allegedly suffered damages in a large variety of RMBS, Lead Plaintiffs would not be members of the class they are seeking to certify because they suffered no damages arising from the investments that are at issue here, and indeed are only claiming damages as to one of the Offerings.  Lead Plaintiffs are also subject to unique statute of limitations and other defenses that render them atypical and inadequate class representatives.  Moreover, the inherent conflicts between Lead Plaintiffs and other members of the proposed

class, as well as Lead Counsel's own conflicts, further militate against Lead Plaintiffs' appointment as class representatives. *See* Point III.

Finally, Plaintiffs have failed to demonstrate the superiority of a class action, and the public record suggests that the members of the Proposed Class are fully capable of litigating their claims, to the extent they believe they are meritorious, on an individual basis. *See* Point IV.

For all these reasons, class certification should be denied.

## THE PLAINTIFFS AND THEIR INVESTMENTS

Ft. Worth commenced this putative class action in state court on March 11, 2009, and later moved to be appointed lead plaintiff, but withdrew its motion after USVI GERS—which had purchased the same Certificates—intervened. [Dkt. 1, 35, 38, 52] There was no other applicant to be lead plaintiff and the Court appointed USVI GERS lead plaintiff and its counsel, Robbins Geller, as Lead Counsel on April 8, 2010. [Dkt. 74]

On October 28, 2011, Lead Counsel informed Defendants that USVI GERS wished to withdraw as lead plaintiff because it had sold its Certificates at a profit in mid-September 2011.[1] The Court accepted Lead Counsel's argument that "[n]ot only is USVI GERS no longer lead plaintiff, it is no longer a member of the class, since it sold all of its certificates and has not suffered any damages as a result of the investments at issue" [Dkt. 235 at 2-3] and, on May 15, 2012, the Court permitted the withdrawal and gave other parties 30 days to move to be lead plaintiff. [Dkt. 170 at 33] NorCal and SoCal were the only applicants and the Court granted their joint motion. [Dkts. 174, 175] NorCal invested in only one of the nine Offerings, the S3 Offering, which both Lead Plaintiffs purchased more than two months after issuance. [Dkt. 173-

---

[1] [*See* Dkt. 159, Ex. A at S-7, Ex. B; Ex. C] ████████████████████████████████████████

1]  The S3 Offering was backed 100% by prime, fixed-rate loans. [JR ¶ 10 & Exs. 4, 20-21]  In

its PSLRA certification setting forth "transaction(s) … in the securities that are the subject of this

action," SoCal disclosed only its purchases of the S3 Offering, and appears to seek damages only

as to that Offering.



## ARGUMENT

"Rule 23(a) states four threshold requirements" for class certification: "(1) numerosity (a 'class [so large] that joinder of all members is impracticable'); (2) commonality ('questions of law or fact common to the class'); (3) typicality (named parties' claims or defenses 'are typical … of the class'); and (4) adequacy of representation (representatives 'will fairly and adequately protect the interests of the class')." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997); *Rapcinsky v. Skinnygirl Cocktails, L.L.C.*, 2013 WL 93636, at *3 (S.D.N.Y. Jan. 9, 2013) (Oetken, J.). Under Rule 23(b)(3), "[c]ommon questions must 'predominate over any questions affecting only individual members'; and class resolution must be 'superior to other available methods for the fair and efficient adjudication of the controversy.'" *Amchem*, 521 U.S. at 615.

Lead Plaintiffs bear the burden to prove, by a preponderance of the evidence, each Rule 23 prerequisite for class certification. *See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008) ("*Bombardier*"); *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41-42 (2d Cir. 2006) ("*IPO*"); *Rapcinsky*, 2013 WL 93636 at *3. To certify a class, a district court must make "findings" after a "rigorous analysis" that Lead Plaintiffs have satisfied each requirement. *See Wal-Mart*, 131 S. Ct. at 2551-52 & n. 6, 2559. Mere allegations are insufficient: the Supreme Court has "[r]epeatedly … emphasized that it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," and this inquiry "will frequently entail overlap with the merits of the plaintiff's underlying claim." *Comcast*, 133 S. Ct. at 1432 (internal quotations omitted). Courts

must "assess all of the relevant evidence admitted at the class certification stage" and "resolve[]
factual disputes relevant to each Rule 23 requirement." *IPO*, 471 F.3d at 41-42; *Bombardier*,
546 F.3d at 202. Courts should carefully analyze and weigh the persuasiveness of expert
testimony, even if it means resolving disputes among conflicting expert opinions. *See Wal-Mart*,
131 S. Ct. at 2553-54; *IPO*, 471 F.3d at 42. In addition to the elements of a plaintiff's *prima
facie* case, it is "well established that courts must consider potential defenses in assessing the
predominance requirement." *Myers v. Hertz Corp.*, 624 F.3d 537, 551 (2d Cir. 2010); *see also
Wal-Mart*, 131 S. Ct. at 2561 ("a class cannot be certified on the premise that Wal-Mart will not
be entitled to litigate its statutory defenses to individual claims").

 As set forth below, Lead Plaintiffs have not met these standards.

## I.   <u>COMMON ISSUES DO NOT PREDOMINATE</u>

 A class action is not intended to alter the substantive rights of the parties through "Trial
by Formula" to prevent inquiry into the distinct, relevant facts of each class member's individual
claims. *Wal-Mart*, 131 S. Ct. at 2550, 2561. Class claims "must depend upon a common
contention," which "must be of such a nature that it is capable of classwide resolution—which
means that determination of its truth or falsity will resolve an issue that is central to the validity
of each one of the claims *in one stroke*." *Wal-Mart*, 131 S. Ct. at 2551 (emphasis added). "What
matters … is not the raising of common 'questions'—even in droves—but, rather the capacity of
a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation."
*Id.* (emphasis in original). If common issues do not predominate over individual issues—
including issues of damages or the definition of the class—class certification must be denied.
*See Comcast*, 133 S. Ct. at 1433; *IPO*, 471 F.3d at 41-42. The Proposed Class falls far short of
this core requirement, as litigation of its claims will require answering numerous questions

specific to particular Offerings, particular investors, particular transactions, particular originators

or particular appraisers, and those questions predominate over common questions.

**A.**   ***NECA* Does Not Support Certification of the Proposed Class Because Each Offering Presents Individual and Unique Liability Issues**

In their complaint, Lead Plaintiffs asserted "class standing" to represent purchasers in

nine completely separate and distinct Offerings on the basis of a common, generic shelf

registration statement.[2]   The Court permitted this at the pleading stage under *NECA-IBEW*

*Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012).   But, the Second

Circuit in *NECA* made clear that it was addressing only standing and *not* addressing class

certification and left undisturbed the requirements and burdens of Rule 23:

> We emphasize that *it is by no means a foregone conclusion* that, because
> plaintiff has standing to assert [Section 11] claims on behalf of Certificate-
> holders from different tranches of Offerings (or within Offerings) backed by
> loans originated by the same originators, a putative class comprised of such
> Certificate-holders should be certified. *The district court, after reviewing
> all of the Rule 23 factors, retains broad discretion to make that
> determination.*

*Id.* at 165 (emphasis added).   "A party seeking class certification must affirmatively demonstrate

his compliance with the Rule—that is, he must be prepared to prove that there are *in fact*

sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart*, 131 S. Ct. at

2551 (emphasis in original).   No court in this Circuit since *NECA* has certified a class like that

sought by Lead Plaintiffs; indeed, Judge Kaplan, in reinstating six offerings that "implicate

statements and omissions substantially similar to those that Lead Plaintiffs allege to be false or

misleading" in the *IndyMac* RMBS litigation, cautioned that, while "[n]othing more is required

---

[2] This Court originally dismissed claims arising from ten offerings in which USVI GERS did not invest.  *See USVI GERS v. J.P. Morgan Chase & Co.*, 804 F. Supp. 2d 141, 150-51 (S.D.N.Y. 2011).  The Offerings in which no Lead Plaintiff invested were later reinstated on the basis of the Second Circuit's intervening decision in *NECA*, but Lead Plaintiffs dropped two of the 11 Offerings from the Proposed Class. [Dkt. 195 at 3:17-4:11; P. Br. at 1 n. 1]

for class *standing* under *NECA* ... it may be that differences in time periods, loan products, and disclosures are significant enough to preclude certification of a class comprised of investors in all of the offerings at issue." *In re IndyMac Mortg.-Backed Sec. Litig.*, 1:09-CV-04583-LAK, slip op. at 3 (S.D.N.Y. Jul. 23, 2013) (emphasis added).[3] The significant differences in time periods, loan products and disclosures in this case demonstrates why a class cannot be certified.

