UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

FORT WORTH EMPLOYEES'
RETIREMENT FUND, On Behalf of Itself and
All Others Similarly Situated,

                           Plaintiff,

        vs.

J.P. MORGAN CHASE & CO., et al.,

                      Defendants.

———————————————————— x

:  Civil Action No. 1:09-cv-03701-JPO-JCF
:
:  <u>CLASS ACTION</u>
:
:  PLAINTIFFS' REPLY MEMORANDUM OF
:  LAW IN FURTHER SUPPORT OF MOTION
:  FOR CLASS CERTIFICATION AND
:  APPOINTMENT OF CLASS
:  REPRESENTATIVES AND CLASS
:  COUNSEL
:
:

**[REDACTED]**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................1

II.   PLAINTIFFS SATISFY RULE 23(b) ...............................................................3

    A.    Common Issues Predominate.................................................................3

        1.    Defendants' Misrepresentations and Omissions Were Common Across All Offerings .................................................................4

        2.    Common Employees, Groups, and Entities Structured and Sold All Offerings Using Common Procedures .........................................5

        3.    Common Originators Originated Loans Underlying All Offerings ............6

        4.    Common Questions Will Provide Common Answers ................................7

    B.    Defendants' Additional Arguments Do Not Defeat Predominance.......................10

        1.    The Falsity of Defendants' Representations About Appraisals Can Be Proven with Common Evidence .........................................................10

        2.    Damages Can Be Proven Classwide and Do Not Present Manageability or Ascertainability Issues .....................................................11

        3.    Defendants' Negative Causation Defense Bolsters Predominance and Does Not Present Manageability Issues ................................................14

        4.    Defendants' Knowledge Defense Does Not Raise Individual Issues that Predominate ......................................................................................15

        5.    Differences in Investor Makeup Do Not Defeat Predominance ...............19

        6.    Differences in the Timing of Plaintiffs' Purchases Do Not Create Individual Issues that Predominate ...........................................................20

    C.    A Class Action Is Superior to Other Methods of Adjudication ............................22

III.  PLAINTIFFS SATISFY RULE 23(a) ...............................................................23

    A.    Plaintiffs Will Fairly and Adequately Represent the Class ................................23

        1.    Plaintiffs Have the Same Incentive as the Class to Prove the Falsity of Defendants' Common Misrepresentations ...............................................24

        2.    Plaintiffs Suffered Damages Consistent with the Class...........................26

**Page**

3.  Plaintiffs' and the Class's Claims Are Timely ..........................................29

4.  Plaintiffs Are Actively Participating in This Litigation and Are
    Supervising Experienced Counsel ............................................................32

5.  Defendants' Additional Attacks on Plaintiffs and Lead Counsel
    Are Invalid ...............................................................................................33

IV.  CONCLUSION...............................................................................................35

926104_1

## TABLE OF AUTHORITIES

Page

**CASES**

*Abrams v. Van Kampen Funds, Inc.*,
    No. 01 C 7538, 2005 U.S. Dist. LEXIS 531
    (N.D. Ill. Jan. 12, 2005) ........................................................................................................28

*Akerman v. Oryx Commc'ns, Inc.*,
    810 F.2d 336 (2d Cir. 1987)...................................................................................................14

*Applestein v. Medivation, Inc.*,
    861 F. Supp. 2d 1030 (N.D. Cal. 2012) .................................................................................35

*Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*,
    920 F. Supp. 2d 475 (S.D.N.Y. 2013)...................................................................................7

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
    222 F.3d 52 (2d Cir. 2000).....................................................................................................33

*Bd of Trs. of the AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*,
    269 F.R.D. 340 (S.D.N.Y. 2010) ..........................................................................................23

*Belmont Holdings Corp. v. SunTrust Banks, Inc.*,
    896 F. Supp. 2d 1210 (N.D. Ga. 2012) .................................................................................35

*Campo v. Sears Holding Corp.*,
    371 F. App'x 212 (2d Cir. 2010) ..........................................................................................35

*Colozzi v. St. Joseph's Hosp. Health Ctr.*,
    275 F.R.D. 75 (S.D.N.Y. 2011) ............................................................................................13

*Comcast Corp. v. Behrend*,
    __ U.S. __, 133 S. Ct. 1426 (2013)..........................................................................11, 12, 13

*Dadona I, LLC v. Goldman Sachs & Co.*,
    296 F.R.D. 261 (S.D.N.Y. 2014) ..........................................................................................13

*DeMaria v. Andersen*,
    318 F.3d 170 (2d Cir. 2003)...................................................................................................20

*Eisen v. Carlisle & Jacquelin*,
    391 F.2d 555 (2d Cir. 1968)...................................................................................................23

*Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.*,
    No. 11 Civ. 6189 (DLC), 2012 U.S. Dist. LEXIS 173768
    (S.D.N.Y. Dec. 3, 2012).........................................................................................................7

**Page**

*Funke v. Life Fin. Corp.*,
  No. 99 Civ. 11877 (CBM), 2003 U.S. Dist. LEXIS 5418
  (S.D.N.Y. Apr. 3, 2003)..................................................................................................2, 19

*Genesee Cnty. Emps. Ret. Sys. v. Thornburg Mortg. Sec. Trust 2006-3*,
  825 F. Supp. 2d 1092 (D.N.M. 2011) ...............................................................................6, 28

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983)...............................................................................................................3

*In re AOL Time Warner Sec. & ERISA Litig.*,
  381 F. Supp. 2d 192 (S.D.N.Y. 2004)...................................................................................27

*In re Barclays Bank PLC Sec. Litig.*,
  No. 09 Civ. 1989 (PAC), 2011 U.S. Dist. LEXIS 2667
  (S.D.N.Y. Jan. 5, 2011)........................................................................................................30

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
  851 F. Supp. 2d 746 (S.D.N.Y. 2012)...................................................................................28

*In re Cardinal Health Inc. Sec. Litig.*,
  528 F. Supp. 2d 752 (S.D. Ohio 2007) .................................................................................35

*In re Constar Int'l Inc. Sec. Litig.*,
  585 F.3d 774 (3d Cir. 2009).............................................................................................14, 15

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*,
  934 F. Supp. 2d 1219 (C.D. Cal. 2013) ................................................................................30

*In re Countrywide Fin. Corp. Sec. Litig.*,
  588 F. Supp. 2d 1132 (C.D. Cal. 2008) ................................................................................29

*In re Dreyfus Aggressive Growth Mut. Fund Litig.*,
  No. 98 Civ. 4318 (HB), 2000 U.S. Dist. LEXIS 13469
  (S.D.N.Y. Sept. 20, 2000).....................................................................................................25

*In re Dynex Capital Sec. Litig.*,
  No. 05 Civ. 1897 (HB), 2011 U.S. Dist. LEXIS 22484
  (S.D.N.Y. Mar. 7, 2011) ..................................................................................................12, 22

*In re Enron Corp. Sec. Litig.*,
  586 F. Supp. 2d 732 (S.D. Tex. 2008) ..................................................................................35

**Page**

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    574 F.3d 29 (2d Cir. 2009)..................................................................................24

*In re FleetBoston Fin. Corp. Sec. Litig.*,
    No. 02-cv-4561, 2005 U.S. Dist. LEXIS 36431
    (D.N.J. Dec. 28, 2005) ......................................................................................14

*In re IndyMac Mortg.-Backed Sec. Litig.*,
    286 F.R.D. 226 (S.D.N.Y. 2012) ................................................................. *passim*

*In re IndyMac Mortg.-Backed Sec. Litig.*,
    718 F. Supp. 2d 495 (S.D.N.Y. 2010)..............................................................30

*In re Initial Pub. Offering Sec. Litig.*,
    671 F. Supp. 2d 467 (S.D.N.Y. 2009)..............................................................14

*In re Lehman Bros. Sec. & ERISA Litig.*,
    No. 09 MD 2017 (LAK), 2013 U.S. Dist. LEXIS 13999
    (S.D.N.Y. Jan. 23, 2013)...................................................................................25

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
    No. 04 Civ. 8144 (CM), 2009 U.S. Dist. LEXIS 120953
    (S.D.N.Y. Dec. 23, 2009)....................................................................................3

*In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*,
    810 F. Supp. 2d 650 (S.D.N.Y. 2011)................................................................7

*In re NovaGold Res. Inc. Sec. Litig.*,
    629 F. Supp. 2d 272 (S.D.N.Y. 2009)..............................................................30

*In re Openwave Sys. Sec. Litig.*,
    528 F. Supp. 2d 236 (S.D.N.Y. 2007)..............................................................30

*In re Parmalat Sec. Litig.*,
    No. 04 Civ. 0030 (LAK), 2008 U.S. Dist. LEXIS 64296
    (S.D.N.Y. Aug. 21, 2008) ..................................................................................22

*In re US Foodserv. Pricing Litig.*,
    729 F.3d 108 (2d Cir. 2013)..............................................................................12

*In re Winstar Commc'ns Sec. Litig.*,
    290 F.R.D. 437 (S.D.N.Y. 2013) ......................................................................26

926104_1

**Page**

*LC Capital Partners, L.P. v. Frontier Ins. Grp., Inc.*,
   318 F.3d 148 (2d Cir. 2003)........................................................................30

*Me. State Ret. Sys. v. Countrywide Fin. Corp.*,
   722 F. Supp. 2d 1157 (C.D. Cal. 2010) .....................................................31

*N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*,
   No. 08 Civ 5653 (PAC), 2011 U.S. Dist. LEXIS 92597
   (S.D.N.Y. Aug. 16, 2011) .............................................................1, 16, 19

*N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*,
   No. 08 Civ. 5653 (PAC), 2014 U.S. Dist. LEXIS 35326
   (S.D.N.Y. Mar. 17, 2014) .......................................................... *passim*

*N.J. Carpenters Health Fund v. RALI Series 2006-Q01 Trust*,
   477 F. App'x 809 (2d Cir. 2012) .......................................11, 15, 20, 21

*N.J. Carpenters Health Fund v. Residential Capital, LLC*,
   272 F.R.D. 160 (S.D.N.Y. 2011) .............................................................11, 21

*N.J. Carpenters Health Fund v. Residential Capital, LLC*,
   No. 08 CV 8781 (HB), 2012 U.S. Dist. LEXIS 148865
   (S.D.N.Y. Oct. 15, 2012) .............................................................1, 17, 19, 21

*N.J. Carpenters Health Fund v. Residential Capital, LLC*,
   No. 08 CV 8781 (HB), 2013 U.S. Dist. LEXIS 180913
   (S.D.N.Y. Dec. 27, 2013).......................................................... *passim*

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
   693 F.3d 145 (2d Cir. 2012).......................................................... *passim*

*Nielsen v. Greenwood*,
   No. 91 C 6537, 1996 U.S. Dist. LEXIS 14441
   (N.D. Ill. Sept. 27, 1996) ........................................................................28