NorCal and SoCal seek damages for Certificates in only one of the nine Offerings during the Proposed Class Period, the S3 Offering. The S3 Offering differed in significant ways from the Non-S3 Offerings, which also differed from each other:

- Proof that loans underlying any one Offering complied with, or deviated from, underwriting guidelines would not answer the question of compliance of loans underlying different Offerings. [JR ¶¶ 47-58; SR ¶ 34] The same would be true of appraisals. ███████████ JR ¶¶ 51, 53]

- The trading behavior of one Offering, including downgrades of its Certificates, appears to have had no effect on the prices of other Certificates. ███████

- The S3 Offering was backed by prime collateral; three other Offerings were subprime and two were Alt-A. The differences in collateral type have significant effects on investor expectations, levels of documentation, Certificate performance and underwriting guidelines. [JR ¶¶ 26, 47-76 & Exs. 4, 9-15; SR ¶¶ 12-25]

- AHM originated 27% of the loans in the S3 Offering. By contrast, five other Offerings had few or no AHM loans, and two had a significant number of loans originated by PHH, whereas the S3 Offering did not. [JR ¶¶ 30-31 & Ex. 17]

- 72% of the loans in the S3 Offering were originated in the second quarter of 2007, whereas only one Non-S3 Offering contained more than 10% loans originated in this period, and as high as 88% of the loans backing other Offerings were originated in 2006 or earlier. [JR ¶¶ 32, 48 & Exs. 18-19] It is widely recognized that underwriting standards and property values changed over this time period. [JR ¶¶ 36, 51 & Exs. 24-25, 39-41; D.██████████████ ███ D. Ex. M at ¶¶ 22-24]

---

[3] *See also In re Frito-Lay N. Am., Inc. All-Natural Litig.*, 2013 WL 4647512, at *12 (E.D.N.Y. Aug. 29, 2013) (collecting cases; *NECA* "instructs that . . . plaintiffs have satisfied the Article III standing inquiry [at the motion to dismiss stage], their ability to represent putative class members who purchased products plaintiffs have not themselves purchased is a question for a class certification motion").

- The first S3 Offering Certificates were not downgraded until August 2008, whereas Certificates in other Offerings were downgraded as early as October 2007. [JR ¶¶ 70-73, 124 & ███████]

- The S3 Offering consisted entirely of fixed-rate loans, whereas six of the eight Non-S3 Offerings consisted at least 70% of ARM loans. Interest rate features can impact delinquencies. [JR ¶¶ 33-35, 39-42 & Exs. 9, 20-21]

Lead Plaintiffs' description of this action as "the latest of six cases in this Circuit in which courts certified classes of MBS investors pursuing claims under the Securities Act" [P. Br. at 3] glosses over the unprecedented nature and scope of the Proposed Class.[4]  The only RMBS class in this Circuit to include buyers in offerings the representative plaintiffs did not buy is *New Jersey Carpenters Health Fund v. Residential Capital, LLC* ("*RALI*"), in which Judge Baer limited the two classes to purchasers within 10 trading days of the offering date (*a class definition that would exclude NorCal, SoCal, USVI GERS and Ft. Worth*) and excluded, *inter alia*, "anyone who purchased on or after the date of the first downgrade or the first material downgrade of the certificates after the offering," *see* 2013 WL 55854, at *1-4 (S.D.N.Y. Jan. 8, 2013) ("*RALI IV*"); 2012 WL 4865174, at *4 (S.D.N.Y. Oct. 15, 2012) ("*RALI III*").  The class definition in *RALI* was dramatically narrower than the Proposed Class here.[5]

---

[4] Three of the six cases cited by Lead Plaintiffs, *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 283 F.R.D. 199, 203-04 (S.D.N.Y. 2012), *Public Empl. Ret. Sys. of Miss. v. Goldman Sachs Group, Inc.*, 280 F.R.D. 130, 132-33 (S.D.N.Y. 2012) ("*Goldman*"), and *New Jersey Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, 2011 WL 3874821, at *1 (S.D.N.Y. Aug. 16, 2011) ("*DLJ*"), involved only a single offering; in fact, both *Tsereteli* and *Goldman* also involved only a single originator (*DLJ* involved three principal originators [*see* D. Ex. RR ¶ 6]). Two others, *IndyMac Mortg.-Backed Secs. Litig.*, 286 F.R.D. 226, 231 (S.D.N.Y. 2012), and *Public Empl. Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 277 F.R.D. 97, 102 (S.D.N.Y. 2011) ("*Merrill Lynch*"), were certified after pre-*NECA* motions had dismissed all offerings not purchased by the representative plaintiffs, and *IndyMac* involved a single originator. Also, the claims differ from those at issue here—only two of the cases cited by Lead Plaintiffs (*Goldman*, 280 F.R.D. at 133, and *Merrill Lynch*, 277 F.R.D. at 103) involved appraisal allegations. Plaintiffs also cite a settlement class in another District, *see* P. Ex. 2, and *In re Dynex Cap., Inc. Sec. Litig.*, 2011 WL 781215 (S.D.N.Y. Mar. 7, 2011), which involved two offerings, both purchased by the representative plaintiffs, and a single originator. The only one of these cases that involved both multiple offerings and multiple originators, *Merrill Lynch*, settled shortly after certification and did not put the workability of the class definition to a practical test.

[5] *RALI* originally certified only the pre-*NECA* class of offerings purchased by the representative plaintiffs, and Defendants respectfully submit that even given the narrower class definition involved, Judge Baer's analysis of the post-*NECA* expansion of these classes in the *New Jersey Carpenters/RALI* decisions fails to grapple meaningfully with the manageability, typicality, adequacy, predominance or damages issues raised by such an expansion, and

To prove their case, Plaintiffs must establish that a material number of loans in each of the nine separate Offerings deviated materially from the standards described in the individual Prospectus Supplement for each Offering.  These Offerings involve more than 40 different originators and 8,196 different underwriting guidelines, neither of which are common to every Offering, as well as the work of thousands of appraisers. [*See* SR ¶¶ 9-10]  Plaintiffs cannot meet their burden by making reference to a common registration statement; information about the loans, such as the originator, collateral type, date of origination or LTV ratios and the overwhelming bulk of the statements alleged to be false or misleading, was contained in the Prospectus Supplements. [*See, e.g.*, P. Br. at 6-8; SAC ¶¶ 69-78, 94, 98-102, 113-16; Dkt. 92 at 2-5; D. Ex. N (excerpting the Prospectus Supplements)]



In short, the common registration statement may play a minor role in this case; the nine Prospectus Supplements and individual loan documents will be the factfinder's primary focus, and the truth or falsity of the Prospectus Supplements will require Offering-by-Offering, loan-

necessarily does not address the secondary-market issues that pervade this case.  *See N.J. Carpenters Health Fund v. Residential Capital, LLC*, 2013 WL 1809767, at *2-5 (S.D.N.Y. Apr. 30, 2013); 2013 WL 6669966, at *3-4 (S.D.N.Y. Dec. 18, 2013); 2013 WL 6839093, at *4-5 (S.D.N.Y. Dec. 27, 2013) ("*RALI VII*").  *RALI VII* explicitly rejected an effort by the *RALI* plaintiffs to expand the class to include secondary-market buyers like Lead Plaintiffs here, *id.*, 2013 WL 6839093, at *5, an exclusion needed given the Second Circuit's affirmance of the denial of a broader *RALI* class on the grounds that "the differences in purchase timing" precluded common proof of knowledge. *N.J. Carpenters Health Fund v.RALI Series 2006-QO1 Trust*, 477 Fed. Appx. 809, 814 (2d Cir. 2012) ("*RALI II*").

10

by-loan and appraiser-by-appraiser examination of the particular Offerings. As set forth below, this inquiry will generate an unmanageable and predominant multiplicity of individual questions.