*Plumbers' & Pipefitters' Local #562 Supp. Plan & Trust
   v. J.P. Morgan Acceptance Corp.*,
   No. 08 CV 1713 (ERK) (WDW), 2012 U.S. Dist. LEXIS 24106
   (E.D.N.Y. Feb. 23, 2012)........................................................................28

*Plumbers & Pipefitters Nat'l Pension Fund v. Burns*,
   No. 3:05CV7393, 2013 U.S. Dist. LEXIS 126974
   (N.D. Ohio Sept. 4, 2013).......................................................................13

926104_1

**Page**

*Police & Fire Ret. Sys. v. Goldman, Sachs & Co.*,
   No. 10 Civ. 4429 (MGC), 2014 U.S. Dist. LEXIS 42452
   (S.D.N.Y. Mar. 27, 2014) ...................................................................................28

*Police & Fire Ret. Sys. v. IndyMac MBS, Inc.*,
   721 F.3d 95 (2d Cir. 2013) ..................................................................................23

*Pub. Emps.' Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc.*,
   No. 09 CV 1110 (HB), 2011 U.S. Dist. LEXIS 3267
   (S.D.N.Y. Jan. 12, 2011) ...........................................................................26, 28, 29

*Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc.*,
   280 F.R.D. 130 (S.D.N.Y. 2012) ................................................................. *passim*

*Ret. Sys. of Miss. v. Merrill Lynch & Co.*,
   277 F.R.D. 97 (S.D.N.Y. 2011) ................................................................... *passim*

*Ret. Sys. v. Boeing Co.*,
   711 F.3d 754 (7th Cir. 2013) ...............................................................................35

*Ret. Sys. v. J.P. Morgan Chase & Co.*,
   804 F. Supp. 2d 141 (S.D.N.Y. 2011) ...............................................................6, 18

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) ...................................................................................3

*Seijas v. Republic of Arg.*,
   606 F.3d 53 (2d Cir. 2010) ...............................................................................2, 13

*Schuleman v. Union Asset Mgmt. Holding A.G*,
   __ U.S. __, 133 S. Ct. 317 (2012) ........................................................................14

*Staehr v. Hartford Fin. Servs. Grp.*,
   547 F.3d 406 (2d Cir. 2008) .................................................................................30

*Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*,
   802 F. Supp. 2d 1125 (C.D. Cal. 2011) ...............................................................30

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
   546 F.3d 196 (2d Cir. 2008) .................................................................................12

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
   No. 05 Civ. 1898 (SAS), 2005 U.S. Dist. LEXIS 19506
   (S.D.N.Y. Sept. 6, 2005) .......................................................................................16

Page

*Tsereteli v. Residential Asset Securitization Trust 2006-A8*,
283 F.R.D. 199 (S.D.N.Y. 2012) ................................................................ *passim*

*Union Asset Mgmt. Holding A.G. v. Dell, Inc.*,
669 F.3d 632 (5th Cir. 2012) ......................................................................14

*Wagner v. Barrick Gold Corp.*,
251 F.R.D. 112 (S.D.N.Y. 2008) ...............................................................33

*Wal-Mart Stores, Inc. v. Dukes*,
__ U.S. __, 131 S. Ct. 2541 (2011)..............................................................8

*Woori Bank v. Merrill Lynch*,
923 F. Supp. 2d 491 (S.D.N.Y. 2013)........................................................30

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
§77k...................................................................................................... *passim*
§77k(e) ...................................................................................................12, 26
§77k(e)(3) ...................................................................................................26
§77k(1), .................................................................................................26, 27
§77l(b)..........................................................................................................12

Federal Rules of Civil Procedure
Rule 11.........................................................................................................35
Rule 23...........................................................................................................3
Rule 23(a)...............................................................................................23, 35
Rule 23(b)......................................................................................................3
Rule 23(b)(3) .....................................................................................15, 18, 35
Rule 23(c)....................................................................................................21

## SECONDARY AUTHORITIES

J. William Hicks, 17 *Civil Liabilities: Enforcement
& Litigation Under the 1933 Act* (2013)
§4:43 .............................................................................................................4

## I.       INTRODUCTION

This case is ideally suited for class treatment for the reasons discussed in Lead Plaintiffs Laborers Pension Trust Fund for Northern California and Construction Laborers Pension Trust Fund for Southern California's ("Plaintiffs") opening brief ("Pls.' Br.").  Plaintiffs' claims are typical of the more than 1,541 investors in the Class;[1] common legal and factual questions predominate over individual ones; Plaintiffs have no conflicts with the other Class members and have retained and are overseeing competent Lead Counsel; and a class action is a superior way to adjudicate this action. Presented with similar records in nearly identical class actions involving residential mortgage-backed securities ("RMBS"), six other courts in this District granted class certification on eight separate occasions.[2]

Defendants' scattershot arguments against certification are unavailing.   The minor differences in the information available to investors over time, in Class member damages, and in the collateral underlying the nine Offerings here at issue are insufficient to defeat class certification.  As Judge Rakoff held in rejecting the same arguments defendants make here, "[d]efendants' arguments grossly overstate the differences."   *Merrill*, 277 F.R.D. at 113.  After all, the test is not whether differences exist; the test is whether those differences predominate.   They do not.   They are overwhelmed by the common legal and factual questions this case presents.

---

[1]     All capitalized terms have the same meaning as used in Pls.' Br. or Defs.' Br.

[2]     *N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, No. 08 Civ. 5653 (PAC), 2011 U.S. Dist. LEXIS 92597 (S.D.N.Y. Aug. 16, 2011) ("*DLJ I*"); *N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, No. 08 Civ. 5653 (PAC), 2014 U.S. Dist. LEXIS 35326 (S.D.N.Y. Mar. 17, 2014) ("*DLJ II*"); *Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 277 F.R.D. 97 (S.D.N.Y. 2011) ("*Merrill*"); *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 283 F.R.D. 199 (S.D.N.Y. 2012) ("*Tsereteli*"); *Pub. Emps.' Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc.*, 280 F.R.D. 130 (S.D.N.Y. 2012) ("*Goldman RMBS II*"); *In re IndyMac Mortg.-Backed Sec. Litig.*, 286 F.R.D. 226 (S.D.N.Y. 2012) ("*IndyMac*"); *N.J. Carpenters Health Fund v. Residential Capital, LLC*, No. 08 CV 8781 (HB), 2012 U.S. Dist. LEXIS 148865 (S.D.N.Y. Oct. 15, 2012) ("*RALI III*"); *N.J. Carpenters Health Fund v. Residential Capital, LLC*, No. 08 CV 8781 (HB), 2013 U.S. Dist. LEXIS 180913 (S.D.N.Y. Dec. 27, 2013) ("*RALI IV*").

- 1 -

The varying types of loans backing the Certificates (*i.e.*, subprime, prime, and Alt-A) are immaterial to class certification. *See, e.g.*, *id.* at 114 (certifying a class with 18 offerings that were subprime, prime, and Alt-A); *IndyMac*, 286 F.R.D. at 243 (same for a class with ten offerings). In fact, courts have "swiftly rejected" the argument that differences in loan type create insurmountable obstacles to class certification where, as here, the alleged misrepresentations are nearly identical and the Offerings are backed by loans with common originators and assembled and sold by common personnel using common procedures. *Merrill*, 277 F.R.D. at 114; *see also DLJ II*, 2014 U.S. Dist. LEXIS 35326, at *13, *22-*23.

Differences in the timing of class member purchases also do not defeat class certification. In *Merrill*, for example, the court certified a class with class members who purchased certificates "more than a year after the prospectus supplements for those offerings became effective" and "after more than 12 monthly distribution reports became available to holders for those offerings." 277 F.R.D. at 114. The existence of varying news articles concerning the general housing market are also irrelevant. *See DLJ II*, 2014 U.S. Dist. LEXIS 35326, at *24 ("'[P]ublicly available news articles do not create individualized knowledge.'").[3] Differences in the sophistication of class members are similarly irrelevant, for the federal securities laws – §11 in particular – protect sophisticated and unsophisticated investors alike. *See Funke v. Life Fin. Corp.*, No. 99 Civ. 11877 (CBM), 2003 U.S. Dist. LEXIS 5418, at *6 (S.D.N.Y. Apr. 3, 2003) (investor sophistication in a §11 case is "***irrelevant***"). Nor do differences in class member damages pose certification problems, as "it is well-established that the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification" because all class member damages will be calculated using §11's straightforward formula. *Seijas v. Republic of Arg.*, 606 F.3d 53, 58 (2d Cir. 2010).

---

[3]   All citations are omitted and emphasis is added unless otherwise noted.

- 2 -

Finally, Plaintiffs are adequate class representatives. Each of the Plaintiffs is an institutional investor that is actively participating and supervising Lead Counsel in this litigation. As demonstrated by their actions in this case, each is motivated and committed to prosecuting this action and proving defendants' misrepresentations across all Offerings, even those Offerings from which Plaintiffs did not purchase. In light of the uniform misrepresentations and common originators across Offerings, plaintiffs "have every incentive to prove that those statements were material and misleading." *DLJ II*, 2014 U.S. Dist. LEXIS 35326, at *19. Lead Counsel also has an exemplary track record of successful securities litigation prosecution.

In sum, Plaintiffs have satisfied all elements of Rule 23, and respectfully submit that the Court should certify the Class.

## II.     PLAINTIFFS SATISFY RULE 23(b)

Section 11 imposes "a ***stringent standard of liability*** on the parties who play a direct role in a registered offering." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-83 (1983). The statute "places a relatively ***minimal burden*** on a plaintiff," requiring only that "a plaintiff [who] purchased a security issued pursuant to a registration statement . . . show a material misstatement or omission to establish his *prima facie* case." *Id.* at 382. There is no requirement that the plaintiff prove scienter, reliance, or loss causation. *Rombach v. Chang*, 355 F.3d 164, 169 n.4 (2d Cir. 2004). Once a plaintiff establishes an untrue statement or omission, "[l]iability against the issuer of a security is virtually absolute, even for innocent misstatements." *Herman*, 459 U.S. at 382.

### A.     Common Issues Predominate

"'Courts generally focus on the liability issue,'" and not potential affirmative defenses, "'in deciding whether the predominance requirement is met, and if the liability issue is common to the class, common questions are held to predominate over individual questions.'" *In re Marsh &*

*McLennan Cos., Inc. Sec. Litig.*, No. 04 Civ. 8144 (CM), 2009 U.S. Dist. LEXIS 120953, at *35 (S.D.N.Y. Dec. 23, 2009).  Establishing predominance does not require that all class members make identical claims and arguments; instead, "[c]lass-wide issues predominate 'if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.'"  *Tsereteli*, 283 F.R.D. at 210.  Given that a plaintiff must only show the existence of a material untrue statement or omission in the Offering Documents, courts "usually find that common factual and legal issues . . . predominate" in §11 cases.  J. William Hicks, 17 *Civil Liabilities: Enforcement & Litigation Under the 1933 Act*, §4:43 (2013).