**B.     The Veracity of the Statements at Issue Cannot Be Determined on a Common Basis**



Moreover, the appraisals challenged by Lead Plaintiffs were conducted by thousands of individual appraisers. [SR ¶ 25] Contrary to *Wal-Mart*'s imperative to identify the common question resolvable in "one stroke," resolution of the claims here will require an individualized, Offering-by-Offering inquiry to determine the compliance of thousands of loans with their respective guidelines and the integrity of thousands of appraisers' work.



### 1.   Statements About Underwriting Guidelines

Plaintiffs allege that the loans backing each of the nine Offerings deviated from underwriting standards when originated. To prevail, Plaintiffs must prove not only that the statements in the Prospectus Supplements regarding compliance with underwriting standards were false, but that they were false to a *material* degree as to *each* Offering.

At the pleading stage, the Court held that, under Rule 8, Plaintiffs did not need to allege "that any particular loan or loans were issued in deviation from the underwriting standards, so long as the complaint alleges 'widespread abandonment of underwriting guidelines.'" *USVI GERS*, 804 F. Supp. 2d at 152-53 (citation omitted). Lead Plaintiffs' Motion likewise addresses generalities untethered to a particular Offering without explaining how they will prove their allegations. [*See, e.g.*, P. Exs. 5, 7, 8, 9, 12][6]

In order to *prove* that the Prospectus Supplements were materially false—and rebut Defendants' proof that any losses on the Certificates were due to the housing crisis and other factors—Plaintiffs will have to prove that a material number of loans in each Offering deviated materially from underwriting guidelines. This will necessarily raise a host of individualized

---

[6] The strength or weakness of Plaintiffs' case on the merits is not a factor in the Rule 23 analysis. *See Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 177-78 (1974). Thus, the Court should not accept Lead Plaintiffs' implication that their allegations of "widespread abandonment" render it unnecessary to address proof specific to particular Offerings. In any event, the evidence will show, among other things, that there was no material—let alone widespread—abandonment of underwriting guidelines with respect to the particular loans backing the Offerings and that Defendants engaged in robust due diligence in purchasing those loans. The originators did, in fact, distinguish among the different types of borrowers and collateral and did engage in diligence to determine whether loans complied with guidelines. For example, data produced by CHF under the federal Home Mortgage Disclosure Act of 1975 shows that CHF denied between 24-29% of all mortgage applications between 2005 and 2007. [D. Ex. O]

questions. As set forth in the Report of Frank Sillman, an expert in re-underwriting mortgage loans, each side's experts will need either to (1) review all 34,492 loans or (2) review numerous samples (likely 22—the number of mortgage groups or pools, but in no event less than one per Offering), in order to review a representative sample of the variety of loans in the Offerings. [SR ¶¶ 8-10]

There are 41 different originators. Each originator established different standards for different product types, documentation levels, interest rate features, origination channels and other factors, which standards themselves changed over time and required, for example, different credit scores, LTV ratios, and documentation, and contained different policies for exceptions (which may have been applied differently by different offices in different geographical areas) and other factors from one loan product or loan origination channel to the next. [*Id.* ¶¶ 7, 12-25; JR ¶¶ 47-53] In fact, there are 8,196 separate and distinct underwriting guidelines to review. [SR ¶¶ 16-17] Each of these distinct re-underwriting analyses will then have to be evaluated by the factfinder; no single inquiry could determine the compliance of all these loans with all those guidelines in "one stroke," particularly because the inquiry for each loan turns on a subjective evaluation of whether each loan complied with the applicable underwriting guidelines and/or had sufficient compensating factors. Establishing that one Originator disregarded underwriting or appraisal guidelines at a particular time for a particular loan type in a particular region would not establish the existence of a misrepresentation impacting any other Originator, product or region. [SR ¶ 34; JR ¶¶ 59-76]; *see Wal-Mart*, 131 S. Ct. at 2555 (questioning expert testimony that employment discrimination claims were subject to common proof; given that claims involved discretionary decisionmaking over a broad geographical scope, "it is quite unbelievable that all managers would exercise their discretion in a common way without some common direction").

The need for separate analysis of each Offering, and of each loan within each Offering, "defeats the whole point of class treatment, which is that the claims of a large group of people can be resolved *without* resort to individual proof." *Mata v. Citimortgage, Inc.*, 2012 WL 7985175, at *1 (C.D. Cal. July 20, 2012) (class challenging transfer of mortgage notes improper where "each note will have to be inspected" to confirm that injury is common).

### 2.    *Statements About Appraisals*

The Court found that the Complaint's appraisal allegations were sufficient to survive a motion to dismiss because plaintiffs alleged "that appraisers *did not in fact believe in the truth of their appraisals* at the time they gave them," specifically, "that appraisers were ordered to" and "'frequently succumbed to brokers' demands to appraise at predetermined inflated values,' leading to '[a]ppraisals ... not based upon the appraiser's professional conclusion based on market data of sales of comparable properties and a logical analysis and judgment.'" *USVI GERS*, 804 F. Supp. 2d at 153-54 (emphasis added; citations omitted). In order to *prove* these allegations, Lead Plaintiffs must establish that thousands of individual appraisers who appraised each of the loans in the nine Offerings "did not believe the appraisals when they made them" or accepted assignments to appraise these underlying properties "that were contingent on predetermined results." *Id*. These are, by definition, individualized, appraiser-by-appraiser inquiries that will predominate over any common questions.

In *Wal-Mart*, the Supreme Court held class certification was inappropriate because, in light of the defendant's delegation of authority over personnel to its store managers, resolution of the plaintiffs' claims of gender discrimination against employees required individual inquiries into each store manager's subjective state of mind. 131 S. Ct. at 2553. Similarly, the Plaintiffs' allegations concerning appraisal standards and LTV ratios turn on the state of mind of each individual appraiser to determine whether the appraisals "were not subjectively believed at the

time they were given." *USVI GERS*, 804 F. Supp. 2d at 153.  Thus, the appraisers in this case

occupy the same position as the store managers in *Wal-Mart*:  it is their subjective judgments that

must be evaluated by the jury.[7]  A class-wide proceeding does not have the capacity to generate

common answers as to the subjective beliefs of each appraiser (or a material number of them).

There were nearly 35,000 loans contained in the nine Offerings, involving thousands of

individual appraisers. [*See* SR ¶ 25]  To make this evaluation as to a single offering would be a

Herculean task—doing it across nine Offerings is beyond the capacity of any jury.

## II.      THE PROPOSED CLASS IS NOT ASCERTAINABLE OR MANAGEABLE

In addition to the fundamental predominance requirement, Rule 23(b)(3)(D) mandates

consideration of "the likely difficulties to be encountered in the management of a class action."

Fed. R. Civ. P. 23(b)(3)(D).  Manageability "encompasses the whole range of practical problems

that may render the class action format inappropriate for a particular suit." *Eisen v. Carlisle &*

*Jacquelin*, 417 U.S. 156, 164 (1974).  All of the issues discussed in Point I raise serious concerns

about the manageability of the Proposed Class.  Moreover, the necessity to determine on an

individual basis whether investors have been damaged (in order to ascertain whether they are

class members), and the disparate levels of investor knowledge and sophistication among the

members of such a wide-ranging class, render the Proposed Class unmanageable.

### A.      The Class Is Not Ascertainable or Manageable Because Loss Causation and Damages Can Only Be Determined on an Individual Basis

Dr. Mason assumes all the elements of liability, offers no opinions as to Defendants'

defenses, has not examined the trading history of the Certificates and has not developed a

---

[7] Even before *Wal-Mart*, the need to analyze the reasonableness of the loan-by-loan conduct of individual mortgage brokers precluded class treatment. *See Glover v. Standard Fed. Bank*, 283 F.3d 953, 965 (8th Cir. 2002); *Heimmermann v. First Union Mortg. Corp.*, 305 F.3d 1257, 1264 (11th Cir. 2002); *Schuetz v. Banc One Mortg. Corp.*, 292 F.3d 1004, 1014 (9th Cir. 2002); *see also Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 178, 180-81 (3d Cir. 2001) (securities brokers).

damages model. He asserts that damages could be calculated in a formulaic manner, but offers no such formula. As Defendants' experts (Dr. Christopher James, an expert economist, and Frank Sillman, an underwriting expert) show through detailed and specific opinions as to underwriting guidelines, the nature of the Offerings and the trading and price history of the Certificates, the Proposed Class would be unmanageable and is not even ascertainable.