Here, predominance is established because defendants' misrepresentations and omissions were common across all Offerings, the same employees and entities structured and sold the Offerings, common entities originated the loans underlying the Offerings, and common questions will provide common answers.  Defendants' arguments against predominance ignore the record and have been rejected on numerous occasions in nearly identical cases.

### 1.   Defendants' Misrepresentations and Omissions Were Common Across All Offerings

In certifying a similar class involving varied RMBS offerings, the court in *DLJ II* recently held that common questions predominate where there is "at least one core question that is susceptible to a common answer for the entire putative class: whether the Offering Documents' statement that all mortgage originators adhered to their underwriting guidelines was a material misrepresentation." 2014 U.S. Dist. LEXIS 35326, at *13; *see also Merrill*, 277 F.R.D. at 114.

Here, the Offering Documents for each Offering contained the same false representations about borrowers' ability to repay their mortgages, the appraisal standards used to value the mortgaged properties, and the resultant LTVs associated with the underlying mortgage loans,

926104_1

regardless of loan type.  *See, e.g.*, ¶¶2-4, 67-77[4]; *see also* Mason Report, ¶42.  Thus, common questions predominate in light of the common misrepresentations at issue in this case.  *See, e.g.*, *DLJ II*, 2014 U.S. Dist. LEXIS 35326, at *13.

### 2. Common Employees, Groups, and Entities Structured and Sold All Offerings Using Common Procedures

As *Merrill* recognized in certifying a class of 18 offerings backed by different types of loans, common questions predominate when offerings are created pursuant to the same procedures and processes:

> [T]he common issues here overwhelm the individual ones.  To begin with . . . '[e]ach of the Certificates . . . were created and issued pursuant to [the] same process by the same Defendants.'  . . . ***The alleged flaws common to that process, which resulted in the misstatements, will be the subject of common proof***.

*Merrill*, 277 F.R.D. at 113; *see also DLJ II*, 2014 U.S. Dist. LEXIS 35326, at *22-*23 (common questions predominate where plaintiffs cite evidence of "the same entities and employees involved in making the offerings").



---

[4]   Unless otherwise noted, references to "¶_" or "¶¶_" are to the SAC.

[5]   *See* ¶¶17-25, 148-149; Pls.' Br., Ex. 5 at JPMC_DEX_002919690, 713-14; Pls.' Br., Ex. 6 at 35:11-37:1, 53:21-54:25, 110:7-23, 126:3-10, 138:25-139:22, 152:1-153:12; Pls.' Br., Ex. 12 at 126:19-127:12.

[6]   *See* Pls.' Br., Ex. 6 at 35:23-36:6; Ex. 12 at 40:19-41:2, 126:19-127:12.

- 5 -

926104_1

███████[7] Because all of the Offerings were assembled and sold by the same core group of individuals and entities using uniform procedures and processes – a fact that defendants completely ignore – defendants' efforts to defeat predominance fail.  *See, e.g.*, *Merrill*, 277 F.R.D. at 113; *DLJ II*, 2014 U.S. Dist. LEXIS 35326, at *22-*23.

### 3. Common Originators Originated Loans Underlying All Offerings

Predominance is also satisfied in light of the uncontroverted evidence of "overlap in mortgage originators."  *DLJ II*, 2014 U.S. Dist. LEXIS 35326, at *22-*23; *see also Merrill*, 277 F.R.D. at 106; *Goldman RMBS II*, 280 F.R.D. at 135; *IndyMac*, 286 F.R.D. at 235.

Here, **all** of the Offerings contain loans originated by Chase.  *See* Pls.' Br., Table 1.  Chase loans accounted for approximately 81% of the total loans across all Offerings.  *Id.*, Table 2.  Further, all of the Offerings that are not comprised exclusively of Chase loans (six out of nine Offerings) contained loans originated by nine common Originators, which collectively accounted for more than **84.5%** of the total loans underlying these Offerings.  *See id*.  The Originators in the Offering purchased by the Plaintiffs originated **93.7%** of the total loans across all of the Offerings.  *See* Pls.' Br., Chart 1.  Thus, defendants are incorrect that proof of one Originator's failure in one Offering to comply with underwriting guidelines would be irrelevant to the compliance of loans in the other Offerings because **all** of the Offerings contained loans originated by common Originators.  *See, e.g.*, *DLJ II*, 2014 U.S. Dist. LEXIS 35326, at *22-*23.

Even if there are minor differences among the originators or loans, the issue here is whether there was "**widespread abandonment**" of underwriting guidelines.  *Emps.' Ret. Sys. v. J.P. Morgan Chase & Co.*, 804 F. Supp. 2d 141, 152-53 (S.D.N.Y. 2011).  In a similar RMBS action involving

---

[7]   *See* Pls.' Br., Ex. 5 at JPMC_DEX_002919690; Ex. 6 at 35:11-37:1, 53:21-54:25, 133:18-134:17, 138:25-139:22, 152:1-153:12.

*427* separate offerings, the court explained:

> [A plaintiff] need only show that a significant number of the loans included in the securitizations were not originated in accordance with the applicable guidelines. Differences in the guidelines that were applied by different originators can be accounted for in [the loan re-underwriting process].

*Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.*, No. 11 Civ. 6189 (DLC), 2012 U.S. Dist. LEXIS 173768, at *58 (S.D.N.Y. Dec. 3, 2012); *accord In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, 810 F. Supp. 2d 650, 672 (S.D.N.Y. 2011). Accordingly, any minor differences among loan types or originators do not defeat predominance.

████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████ [8] "Sampling is a widely accepted method of proof in . . . cases relating to RMBS and involving repurchase claims." *Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, 920 F. Supp. 2d 475, 512 (S.D.N.Y. 2013). Moreover, re-underwriting loan samples is also an accepted process to determine whether loans were originated in accordance with applicable guidelines. *See Fed. Hous. Fin. Agency*, 2012 U.S. Dist. LEXIS 173768, at *57; *Flagstar*, 920 F. Supp. 2d at 475, 478, 487, 501 (re-underwriting evidence credited at trial). At the appropriate time, Plaintiffs will proffer expert re-underwriting analyses. *See* Amended Scheduling Order, Dkt. No. 210.

### 4. Common Questions Will Provide Common Answers

Defendants do not dispute making identical representations across the Offerings. Neither do defendants dispute that the Offerings are backed by loans originated by common Originators pursuant to uniform procedures using overlapping personnel. Instead, defendants point to minor differences and argue that their misrepresentations are not subject to common proof. "Defendants'

---

[8]  Unless otherwise noted, all "Ex." or "Exs." references are to exhibits attached to the Declaration of Daniel S. Drosman in Support of Plaintiffs' Reply in Further Support of Motion for Class Certification and Appointment of Class Representatives and Class Counsel.

arguments grossly overstate the differences."  *Merrill*, 277 F.R.D. at 113.[9]

For example, defendants make much ado about the purported "41 different originators" and "8,196 separate and distinct underwriting guidelines" to suggest that common questions do not predominate.  *See, e.g.*, Defs.' Br. at 13.  But the number of underwriting guidelines is irrelevant where, as here, ***all*** of the underwriting guidelines analyzed: (1) borrowers' ability to repay; (2) appropriateness of appraisals; and (3) LTV ratios.  *See* Ex. 2, Expert Rebuttal Report of Joseph R. Mason ("Mason Rebuttal"), ¶39.



Thus, there are ***no*** individualized issues of falsity that vary from Class member to Class member.

Defendants also assert that there is a lack of commonality because some Offerings were backed by different loan types (*i.e.*, subprime, prime, or Alt-A).  Defs.' Br. at 8.  Not so.  All of the prospectus supplements contained substantially identical misrepresentations concerning underwriting and appraisal standards – regardless of whether the loans were subprime, prime, or Alt-A and regardless of which lender originated the loans.[11]  Accordingly, the type of loan underlying each

---

[9]    Defendants cite *Wal-Mart Stores, Inc. v. Dukes*, __ U.S. __, 131 S. Ct. 2541 (2011), but that case is factually inapposite.  In *Wal-Mart*, the plaintiffs – 1.5 million female employees nationwide – were attempting to prove that the discretionary employment decisions of "thousands of managers" raised common questions.  *Id.* at 2548.  By contrast, here, there is a single securitization machine, common misstatements, and only nine Offerings, all of which were issued within a three-month period.  Accordingly, "*Wal-Mart* has no effect on the commonality determination in this case." *Merrill*, 277 F.R.D. at 105-06.

[10]

[11]    For example, all of the Offering Documents, regardless of underlying loan type, uniformly represented that the "General Underwriting Guidelines" pursuant to which the loans underlying the Offerings were originated ensured borrowers' ability to repay: "Based on the data provided in the

Offering is immaterial.  *See Merrill*, 277 F.R.D. at 106-07 (certifying class of 18 offerings with subprime, Alt-A, and prime loans); *IndyMac*, 286 F.R.D. at 243 (same for a class with ten offerings).

Defendants also point to potential differences in FICO scores, documentation requirements, and differences in guidelines over time to argue that individual issues predominate.[12]  As noted above, however, defendants ignore that all of the Offering Documents represented that J.P. Morgan purchased loans pursuant to standards that were designed to evaluate each borrower's creditworthiness.  *See* ¶¶67-69; Mason Report, ¶42.  Thus, no matter the loan characteristics or applicable underwriting guidelines, Originators were required to use prudent underwriting practices, including determining borrowers' ability to repay the loan, utilizing accurate appraisals, and reporting accurate LTV ratios.  Evidence that these statements are false will apply across all Offerings.

The recent *RALI IV* opinion is instructive.  In that case, following the Second Circuit's *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012) decision, the court restored – as the Court did here – a number of the previously-dismissed offerings. After the additional offerings were reinstated, the plaintiffs moved to add them to the already-certified class.  Defendants opposed the motion on many of the same grounds advanced by

---

application and certain verification (if required), a determination is made by the original lender that the mortgagor's monthly income (if required to be stated) will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses."  *See, e.g.*, Ex. 4 at S-42; *see also* Ex. 5 at S-67 (underwriting guidelines "consider the value and adequacy of the mortgaged property as collateral for the proposed mortgage loan, but also take into consideration the credit standing and repayment ability of the prospective borrower").

12 ███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████

- 9 -

defendants here, including the existence of multiple originators and supposed differences in underwriting guidelines.   The court rejected those arguments, finding common questions predominated because "Plaintiffs [had] demonstrated that the common questions at issue, Defendants' compliance with underwriting guidelines and due diligence requirements and nondisclosure of adverse information, will 'generate common answers apt to drive the resolution of the litigation.'"   *RALI III*, 2013 U.S. Dist. LEXIS 180913, at *19.   "The addition of new offerings and new class representatives does not disturb this analysis."   *Id.* at *20.