The Supreme Court has held that, given the need to satisfy Rule 23(b)(3)'s predominance requirement "through evidentiary proof," a plaintiff seeking to certify a class bears the burden to proffer a damages model "establishing that damages are capable of measurement on a classwide basis." *Comcast*, 133 S. Ct. at 1432-33. Such a model must be consistent with the plaintiff's theory of liability and not an "arbitrary ... methodology that identifies damages that are not the result of the wrong"; it cannot "establish the requisite commonality of damages unless it plausibly showed" that the defendant's wrongdoing had a sufficiently similar effect across all class members. *Id.* at 1433-34, 1435 n.6. Plaintiffs have produced no damages model, and certification should be denied for that reason alone. In fact, as discussed below at Point III(A), given that the Proposed Class by its own terms is limited to those damaged by their purchases of Certificates, NorCal and SoCal are not even members of the Proposed Class. This illustrates a broader problem: the trading history of the Certificates and the nature of RMBS pricing during this period demonstrates the need for transaction-by-transaction analysis before the membership in the class can even be ascertained and before issues such as materiality, loss causation or damages can be resolved.

### 1. *Plaintiffs Have Not Met Their Burden To Produce a Damages Model*

"*Comcast* signals a significant shift in the scrutiny required for class certification," including in securities cases. *In re BP p.l.c. Sec. Litig.*, 2013 WL 6388408, at \*17 (S.D. Tex. Dec. 6, 2013). As this Court explained, "*Comcast* requires that a putative class seeking Rule

23(b)(3) certification demonstrate a linkage between its theory of liability and its theory of damages. The Court must examine this relationship at the class certification stage, even where the inquiry overlaps with, or is pertinent to, the merits determination." *Jacob v. Duane Reade, Inc.*, 293 F.R.D. 578, 587-88 (S.D.N.Y. 2013) (Oetken, J.) (internal quotation marks omitted). Plaintiffs moving to certify a class now "cannot avoid" the "hard look" at proposed damages that *Comcast* requires "by refusing to provide the specifics of their proposed methodology." *BP*, 2013 WL 6388408, at *17 (denying class certification motion "[w]ithout a more complete explication" of how plaintiffs' proposed damages methodology would operate). In short: "No damages model, no predominance, no class certification." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252-53 (D.C. Cir. 2013) (model must "show all class members suffered *some* injury") (emphasis added).

Lead Plaintiffs have not met their burden.



████████████████████████████████

████████████████████████████████████████████ The fact that

NorCal, SoCal, USVI GERS and Ft. Worth were not damaged suggests a significant likelihood

that many members of the Proposed Class have not been injured. Yet, Lead Plaintiffs have not

even begun to address the trading history of the Certificates to show how they would exclude

uninjured investors without individual inquiries. Because Lead Plaintiffs have not carried this

important burden, class certification should be denied. *See BP*, 2013 WL 6388408, at *17.

### 2. *No Damages Model Could Eliminate the Individual Issues, Which Are Intertwined with Both Liability and the Class Definition*

The fact that NorCal and SoCal suffered no damages not only should disqualify them

serving as class representatives, but it also illustrates that damages calculations present

individual issues that cannot be eliminated by a damages model. Certification should be denied,

therefore, because the Proposed Class is simply not manageable.

"An essential prerequisite of a class action, at least with respect to actions under Rule

23(b)(3), is that the class must be currently and readily ascertainable on objective criteria."

*Marcus v. BMW of N. Am. LLC*, 687 F.3d 583, 592-93 (3d Cir. 2012) (collecting cases); *see*

*Burley v. The City of New York*, 2005 WL 668789, at *8 (S.D.N.Y. Mar. 23, 2005) ("Rule 23

contains an implicit requirement that the proposed class be precise, objective and presently

ascertainable" (quotation omitted)). A "proposed class must be clearly defined in order to make

it administratively feasible for the court to determine whether a particular individual is a

member." *Rios v. Marshall*, 100 F.R.D. 395, 403 (S.D.N.Y. 1983) (quotation omitted). If

"extensive and individualized fact-finding or 'mini-trials'" are required even to identify the

members of the class, "then a class action is inappropriate." *Marcus*, 687 F.3d at 593.[8]

Requiring that the members of a class be readily ascertainable (1) "eliminates serious

administrative burdens that are incongruous with the efficiencies expected in a class action";

(2) protects absent class members; and (3) "protects defendants by ensuring that those persons

who will be bound by the final judgment are clearly identifiable." *Id.* (quotation omitted).

Plaintiffs' class definition is problematic because it attempts to evade the issue by

excluding from the Proposed Class those who were not "damaged thereby." But this just

emphasizes that damages need to be evaluated separately for each class member. *See Rail*

*Freight*, 725 F.3d at 253 ("When a case turns on individualized proof of injury, separate trials are

in order."); *Bruce v. Teleflora, LLC*, 2013 WL 6709939, at *7 (C.D. Cal. Dec. 18, 2013)

(plaintiffs' damages model "only compounded the problem" by limiting the model so it "only

comes into play once one assesses each putative class member's case on a singular basis").

Computing damages will not be a simple matter of arithmetic, but rather will require an

individual assessment of prices for each class member.

---

[8] *Accord Burley*, 2005 WL 668789 at *9 (denying certification of one class of plaintiffs as "too vague to be clearly ascertainable"; a "class whose definition hinges on subjective determinations is incompatible with Rule 23's definiteness requirement"); *Wilson v. Toussie*, 2008 WL 905903, at *5 (E.D.N.Y. Mar. 31, 2008) (denying class certification on ascertainability grounds where "determining membership would essentially require a mini-hearing on the merits of each class member's case, including their individual injury").



As Dr. James explains, there are significant variations in the prices reported by the various pricing services and significant differences in the amount, or even the existence, of damages that would result from using different models. [JR ¶¶ 95-102 & Exs. 50-61]  Multiplying this trade-by-trade analysis over 308 Certificates across a Proposed Class Period of nearly two years completely undermines any efficiency advantage of the class action mechanism.  *See Abrams v. Interco Inc.*, 719 F.2d 23, 31 (2d Cir. 1983) (Friendly, J.) (affirming the denial of class certification on manageability grounds because the determination of free market prices was "complicated by the scores of different products involved, varying local market conditions, fluctuations over time, and the difficulties of proving consumer purchasers after a lapse of five or ten years").

██████████████████████ This belies Plaintiffs' unsupported assertion that "the value of the Certificates was artificially inflated in a uniform manner." [P. Br. at 13]

The loss causation inquiry—another necessary step toward ascertaining the composition of the Proposed Class of "damaged" investors—also will require a distinct analysis for each of the 308 Certificates. ████████████████████

████████████████████████████████████████████

████████████████████████████████ Dr. James demonstrates that the Certificates' prices did not all decline when there was a downgrade of any Offering—a downgrade of certain tranches in certain Offerings often was followed by a price increase for Certificates in other Offerings. [JR ¶¶ 74-76 & Exs. 28-38]  Similarly disparate price reactions followed other, major news events. [*Id.* Exs. 33-38].  Moreover, secondary-market sellers will have a strong incentive to argue that they sold after corrective disclosures that caused their losses, ████████████████████████████████

████████████████████████████████████████████

The reality is that the Proposed Class Period coincided with a deepening financial crisis which impacted, but was not limited to, RMBS. [*See* JR ¶¶ 77-91] █████████

████████████████████████████████████████████

21

As reflected in Dr. James' report, "[g]iven these conditions, one would certainly expect deterioration in Offering collateral performance and therefore the expected level of future cash flows, even absent any misrepresentations." [JR ¶ 88]  Trying to disentangle whether and how downgrades and news events impacted different Certificates and different Offerings, and the impact of the financial crisis on the prices of Certificates at different points in time, would present a myriad of unmanageable issues of causation, materiality and inquiry notice.