The recent *DLJ II* opinion is similarly instructive.   There, the plaintiffs moved post-*NECA* to add previously-dismissed offerings to the already-certified class.   *DLJ II*, 2014 U.S. Dist. LEXIS 35326, at *7-*8.   Over the defendants' similar arguments that the offerings were "fundamentally different deals," made on different dates, and backed by different loan pools originated by different originators, the court held that common questions predominated because plaintiffs cited "evidence of the substantial factual and legal overlap between the two offerings: ***identical alleged misrepresentations, the same entities and employees involved in making the offerings, the same 'wrongful course of conduct' with regard to underwriting guidelines, and the overlap in mortgage originators***."   *Id.* at *22-*23.   For the same reasons, predominance is readily satisfied in this case.

### B.   Defendants' Additional Arguments Do Not Defeat Predominance

#### 1.   The Falsity of Defendants' Representations About Appraisals Can Be Proven with Common Evidence

Defendants next exaggerate what will be required to prove the falsity of defendants' appraisal statements.   In fact, contemporaneous due diligence reports and other evidence demonstrating widespread inaccurate appraisal reporting, failure to comply with USPAP, and failure to comply with seller underwriting guidelines establish the falsity of defendants' appraisal statements. ███

████████████████████████████████████████████████

- 10 -



Finally, as discussed *supra*, §II.A.3., defendants' own expert concedes that expert analysis of a statistically significant sample of loans can be used to establish whether defendants' statements concerning appraisals and LTVs were materially false when made.

### 2. Damages Can Be Proven Classwide and Do Not Present Manageability or Ascertainability Issues

Plaintiffs in their opening brief showed through Dr. Mason's expert declaration that: (1) classwide damages can be calculated in a formulaic manner described in the Securities Act; and (2) there are several ways in which RMBS can be valued, including utilizing prices from pricing services and modeling cash flows. *See* Mason Report, ¶¶102-106; *see also* Mason Rebuttal, ¶42.

Defendants claim that because Dr. Mason has not yet produced a damages model in this case or calculated classwide damages at this early stage, certification is inappropriate under *Comcast Corp. v. Behrend*, __ U.S. __, 133 S. Ct. 1426, 1433 (2013). Rejecting this identical argument in an RMBS class action, however, the *RALI IV* court recently held that "[w]hile *Comcast* requires that 'any model supporting a plaintiff's damages case must be consistent with its liability case,' . . . it is ***inapposite*** here, where damages reflect liability by statutory formula." 2013 U.S. Dist. LEXIS 180913, at *27; *see also N.J. Carpenters Health Fund v. Residential Capital, LLC*, 272 F.R.D. 160,

---

13

926104_1

167 (S.D.N.Y. 2011) ("*RALI I*") ("While the lack of a comprehensive damage model could certainly point to underlying differences defeating typicality, Rule 23 imposes no such express obligation, and in this context, '[t]he plain language of section 11(e) prescribes the method of calculating damages . . . .'"), *aff'd*, 477 F. App'x 809 (2d Cir. 2012).[14]  As Dr. Mason testified, individual Class member damages are easily ascertainable using the straightforward statutory formula.   Mason Report, ¶¶103-105.

Moreover, the fact that class member damages may depend on analyzing market prices and/or values does not render the class unmanageable or unascertainable.  As Dr. Mason makes clear, the Certificates can be valued in a formulaic manner using pricing services and other data that is applicable to all Class members.  *Id.*; *see also* Mason Rebuttal, ¶¶55-62.  Contrary to defendants' suggestion, the "value of a security is not unascertainable simply because it trades in an illiquid market."  *NECA*, 693 F.3d at 167.  Indeed, "valuing illiquid assets is an important (and routine) activity for asset managers."  *Id.*  Valuing a security using various pricing models, IDC prices, or transaction prices, as Dr. Mason suggests, is well-accepted under the securities laws.  *See, e.g.*, *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 208 (2d Cir. 2008); *In re Dynex Capital Sec. Litig.*, No. 05 Civ. 1897 (HB), 2011 U.S. Dist. LEXIS 22484, at

---

[14]   In *Comcast*, unlike here, plaintiffs presented a methodology that depended upon theories of antitrust liability that had been rejected for class treatment.  133 S. Ct. 1426.  The Supreme Court found that plaintiffs' methodology measuring damages for the three rejected theories could not be applied to the one remaining classwide antitrust theory.  *Id.* at 1433, 1435.  That situation is far different from the instant case, where class damages are directly linked to the damages formula specified by §11.  Further, under *Comcast*, a plaintiff must show at class certification only that its proposed damages methodology is "consistent with" its theory of liability.  133 S. Ct. at 1433; *see also In re US Foodserv. Pricing Litig.*, 729 F.3d 108, 123 n.8 (2d Cir. 2013) (finding that plaintiffs' proposed methodology satisfied *Comcast* as it was "directly linked with their underlying theory of classwide liability").  Here, Plaintiffs' damages methodology is entirely consistent with liability theory and with *Comcast* since §11 "presumes that any diminution in value is attributable to the alleged misrepresentations, and places the burden on defendants to ***disprove*** causation."  *NECA*, 693 F.3d at 167 (emphasis in original); *see also* 15 U.S.C. §77k(e), §77l(b).

- 12 -

*18-*19 (S.D.N.Y. Mar. 7, 2011); *Plumbers & Pipefitters Nat'l Pension Fund v. Burns*, No. 3:05CV7393, 2013 U.S. Dist. LEXIS 126974, at *30-*33 (N.D. Ohio Sept. 4, 2013).  In fact, J.P. Morgan itself relies on IDC prices and transaction prices when valuing RMBS.  *See* Mason Rebuttal, ¶58 (J.P. Morgan values RMBS using "'transaction prices, independent pricing services and relevant broker quotes'"), ¶64 ("J.P. Morgan, itself, considers IDC to be a valid source for fair value indications to use for their own financial reporting.").[15]

Further, defendants' contention that the Class is somehow "unascertainable" and "unmanageable" because of the required damages calculations misapprehends the relevant law. While it is true that the specific amount of each Class member's damages may vary, "it is well-established that the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification."  *Seijas*, 606 F.3d at 58; *see also Dadona I, LLC v. Goldman Sachs & Co.*, 296 F.R.D. 261, 270 (S.D.N.Y. 2014) (distinguishing *Comcast* on the grounds that "individual class members' damages will rely on common methodology" and crediting Dr. Mason's opinion that "'damages to each of the Class members can be calculated in a formulaic manner'").  At bottom, "[t]he existence of individualized claims for damages, alone, is not a barrier to class certification on grounds of manageability."  *Colozzi v. St. Joseph's Hosp. Health Ctr.*, 275 F.R.D. 75, 89 (S.D.N.Y. 2011).

Finally, defendants wrongly argue that the proposed class is "unascertainable" and the class definition "problematic" because of its inclusion of "and were damaged thereby" language.  Defs.' Br. at 19.  Such limiting language, however, is "routine in class definitions" and does not require any

---

[15]   That variations may exist in the prices of some of the Certificates does not change the analysis. *See* Defs.' Br. at 20.  Variations in pricing data would need to be considered in **any** damages analysis whether this case proceeded as a class action or an individual action; in other words, there is no component of valuing a certificate that depends on facts specific to any class member.  *See* Mason Report, ¶¶105-107.  Instead, any variations in prices are common to the class and do not cause individual issues as to damages to predominate.

special inquiry.  *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 639-40 (5th Cir. 2012) ("[T]he phrase 'damaged thereby' is '*superfluous*,' merely conveying a basic standing requirement.") (citing *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 492 (S.D.N.Y. 2009)), *cert. denied*, *Schuleman v. Union Asset Mgmt. Holding A.G.*, __ U.S. __, 133 S. Ct. 317 (2012); *see also In re FleetBoston Fin. Corp. Sec. Litig.*, No. 02-cv-4561, 2005 U.S. Dist. LEXIS 36431, at *4-*5 (D.N.J. Dec. 28, 2005).  The straightforward damages calculations performed by Plaintiffs' expert at the appropriate time will determine ultimate class membership.  Such an undertaking does not render the Class unmanageable or unascertainable.

### 3.   Defendants' Negative Causation Defense Bolsters Predominance and Does Not Present Manageability Issues

Under §11, it is defendants – not Plaintiffs – "who must marshal the evidence" to prove that any portion of the damages was not the result of their false statements.  *Merrill Lynch*, 277 F.R.D. at 119; *see also Akerman v. Oryx Commc'ns, Inc.*, 810 F.2d 336, 341 (2d Cir. 1987) (defendants' "heavy burden" to prove negative causation arises out of "Congress' desire to allocate the risk of uncertainty to the defendants in these cases"). ███████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████

Even if defendants had such evidence, negative "causation presents a common, not an individual, issue."  *Merrill*, 277 F.R.D. at 119.  "If the decline in the value of the securities was caused by something other than the alleged misrepresentations or omissions, say, for example, by the general decline in the U.S. securities market," as defendants here suggest, "[d]efendants will be required to rely on generalized proof to support this assertion."  *Id.*; *see also In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 785 (3d Cir. 2009) ("Any affirmative [negative causation] defense . . .

- 14 -

would present a ***common*** issue – not an individual one.") (emphasis in original).   It is thus unsurprising that "defendants have not cited . . . a Section 11 case in which a court has ruled that the existence of a loss causation defense precludes certification under Rule 23(b)(3)."  *IndyMac*, 286 F.R.D. at 242 n.131.   Indeed, because it applies classwide, defendants' negative causation affirmative defense actually ***bolsters*** predominance.

**4.    Defendants' Knowledge Defense Does Not Raise Individual
          Issues that Predominate**

It is well settled that "differences in publicly available information over time" do not "create issues subject to individual proof sufficient to overwhelm common issues."  *Goldman RMBS II*, 280 F.R.D. at 137, 139; *Constar*, 585 F.3d at 784 ("[A] §11 case will ***never*** demand individualized proof as to an investor's reliance or knowledge.").   As the *RALI IV* court stated succinctly, "publicly available news stories do not create individualized knowledge."  2013 U.S. Dist. LEXIS 180913, at *24; *see also DLJ II*, 2014 U.S. Dist. LEXIS 35326, at *23 ("changes in the mortgage market" do not create individualized issues); *Tsereteli*, 283 F.R.D. at 214 ("Either the news reports, ratings downgrades, trustee reports, and other indicators [defendants] rely on would have to be sufficient to put ***any*** reasonable investor on notice, or they would not.") (emphasis in original).