This Court has noted that, while in some cases the presence of individual damages issues can be cured by certifying a liability class only, "there are due process implications for defendants, which render the so-called 'trial by formula' approach, whereby representative testimony is utilized to determine damages for an entire class, inappropriate where individualized issues of proof overwhelm damages calculations," and "where so-called 'noncommon issues are inextricably entangled with common issues or … the noncommon issues are too unwieldy or predominant to be handled adequately on a class action basis,' bifurcation or limited certification under Rule 23(c)(4) is inappropriate." *Jacob*, 293 F.R.D. at 588-89 (citation omitted).  Because issues regarding the pricing of the Certificates, the reactions of those prices to news and the Great Recession, and the payment of principal and interest pervade the Class Definition and multiple elements of the cause of action, this is one of those cases where the noncommon issues are "inextricably entangled" with the purportedly common issues.[9]

---

[9] Issue certification also presents Constitutional problems if there is any overlap between the determinations made by different factfinders.  Under the Seventh Amendment, "no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law."  U.S. CONST. amend. VII.  An issue may not be re-tried by different juries.  *See Gasoline Prods. Co. v. Champlin Ref. Co.*, 283 U.S. 494 (1931).  In the class action context, this means that the determination of any issue (such as materiality or loss causation) that forms part of the jury's verdict must be conclusive as to every member of the class in subsequent proceedings.  *See, e.g., Blyden v. Mancusi*, 186 F.3d 252, 268-69 (2d Cir. 1999); *see also Castano v. Am. Tobacco Co.*, 84 F.3d 734, 750-51 (5th Cir. 1996); *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1303 (7th Cir. 1995).

**B.**  **The Knowledge of RMBS Purchasers Varied Widely Across the Class and Over the Class Period, Raising Additional Individualized Issues and Rendering the Claims of NorCal and SoCal Atypical**

The nine Offerings include everything from prime to subprime Offerings.  The Proposed Class would encompass investors in different types of offerings, at different points in the cash flow structure, and at different times as the financial crisis deepened.  It would also encompass different buyers and sellers, ranging from initial purchasers in the spring of 2007 to secondary-market buyers in the spring of 2009 after the credit ratings of many of the Certificates had been downgraded and the RMBS market had collapsed. [JR ¶¶ 20, 114-125]  Different investors would find different information to be material, and there is great variation in what the members of the Proposed Class knew and what was material to them in light of the total mix of available information about the Certificates' collateral, the originators, the credit ratings, prices, performance, as well as more general market information about underwriting and appraisal practices.

Different investors are subject as well to different specific defenses; as discussed *infra* Point III(B), NorCal's and SoCal's claims, for example, are subject to a statute of limitations defense that does not apply to all class members (and did not apply to the prior Lead Plaintiffs), and did not suffer any damages.  *See Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 325-26 (4th Cir. 2006) (widespread publicity throughout class period created significant variations in knowledge among class members over time regarding inquiry notice of discriminatory practices in offering of insurance).  It is unrepresentative and unfair both to Defendants and to members of the Proposed Class to litigate classwide claims based solely on the atypical cases of NorCal and SoCal.  *See* Rule 23(a)(3).

### *1. Differences in Knowledge and Materiality Over Time And Between Initial and Secondary Market Purchasers*

The "total mix of information" was shifting dramatically during the Proposed Class Period.[10]  The closing dates for the nine Offerings fell between April 27, 2007 and July 27, 2007.  During that five-month period, housing prices declined dramatically. [JR Exs. 39-41]  By the time Lead Plaintiffs made their first purchases on October 1, 2007, no fewer than 100 mortgage originators had filed for bankruptcy or had closed their doors, and problems at many others were widely reported. [*See* D. Ex. P]  By the second half of 2007, the flow of new mortgage securitizations had collapsed, and observers—including Lead Plaintiffs' own expert and investment advisors—were warning of the market turmoil and the resulting lack of liquidity. [*See infra* n. 22]  Ratings agencies downgraded Certificates in two of the offerings on October 17, 2007, shortly after Lead Plaintiffs' first purchase; other downgrades followed throughout the Class Period. [JR Exs. 26-38]  Ratings downgrades of or actions for Certificates in five of the nine Offerings had occurred by March 2008. [JR Exs. 26-27]

---

[10] When there are major shifts in the mix of public information, different members of a putative class are not similarly situated.  *See, e.g., Shah v. Meeker*, 435 F.3d 244, 252 (2d Cir. 2006) (it was "unreasonable ... to rely on the market price" after date when magazine article alerted class members to a conflict of interest that undermined confidence in the credibility of research analysts) (abrogated on other grounds); *In re Fed. Nat'l Mortg. Ass'n Sec., Derivatives & "ERISA" Litig.*, 247 F.R.D. 32, 40-41 (D.D.C. 2008) (limiting the duration of a certified class where subsequent disclosures correctly restating the company's financials rendered further reliance on the prior financials unreasonable).  The test for materiality is whether there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).  The 'reasonable investor' materiality test "is an objective one," like any other common law reasonableness standard.  *Id.* at 445, 449, 450 n. 12.  *See, e.g.*, Restatement (Second) of Torts, § 283 ("reasonable man" standard involves inquiry into what "a reasonable man *under like circumstances*" would do) (emphasis added).  The factfinder is not asked to determine materiality in the abstract, but rather in the context of a reasonable investor acting under "all the circumstances" presented—in other words, "a reasonable investor *in [the plaintiff's] position*". *Folger Adam Co. v. PMI Industries, Inc.*, 938 F.2d 1529, 1535 (2d Cir. 1991) (emphasis added).  *Accord McGonigle v .Combs*, 968 F.2d 810, 817 (9th Cir. 1992).  This may vary by the sophistication of the investor.  *See also SEC v. Happ*, 392 F.3d 12, 21-22 (1st Cir. 2004) (considering characteristics and knowledge of the alleged investor, a "financial expert," in determining whether information was material); *Banca Cremi, S.A. v. Alex, Brown & Sons, Inc.*, 132 F.3d 1017, 1028-1029 (4th Cir. 1997) ("A sophisticated investor requires less information to call a misrepresentation into question ... Likewise, when material information is omitted, a sophisticated investor is more likely to know enough so that the omission still leaves him cognizant of the risk) (internal quotations omitted).

As Dr. James details, the nature and extent of any purported misrepresentation differs among potential class members and depends on which pool(s) of mortgages backed a particular investor's Certificates. [JR ¶¶ 61-76]  Buyers of Certificates in Offerings that had already seen downgrades were not similarly situated with those (including Lead Plaintiffs) who purchased before such downgrades. [*See* JR ¶¶ 70-76]  Other major events, including the AHM bankruptcy discussed below, concussed the RMBS market for many months between mid-2007 and the putative end of the Class Period in March 2009. [JR ¶¶ 79-91]

NorCal and SoCal, as secondary-market purchasers more than two months after the S3 Offering, are also atypical of buyers who bought in or around the date of an Offering.



The timing of putative class members' purchases thus reflect differences in the purchasers' knowledge; what information was material at different points in time; what, if any, damages they incurred; and what caused their individualized damages.

---

[11] The knowledge of investors' investment advisors is imputed to the investor, particularly where the investor—as NorCal and SoCal did here—granted discretion to investment advisors to make investments on its behalf. *Tsereteli*, 283 F.R.D. at 213 (noting that some potential class members had delegated authority to investment advisors when considering whether those class members had knowledge); *Merrill Lynch*, 277 F.R.D. at 118-19 (considering the knowledge of plaintiffs' investment advisors).

Avoiding the complexities presented by such issues is precisely why the *RALI* court limited class certification to RMBS purchasers who bought certificates directly from the issuers within ten days of the offering date. *See RALI IV*, 2013 WL 55854, at *6 (setting "a strict temporal limit that ends prior to any downgrade or delinquency reports showing increased default rates"); *RALI III*, 2012 WL 4865174, at *4; *see also RALI II*, 477 Fed. Appx. At 814; *RALI VII*, 2013 WL 6839093, at *5 (refusing to reconsider; "I am not convinced that such a significant expansion of the class is warranted at this time, or that such an expansion would not disrupt other class certification requirements.") Here, the line drawn by the *RALI* court would separate the Lead Plaintiffs from putative class members who bought in the initial offering.