Nevertheless, defendants submit a collection of public information regarding the Offerings' performance, downgrades, news articles, and mortgage industry commentary to argue that varying levels of investor knowledge regarding the general housing market – unconnected to the Offerings or loans here at issue – preclude certification.   None of these materials are sufficient to show – as they must to provide a defense under §11 – that investors had "***actual knowledge*** of the specific untruth or omission" regarding the specific loans and Offerings at issue here.  *N.J. Carpenters Health Fund v. RALI Series 2006-Q01 Trust*, 477 F. App'x 809, 813 (2d Cir. 2012) ("*RALI II*"); *see also Merrill*, 277 F.R.D. at 116 (rejecting "generic news reports regarding the mortgage-backed securities market

- 15 -

[that] do not directly focus on the Certificates here at issue"); *IndyMac*, 286 F.R.D. at 239 (same); *see also DLJ I*, 2011 U.S. Dist. LEXIS 92597, at *20 n.1 (same).[16]

Articles and testimony concerning relaxed underwriting standards are similarly irrelevant to defendants' actual knowledge defense.  Even assuming investors could have determined that J.P. Morgan and the Originators had relaxed their underwriting standards, investors had no way of knowing that J.P. Morgan and the Originators systematically ignored even those "relaxed" standards.

█████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████  To be sure, none of the news articles or other information to which defendants point informed investors that defendants and Originators had failed to follow their standards.  Thus, generic materials concerning relaxed guidelines or aggressive underwriting do not demonstrate actual knowledge because "[a]ggressive underwriting . . . does not amount to 'routine disregard [for] all underwriting guidelines.'" *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, No. 05 Civ. 1898 (SAS), 2005 U.S. Dist. LEXIS 19506, at *40 (S.D.N.Y. Sept. 6, 2005); *see also* Mason Rebuttal, ¶27 ("The dispute in this matter does not relate to whether underwriting guidelines were loosened; rather, the dispute is whether the stated guidelines – whatever they were – were actually *followed*.").

Likewise, rating agency reports announcing downgrades of certain Certificates on which

---

[16] ████████████████████████████████████████████████████████████████

████████████████████████████████████████  s the law makes clear, information that does "not directly focus on the ***Certificates here at issue***" or the loans underlying the Offerings is irrelevant for purposes of defendants' knowledge defense.  *Merrill*, 277 F.R.D. at 116; *see also IndyMac*, 286 F.R.D. at 239 (knowledge defense fails where information does not "establish that any prospective class member likely knew or had notice that the Offering Documents contained misstatements or omissions about [originators'] adherence to underwriting standards for the ***Certificates at issue in this case***").

████████████████████████████████████████████████████████████████

defendants and their expert James rely said nothing about a failure to comply with the underwriting and appraisal standards applicable to the loans underlying the Offerings. *See, e.g.*, *Goldman RMBS II*, 280 F.R.D. at 140 (downgrades insufficient to impart actual knowledge because they do "not directly relate to the alleged misstatements in the Offerings Documents"); *DLJ II*, 2014 U.S. Dist. LEXIS 35326, at *25 (downgrades citing "aggressive underwriting" insufficient to impart actual knowledge). In fact, James admitted that RMBS rating downgrades do not reveal that the underlying loans were not underwritten in accordance with applicable guidelines. *See, e.g.*, Ex. 3 at 163:2-164:7.

Rather, courts in RMBS cases have recognized that only "the actual due diligence results and loan files" would provide investors with actual knowledge of the misstatements. *RALI III*, 2012 U.S. Dist. LEXIS 148865, at *20. ███████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████ And although defendants devote several pages describing certain information that may have been available to investors from loan tapes, the Court will search defendants' brief in vain for any evidence establishing that investors were provided or had access to defendants' internal due diligence information and loan files. Without that material, investors simply could not know that the loans underlying the Offerings were not underwritten in accordance with applicable underwriting guidelines. *See RALI III*, 2012 U.S. Dist. LEXIS 148865, at *20 (distinguishing loan tapes from due diligence information); *cf.* █████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████ Mason Rebuttal, ¶¶22-26.

Finally, defendants argue that varying levels of news articles create individual issues of materiality.  Defendants are wrong:

> Because materiality is determined by an objective rather than a subjective standard, the question of materiality, "rather than being an individual issue, is in fact a common issue."  This is true even if, as seems doubtful, a misstatement that is material at the time of one offering is no longer material at the time of another offering, for this would still need to be determined by common evidence as to the objective state of affairs at a given time.

*Merrill*, 277 F.R.D. at 114.  Further, while defendants' expert points to potential differences in the impact of the alleged false statements, he admitted that he has no opinion regarding the importance to RMBS investors of the alleged false statements concerning borrowers' ability to repay, appraisals, and LTV ratios.  *See, e.g.*, Ex. 3  at 81:6-16, 83:22-84:18, 85:20-86:19.  In any event, "[a]llegations of widespread abandonment of underwriting and appraisal guidelines can hardly be held immaterial as a matter of law."  *J.P. Morgan*, 804 F. Supp. 2d at 154.

At bottom, defendants' scattershot, generalized knowledge arguments amount to nothing more than suppositions that someone "must have known" that defendants were systematically securitizing loans that failed to comply with published underwriting criteria.



"Sheer conjecture that class members 'must have' discovered that the 'reps and warranties' at issue in this case were in fact false is insufficient to defeat Plaintiff's showing of predominance when there is no admissible evidence to support Defendants' assertions."  *Merrill*, 277 F.R.D. at 119.  Accordingly, defendants' knowledge defense cannot defeat Plaintiffs' Rule 23(b)(3) showing here.

### 5.      Differences in Investor Makeup Do Not Defeat Predominance

Under §11, investor "'sophistication' regarding securities and investment practices is irrelevant." *Funke*, 2003 U.S. Dist. LEXIS 5418, at *6. For this reason, all courts in this District to consider the argument have found that sophistication does not defeat predominance in an RMBS case:

> [W]hile demonstrating that certain class members are sophisticated investors may indicate that these class members were familiar with the MBS market and even understood that there were varying standards for and exceptions to underwriting guidelines used in the industry generally and by IndyMac Bank in particular, *it does not establish that any prospective class member likely knew or had notice that the Offering Documents contained misstatements or omissions about IndyMac Bank's adherence to underwriting standards for the Certificates at issue* in this case.

*IndyMac*, 286 F.R.D. at 239; *see DLJ I*, 2011 U.S. Dist. LEXIS 92597, at *20 n.1; *Goldman RMBS II*, 280 F.R.D. at 137; *RALI III*, 2012 U.S. Dist. LEXIS 148865, at *21-*22; *Tsereteli*, 283 F.R.D. at 213. █████████████████████████████████████████████████████████████████

Thus, there are no individualized knowledge issues where, as here, "'there is no testimonial or documentary evidence directly suggesting that a potential plaintiff has knowledge of the misstatements or omissions at issue.'" *DLJ II*, 2014 U.S. Dist. LEXIS 35326, at *24-*25.

Defendants suggest that the proposed class should be limited to exclude entities "connected to 'originators' or 'Wall Street firms.'" Defs.' Br. at 28. First, Plaintiffs' proposed class definition already excludes the Originators and their affiliates. *See* Pls.' Br. at 3 n.5. Further, Plaintiffs' class definition excludes the defendants and any of their affiliates – those who were involved with and responsible for issuing the Offerings – from the Class. *Id.* Although defendants do not identify the "Wall Street firms" they believe should be excluded from the Class or provide the basis on which

- 19 -

those unnamed entities should be excluded, they suggest that such entities "have been[] sued in RMBS litigation" and are therefore not properly included here.  Defs.' Br. at 29.  Defendants' argument ignores the fact that even if certain absent Class members "have been sued in connection with *their own MBS offerings*, this is irrelevant to the Offerings at issue in this case."  *Merrill*, 277 F.R.D. at 118 (emphasis in original); *see also IndyMac*, 286 F.R.D. at 239 (same).

### 6. Differences in the Timing of Plaintiffs' Purchases Do Not Create Individual Issues that Predominate

Differences in the timing of Class member purchases also do not defeat class certification where, as here, there is no evidence that *any* putative Class member had actual knowledge that defendants' statements were false regardless of when they purchased.  *Merrill*, 277 F.R.D. at 116-17, 119 (finding that "what was known about Defendants' practices at different points in time" does not create individual issues absent evidence of actual knowledge).  In *Merrill*, for example, the court certified a class with class members who purchased certificates "more than a year after the prospectus supplements for those offerings became effective" and "after more than 12 monthly distribution reports became available to holders for those offerings" because there was no showing that any putative class member, regardless of when they purchased, had actual knowledge of the falsity.  *Id.* at 114, 116-19; *see also Goldman RMBS II*, 280 F.R.D. at 139 (certifying RMBS class action regardless of the timing of class member purchases where there was no evidence that any putative class member had actual knowledge of defendants' false statements).  Defendants' argument also ignores that under §11 *any* person who acquires a security traceable to the misleading registration statement may sue "'regardless of whether he bought in the initial offering, a week later, or a month after that.'"  *DeMaria v. Andersen*, 318 F.3d 170, 176 (2d Cir. 2003).

The *RALI* cases cited by defendants actually support Plaintiffs.  In *RALI II*, the Second Circuit affirmed the district court's decision that, on the particular record in that case, class

926104_1

certification was inappropriate because individual issues of knowledge predominated.  477 F. App'x at 813.  The court suggested, however, that with a "fuller record," the outcome may have been different.  *Id.*  Following the Second Circuit's guidance, the district court later certified the class after plaintiffs developed an "expanded record" that "assuage[d]" the court's "prior concern" regarding individualized issues of knowledge.  *RALI III*, 2012 U.S. Dist. LEXIS 148865, at *20.  In particular, the court noted that "adverse due diligence results and loan files, which could have yielded specific information about [the alleged] underwriting [non]compliance unlike loan tapes that merely convey loan characteristics, were not disclosed to the investors."  *Id.* at *19.