### 2. *Differences in Knowledge and Materiality Among Purchasers in Prime, Alt-A, and Suprime Offerings*

Different information was material to different investors depending on whether they were investing in Offerings backed by prime, Alt-A, or subprime collateral, as illustrated by the information they commonly requested and were provided. Some investors conducted extensive independent due diligence of individual loans, originators and borrowers—and such variations can be seen even between Lead Plaintiffs' two advisors.



---

[12] The *Wall Street Journal* reported in October 2006 that such information led Whalen and other investors like him to use derivative contracts to "bet against the homeowners they consider most likely to suffer in a housing downturn." [D. Ex. G]





NorCal and SoCal are subject to unique defenses on this ground as well.

### 3.    *Differences in Knowledge Based on Purchaser Sophistication and Access to Information*

The Proposed Class includes a number of entities that had substantial information about

mortgage underwriting in general, and the originators' underwriting practices in particular, due

to their own involvement in the mortgage origination and mortgage securitization industries (as

well as the multiple originators at issue in this case). The Complaint alleges in blunderbuss

terms that "2007, there were systemic problems in the residential lending industry … [l]oan

originators knew that Wall Street firms such as defendants were purchasing large quantities of

home loans to be securitized and resold to the investing public without regard to whether

borrowers could repay those loans," that deficient origination was "throughout the home loan

industry," and that AHM's problems were driven by the desire of "Wall Street firms" that "fed

off each other". [SAC ¶¶ 62, 64, 89]  These allegations alone mandate exclusion of any

individual or entity connected to "originators" or "Wall Street firms". *See IPO*, 471 F.3d at 43-

[13] ████████████: D. Ex. K (in 2004, MetWest "started writing to its clients about the growing market dependent on mortgage lenders relaxing their [underwriting] standards and borrowers who were stretching beyond their means"); D. Ex. E (2004: "the market does not fully appreciate the current risks . . . If the lending environment is so favorable for the marginal borrower, it is reasonable to assume that marginal lenders, and the asset-backed securities they sell, are at risk.")]

44 (rejecting class certification where plaintiffs' own allegations of "widespread knowledge" of Wall Street and investor practices underlying the claims "would precipitate individual inquiries as to the knowledge of each member of the class").[14] ███████████████████████████

███████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████

## III.   NEITHER LEAD PLAINTIFFS NOR LEAD COUNSEL CAN ADEQUATELY REPRESENT THE PROPOSED CLASS

Lead Plaintiffs and Lead Counsel must show that they "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Generally, adequacy of representation entails inquiry as to whether: (1) plaintiff's interests are antagonistic to the interest of other members of the class, and (2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000). "It is axiomatic that 'a class representative must be part of the class and possess the same interest and suffer the same injury as the class members.'" *Rapcinsky*, 2013 WL 93636 at *6 (quoting *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 156 (1982)); *see Wal-Mart*, 131 S. Ct. at 2550 (same). As set forth above, Lead Plaintiffs seek to represent the interests of investors

---

[14] Judge Baer, in *RALI III*, 2012 WL 4865174 at *3, took the view that the knowledge defense could only apply to plaintiffs who had access to defendants' internal "due diligence results and loan files," but given that so much of the Complaint focuses on the general practices of the originators and the state of the appraisal business, it is sufficient to show that an investor knew of these alleged common industry and originator practices. *See In re Superior Offshore Int'l Sec. Litig.*, 2010 WL 2305742 at *5 (S.D. Tex. June 8, 2010) (finding lack of predominance where the issue of knowledge "must be determined on an individualized basis as to each investor," "particularly" where there is "widespread knowledge from multiple public and private sources").

[15] [*See* ███████████████ D. Ex. T at 1-49 (listing, *inter alia*, Bank of America, Barclays, BNP Paribas, Capital One, Citibank, Countrywide, Credit Suisse, Deutsche Bank, GMAC Commercial Mortgage Corp., Goldman Sachs, HSBC, Lehman Brothers, Morgan Stanley, UBS, and Wells Fargo)] Some of these are affiliates of members of the Proposed Class. Corporations may or may not share the knowledge of their affiliates; the inquiry is a fact-specific one that will vary with the corporate structure and business practices of the particular company.

in Offerings and Certificates they never purchased; their claims are not typical of other investors in these Offerings, they have no incentive to pursue those claims, and they are—at a minimum—subject to unique defenses that would threaten to become the focus of the litigation and render them atypical and inadequate class representatives. *See, e.g., Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990) ("there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it").[16] Moreover, as discussed below, Lead Plaintiffs cannot adequately represent the Proposed Class because (1) they have not been damaged and are therefore not even *members* of the Proposed Class; (2) their claims are time-barred; and (3) Lead Plaintiffs' and Lead Counsel's inherent conflicts and conduct in this case raise grave questions about their diligence and candor.

## A.   NorCal and SoCal Are Not Members Of The Proposed Class Because They Suffered No Damages

Lead Plaintiffs expressly limit the Proposed Class to "[a]ll persons or entities who, prior to March 12, 2009, purchased or otherwise acquired any Certificates in any of the Offerings … and were damaged thereby" [P. Br. at 3 & n.5] and Lead Counsel successfully resisted discovery of the former Lead Plaintiff, USVI GERS, on the grounds that USVI GERS ceased to be a member of the class when it sold its Certificates at a profit three years after this action was filed. [Dkt. 235 at 2-3]  A buyer of debt securities who earned a profit on the investment may not sue under Section 11. *See, e.g., In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, 381 F. Supp. 2d 192, 245-46 (S.D.N.Y. 2004).  Because NorCal and SoCal suffered no damages, they are not

---

[16] Lead Plaintiffs' claims are atypical where they may be preoccupied with rebutting unique defenses, *id.*; it is not necessary that the Court decide "whether a unique defense ultimately will prove meritorious." *Beck v. Status Game Corp.*, 1995 WL 422067, at *4 (S.D.N.Y. Jul. 14, 1995). *See also Fogarazzo v. Lehman Bros., Inc.*, 232 F.R.D. 176, 180 (S.D.N.Y. 2005).

members of the Proposed Class and cannot represent it.  Therefore, neither can represent the class.

SoCal's and NorCal's October 2007 investments in S-3 Certificates—the only Offering purchased by NorCal and the only one as to which SoCal seeks damages—earned a net profit when principal and interest payments are included. [JR Exs. 6-7] █████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████ For buy-and-hold investors, which represent the bulk of RMBS buyers, principal and interest are their *entire* expected investment return. [JR ¶ 11]

███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████

Section 11(e)'s three-part formula for computing damages turns on whether and when the plaintiff "disposed of" the security.  Because NorCal and SoCal sold after suit was filed in March 2009, their maximum damages would be the *lesser* of those provided in subparts (1) or (3):

> The suit … may be to recover such damages as shall represent *the difference* between *the amount paid* for the security … and
>
> > (1) the *value thereof* as of the time such suit was brought, or
> >
> > (2) the *price* at which such security shall have been *disposed of* in the market before suit, or

(3) the *price* at which such security shall have been *disposed of* after suit but before judgment *if such damages shall be less* than the *damages representing* [the formula in subpart (e)(1)].

15 U.S.C. § 77k(e) (emphasis added).[18]  This formula can prove complex to apply to RMBS

purchasers; as noted above, Lead Plaintiffs' expert did not even try.  The formula incorporates all

elements of the investment value of a security, including principal and interest.  Under subpart

(1), while damages are customarily computed based on market prices in cases involving equity

securities, "the key is not … market price; the key is value."  *NECA*, 693 F.3d at 165-6.  In the

context of mortgage-backed securities, that value at any given time, in an ordinary market,

depends on the "future cash flows"—*i.e.*, principal and interest payments—anticipated from the

security.  *Id.* at 166.  ████████████████████████████

████████████████████████████████████████████████████

████████████████████  Under the other two subparts, the term "disposed of" is not limited to

prices received on "a formal securities exchange," but can include exchange transactions with the

issuer, *In re Broderbund/Learning Co. Sec. Litig.*, 294 F.3d 1201, 1203-05 (9th Cir. 2002), such

as the principal and interest payments here.  In either event, interest- and principal-generated

cash flow is a touchstone of both present value and market price, and is an integral component of

both the "value" of RMBS and the "price" at which RMBS are "disposed of" (a pricing

mechanism that depends on the liquidity of the market and the presence of willing buyers).