The court's subsequent class certification decision in *RALI III* does not, as defendants contend, require the class definition to be limited to investors that purchased only during specific time frames.  First, as noted above, §11 extends to any person who acquires a security that is traceable to the misleading registration statement regardless of whether the purchase occurred in the initial offerings or later.  Second, the court in *RALI III* exercised its discretion under Rule 23(c) to modify the class because there, unlike here, the plaintiffs proposed a "cumbersome" class that included purchasers in "59 separate [RALI] offerings" and "15 [Harborview] offerings" that were issued over an 18-month period.  2012 U.S. Dist. LEXIS 148865, at *23.  Thus, the court noted, "the sheer number of offerings" and 18-month issuance period posed a "challenge" to class cohesiveness.  *Id.*  Here, by contrast, there are no similar cohesiveness issues as the nine Offerings were all issued from the same shelf within a three-month time frame (April 27, 2007-July 27, 2007).[17]

---

[17]   The decision in *RALI IV* not to reconsider its earlier holding from *RALI III* limiting the end date of the class period was based on the reasoning set forth in *RALI I* and *RALI III*.  *See RALI IV*, 2013 U.S. Dist. LEXIS 180913, at *28 ("I am not convinced that such a significant expansion of the class

### C.    A Class Action Is Superior to Other Methods of Adjudication

This case involves at least 1,541 geographically dispersed Class members.  Mason Report, ¶¶99, 101. "Requiring [plaintiffs'] claims to proceed as separate cases on behalf of multiple plaintiffs therefore would be inefficient, would fragment the recovery effort, and would diminish the incentives for pursuing the claims." *Tsereteli*, 283 F.R.D. at 217; *accord Dynex*, 2011 U.S. Dist. LEXIS 22484, at \*22-\*23; *Goldman RMBS II*, 280 F.R.D. at 141 ("several other benefits" of class treatment are "the elimination of the risk of inconsistent judgments, benefits in terms of judicial resources, and the familiarity of the Southern District of New York with securities law").[18]

Moreover, whether the class includes "institutional investors [that] might be capable of bringing individual actions to remedy their alleged injuries" is irrelevant. *In re Parmalat Sec. Litig.*, No. 04 Civ. 0030 (LAK), 2008 U.S. Dist. LEXIS 64296, at \*17 (S.D.N.Y. Aug. 21, 2008) ("Although it is possible that some institutional investors might be capable of bringing individual actions . . . those parties who choose not to do so 'should not be deprived the opportunity to pursue this [class] action simply because some [other] litigants . . . [might pursue] parallel actions.'").  In any event, only 15 of the more than 1,500 investors in the proposed Class have filed individual cases and less than half of those cases involve §11 claims.  *See* Defs.' Br., Ex. PP.  Thus, there is no dispute that a class action is the superior method of adjudicating Plaintiffs' claims.  *See RALI IV*, 2013 U.S. Dist. LEXIS 180913, at \*25-\*26 (finding superiority satisfied where "there [was] no dispute that only fifteen investors [had] opted out" and "[n]otwithstanding these opt outs, hundreds

---

is warranted at this time . . . .").

[18]   Without support, defendants argue that because there is more than one Offering at issue in this action, "any efficiency advantages from litigating this case as a class action are illusory." Defs.' Br. at 40.  Defendants fail, however, to explain how litigating thousands of "individual suit[s] specific to one Offering purchased at a single point in time in a single transaction" (*id.*) constitutes a better use of judicial resources than resolving the exact same questions of law and fact, common to all nine Offerings, in one class action.  *Cf. Goldman RMBS II*, 280 F.R.D. at 141 ("Collective action can be expected to bring advantages in terms of bargaining and efficiency.").

of investors remain[ed] in each case").  Further, it is desirable to concentrate the litigation here because the Court is already "familiar with the history of this case, having ruled on earlier motions and discovery disputes" and because this forum has significant "familiarity . . . with securities law." *Goldman RMBS II*, 280 F.R.D. at 141.

Defendants' assertion that the opt-out cases constitute nearly 25% of the original principal balance of the Certificates is not only mere *ipse dixit*, as defendants present no calculations supporting that figure, it is a red herring.  The size of the purchases made by the few investors who have opted out of this action does not impact or diminish the claims of over 1,500 investors that have suffered losses ranging from thousands of dollars to millions of dollars as a result of defendants' misrepresentations and omissions.  Indeed, one of the primary purposes of class actions is to vindicate the rights of plaintiffs with claims too small to justify individual suit.  *See Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 560 (2d Cir. 1968).  Thus, "'[t]he existence of large individual claims that are sufficient for individual suits is no bar to a class when the advantages of unitary adjudication exist to determine the defendant's liability.'"  *Bd of Trs. of the AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, 269 F.R.D. 340, 354-55 (S.D.N.Y. 2010); *see also RALI IV*, 2013 U.S. Dist. LEXIS 180913, at *25 (rejecting defendants' argument that "because some class members have opted out of the class, superiority is defeated" as "far-fetched").  Further, in light of the Second Circuit's recent decision in *Police & Fire Ret. Sys. v. IndyMac MBS, Inc.*, 721 F.3d 95 (2d Cir. 2013), class members that have to this point relied on this case may be barred by the statute of repose from filing future individual actions.  Accordingly, certification of a class is superior.

## III.   PLAINTIFFS SATISFY RULE 23(a)

### A.     Plaintiffs Will Fairly and Adequately Represent the Class[19]

---

[19]  Defendants do not dispute Plaintiffs' showing of typicality.  For the reasons set forth in Pls.' Br.,

926104_1

The question of whether a named plaintiff will adequately represent the class turns on "'whether (1) plaintiff's interests are antagonistic to the interest of other members of the class and (2) plaintiff's attorneys are qualified, experienced, and able to conduct the litigation.'" *Flag Telecom*, 574 F.3d at 35. "The focus is on uncovering 'conflicts of interest between named parties and the class they seek to represent.'" *Id.*

### 1.  Plaintiffs Have the Same Incentive as the Class to Prove the Falsity of Defendants' Common Misrepresentations

Plaintiffs' interests are perfectly aligned with the Class's because they purchased Certificates through Offering Documents that contained the same common misrepresentations about the same core group of common originators. *See supra*, §II.A. The uniform misrepresentations concerned the quality of the underwriting and appraisals, not the types of loans included in the pools. *Id.* Because "the core alleged misrepresentations in [all] offerings relate to whether the mortgage originators adhered to their own underwriting guidelines," Plaintiffs "have every incentive to prove that those statements were material and misleading." *DLJ II*, 2014 U.S. Dist. LEXIS 35326, at *19.

Recently, the court in *DLJ II* rejected the contention – made by defendants here – that a class representative must have purchased in an offering to satisfy adequacy. 2014 U.S. Dist. LEXIS 35326, at *18. Especially in light of *NECA*, the court held, a class representative may adequately represent investors that purchased in other offerings "'as long as conflicts or antagonism do not exist between class members and representatives.'" *Id.* at *19. Recognizing that the core misrepresentations were identical, the court noted that "[a]lthough the proof regarding the falsity and materiality of those statements may differ somewhat in light of other statements in the respective

---

Plaintiffs satisfy typicality because, among other things, "'each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability.'" *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009).

Offering Documents, there is no apparent reason why they would raise conflicting theories." *Id.* at *19-*20.

Plaintiffs' incentives are further aligned with the Class's because the loans backing the Certificates that Plaintiffs purchased were originated by the same lenders that originated the loans backing the Certificates purchased by absent Class members.  Indeed, 32,334 out of the 34,492 total loans underlying the nine Offerings – or 93.7% – were originated by lenders that originated loans in the one Offering that Plaintiffs purchased.  *See* Pls.' Br., Chart 1.  As the Second Circuit held in *NECA*, "each Certificate-holder within an Offering or Group backed by loans originated by similar lenders has the ***same 'necessary stake*** in litigating' whether those lenders in fact abandoned their underwriting guidelines."  693 F.3d at 164.  Thus, defendants' misrepresentations and misconduct infected all Certificates equally, and proving those misrepresentations and that misconduct will benefit purchasers of all Certificates equally.  Plaintiffs therefore are fully motivated to prove the falsity of defendants' misrepresentations across all Offerings.

Nevertheless, defendants contend that Plaintiffs are inadequate to represent purchasers of Certificates in eight Offerings because they do not stand to benefit economically from proving such claims.  *See* Defs.' Br. at 2, 29-30.  This precise argument has been rejected in at least two RMBS class certification orders, where plaintiffs were appointed class representatives even where they had not purchased certificates from all of the certified offerings.  *See, e.g.*, *RALI IV*, 2013 U.S. Dist. LEXIS 180913, at *20-*21 (certifying class of 17 offerings where class representatives did not purchase in all offerings); *DLJ II*, 2014 U.S. Dist. LEXIS 35326, at *18-*19 (same, with two offerings).  Indeed, "[c]ourts have repeatedly certified classes where the class representatives had not invested in all of the subject securities."  *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98 Civ. 4318 (HB), 2000 U.S. Dist. LEXIS 13469, at *9 (S.D.N.Y. Sept. 20, 2000); *see also In re*

- 25 -

*Lehman Bros. Sec. & ERISA Litig.*, No. 09 MD 2017 (LAK), 2013 U.S. Dist. LEXIS 13999, at *19-*20 (S.D.N.Y. Jan. 23, 2013) (finding class representatives adequate representatives for investors of other securities not purchased by class representatives because the securities were issued off of the same shelf registration and the misrepresentations were substantially similar); *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 443-45 (S.D.N.Y. 2013) (certifying class of purchasers of company's common stock and certain bonds even though no class representative had purchased any bonds).

### 2. Plaintiffs Suffered Damages Consistent with the Class

Plaintiffs each suffered significant damages recoverable under §11 and, as such, both are members of the proposed Class. In accordance with §11(e), Plaintiffs' damages are measured as the difference between the amount originally paid for the Certificates and either: (1) the Certificates' **value** as of the time Plaintiffs brought suit, under §11(e)(1); or, (2) under §11(e)(3), the **price** at which the Certificates were disposed of after Plaintiffs filed suit but before judgment, if this calculation would lead to lesser damages than the calculation in §11(e)(1). *See* 15 U.S.C. §77k(e). Plaintiffs suffered damages using either method of calculation.

By selling at a price lower than that at which they purchased, Plaintiffs incurred damages recoverable under the statutory formula provided in §11(e)(3). *See, e.g., Pub. Emps.' Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc.*, No. 09 CV 1110 (HB), 2011 U.S. Dist. LEXIS 3267, at *28-*29 (S.D.N.Y. Jan. 12, 2011) ("*Goldman RMBS I*") (holding that plaintiffs' purchase of mortgage pass-through certificates at a price of $99.99 and sale at a price of $16.15 demonstrated damages under §11(e)). Defendants' expert concedes that Plaintiffs sold the Certificates at prices lower than those

- 26 -

at which they purchased, resulting in principal losses in excess of $1.8 million.  *See* James Report, Ex. 7; *see also* Ex. 3 at 36:24-37:3 ("[T]he statutory language suggests that you look at the price at purchase relative to the price or value at sale.").[20]

Plaintiffs also suffered damages under §11(e)(1) because at the time this action was brought in March 2009, the value of their Certificates had declined precipitously from the value at which they were purchased.  "'[T]he term [value] was intended to mean [a] security's true value,'" which may or may not be equivalent to its market price.  *NECA*, 693 F.3d at 165. ███████████████

██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
███████

██████████████████████████████████████████████████ defendants claim that plaintiffs suffered no damages, arguing that the value of Plaintiffs' Certificates for purposes of §11 damages calculations must account for past interest payments.  *See* Defs.' Br. at 32. Defendants' argument finds no support in law or logic.[21]   Indeed, the Second Circuit recently emphasized that previously-scheduled or received interest payments are ***not*** relevant to the calculation of an RMBS's value.  *See NECA*, 693 F.3d at 166 (noting that "basic securities valuation principles . . . belie the proposition that a fixed income investor must miss an interest payment before his securities can be said to have declined in 'value'").  "'[I]t is not just plausible – but obvious –

---

[20]  *AOL*, a case relied upon by defendants, is inapposite because there, unlike here, the market price of the subject certificates had ***increased*** between the time of purchase and the date the complaint was filed.  *In re AOL Time Warner Sec. & ERISA Litig.*, 381 F. Supp. 2d 192, 245-46 (S.D.N.Y. 2004).