Section 11(e) also provides for reduction of damages based upon loss causation:

---

[18] Because this case was filed as a putative class action, the terms "before suit" and "after suit" refer to the March 2009 commencement of the action, not NorCal's and SoCal's June 2012 intervention as Lead Plaintiffs.

[19] [JR ¶¶ 77-91 & Exs. 47-48; ████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

> [I]f the defendant proves that any portion or all of such damages represents *other than the depreciation in value of such security resulting from such part of the registration statement* ... not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading, *such portion of or all such damages* shall not be recoverable.

15 U.S.C. § 77k(e) (emphasis added). Thus, a plaintiff may not recover damages that do not consist of "depreciation in value" resulting from a misstatement or omission—such as a reduction in out-of-pocket sales price due to a principal repayment or the economic climate at the time suit was brought or the securities were sold. As explained above, NorCal's and SoCal's investments did not depreciate at all: they returned more than the amount invested.

Because Lead Plaintiffs were not damaged, and are therefore not in the Proposed Class, they are inadequate class representatives.

### B.   NorCal's and SoCal's Claims Are Time-Barred

Lead Plaintiffs seek damages only with respect to the S-3 Certificates they purchased in October 2007, 17 months before this suit was filed in March 2009. Section 11 claims are subject to a one year statute of limitations that commences with "inquiry notice": when a plaintiff discovers the untrue statement or omission "or after such discovery should have been made by the exercise of reasonable diligence." *In re Barclays Bank PLC Sec. Litig.*, 2011 WL 31548, at *6 (S.D.N.Y. Jan. 5, 2011) ("*Barclays*") (internal quotation marks omitted), *aff'd* 734 F.3d 132 (2d Cir. 2013).[20] NorCal and SoCal are subject to a significant unique defense that they were on inquiry notice of their claims before March 2008, and those claims are therefore time-barred.

---

[20] The longstanding test for inquiry notice under Section 13 of the 1933 Act, 15 U.S.C. § 77m, which governs Section 11 claims, was not modified by the Supreme Court's decision in *Merck & Co. v. Reynolds*, 130 S. Ct. 1784 (2010), which construed the distinct language in the 1934 Act, 28 U.S.C. § 1658(b). *See Barclays*, 2011 WL 31548 at *6 (affirmed by the Second Circuit without reaching this point, *see* 743 F.3d at 138).

(Indeed, had NorCal and SoCal been plaintiffs at the time of the motion to dismiss, rather than USVI GERS, their claims would have been dismissed.)

Courts have previously found some RMBS claims time-barred where investors were on notice of problems with the particular originator. *See, e.g., Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F. Supp.2d 1125, 1136 (C.D. Cal. 2011) ("Other complaints and public press reports make clear that a reasonable investor would have been aware of problems with underwriting at Countrywide by early 2008.").[21] Here, AHM was the disclosed originator of nearly 27% of the S3 Offering; this was highlighted *in the very first line of the "Underwriting Guidelines" section of the Prospectus Supplement.* [*See* D. Ex. N at JPMMT 2007 S-3 Pro. Supp. at S-42; JR Ex. 17] Investors in the S3 Offering were placed on inquiry notice by the collapse of AHM in early August 2007, triggered by problems with AHM's loan origination business. [SAC ¶¶ 83, 90] The record demonstrates extensive press coverage of origination problems at AHM in the wake of its collapse.[22] Indeed, on July 31, 2007, Lead Counsel filed suit on behalf of investors in AHM, alleging that AHM "was experiencing an increasing level of loan delinquencies" and ""non-performing loans," resulting from its own origination practices. [*See* D. Ex. II at ¶¶ 26-28; D. Ex. JJ (Lead Counsel's press release)] The Complaint itself cites a public report dated July 31, 2007 as evidence that AHM's collapse was tied to the origination

---

[21] *See also In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 934 F. Supp. 2d 1219, 1227 (C.D. Cal. 2013) (claims time-barred where information such as rating downgrades, filing of complaints, and reports from media outlets provided inquiry notice and commenced the statute of limitations); *Me. State Ret. Sys. v. Countrywide Fin. Corp.*, 722 F. Supp. 2d 1157, 1165 (C.D. Cal. 2010) (filing of prior complaints was sufficient to place plaintiffs on inquiry notice of claims); *In re IndyMac Mortg.-Backed Sec. Litig.*, 718 F.Supp.2d 495, 505-6 (S.D.N.Y. 2010) (information in publicly available report was sufficient to place plaintiffs on inquiry notice of claims).

[22] [*See, e.g.,* D. Ex. X (August 28, 2007 Newsday report on s the convictions of several former AHM employees, detailing internal e-mails that stated "[a]t AHM, we pride ourselves on having a loan for virtually any borrower, regardless of whether or not they have the ability to verify their Income, Assets or Employment history."); D. Ex. KK (Oct. 3, 2007 L.A. Times report that Federal prosecutors and the FBI have opened an investigation into whether criminal misconduct was involved in AHM's collapse; *see also* D. Ex. LL (chronology of selected publicly available materials, including materials concerning AHM, from January 2007 through March 2008)]

problems that Lead Plaintiffs complain about. [SAC ¶ 90][23]  This was more than sufficient cause

for NorCal and SoCal to investigate improper underwriting at AHM after August 2007, and to

develop the evidence needed to plead the claims found in the Complaint by March 2008.

        While Lead Plaintiffs may argue that they were not on notice until they learned of

problems with the underwriting of the specific Offerings in which they invested, such an

argument is belied by their own Complaint, which survived a motion to dismiss.  The Court

found that Lead Plaintiffs stated a claim without reference to allegations about the particular

Offerings, on the basis of allegations about general disregard for underwriting and appraisal

standards.  *USVI GERS*, 804 F. Supp. 2d at 152-54.  General allegations of AHM's origination

and appraisal practices featured prominently in the Complaint and the Court's prior ruling.  *See

id.* at 148, 153; SAC ¶¶ 71, 78-85.  Lead Plaintiffs are judicially estopped now from denying that

such allegations were sufficient to state a claim prior to March 2009.[24]

        A plaintiff is on "inquiry notice" of its claims, and the limitations period begins to run,

"when the plaintiff *should have discovered* the fraudulent conduct."  *Staehr v. Hartford Fin.

Servs. Grp., Inc.*, 547 F.3d 406, 427 (2d Cir. 2008); *see In re Openwave Sys. Sec. Litig.*, 528 F.

Supp. 2d 236, 245 (S.D.N.Y. 2007) (a "duty to inquire arises 'when the circumstances would

suggest to an investor of ordinary intelligence the probability' that she has a cause of action"

(quoting *Levitt v. Bear Stearns & Co.*, 340 F.3d 94, 101 (2d Cir. 2003)).  If an investor made no

inquiry, as Lead Plaintiffs did not, the claims accrue as of the date the plaintiff is placed on

inquiry notice.  *See LC Capital Partners, LP v. Frontier Ins. Group., Inc.*, 318 F.3d 148, 154 (2d

Cir.2003).  The "duty to inquire can be triggered by information contained in the financial press,

---

[23] The Complaint cites a survey of appraisers *published in early 2007*: "90% of appraisers reported that mortgage brokers and others pressured them to raise property valuations to enable deals to go through." [SAC ¶ 106; JR ¶ 125]
[24] *See Woori Bank v. Merrill Lynch*, 923 F. Supp. 2d 491, 496-99 (S.D.N.Y. 2013) (investor in mortgage-backed securities on notice of claims by 2009 where majority of evidence cited in complaint was available by then).

mainstream media, and publicly filed documents," and it is "well established" that "facts placing one on inquiry notice need not detail every aspect of the alleged fraudulent scheme, but only enough in the totality of the circumstances to establish a probability of the alleged claim." *Barclays*, 2011 WL 31548, at *6 (internal quotation marks omitted)). [25]

Both NorCal and SoCal have monitoring agreements with Lead Counsel, and could have requested Lead Counsel to file suit on the basis of the investigation that led it to file suit on behalf of AHM's investors. [D. Ex. S at 53:5-54:19; D. Ex. MM at 53:22-55:8, 59:8-24] Furthermore, the sophisticated investment advisors retained by NorCal and SoCal followed the RMBS markets and RMBS originators, and were plainly capable of conducting an investigation.