[21] ██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
███████

that mortgage-backed securities . . . would suffer a decline in value as a result of (1) rating downgrades and (2) less certain future cash flows' *even if the securities did not miss an interest payment*." *Police & Fire Ret. Sys. v. Goldman, Sachs & Co.*, No. 10 Civ. 4429 (MGC), 2014 U.S. Dist. LEXIS 42452, at *4-*5 (S.D.N.Y. Mar. 27, 2014).  Thus, "the fact that [plaintiff] received payments throughout the life of the certificates . . . is *immaterial*." *Id.* at *5.[22] ███████████

███████████████████████████████████████████████████████████████

███████████████████████

Rather, the Second Circuit in *NECA* reaffirmed that the "value" of a security for purposes of §11 statutory damages is calculated by discounting the security's anticipated *future* cash flows as of the date of sale using a discount rate that reflects the cash flow's risk on such date.  693 F.3d at 166. This is only logical; a fixed income investor values a security based on its expected future cash flows and the risk that she will not receive them.  *See* Mason Rebuttal, ¶79.  Because interest payments

---

[22]   *See also Goldman RMBS I*, 2011 U.S. Dist. LEXIS 3267, at *27-*28 (receipt of principal and interest payments irrelevant where plaintiff bought RMBS at a price of $99.99 and sold at a price of $16.15); *Merrill*, 277 F.R.D. at 108 ("Defendants' argument that Plaintiffs must show that they failed to receive principal or interest" before having §11 damages "constitutes 'too cramped a reading of damages.'"); *Plumbers' & Pipefitters' Local #562 Supp. Plan & Trust v. J.P. Morgan Acceptance Corp.*, No. 08 CV 1713 (ERK) (WDW), 2012 U.S. Dist. LEXIS 24106, at *30-*31 (E.D.N.Y. Feb. 23, 2012) (holding receipt of principal and interest payments irrelevant where §11 damages are based on "a decrease in market value"); *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 773 (S.D.N.Y. 2012) (receipt of mortgage pass-through payments does not affect damages); *Genesee Cnty. Emps. Ret. Sys. v. Thornburg Mortg. Sec. Trust 2006-3*, 825 F. Supp. 2d 1092, 1149 (D.N.M. 2011) ("The Second Circuit recognized that section 11 prescribes a particular measure of damages, and that neither the plaintiff nor the defendant can take advantage of another measure of damages to increase or reduce recovery."); *Abrams v. Van Kampen Funds, Inc.*, No. 01 C 7538, 2005 U.S. Dist. LEXIS 531, at *37-*40 (N.D. Ill. Jan. 12, 2005) (granting motion *in limine* to exclude evidence of the fund's payment of $1.69 in dividend where the decline in principal value was $1.18, because the dividends paid by a loan fund were equivalent to interest earned on the underlying loans, and as a matter of law, not relevant to the calculation of §11 damages); *Nielsen v. Greenwood*, No. 91 C 6537, 1996 U.S. Dist. LEXIS 14441, at *26-*30 (N.D. Ill. Sept. 27, 1996) (certifying a class and holding that plaintiff sustained damages under §11 where he sustained a $1,250 principal loss from the sale of his holding of debentures prior to judgment even though he had received $11,000 in interest payments).

received by the seller in the **past** are wholly irrelevant to a security's **future** cash flows, they are irrelevant to the valuation of a security and, as a result, §11 damages calculations. ███████████

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████

Finally, defendants' argument that Plaintiffs could not have suffered damages because of the economic climate at the time they sold is nothing more than an improper attempt to shift the burden of proving loss causation to Plaintiffs. But "[r]equiring a plaintiff to [prove loss causation] would invert the burden of the defendants' causation defense, expressly framed as such in a statutory proviso. . . . The practical effect would be to try damages on the pleadings." *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1170 n.45 (C.D. Cal. 2008). Rather, it is defendants' burden to prove that Plaintiffs' losses were caused in whole or in part by something other than the alleged misrepresentations – a burden they have failed to carry. *See supra*, §II.B.3. ███████████

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████

### 3.        Plaintiffs' and the Class's Claims Are Timely

Plaintiffs' claims are timely for the same reason virtually every other court to consider the statute of limitations issue in RMBS class actions has found the plaintiffs' claims timely: defendants cannot point to a single piece of information available to the public more than a year before the Complaint was filed that "'*relate[s] directly* to the misrepresentations and omissions'" concerning the Offerings at issue in this case. *Goldman RMBS I*, 2011 U.S. Dist. LEXIS 3267, at *26. Where, as here, the articles cited by defendants are not "directly related to the [J.P. Morgan] issuing trusts"

and concern, instead, "the mortgage originators whose loans comprised the pools out of which the Certificates at issue were created," those articles are insufficient to place Plaintiffs on inquiry notice of the alleged misrepresentations and omissions concerning the loans and Offerings here at issue. *Id.* at *27.

Thus, defendants' argument that information about a third-party originator, AHM, put Plaintiffs on notice of their claims regarding ***J.P. Morgan's*** misrepresentations and omissions misses the mark. "For inquiry notice to exist, the triggering information must 'relate[] directly to the misrepresentations and omissions the Plaintiffs later allege in their action against the defendants.'" *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 427, 429 (2d Cir. 2008) (finding no inquiry notice where the publicly available information was not "specific to the company in which Appellants hold stock"); *see also Goldman RMBS II*, 280 F.R.D. at 140 (finding no inquiry notice where the information "did not directly relate to the alleged misstatements in the Offering Documents"); *In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 285 (S.D.N.Y. 2009) (same). Unsurprisingly, ***none*** of the cases cited by defendants support inquiry notice where the information did not relate directly to the defendants' alleged misstatements or the specific securities at issue in the case.[23]

---

[23]    *See In re Barclays Bank PLC Sec. Litig.*, No. 09 Civ. 1989 (PAC), 2011 U.S. Dist. LEXIS 2667, at *24-*27 (S.D.N.Y. Jan. 5, 2011) (finding notice where the information omitted from the offering documents was the same information disclosed in ***defendant's*** trading SEC filings); *Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125, 1136 (C.D. Cal. 2011) (finding notice where public press releases and filed complaints detailed problems with ***defendant's*** underwriting); *In re IndyMac Mortg.-Backed Sec. Litig.*, 718 F. Supp. 2d 495, 506 (S.D.N.Y. 2010) (finding notice where a publicly available report disclosed detailed information concerning ***defendant's*** underwriting); *Woori Bank v. Merrill Lynch*, 923 F. Supp. 2d 491, 496 (S.D.N.Y. 2013) (finding notice where information revealed that mortgages packaged by ***defendant*** did not meet underwriting standards and that ***defendant*** itself pressured originators to issue shoddy loans); *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 246 (S.D.N.Y. 2007) (finding that public information connecting the ***defendant*** company to backdated stock options was "sufficiently 'company-specific' to 'trigger a duty to investigate'"); *LC Capital Partners, L.P. v. Frontier Ins. Grp., Inc.*, 318 F.3d 148, 155 (2d Cir. 2003) (finding notice where ***defendant's*** own public admissions alerted the public to the fraud); *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*,

Here, Plaintiffs' claims concern misrepresentations and omissions by J.P. Morgan, not AHM; thus, news articles about AHM wholly unconnected to the Offerings specifically or even J.P. Morgan's securitization business generally fall far short of providing Plaintiffs with inquiry notice of their claims against J.P. Morgan.  Importantly, defendants fail to point to any information related to J.P. Morgan RMBS – much less information related to the specific Offerings or Certificates that Plaintiffs purchased – that would have put Plaintiffs on inquiry notice of their claims by March 2008, a year before the Complaint was filed.  In the end, articles concerning "origination problems" at AHM (Defs.' Br. at 34-35) are nothing more than articles on "larger issues in the market and in mortgage-backed securities generally" that are unrelated to "the alleged misstatements in this matter" and, thus, insufficient to provide inquiry notice of Plaintiffs' or any other putative Class member's claims against J.P. Morgan.  *Goldman RMBS II*, 280 F.R.D. at 140; *see also Merrill*, 277 F.R.D. at 116 (same).[24]

Moreover, defendants' argument that an unrelated action filed by Lead Counsel against AHM put Plaintiffs on notice of their claims in this case is meritless.  Nowhere in the unrelated action cited by defendants are the Offerings or J.P. Morgan even mentioned.  *See generally* Defs.' Br., Ex. II. Defendants also do not proffer any evidence showing that Lead Counsel was on notice of the

---

934 F. Supp. 2d 1219, 1227 (C.D. Cal. 2013) (finding notice where facts about the particular securities at issue were revealed); *Me. State Ret. Sys. v. Countrywide Fin. Corp.*, 722 F. Supp. 2d 1157, 1165 (C.D. Cal. 2010) (finding notice where earlier-filed complaints pleaded claims relating to the particular securities at issue).

[24]   AHM's bankruptcy also failed to put Plaintiffs and the Class on notice of their claims because there is no evidence that AHM's bankruptcy was connected to the failure to properly underwrite loans that were sold to and securitized by J.P. Morgan generally or the loans underlying the Offerings at issue in this case specifically. ███████████████████████████████████████████████████████████████████████████████████████████████████  As such, AHM's bankruptcy "does not establish that any prospective class member likely knew or had notice that the Offering Documents contained misstatements or omissions about [J.P. Morgan's] adherence to underwriting standards for the Certificates at issue in this case." *IndyMac*, 286 F.R.D. at 239.

misstatements concerning the nine Offerings here at issue before March 2008.  *See Goldman RMBS II*, 280 F.R.D. at 141 (holding that counsel's prior complaint against a mortgage originator and press release regarding the originator's "underwriting practices" generally did not suggest that counsel was on notice of the misstatements in the Offering Documents).  Further, contrary to defendants' suggestion, any knowledge by counsel cannot be imputed to Plaintiffs through monitoring agreements.  *See id.*

In the end, Plaintiffs are not subject to a unique statute of limitations defense.  Rather, any statute of limitations affirmative defense is common to the Class because "even assuming that the news reports provided some knowledge to investors, this information is 'subject to generalized proof.'"  *RALI IV*, 2013 U.S. Dist. LEXIS 180913, at *24; *see also Goldman RMBS II*, 280 F.R.D. at 136 ("I find little evidence that the nature of Plaintiff's susceptibility to the affirmative defense is distinctly different from that of any other institutional investor."); *Merrill*, 277 F.R.D. at 116 (finding plaintiff's claims were not time-barred and noting that even if defendants' materials were sufficient, the issue would be common to all class members).[25]

### 4.   Plaintiffs Are Actively Participating in This Litigation and Are Supervising Experienced Counsel

Taking snippets from depositions out of context and citing irrelevant facts, defendants contend that Plaintiffs "have failed to meet the most basic requirements to serve as class representatives."  Defs.' Br. at 38.  To the contrary, despite defendants' very limited questioning on the topics, ███████████████████████████████████████████

---

[25]   Defendants' speculation that Plaintiffs' claims would have been dismissed if they had been the Plaintiffs at the time of the motion to dismiss is baseless.  Like USVI GERS, Plaintiffs purchased certificates in the 2007-S3 Offering and do not have any individualized knowledge about any of the securities at issue here.  *See infra.*  Accordingly, defendants have no basis to again raise this argument that they withdrew during the motion to dismiss proceedings.  *See* Order dated Mar. 30, 2011 (Dkt. 121) at n.2.