---

[25] A plaintiff need not have detailed knowledge of each element of its 1933 Act claims to be on inquiry notice. *See Openwave*, 528 F. Supp. 2d at 247-48 (finding plaintiff on inquiry notice where it was aware of "the facts underlying the core of the Securities Act claims" and explaining that plaintiff "need not have been aware of the precise accounting consequences of that scheme to have been put on inquiry notice, because the scheme that was alleged, and of which plaintiff was aware, was adequate to place plaintiff on inquiry notice as to its potential consequences"). Inquiry notice is easier to establish for 1933 Act claims because scienter is not an element, so inquiry notice turns on the misstatements alone. *See In re SCOR Holding (Switzerland) AG Litig.*, 537 F. Sup. 2d 556, 580 (S.D.N.Y. 2008); *Openwave*, 528 F. Supp. 2d at 246 ("because plaintiff's Securities Act claims are not fraud-related, but rather concern strict liability and negligence for misrepresentations or misstatements by the defendants, the disclosures gave plaintiff more than adequate prompting to inquire into [the] alleged wrongdoing").

███████████████████████████████████████████████

AHM was a disclosed originator in four of the nine Offerings, and the percentage of

AHM loans in these four Offerings ranges between 16% and 37%. [SAC ¶ 71; JR Ex. 17]  Thus,

the same limitations defense that bars NorCal's and SoCal's claims would apply to some

members of the Proposed Class, but not to (a) buyers of Certificates in the five Offerings that

contained no AHM loans; or (b) purchasers, such as USVI GERS, who bought Certificates less

than a year before the March 2009 filing of suit.

An even starker divide appears with regard to loss causation and damages.  Members of

the Proposed Class who bought *before* AHM's collapse and sold thereafter will have a strong

incentive to argue that the bankruptcy was a significant corrective disclosure causing their

losses—a position that conflicts diametrically with the interests of Lead Plaintiffs and others who

purchased *after* AHM's demise.  [*See* JR Exs. 29-38 (illustrating points in time that some

members of the Proposed Class would benefit from citing as corrective disclosures)]  As noted

above, *supra* Point II(A)(2), this is merely one of many situations in which the interests of

secondary market buyers and sellers will be diametrically opposed.

**C.     Lead Plaintiffs' and Lead Counsel's Conflicts and Prior Conduct Raise
        Grave Questions About Their Ability To Represent The Class**

Lead Counsel has filed RMBS actions against numerous defendants who are members of

the class that Lead Plaintiffs seek to certify, which presents a clear conflict of interest in their

current quest to represent them.[27]  And Lead Counsel's conduct of this case illustrates its lack of

---

[26] NorCal and SoCal are thus also subject to a knowledge defense that does not apply to those investors in AHM-backed Offerings who bought their Certificates before the collapse of AHM.

[27] [*See* D. Ex. NN] ███████████████████████████████████████

diligence and candor. The SAC cites confidential witnesses who contend that (1) it misrepresents what they told Lead Counsel and (2) they were misled by Lead Counsel and were not aware they were speaking with lawyers preparing a complaint. Specifically, counsel to one of the confidential witnesses wrongly quoted in the SAC wrote a letter to the Court detailing Lead Counsel's tactics, including, among other things, hiring investigators to pose as mortgage-backed securities researchers, attorneys secretly listening to phone conversations of potential confidential witnesses, and blatant misrepresentations concerning the so-called confidential witness' statements. [*See* D. Ex. OO (May 30, 2013 Letter to the Court from Mark G. Peters)] Robbins Geller has been criticized for this type of misconduct in other cases.[28] ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Even on this Motion, Lead Counsel's brief twice presses claims about credit ratings [P. Br. at 2, 8-9], even though those claims were dismissed by the Court. *USVI GERS*, 804 F. Supp. 2d at 15.

Lead Plaintiffs have failed to meet the most basic requirements to serve as class representatives. Incredibly, in light of the circumstances that prompted original lead plaintiff USVI GERS to withdraw as lead plaintiff, NorCal's and SoCal's representatives admitted that they did not investigate whether they had lost money before joining this suit, and did not know

---

[28] *See City of Livonia Employees' Ret. Sys., et al. v. The Boeing Co.*, 711 F.3d 754, 762 (7th Cir. 2013) (Posner, J.) (commenting that Robbins Geller's "failure to inquire further" with respect to a confidential source's dubious knowledge or veracity "puts one in mind of ostrich tactics" and noting that "plaintiffs' law firm—Robbins Geller Rudman & Dowd LLP—was criticized for misleading allegations, concerning confidential sources, made to stave off dismissal of a securities-fraud case much like this one in *Belmont Holdings Corp. v. SunTrust Banks, Inc.*, No. 1:09-cv1185-WSD, 2012 WL 4096146, at *16-18 (N.D. Ga. Aug. 8, 2012)" and noting further that the "firm is described in two other reported cases as having engaged in similar misconduct: *Campo v. Sears Holdings Corp.*, 371 Fed. Appx. 212, 216-17 (2d Cir. 2010); *Applestein v. Medivation, Inc.*, 861 F. Supp. 2d 1030, 1037-39 (N.D. Cal. 2012)").

whether they had sold their Certificates or received principal or interest payments. [D. Ex. S at 70:13-25, 74:13-75:18 & 77:12-78:21; D. Ex. MM at 56:7-23 & 64:7-17] Their PSLRA certifications were inaccurate, reporting certain of the trades as taking place 30 days after the actual trade date; NorCal and SoCal representatives who signed the Certifications concerning their own investments made no independent effort to verify their accuracy, but relied entirely on Lead Counsel. [D. Exs. S at 70:13-25, 74:13-75:18; D. Ex. MM at 64:7-17] Moreover, SoCal failed to disclose its investments in other Offerings on which it turned a significant profit. [D. Ex.MM at 65:6-10, 66:4-67:22, 117:4-118:5] Neither NorCal's nor SoCal's representatives were aware of whether the Proposed Class would include any investors other than Taft-Hartley pension plans [D. Ex. S at 59:18-60:9; D. Ex. MM at 60:22-61:6]—a significant failure, given that one of the paramount duties of a lead plaintiff is to understand the interests of the class it is supposed to protect. NorCal's representative was even unaware that *other funds managed in common with NorCal* had invested in the Certificates and could be members of the class.[29]

## IV.    LEAD PLAINTIFFS HAVE NOT SHOWN THAT A CLASS ACTION IS A SUPERIOR VEHICLE TO RESOLVE THIS CASE

Lead Plaintiffs have not established the superiority of a class action under Rule 23(b)(3).



[D. ¶ 2] Many other members of the Proposed Class purchased large enough positions, larger than Lead Plaintiffs, in the Certificates to have an incentive to file their

---

[29] Edward Smith is the fund administrator for NorCal and three other funds under the umbrella of the Laborers Trust Funds for Northern California, reporting to the boards of these four funds, whose members almost entirely overlap. [D. Ex. S at 18:1-15, 20:7-22:8] ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Smith testified that the other three Northern California Laborers funds that he administers are not members of the Proposed Class [D. Ex. S at 58:20-59:9].

own suits if (unlike Lead Plaintiffs) they actually lost money. [JR ¶ 118]  Moreover, many of the members of the Proposed Class are sophisticated institutional investors and/or are advised by professional investment managers, and thus are fully capable and experienced in vindicating their own rights.  Second, any efficiency advantages of litigating this case as a class action are illusory.  The manageability problems described above would be ameliorated in an individual suit specific to one Offering purchased at a single point in time in a single transaction, or even a small number of transactions; the pricing issues would be vastly more manageable, fewer Offerings would require review [*see* SR ¶ 11], and there would be none of the conflicts described above regarding materiality, causation and damages.

## CONCLUSION

For the foregoing reasons, the Court should deny Lead Plaintiffs' motion for class certification.

Dated: New York, New York
       January 10, 2014

SIDLEY AUSTIN LLP

By: _Cameron Moxley_

A. Robert Pietrzak
Andrew W. Stern
Dorothy J. Spenner
Daniel A. McLaughlin
Cameron Moxley
David L. Breau
787 Seventh Avenue
New York, New York  10019
Telephone:  (212) 839-5300
Facsimile:  (212) 839-5599

*Attorneys for Defendants*

40