926104_1



Such knowledge more than meets the level required of class representatives in a complicated case like this one. *See Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112, 118 (S.D.N.Y. 2008) ("'[A] plaintiff need not have expert knowledge of all aspects of the case to qualify as a class representative, and a great deal of reliance on the expertise of counsel is to be expected.'").[26]

### 5.   Defendants' Additional Attacks on Plaintiffs and Lead Counsel Are Invalid

First, there is no conflict between Lead Counsel and absent Class members. The fact that certain absent Class members may have been sued in connection with their own RMBS offerings is irrelevant here. *See Merrill*, 277 F.R.D. at 118 ("Although Defendants note that some members of the class, including Morgan Stanley Co., have been sued in connection with ***their own MBS offerings***, this is ***irrelevant*** to the Offerings at issue in this case.") (emphasis added and in original). Moreover, defendants provide no support for their argument that Lead Counsel has conflicts with any absent Class member. In fact, they do not even identify which absent Class members

---

[26]   For this reason, the fact that Plaintiffs had not memorized every minute detail of the case is immaterial to adequacy. Indeed, the Supreme Court has "expressly disapproved of attacks on the adequacy of a class representative based on the representative's ignorance." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 61 (2d Cir. 2000).

- 33 -

purportedly have conflicts.

Second, defendants' attempt to tarnish Lead Counsel should be given short shrift.  Contrary to defendants' suggestion, one confidential witness out of 11 sought to disavow the statements he made to Lead Counsel upon learning that he would be identified as one of the confidential witnesses in this action.[27]  Lead Counsel informed Magistrate Judge Francis of the confidential witness's position as soon as they learned of it.  *See* Exs. 8-9.  Thereafter, Lead Counsel reported to Magistrate Francis on *every* aspect of the discussions with the confidential witness's attorney – the epitome of diligence and candor.  Although Plaintiffs reported this situation to the Court nearly a year ago, defendants have never sought to take the witness's deposition or otherwise challenge Plaintiffs' allegations.

Notwithstanding the confidential witness's new position, the information received from the confidential witness – a former employee of AHM – is supported by the evidence in this case.



---

[27]

926104_1

███████████████████████████████████████████████

████ [28]

Far from defendants' aspersions, numerous courts have lauded Lead Counsel's exemplary representation of countless classes in complex litigation over many years. *See, e.g.*, *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 768 (S.D. Ohio 2007) ("The quality of representation in this case was superb. Lead Counsel [Robbins Geller] are nationally recognized leaders in complex securities litigation class actions."); *In re Enron Corp. Sec. Litig.*, 586 F. Supp. 2d 732, 789 (S.D. Tex. 2008) (Robbins Geller attorneys "are to be commended for their zealousness, their diligence, their perseverance, their creativity, the enormous breadth and depth of their investigations and analysis, and their expertise in all areas of securities law on behalf of the proposed class."). Lead Counsel's ability to diligently represent the Class in this action is without question.

## IV.     CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court: (1) certify this case as a class action pursuant to Rule 23(a) and 23(b)(3); (2) appoint Plaintiffs as Class Representatives; and (3) appoint Robbins Geller Rudman & Dowd LLP as Class Counsel.

---

[28]     Defendants' citation to *City of Livonia Emps.' Ret. Sys. v. Boeing Co.*, 711 F.3d 754, 762 (7th Cir. 2013) further demonstrates the infirmity of their attacks on Lead Counsel. The similarities between this case and *Boeing* begin and end with the fact that both contained confidential witnesses. In *Boeing*, the Seventh Circuit could have sanctioned either party but declined to do so. Instead, the Seventh Circuit remanded the case to the district court with instructions to perform the PSLRA-required Rule 11 analysis. There has never been a finding by either the Seventh Circuit or the district court that Plaintiffs or its counsel violated Rule 11. Similarly, there were no sanctions in *Belmont Holdings Corp. v. SunTrust Banks, Inc.*, 896 F. Supp. 2d 1210, 1231-33 (N.D. Ga. 2012). In *Applestein v. Medivation, Inc.*, 861 F. Supp. 2d 1030 (N.D. Cal. 2012), Robbins Geller did not even serve as lead counsel; the firm did not submit any confidential source statements in that case and had no substantive role in the litigation after the court appointed a different firm to serve as lead counsel. Finally, *Campo v. Sears Holding Corp.*, 371 F. App'x 212, 216-17 (2d Cir. 2010), makes no findings regarding "misconduct" by counsel and does not even mention Robbins Geller.

- 35 -

DATED:  April 11, 2014                    Respectfully submitted,

                                          ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                          ARTHUR C. LEAHY
                                          DANIEL S. DROSMAN
                                          SUSAN G. TAYLOR
                                          IVY T. NGO
                                          DARRYL J. ALVARADO
                                          ANGEL P. LAU


                                                  s/ DANIEL S. DROSMAN
                                                  DANIEL S. DROSMAN

                                          655 West Broadway, Suite 1900
                                          San Diego, CA  92101
                                          Telephone:  619/231-1058
                                          619/231-7423 (fax)

                                          ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                          SAMUEL H. RUDMAN
                                          DAVID A. ROSENFELD
                                          58 South Service Road, Suite 200
                                          Melville, NY  11747
                                          Telephone:  631/367-7100
                                          631/367-1173 (fax)
                                          srudman@rgrdlaw.com
                                          drosenfeld@rgrdlaw.com

                                          ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                          LUKE O. BROOKS
                                          Post Montgomery Center
                                          One Montgomery Street, Suite 1800
                                          San Francisco, CA  94104
                                          Telephone:  415/288-4545
                                          415/288-4534 (fax)

                                          Lead Counsel for Plaintiff

- 36 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 11, 2014, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on April 11, 2014.

s/ DANIEL S. DROSMAN
DANIEL S. DROSMAN

ROBBINS GELLER RUDMAN
   & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:dand@rgrdlaw.com

926104_1

# Mailing Information for a Case 1:09-cv-03701-JPO-JCF

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Floyd Abrams**
  fabrams@cahill.com

- **Mario Alba , Jr**
  malba@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com,drosenfeld@rgrdlaw.com

- **Darryl J. Alvarado**
  dalvarado@rgrdlaw.com,nhorstman@rgrdlaw.com

- **David Lionel Breau**
  dbreau@Sidley.com,nyefiling@Sidley.com

- **Luke Orion Brooks**
  lukeb@rgrdlaw.com

- **Rebecca L. Butcher**
  butcher@lrclaw.com

- **Darrell Scott Cafasso**
  cafassod@sullcrom.com,s&cmanagingclerk@sullcrom.com

- **Jarrett Scott Charo**
  jcharo@rgrdlaw.com

- **James J. Coster**
  jcoster@ssbb.com

- **Daniel S. Drosman**
  ddrosman@rgrdlaw.com,jillk@rgrdlaw.com,E_File_SD@rgrdlaw.com,tholindrake@rgrdlaw.com,kcook@rgrdlaw.com

- **Thomas Edward Egler**
  tome@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Andrew James Ehrlich**
  aehrlich@paulweiss.com

- **Martin Flumenbaum**
  mflumenbaum@paulweiss.com

- **Jonah H. Goldstein**
  jonahg@rgrdlaw.com

- **Joseph Peter Guglielmo**
  jguglielmo@scott-scott.com,sfein@scott-scott.com,edewan@scott-scott.com,tcrockett@scott-scott.com,efile@scott-scott.com,aslaughter@scott-scott.com

- **Geoffrey M. Johnson**
  gjohnson@scott-scott.com,edewan@scott-scott.com,efile@scott-scott.com

- **Roberta Ann Kaplan**
  rkaplan@paulweiss.com

- **Justin Evan Klein**
  jklein@ssbb.com,managingclerk@ssbb.com

- **Angel P. Lau**
  alau@rgrdlaw.com

- **Thomas Livezey Laughlin , IV**
  tlaughlin@scott-scott.com,efile@scott-scott.com

- **Arthur C. Leahy**
  artl@rgrdlaw.com

- **Nathan R. Lindell**
  nlindell@rgrdlaw.com

- **Richard Franklin Lubarsky**
  rlubarsky@llf-law.com

- **Alison Leigh MacGregor**
  amacgregor@kelleydrye.com,docketing@kelleydrye.com

- **L. Dana Martindale**
  dmartindale@rgrdlaw.com

- **Daniel Allan McLaughlin**
  dmclaughlin@sidley.com,nyefiling@sidley.com

- **Danny Cameron Moxley**
  cmoxley@sidley.com,nyefiling@sidley.com

- **Ivy T. Ngo**
  ingo@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Alfred Robert Pietrzak**
  rpietrzak@sidley.com,nyefiling@sidley.com

- **Caroline M Robert**
  crobert@rgrdlaw.com

- **Ashley M Robinson**
  ashleyr@rgrdlaw.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Tammy Lynn Roy**
  troy@cahill.com,ndelutri@cahill.com,mmcloughlin@cahill.com,nmarcantonio@cahill.com

- **Joshua M. Rubins**
  jrubins@ssbb.com

- **Samuel Howard Rudman**
  e_file_ny@rgrdlaw.com,mblasy@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Robert Andrew Sacks**
  sacksr@sullcrom.com,s&cmanagingclerk@sullcrom.com

- **Scott H. Saham**
  scotts@rgrdlaw.com,e_file_sd@rgrdlaw.com

Case 1:09-cv-03701-JPO-JCF   Document 288   Filed 04/11/14   Page 49 of 49

- **Alan Howard Scheiner**
  ascheiner@llf-law.com

- **Owen Harris Smith**
  owen.smith@bfkn.com,lauren.dwyer@bfkn.com

- **Dorothy Jane Spenner**
  dspenner@sidley.com,nyefiling@sidley.com

- **Hillary B. Stakem**
  hstakem@rgrdlaw.com

- **Andrew W. Stern**
  astern@sidley.com,nyefiling@sidley.com

- **Tobias James Stern**
  tstern@paulweiss.com

- **Susan G. Taylor**
  susant@rgrdlaw.com

- **Carolina Cecilia Torres**
  ctorres@csgrr.com

- **Sarah Penny Windle**
  windls@cahill.com

- **Adam N. Zurofsky**
  azurofsky@cahill.com,MMcLoughlin@cahill.com,NMarcantonio@cahill.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)