UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
                                       :

FORT WORTH EMPLOYEES' RETIREMENT  :
FUND, on behalf of itself and all others similarly  :
situated,  :
  :
                      Plaintiffs,  :
  :
             -v-           :
  :         09-CV-3701 (JPO)
J.P. MORGAN CHASE & CO., et al.,      :
  :       OPINION AND ORDER
                   Defendants.  :
-----------------------------------------------------------X

J. PAUL OETKEN, District Judge:

      This putative class-action lawsuit arises from the sale of $10 billion of mortgage pass-

through certificates ("Certificates"), a type of mortgage-backed security ("MBS"), by entities

related to J.P. Morgan Chase & Co. pursuant to a registration statement dated April 27, 2007 and

incorporated prospectus supplements (collectively, the "Offering Documents").  The operative

Second Amended Complaint ("SAC") set forth causes of action under Sections 11, 12(a)(2), and

15 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77k, 77*l*(a)(2), and 77o, on

behalf of purchasers of the Certificates, alleging that the Defendants made misleading statements

in the Offering Documents underlying the Certificates.

      Lead Plaintiffs Laborers Pension Trust Fund for Northern California ("NorCal") and

Construction Laborers Pension Trust for Southern California ("SoCal") (collectively,

"Plaintiffs") brought this action against J.P. Morgan Chase & Co. ("JPMC"), J.P. Morgan

Acquisition Corp. ("JPM Acquisition"); J.P. Morgan Acceptance Corporation I ("JPM

Acceptance"), and J.P. Morgan Securities, Inc.[1] ("JPMS") (collectively, the "JPM Defendants"),

---

[1] J.P. Morgan Securities, Inc. is now known as J.P. Morgan Securities LLC.

and also against six individuals who were officers or directors of JPM Acceptance (collectively, the "Individual Defendants"; together with the JPM Defendants, "Defendants").  (Dkt. No. 85 ("SAC").)

Now before the Court is Plaintiffs' motion to certify a class pursuant to Federal Rule of Civil Procedure 23, and Defendants' submission, styled as a motion in limine, to exclude the reports, opinions, and testimony of Plaintiffs' proffered expert, Dr. Joseph R. Mason.  For the reasons that follow, Plaintiffs' motion is granted in part and denied in part, and Defendants' motion is denied.

## I.      Background

The factual and procedural background of this case is summarized briefly below, but familiarity with the Court's prior decisions is presumed.[2]

### A.      Facts[3]

Defendants were involved in the sale of approximately $10 billion in Certificates, which provide their owners with an interest in the revenue stream from various pools of residential real estate loans contained within several common-law trusts (the "Trusts").  (SAC ¶ 36.)  As alleged in the SAC, JPM Acquisition (the "sponsor" of the Offerings at issue) purchased the loans underlying the Trusts from third parties who originated the loans (the "originators").  (*Id.* ¶ 37.)  Then, JPM Acquisition, in conjunction with JPM Acceptance (the "depositor"), bundled the loans into the Trusts for sale on the market.  (*Id.* ¶¶ 18-19, 36.)  JPMS acted as an underwriter for

---

[2] A fuller summary of the allegations of the SAC is contained in this Court's decision on the motion to dismiss.  *See Emps. Ret. Sys. of the Gov't of the Virgin Islands v. J.P. Morgan Chase & Co.*, 804 F. Supp. 2d 141, 146-49 (S.D.N.Y. 2011) [hereinafter "*Virgin Islands*"].

[3] The following facts are taken from the SAC and the parties' submissions made in connection with the instant motion, as noted herein.

each of the offerings.  (*Id.* ¶ 17.)  The Individual Defendants—Brian Bernard, the President of

JPM Acceptance; Louis Schoppio Jr., the Controller and CFO of JPM Acceptance; and Christine

E. Cole, David M. Duzyk, William King, and Edwin F. McMichael, all directors of JPM

Acceptance—all signed the registration statement.  (*Id.* ¶¶ 20-25.)

      As relevant for purposes of the motion to certify the class, the Certificates were issued in

nine separate offerings (the "Offerings") through a separate Trust for each Offering.[4]  This

lawsuit is premised on Plaintiffs' contention that the registration statements contained falsehoods

or omitted material information, which may give rise to liability for certain parties connected

with the issuance under Sections 11, 12(a)(2), and 15 of the Securities Act.  *See In re Morgan*

*Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010) ("Sections 11, 12(a)(2), and 15

of the Securities Act impose liability on certain participants in a registered securities offering

when the publicly filed documents used during the offering contain material misstatements or

omissions.").

      According to the SAC, the material misstatements or omissions contained in the Offering

Documents included (1) that the underwriting standards set out in the Offering Documents were

abandoned when underwriters in the loans underlying the Certificates, which were not in fact

followed (SAC ¶¶ 67-77); (2) that the appraisers falsified appraisal values and failed to follow

---

[4] The nine Trusts at issue are: J.P. Morgan Alternative Loan Trust 2007-A2, J.P. Morgan
Alternative Loan Trust 2007-S1, J.P. Morgan Mortgage Acquisition Trust 2007-CH3, J.P.
Morgan Mortgage Acquisition Trust 2007-CH4, J.P. Morgan Mortgage Acquisition Trust 2007-
CH5, J.P. Morgan Mortgage Trust 2007-A3, J.P. Morgan Mortgage Trust 2007-A4, J.P. Morgan
Mortgage Trust 2007-S2, and J.P. Morgan Mortgage Trust 2007-S3.  (Dkt. No. 223 ("Ptfs.' Class
Cert. Br.") Ex. A.)
     The SAC originally included allegations as to eleven MBS Trusts.  (SAC ¶ 19.)  In their
class certification papers, however, Plaintiffs state that discovery showed that two of the trusts—
JP Morgan Mortgage Trust 2007-A5 and J.P. Morgan Mortgage Trust 2007-A6—were invested
in by only two investors and one investor, respectively, and separate lawsuits are already pending
regarding those investments.  (Ptfs.' Class Cert. Br. at 1 n.1.)  Plaintiffs therefore have excluded
Certificates connected to these two trusts from their proposed definition of the class.

established appraisal standards (SAC ¶¶ 97-112); and (3) that loan-to-value ("LTV") ratios set out in the Offering Documents were false (SAC ¶¶ 113-16).[5]

**B.      Procedural History**

The complaint in this action was filed in March 2009 in New York Supreme Court, and the suit was removed to this Court on April 10, 2009.  (Dkt. No. 1.)  In April 2010, the Employees Retirement System of the Government of the Virgin Islands ("Virgin Islands") was designated lead plaintiff.  (Dkt. No. 74.)

The operative second amended complaint ("SAC") was filed in July 2010, and the Defendants moved to dismiss.  (Dkt. Nos. 85, 88.)  In an amended order dated May 10, 2011, Judge Koeltl, to whom this matter was previously assigned, dismissed for lack of standing the claims concerning all offerings of Certificates other than the offering in which Virgin Islands had an ownership interest, as well as the claims brought under Section 12(a)(2) of the Securities Act and the claims regarding investment ratings. *Virgin Islands*, 804 F. Supp. 2d at 149-51, 154. The order also dismissed the Section 11 claims as to JPMC and JPM Acquisition, and determined that the Section 15 claims survived only against the Individual Defendants. *Id.* at 156-58.  The Court otherwise denied the motion to dismiss.

In May 2012, the Court granted a motion by Virgin Islands to withdraw as lead plaintiff and ruled that the Northern California Laborers had standing to pursue this action, even though its holdings in the certificates were from different "tranches" from those owned by Laborers and

---

[5] These allegations are discussed in greater detail in this Court's opinion on the motion to dismiss. *See Virgin Islands*, 804 F. Supp. 2d at 147-49.  The SAC also alleged that the investment grades assigned to the Certificates falsely stated that the Certificates were safer investments than they truly were.  (SAC ¶¶ 117-23.)  These claims were dismissed for failure to state a claim. *See Virgin Islands*, 804 F. Supp. 2d at 154.

the Fort Worth Employees' Retirement Fund ("Fort Worth").  *See Fort Worth Emps. Ret. Fund v. J.P. Morgan Chase & Co.*, 862 F. Supp. 2d 322, 333-42 (S.D.N.Y. 2012).  NorCal and SoCal were appointed lead plaintiffs in July 2012, at which time the law firm of Robbins Geller Rudman & Dowd LLP ("Robbins Geller") was approved as lead counsel.  (Dkt. No. 175.)

In April 2013, the Court granted in part a motion for reconsideration of the May 2011 order.  (Dkt. Nos. 197, 200.)  Due to the intervening decision of the Second Circuit in *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012), the Court reinstated certain claims that had been dismissed for lack of standing in the 2011 decision—specifically, those claims brought pursuant to Sections 11 and 15 of the Securities Act, on behalf of purchasers of certificates in offerings that the lead plaintiffs had not invested, which were previously dismissed for lack of standing.  (Dkt. No. 197.)

Plaintiffs now move to certify a class of "[a]ll persons or entities who, prior to March 23, 2009, purchased or otherwise acquired any Certificates in any of the Offerings [specified in the moving papers] and were damaged thereby," to appoint Plaintiffs as class representatives, and to appoint Robbins Geller Rudman & Dowd LLP as class counsel.[6]  (Dkt. No. 223 ("Ptfs.' Class Cert. Br.") at 3.)  In addition, Defendants move to "exclude from consideration on the pending motion for class certification the reports, opinions and testimony of plaintiffs' proffered expert, Dr. Joseph R. Mason."  (Dkt. No. 295 ("Defs.' *Daubert* Br.") at 1.)

---

[6] The proposed class definition excludes "defendants, originators of any loans underlying the Certificates . . . , their successors and assigns, and the directors and officers of such entities at all relevant times, as well as members of such persons' immediate families and their legal representatives, heirs, successors or assigns, and any entity in which any excluded party has or had a controlling interest."  (Ptfs.' Class Cert. Br. at 3 n.5.)

## II.   Legal Standards

### A.  Expert Testimony

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides that an expert who is "qualified . . . by knowledge, skill, experience, training, or education" may testify if the testimony would be helpful to the trier of fact and is "based on sufficient facts or data," is "the product of reliable principles and methods," reliably applied to the facts of the case.  Fed. R. Evid. 702.  "[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied."  *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).  "When a motion to exclude expert testimony is made at the class certification stage, the *Daubert* standard applies, but the inquiry is limited to whether or not the expert reports are admissible to establish the requirements of Rule 23."  *Ge Dandong v. Pinnacle Performance Ltd.*, No. 10 Civ. 8086 (JMF), 2013 WL 5658790, at *13 (S.D.N.Y. Oct. 17, 2013) (brackets and internal quotation marks omitted).

### B.  Class Certification

Class certification is governed by Federal Rule of Civil Procedure 23.  The party seeking certification must establish that the class meets all requirements of the rule by a preponderance of the evidence.  *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010).  Rule 23 "does not set forth a mere pleading standard"; rather, the "party seeking class certification must affirmatively demonstrate . . . compliance with the Rule," *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011), through "evidentiary proof," *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 117 (2d Cir. 2013) [hereinafter "*Foodservice*"], *cert. denied*, 134 S. Ct. 1938 (2014).  The district court can certify the class only if satisfied that the rule's requirements have been satisfied after a "rigorous analysis."  *Wal-Mart*, 131 S. Ct. at 2551.

Rule 23(a) contains four prerequisites, requiring the party seeking certification to demonstrate that:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a); *see Marisol A. v. Giuliani*, 126 F.3d 372, 375 & n.3 (2d Cir. 1997) (per curiam).  These "four requirements—numerosity, commonality, typicality, and adequate representation—effectively limit the class claims to those fairly encompassed by the named plaintiff's claims."  *Wal-Mart*, 131 S. Ct. at 2550 (internal quotation marks omitted).

The movant must also show that the action meets the requirements of at least one of the three subsections of Rule 23(b).  *See Foodservice*, 729 F.3d at 117.  Here, the plaintiffs seek to certify their class under Rule 23(b)(3), which requires the court to find both "(1) predominance—'that the questions of law or fact common to class members predominate over any questions affecting only individual members'; and (2) superiority—'that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.'"  *Id.* (quoting Fed. R. Civ. P. 23(b)(3)).  In evaluating this requirement, Rule 23 requires courts to consider:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)-(D).

III.    **Discussion**

   A. *Daubert* **Motion to Preclude the Opinions and Report of Plaintiffs' Expert**

The Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* interpreted Rule

702 to "impose[] a special obligation upon a trial judge to ensure that any and all scientific

testimony is not only relevant, but reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147

(1999) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)) (ellipsis and

internal quotation marks omitted). The ultimate determination the Court must make on a

*Daubert* motion is that the expert "employs in the courtroom the same level of intellectual rigor

that characterizes the practice of an expert in the relevant field." *Id.* at 152.

While Rule 702 requires that the Court serve an initial gatekeeping function to keep out

"junk science," *Davis v. Carroll*, 937 F. Supp. 2d 390, 412 (S.D.N.Y. 2013), it is nonetheless "a

well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert

opinions," *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005). However, "nothing in

either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion

evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may

conclude that there is simply too great an analytical gap between the data and the opinion

proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

The first question the Court poses in conducting the *Daubert* inquiry is "whether the

expert has sufficient qualifications to testify." *Davis*, 937 F. Supp. 2d at 412 (internal quotation

marks omitted). If so, the "next question is whether the proffered testimony has a sufficiently

reliable foundation." *Id.* (citing *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265

(2d Cir. 2002)) (internal quotation marks omitted).

In answering this second question, the Court may consider factors including:

> (1) whether a theory or technique can be (and has been) tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) a technique's known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation, and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community.

*Amorgianos*, 303 F.3d at 266 (quoting *Daubert*, 509 U.S. at 593-94) (citations and internal quotation marks omitted).  Because "the gatekeeping inquiry must be tied to the facts of a particular case," *Kumho Tire*, 526 U.S. at 150 (internal quotation marks omitted), the "*Daubert* inquiry is fluid and will necessarily vary from case to case," *Amorgianos*, 303 F.3d at 266.  In this regard, the Court notes that the "formality of a separate hearing" is not always required for a district court to "effectively fulfill[] its gatekeeping function under *Daubert*."  *Williams*, 506 F.3d at 161.

### 1. *Daubert* at Class Certification and Timeliness of Motion

Although "[t]he Supreme Court has not definitively ruled on the extent to which a district court must undertake a *Daubert* analysis at the class certification stage," the Court has "suggest[ed] that a *Daubert* analysis is required in at least some circumstances."[7]  *Foodservice*, 729 F.3d at 129 (citing *Wal-Mart*, 131 S. Ct. at 2553-54).  As noted above, the "proper role for a *Daubert* inquiry at the class certification stage . . . is limited to whether or not the [expert reports] are admissible to establish the requirements of Rule 23."  *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 66 (S.D.N.Y. 2009).

---

[7] When the Supreme Court granted certiorari in *Comcast*, it intended to resolve this precise question.  *See Foodservice*, 729 F.3d at 129 n.13 (citing *Comcast Corp. v. Behrend*, 133 S. Ct. 24 (2012) (mem.)).  However, because Comcast had forfeited its objection to the expert testimony in question in the courts below, the Court did not answer the question and ruled on alternate grounds.  *See Comcast*, 133 S. Ct. at 1435-36 (Ginsburg and Breyer, JJ., dissenting).

In May 2014, after the class certification motion was fully briefed, Defendants filed a motion (styled as a motion in limine) to exclude the opinions of Plaintiffs' proposed expert, Dr. Joseph Mason. (Dkt. No. 294.) Plaintiffs protest that the so-called motion in limine should properly have been made a part of Defendants' opposition to the motion to certify the class. (Dkt. No. 297.) Defendants respond that they needed to review Mason's rebuttal report accompanying Plaintiffs' reply memorandum. (Dkt. No. 298.)

Defendants' *Daubert* motion seeks to exclude Mason's reports and opinions "from consideration *on the pending motion for class certification*." (Defs.' *Daubert* Br. at 1 (emphasis added).) The schedule approved by this Court gave Defendants a window of more than three months to depose Mason before Defendants' opposition was filed, with the intention that Defendants could include any objections to Mason's testimony in that opposition. Thus, the proper time to submit the *Daubert* motion was by January 2014, along with Defendants' opposition to class certification. *See, e.g.*, *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, No. 11 Civ. 4209 (KBF), Dkt. Nos. 57, 59 (S.D.N.Y. filed Aug. 29, 2013) (opposition to class certification and *Daubert* motion filed simultaneously). Any response to Mason's rebuttal report could have been submitted separately.

However, as noted above, a "rigorous analysis" is necessary for the Court to ensure that the requirements of Rule 23 are satisfied, *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013), and the submissions of Plaintiffs' expert constitute a significant part of the evidence supporting Plaintiffs' certification motion. Accordingly, even if it is currently unclear whether a full *Daubert* analysis is necessary at the class certification stage, the Court must in any event be satisfied that the Rule 23 factors are met. *See Comcast*, 133 S. Ct. at 1431 n.4 (stating that even if class action defendants "forfeited their ability" to challenge an expert's qualifications under the Federal Rules of Evidence," they can nonetheless "argue that the evidence failed to show that

the case is susceptible to awarding damages on a class-wide basis" (internal quotation marks omitted)).  The Court will accordingly consider the parties' submissions in determining whether the proffered expert's qualifications and methodology permit his testimony to be admissible to establish the Rule 23 requirements.

### 2.  Application

Mason submitted a report that accompanied Plaintiffs' motion to certify the class (Dkt. No. 224 ("Drosman Decl.") Ex. 1 ("Mason Report")), as well as a rebuttal report that responds to the reports of experts proffered by Defendants (Dkt. No. 289 ("Second Drosman Decl.") Ex. 2 ("Mason Rebuttal Report")).  Mason's principal report contains the following opinions: (1) the securities within each offering are interrelated because they were subject to related risks caused by the alleged underwriting deficiencies, incorrect appraisals and LTV values, and unexpected losses suffered even in the more subordinated securities would also case the more senior securities to lose value (Mason Report ¶¶ 80-85); (2) the allegedly false statements and omissions in the Offering Documents affected all of the Certificates similarly (*Id.* ¶¶ 86-89); (3) the class of those who invested in the Certificates contains at least at least 1360 investors (*Id.* ¶¶ 96-99); and (4) the Certificates can be valued on a classwide basis using one of three methods, either by observing prices at which similar securities were offered in the market, by modeling expected cash flow from underlying collateral, or by using third-party pricing (*Id.* ¶¶ 102-05).

 At the first step of the *Daubert* analysis, the Court finds that Mason "has sufficient qualifications to testify."  *Davis*, 937 F. Supp. 2d at 412.  Defendants make no attempt to claim that Mason's qualifications are in doubt.  Mason has a master's degree in economics and a Ph.D. in monetary economics, financial institutions, and economic history.  (Dkt. No. 296 Ex. A ("Mason Deposition") at 23.)  He has served as a financial economist at the Office of the Comptroller of the Currency and held visiting appointments at the Federal Deposit Insurance

11

Corporation and at regional divisions of the Federal Reserve.  (Mason Report ¶ 13.)  He is currently a Professor of Finance at Louisiana State University and a Senior Fellow at the Wharton School of Business.  (*Id.* ¶ 11.)  Mason has also presented expert opinion in other lawsuits involving MBS or the quality of mortgage loans.  *See, e.g.*, *United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, No. 12 Civ. 1422 (JSR), 2014 WL 3734122, at *5 & n.10 (S.D.N.Y. July 30, 2014) (citing Mason report); *Pub. Emps. Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 277 F.R.D. 97, 105 (S.D.N.Y. 2011) [hereinafter "*Merrill*"] (same).

At the second step, the Court must consider whether Mason's methods for reaching the opinions noted above are sufficiently reliable to be admissible under Rule 702.  These opinions are addressed in turn.

*Numerosity opinion.*  Initially, Defendants do not dispute Mason's conclusion that the class is numerous and contains at least 1360 members.  Mason reaches this total by counting a base number of investors who held an interest in the certificates, as set out in more detail below. The Court finds Mason's numerosity calculation method to be reliable.

*Commonality opinion.*  Mason's first and second conclusions—regarding the interrelatedness of the securities underlying the Trusts, and the common effect of the defects in the Offering Documents—go to the liability-related question of whether Defendants' allegedly false statements affected class members in similar ways.  These conclusions do not involve a particular empirical calculation method; rather, they are based on Mason's expertise in economics and understanding of mortgage-backed securities and other complex financial instruments.  Defendants posit that Mason "performed no analysis to support" these assertions and thus they are nothing but "hypothetical speculation."  (Defs.' *Daubert* Br. at 10.)

Where a proposed expert witness bases his testimony on practical experience rather than scientific analysis, courts recognize that "[e]xperts of all kinds tie observations to conclusions

through the use of what Judge Learned Hand called 'general truths derived from . . . specialized experience.'" *Kumho Tire*, 526 U.S. at 149-50 (ellipsis in original). While a "trial judge should exclude expert testimony if it is speculative or conjectural," or if it is "based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison," "[o]ther contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009) (internal quotation marks omitted). The Court has discretion "to determine whether the expert acted reasonably in making assumptions of fact upon which he would base his testimony." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (per curiam) (internal quotation marks omitted).

Defendants' challenge to the admissibility of Mason's opinion regarding commonality is unavailing. The opinion is based in Mason's general knowledge of economic principles and of the market for mortgage-backed securities, and his application of that understanding to the specific facts of the this case—that is, the allegedly false statements in the Offering Documents pursuant to which the Certificates were issued, and the way in which such false statements would affect the Certificates.

Defendants quote sections of Mason's report that discuss general principles of securitization and Mason's rationale for positing that underwriting guidelines are used by buyers of securitized loans in order to make a proper valuation of the investment and argue that Mason has not made a quantitative study of the common effects of Defendants' conduct. (Defs.' *Daubert* Br. at 10-11.) But while Mason may not have *quantified* the effect of the Offering Documents' statements regarding underwriting guidelines, there is no need for him to do so at this stage. Rather, for the present analysis, Mason must only show that falsehoods in the Offering Documents would have affected the value of the Certificates in a common manner. The

*degree* to which particular class members' holdings were affected by misstatements in the Offering Documents is a matter of damages, and is unnecessary to determine whether there are issues that can be resolved commonly for the class.

Mason's assumptions that general economic principles and the characteristics of the relevant securities market will apply to the Certificates are not unrealistic, made in bad faith, or impermissibly speculative. Thus, Defendants may challenge the *weight* that should be given to Mason's testimony or otherwise attempt to contradict it, but Mason's opinions in this area are admissible under Rule 702.

*Damages calculation opinion.* Defendants contend that Mason's methods as to his fourth conclusion are inadequate, claiming (1) that he "does not offer any damages methodology" and (2) that he fails to state "how he would address the crucial issue of negative loss causation on a classwide basis." (Defs.' *Daubert* Br. at 4.) But Defendants do not truly contend that Mason is using junk science. Rather, in essence, both of these arguments as to Mason's fourth opinion go to whether the method that Mason uses to assess the damages will be applicable on a classwide basis—a question that is properly considered as part of the Rule 23(b) issue of whether questions common to the class predominate over individual issues, not to the validity of Mason's methods as a matter of the admissibility of his expert testimony under the Federal Rules of Evidence.

As will be further discussed below, Section 11 of the Securities Act provides a statutory damages calculation methodology. *See* 15 U.S.C. § 77k(e). In his report, Mason cites three principal methods in which the securities at issue can be valued pursuant to the statutory methodology: (1) the market price method, by observing "prices paid in market transactions"; (2) the cash flow method, by "model[ing] the expected cash flows from the underlying collateral"—i.e., the mortgage loans that underlie the Certificates; and (3) third-party pricing, by

using benchmarks for prices kept by third-party providers like the Interactive Data Corporation.
(Mason Report ¶¶ 103-05.)

Defendants assert that they cannot ascertain which particular method Mason would
ultimately use to measure the damages to each of the class members, and accordingly that Mason
has "fail[ed] to set forth a damages methodology." (Defs.' *Daubert* Br. at 5-6.) Furthermore,
they say, Mason has not studied negative loss causation or "created a model to address" its
impact on damages. (*Id.* at 8-9.) But Defendants do not in fact contest the validity of Mason's
methodology. Mason states that his valuation methods "follow[] industry practice insecurities
valuation" and are used in J.P. Morgan's own valuation procedures (Mason Rebuttal Report
¶¶ 55-58), and Defendants do not contest this assertion. Rather, both strands of Defendants'
attack are just slightly different formulations of its argument that Mason has not proposed a
precise methodology for calculating damages for the entire class. The merits of this contention
are separate from the question whether Mason's analytical methodology is sound, and therefore
Defendants' challenge under *Daubert* fails.

The Court finds that Mason's opinions regarding the common effects of false statements
on the Certificates, and the methods Mason uses to calculate the number of class members and
damages, are generally accepted in the relevant community and can be reliably applied to the
evidence in this case. Accordingly, they are admissible for purposes of determining whether the
Rule 23 standards have been met. Defendants' *Daubert* motion is denied.

**B. Rule 23(a)**

On the merits of class certification, the Court notes that courts in this district have
frequently held that "suits alleging violations of Sections 11, 12(a)(2), and 15 of the Securities
Act are 'especially amenable' to class action certification and resolution." *In re IndyMac
Mortgage-Backed Sec. Litig.*, 286 F.R.D. 226, 232 & n.40 (S.D.N.Y. Aug. 17, 2012) [hereinafter

"*IndyMac*"] (collecting cases).  This is due in part due to the fact that Section 11 claims "apply

more narrowly" but subject defendants to liability "more readily" than claims brought under

Section 10(b) of the Securities Exchange Act of 1934.  *See In re Morgan Stanley Info. Fund Sec.

Litig.*, 592 F.3d at 359-60.

Defendants argue that Plaintiffs have failed to meet a number of the requirements of Rule

23, primarily contesting Plaintiffs' assertion that common issues will predominate over

individual issues in the class action under Rule 23(b)(3).  They also state that the class "is not

ascertainable or manageable," contend that Plaintiffs' claims are not typical of the class because

they are subject to unique defenses, and challenge the adequacy of Plaintiffs and their counsel to

protect class members' interests.  Although Defendants do not make any challenge to some

subparts of Rule 23, the Court must nonetheless make a "definitive assessment of [the] Rule 23

requirements," and "may certify a class only after making determinations that each of the Rule

23 requirements has been met."  *In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 41 (2d Cir.

2006), *clarified on denial of rehearing*, 483 F.3d 70 (2d Cir. 2007).  The Court's determinations

as to each of the requirements of Rule 23 follow.

### 1.  Numerosity

The first subsection of Rule 23(a) requires that the class be "so numerous that joinder of

each member is impracticable," Fed. R. Civ. P. 23(a)(1), but "[i]mpracticable does not mean

impossible," *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993).  Courts in the Second Circuit

presume that the numerosity requirement is met if a putative class has forty or more members.

*Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 252 (2d Cir. 2011) (citing *Consol.

Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995)).

The report submitted by Plaintiffs' proffered expert, Dr. Joseph Mason, estimates the

number of investors in the Certificates in the nine offerings at issue, conservatively, at over a

thousand members.  (Mason Report ¶¶ 90-101.)  While Mason concedes that there is "no single, comprehensive list setting forth the identities of all persons or entities possessing a beneficial ownership interest in the securities at any given time," he asserts that a minimum number of owners can be estimated because the Certificates are issued in the United States through the a banking organization and clearing agency known as the Depository Trust Company ("DTC"). Because only participants in the DTC are reflected on its records that show the ownership of the Certificates, some of these ownership entries may reflect ownership by a DTC participant only as a stand-in for a non-DTC participant, which would increase the overall size of the class.  Among the nine Offerings of certificates, Mason estimates a class size of at least 1360, excluding information from a second dataset that could contain duplicates.  (Mason Report ¶¶ 98-99.) Mason's estimates of the number of investors in each Offering exceeds the presumptive level of forty members in all but one of the nine Offerings (Mason Report ¶ 98), but even if this number would fall short of the presumptive level of forty, "decisions in this district have concluded that a class may be certified even where certain sub-groups of that class do not meet the presumptive 40-member requirement," *IndyMac*, 286 F.R.D. at 232; *see also id.* at 232 n.48 ("This and other courts have rejected the argument that numerosity must be established on a tranche-by-tranche basis." (collecting cases)).

Defendants do not challenge the conclusion that the putative class is numerous and have presented no evidence to the contrary.  The Court finds that Plaintiffs have satisfied the requirement of Rule 23(a)(1) by demonstrating that the numerosity of the class would cause joinder of each member to be impracticable.

### 2.  Commonality

"The commonality requirement is met if plaintiffs' grievances share a common question of law or of fact."  *Marisol A.*, 126 F.3d at 376.  Courts in this district have characterized the

commonality requirement as a "low hurdle." *Dodona I, LLC v. Goldman, Sachs & Co.*, 296

F.R.D. 261, 267 (S.D.N.Y. 2014) (internal quotation marks omitted).  This requirement is

"plainly satisfied in a securities case where the alleged misrepresentations in the prospectus

relate to all the investors, because the existence and materiality of such misrepresentations

obviously present important common issues." *IndyMac*, 286 F.R.D. at 233 (brackets and internal

quotation marks omitted).

To address the issue of whether there are common legal questions, it is necessary to set

forth a brief overview of the legal standards governing the principal claim alleged.  In a case

brought pursuant to Section 11 of the Securities Act, "[l]iability attaches to a security's issuer, its

underwriter, and certain other statutorily enumerated parties . . . if 'any part' of the operative

registration statements 'omitted to state a material fact required to be stated therein or necessary

to make the statements therein not misleading.'" *In re ProShares Trust Sec. Litig.*, 728 F.3d 96,

101 (2d Cir. 2013) (quoting 15 U.S.C. § 77k(a)).  To state a claim under Section 11, the plaintiff

must allege that:

> (1) she purchased a registered security, either directly from the
> issuer or in the aftermarket following the offering; (2) the defendant
> participated in the offering in a manner sufficient to give rise to
> liability under section 11; and (3) the registration statement
> contained an untrue statement of a material fact or omitted to state a
> material fact required to be stated therein or necessary to make the
> statements therein not misleading.

*Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 283 F.R.D. 199, 210-11 (S.D.N.Y.

2012) (quoting *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 358-59 (internal

quotation marks omitted)).[8]

---

[8] The Plaintiffs also maintain Section 15 claims against the Individual Defendants.  Because
"Section 15 liability is derivative of liability under Section 11," *IndyMac*, 286 F.R.D. at 236, this
opinion addresses only the elements of the underlying Section 11 claims here.

The claims brought on behalf of the putative class in this case allege that statements in the Offering Documents were false or omitted material information—presenting questions that are "clearly susceptible to common answers." *Merrill*, 277 F.R.D. at 106; *see also Tsereteli*, 283 F.R.D. at 207 ("[T]he central issue is whether the Offering Documents contain material misstatements or omissions, an issue that is common to all class members. The issue of the materiality of the allegedly untrue statements and omissions likewise is similar for all members of the class."). While Defendants challenge whether common issues *predominate* (Dkt. No. 262 ("Defs.' Class Cert. Br.") at 6), they do not contest that there are common questions of law or fact shared by the class. Accordingly, the commonality requirement is satisfied.

### 3. Typicality

"To establish typicality under Rule 23(a)(3), the party seeking certification must show that each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (internal quotation marks omitted). "The commonality and typicality requirements tend to merge into one another, so that similar considerations animate analysis of Rules 23(a)(2) and (3)." *Marisol A.*, 126 F.3d at 376. Like the commonality requirement, showing typicality is "not demanding"; it "does not require that the factual identity between the named plaintiffs and the class members, only that the disputed issues of law or fact occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class." *Dodona*, 296 F.R.D. at 267 (internal quotation marks omitted). The central feature for typicality is that plaintiffs assert "that defendants committed the same wrongful acts in the same manner, against all members of the class," and the court looks "not at the plaintiffs' behavior, but rather at the defendant's actions. *Tsereteli*, 283 F.R.D. at 208 (brackets and internal quotation marks omitted).

The claims of the class members arise from the same course of events: all purchased Certificates that contained similar statements in their Offering Documents regarding underwriting standards.  As other courts have determined, typicality "may be found in a securities class action based on something as simple as a common 'disregard of underwriting guidelines.'"  *Tsereteli*, 283 F.R.D. at 208 (quoting *N.J. Carpenters Health Fund v. Res. Capital, LLC*, 272 F.R.D. 160, 167 (S.D.N.Y. 2011), *aff'd*, 477 F. App'x 809 (2d Cir. 2012)).  This holds "even if certain plaintiffs are unable to demonstrate that they would recover *any* damages with respect to certain certificates."  *Id.*

Defendants' principal argument that Plaintiffs' claims are not typical of the class rests on the assertion that Plaintiffs are subject to unique legal defenses that are not shared by other class members.  *See Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000)) ("While it is settled that the mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification, class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990) (internal quotation marks omitted)).  However, the unique defense rule "is intended to protect [the] plaintiff class—not to shield defendants from a potentially meritorious suit."  *In re Parmalat Sec. Litig.*, No. 04 MD 1653 (LAK), 2008 WL 3895539, at *5 (S.D.N.Y. Aug. 21, 2008) (internal quotations marks omitted).

According to Defendants, Plaintiffs may be subject to a statute of limitations defense because they may have discovered or had sufficient notice of the falsehoods contained in the Offering Documents.  Section 11 suits are barred if they are filed more than "one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence."  15 U.S.C. § 77m.

Although the parties scarcely address the issue, the law is unsettled in this Circuit as to the correct standard for determining the date on which the one-year limitations period begins to run for a Section 11 action.  Under the first possibility, the "'inquiry notice' rule," the one-year period begins to run "when public information, sometimes called 'storm warnings,' would lead a reasonable investor to investigate potential claims."  *In re Magnum Hunter Res. Corp. Sec. Litig.*, No. 13 Civ. 2668 (KBF), 2014 WL 2840152, at *19 (S.D.N.Y. June 23, 2014) (quoting *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 349-50 (2d Cir. 1993)).  In order to put a party on inquiry notice, "the triggering information must relate directly to the misrepresentations and omissions plaintiff later alleges in its action against the defendants."  *Pa. Pub. Sch. Emps. Ret. Sys. v. Bank of America*, 874 F. Supp. 2d 341, 364 (S.D.N.Y. 2012) (quoting *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 427 (2d Cir. 2008)) (brackets and internal quotation marks omitted).

A second possibility is the "discovery rule" set out in *Merck & Co. v. Reynolds*, 559 U.S. 633 (2010).  In *Merck*, the Supreme Court "rejected the inquiry notice standard in the context of a claim brought under Section 10(b) of the Securities [Exchange] Act of 1934," pursuant to a different statute, 28 U.S.C. § 1658(b)(1).  *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 762 (S.D.N.Y. 2012).  The *Merck* Court held that the "discovery of facts that put a plaintiff on 'inquiry notice' does not automatically begin the running of the limitations period" for a Section 10(b) claim; rather, the limitations period "begins to run once the plaintiff did discover or a reasonably diligent plaintiff would have discovered the facts constituting the violation—whichever comes first."  *Id.* at 652-53 (brackets and internal quotation marks omitted).  A fact is deemed to be "discovered" when "a reasonably diligent plaintiff would have sufficient information about that fact to adequately plead it in a complaint." *City of Pontiac Gen. Emps. Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011).

"The Second Circuit . . . has not had the opportunity to determine whether *Merck* also applies to the '33 [Securities] Act," *Lighthouse Fin. Grp. v. Royal Bank of Scot. Grp., PLC*, 902 F. Supp. 2d 329, 346 n.11 (S.D.N.Y. 2012), and courts in this district have split on this question, *see In re Magnum Hunter*, 2014 WL 2840152, at *19; *In re Bear Stearns*, 851 F. Supp. 2d at 762-63.

This question of law does not need to be resolved here, however.  The inquiry at the class certification stage concerns only whether Plaintiffs' claims are typical of the class, not whether any Defendants' statute of limitations defense will be successful.  Defendants do not offer any evidence demonstrating that Plaintiffs had *actual* notice of the falsehoods in the Offering Documents regarding violations of underwriting and appraisal standards or false LTV values.  Rather, they point only to public information that would have had the same effect on all class members.[9]  "[P]ublicly available news stories do not create individualized knowledge," and "even assuming that the news reports provided some knowledge to investors, this information is subject to generalized proof."  *N.J. Carpenters Health Fund v. Res. Capital, LLC*, Nos. 08 Civ. 8781 (HB), 08 Civ. 5093 (HB), 2013 WL 6839093, at *4 (S.D.N.Y. Dec. 27, 2013) (internal quotation marks omitted); *see also Merrill*, 277 F.R.D. at 116 ("If the news reports, government investigations, public hearings, and civil complaints attached as exhibits to Defendants' moving papers were sufficient, either singly or in combination, to place a reasonable investor on inquiry notice of Defendants' alleged securities violations, then the claims of all class members are time-barred.").  Whether the standard is inquiry notice or discovery by a reasonably diligent plaintiff,

---

[9] The fact that Plaintiffs' counsel was involved in a separate lawsuit against American Home Mortgage ("AHM"), one of the loan originators in this case, does not change this result.  The information that Defendants contend would have put investors on notice of issues concerning AHM's underwriting practices prior to and including the lawsuit itself was public and thus would have affected all class members similarly for notice purposes.

the proof of any statute of the statute of limitations defense will not require individualized inquiries.  *See Merrill*, 277 F.R.D. at 109 ("[T]he question of whether class members were on inquiry notice of the conduct alleged in the Amended Complaint more than a year before the filing of the cases consolidated herein will be subject of generalized proof.").

Thus, the statute of limitations defense will be subject to proof on a classwide basis and does not undermine the Plaintiffs' representation of absent class members.  The Court is satisfied that the typicality requirement is met.

### 4.  Adequacy

In conducting the adequacy analysis, the Court must consider whether "1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation."  *In re Flag Telecom*, 574 F.3d at 35 (internal quotation marks omitted).  The adequacy inquiry, like other Rule 23(a) requirements, is intended to ensure "the efficiency and fairness of class certification," *Marisol A.*, 126 F.3d at 378, but with particular focus on "uncover[ing] conflicts of interest between named parties and the class they seek to represent," *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).

Relatedly, Rule 23(g) provides that "a court that certifies a class must appoint class counsel," taking into account factors including counsel's work expended on and resources committed to the case, experience in complex litigation and knowledge of applicable law, and "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class."  Fed. R. Civ. P. 23(g)(1)(A)-(B).

"Inherent in any class action is the potential for conflicting interests among the class representatives, class counsel, and absent class members."  *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1077 (2d Cir. 1995).  However, "[a] conflict or potential conflict

alone will not . . . necessarily defeat class certification—the conflict must be 'fundamental.'"

*Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006).

    *Class representatives.*  Defendants argue that NorCal and SoCal lack sufficient

knowledge about this lawsuit to serve as lead plaintiffs.  (Defs.' Class Cert. Br. at 38-39.)  "In

this circuit," however, "general knowledge is sufficient to show adequacy."  *Res. Capital, LLC*,

272 F.R.D. at 164 (approving lead plaintiff in a MBS case who "showed knowledge of the

general characteristics of mortgage-backed securities, the . . . securities [at issue in the suit] in

particular, and their fiduciary responsibility as class representatives"); *see also Tsereteli*, 283

F.R.D. at 209 ("The Supreme Court has expressly disapproved of attacks on the adequacy of a

class representative based on the representative's ignorance." (internal quotation marks

omitted)); *NYSE Specialists*, 260 F.R.D. at 74 (stating that, in complex securities cases, "named

plaintiffs are not expected to possess expert knowledge of the details of the case and must be

expected to rely on expert counsel" (quoting *Baffa*, 222 F.3d at 61) (internal quotation marks

omitted).  The Plaintiffs' representatives have demonstrated a sufficient understanding of the

litigation and Plaintiffs' role therein to serve as class representatives.  (*See* Second Drosman

Decl., Exs. 6, at 55-57, 71-72; 7, at 55-56.)

    *Lead Counsel.*  The Court finds that Robbins Geller, the firm acting as counsel to

Plaintiffs, is experienced in securities class action litigation and qualified to conduct this lawsuit.

(*See* Drosman Decl. Ex. 10.)  Robbins Geller has previously been deemed qualified in similar

litigation.  *See Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 157 (S.D.N.Y. 2012) ("[C]ourts

within this Circuit have repeatedly found Robbins Geller to be adequate and well-qualified for

the purposes of litigating class action lawsuits."); *Sgalambo v. McKenzie*, 268 F.R.D. 170, 174

(S.D.N.Y. 2010) (characterizing Robbins Geller as a "highly competent plaintiffs' firm[] with

substantial securities class action experience").

Defendants contend that Robbins Geller is inadequate to serve as lead counsel because of a potential conflict of interest arising from the fact that the firm has filed actions against "numerous defendants who are members of the class that . . . Plaintiffs seek to certify." (Defs.' Class Cert. Br. at 37.) Defendants cite other pending litigation in which Robbins Geller has sued members of the putative class, in actions arising from those parties' own MBS offerings. (*See* (Dkt. No. 263 ("McLaughlin Decl.") Ex. NN.) But it is undisputed that those claims are factually unrelated. *Cf. Merrill*, 277 F.R.D. at 118 (noting that while "some members of the class, including Morgan Stanley Co., have been sued in connection with *their own MBS offerings*, this is irrelevant to the Offerings at issue in this case"). Defendants have proffered no evidence beyond their general claim of a conflict, and make no showing that Plaintiffs' counsel's interests in this litigation would be inconsistent with the interests of any member of the instant class. *Cf. Dodona*, 296 F.R.D. at 268 ("[T]he mere statement that [lead plaintiff] Dodona previously made allegations against [two putative class members] in an unrelated litigation— with no direct connection to the [securities in issue]—is insufficient to demonstrate a conflict pernicious enough to suggest that Dodona cannot adequately protect the interests of the class."). The Court is unconvinced on the present record that there is a conflict so "fundamental" as to preclude class certification on adequacy grounds.[10]

Finally, Defendants argue that Robbins Geller has engaged in questionable practices that undermine its adequacy to serve as class counsel. In support of this contention, they cite the fact that one of the "confidential sources" cited in the SAC—a former employee of one of the loan

---

[10] Of course, if such evidence is presented during the course of the litigation, the Court may reconsider the adequacy determination or consider reframing the class definition. *See* Fed. R. Civ. P. 23(c)(1)(C). Furthermore, any class members who "determine for themselves they are sufficiently concerned about a potential conflict of interest with the class representative . . . may choose to opt out of the class action." *Dodona*, 296 F.R.D. at 268; *see* Fed. R. Civ. P. 23(c)(2)(B)(v). The same applies to concerns about potential conflicts with class counsel.

originators—has since withdrawn his testimony, asserting that he did not make the statements ascribed to him or that those statements were mischaracterized.  (*See* McLaughlin Decl. Ex. OO; Second Drosman Decl. Exs. 8, 9.)  Defendants assert that this is part of a pattern of conduct by Robbins Geller, citing other cases in which confidential sources in securities actions have retracted or denied making statements attributed to them.  *See City of Livonia Emps. Ret. Sys. v. Boeing Co.*, 711 F.3d 754, 761-62 (7th Cir. 2013); *Belmont Holdings Corp. v. SunTrust Banks, Inc.*, 896 F. Supp. 2d 1210, 1223-24 (N.D. Ga. 2012).

Judge Rakoff recently considered a similar claim regarding confidential witness statements included in a securities class action complaint filed by Robbins Geller as counsel for the plaintiffs.  *See City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*, 952 F. Supp. 2d 633, 634 (S.D.N.Y. 2013).  After hearing testimony from the witnesses who had recanted the statements previously attributed to them in the complaint, the court's view was that the plaintiffs' counsel was not at fault, and that the witnesses had "den[ied] outright statements they had actually made" due to "pressures" placed on such witnesses by outside forces.  *Id.* at 636-37.

Here, there remains an unresolved factual dispute regarding a statement allegedly made by one confidential source cited in the SAC.  The Court is disinclined at this time to develop the factual record as would be necessary to determine whether Robbins Geller in fact engaged in "misconduct," as Defendants allege, or if the apparent change in position by the confidential witness reflects his reaction to outside pressures to change his testimony, as in *City of Pontiac*. *See* 952 F. Supp. 2d at 636 ("[T]he testimony presented at the . . . hearing bore witness to the competing pressures this process had placed on the confidential witnesses and the impact such pressures had had on their ability to tell the truth.").  The current record establishes no shortcoming by Robbins Geller; nor is the Court convinced that, even assuming the truth of Defendants' claims, this would preclude the firm's appointment as class counsel.  The dispute

about one confidential witness's purported statement does not undermine the Court's approval of the firm's adequacy to represent the plaintiff class.

The Court concludes that the Plaintiffs will adequately represent the interests of the class. Therefore, NorCal and SoCal are designated class representatives.  Further, the Court is satisfied that Plaintiffs' counsel can fairly and adequately represent the class's interests and appoints Robbins Geller as class counsel.

### C.  Rule 23(b)

#### 1.  Predominance

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3). "The predominance requirement is satisfied 'if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.'"  *Foodservice*, 729 F.3d at 118 (quoting *UFCW Local 1776 v. Eli Lilly and Co.*, 620 F.3d 121, 131 (2d Cir. 2010)).

"While the predominance inquiry is more demanding than the commonality determination required by Rule 23(a), predominance does not require a plaintiff to show that there are *no* individual issues."  *Merrill*, 277 F.R.D. at 111 (citing *NYSE Specialists*, 260 F.R.D. at 75).  Instead, "a court's inquiry is directed primarily toward whether the issue of liability is common to members of the class," taking into account "both affirmative claims and potential defenses."  *IndyMac*, 286 F.R.D. at 236 (internal quotation marks omitted).

#### a.  Classwide Consideration of Underwriting Guidelines, Appraisal Values, and LTV Ratios

Defendants argue that this case is simply too complex to be maintained as a class action, contending that there are numerous originators and over 8,000 different underwriting guidelines,

and that ultimately the factfinder will need to conduct a "loan-by-loan" examination of the securities at issue.  (Defs.' Class Cert. Br. at 10-11.)  But the Defendants' basic argument—that this Section 11 claim cannot be adjudicated on a classwide basis due to the complex nature of mortgage-backed financial instruments—has been rejected in other MBS actions by courts in this district.  The class members' proof of liability will principally require an examination of the Defendants' issuance of the Certificates pursuant to the same basic process for purchase by the class members.  "The alleged flaws common to that process, which resulted in the misstatements, will be the subject of common proof."  *Merrill*, 277 F.R.D. at 113.  As in previous cases, there is "substantial factual and legal overlap" between the Offerings, due to similarities in the alleged falsehoods in the offering documents, along with "the same entities and employees involved in making the offerings, the same 'wrongful course of conduct' with regard to underwriting guidelines, and the overlap in mortgage originators."  *N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, No. 08 Civ. 5653 (PAC), 2014 WL 1013835, at *8 (S.D.N.Y. Mar. 17, 2014).

As to Defendants' more particular contentions: it is far from clear that there are thousands of underwriting guidelines to be scoured for material differences.  Defendants' underwriting expert has conceded that he is unsure if there are in fact 8,196 underwriting guidelines—a statement in clear tension with his report, which asserts without qualification that 8,196 is the precise number of such guidelines underlying the Certificates.  (*Compare* Second Drosman Decl. Ex. 1 ("Sillman Deposition"), at 102-03, *with* McLaughlin Decl. Ex. B ("Sillman Report") ¶ 16.) And when Plaintiffs' expert reviewed some of the documents that Defendants tally as separate "underwriting guidelines," he found that many among this number may be either materially identical or irrelevant.  (Mason Rebuttal Report ¶ 38.)  Further, as long as the relevant underwriting guidelines contained substantially similar terms regarding the borrowers' ability to

repay the loans, along with reference to properly calculated appraisals and LTV ratios—as Plaintiffs assert they do, and Defendants have not shown otherwise (*see* Mason Rebuttal Report ¶ 39; Sillman Deposition at 103-04)—relatively minor variations between those guidelines will not require individualized attention.  On the present record, the Court is unconvinced by Defendants' contention that the sheer number of underwriting guidelines, or relevant distinctions between those guidelines, precludes the predominance of common issues.

Furthermore, the evidence adduced by Plaintiffs shows that a single loan originator made about two-thirds of the loans at issue; further, 85% of the loans at issue were originated by a group of nine originators.  (Ptfs.' Class Cert. Br. Tbls. 1-2.)  The Plaintiffs intend to show on the merits that the Offering Documents contained falsehoods or material omissions because Defendants broadly abandoned the underwriting guidelines, not that the guidelines were relaxed in certain ways.  (*See* Mason Rebuttal Report ¶¶ 30-33.)  The merits of Plaintiffs' claims hinge on systemic conduct; accordingly, those claims will be subject to systemic proof.

Defendants contend that it will be necessary to conduct a "subjective evaluation of whether each loan complied with the applicable underwriting guidelines" and that the underwriting inquiry will vary based on "different standards for different product types, documentation levels, interest rate features," along with the possibility that standards differed for "particular region[s]."  (Defs.' Class Cert. Br. at 13.)  However, Defendants have not sufficiently rebutted Plaintiffs' showing that a classwide analysis can be conducted.  It is true that the litigation may require loan analysis in order to determine whether there was in fact a systematic abandonment of underwriting guidelines, accompanied by the inflation of appraisal values and falsification of LTV ratios.  But, as Defendants admit, this can be done through review of a "representative sample" of the loans in the Offerings.  (Defs.' Class Cert. Br. at 13; *see also* Sillman Report ¶¶ 8, 10.)  Thus, "[w]hile an analysis of the alleged falsity of the statements in

the Offering Documents will of course entail some individualized inquiry, the common issues here overwhelm the individual ones." *Merrill*, 277 F.R.D. at 113.  The parties have agreed to produce loan samples and reports on the methodology for producing those samples by March 2015.  (Dkt. No. 317.)

Of course, in the event that it becomes clear, either after loan sampling has been conducted or at any other stage in the litigation, that it is impossible to create appropriate loan samples, or that marked distinctions between the Offerings, loan originators, or in other characteristics will cause individual issues to predominate, the Court retains the ability to reconsider this order and to create subclasses or otherwise modify the class if necessary.  *See Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*, 262 F.3d 134, 139 (2d Cir. 2001) ("[T]he district court is often in the best position to assess the propriety of the class and has the ability, pursuant to Rule 23(c)[], to alter or modify the class, create subclasses, and decertify the class whenever warranted.").

Nor will any question regarding the materiality of the misstatements require individual inquiries.  "Because materiality is determined by an objective rather than a subjective standard, the question of materiality, rather than being an individual issue, is in fact a common issue." *Merrill*, 277 F.R.D. at 114 (internal quotation marks omitted).  Here, as in previous cases in which MBS classes were certified, "the core representations at issue are identical, and the determination of their materiality will be based on an objective assessment of the total mix of information available to investors." *DLJ Mortg. Capital*, 2014 WL 1013835, at *11.

### b.  Knowledge of Putative Class Members

Section 11 claims are subject to a knowledge defense if the purchaser of a "security issued pursuant to a materially false registration" is shown to have "kn[own]" about the false statement at the time of acquisition." *DeMaria v. Andersen*, 318 F.3d 170, 175 (2d Cir. 2003);

*see* 15 U.S.C. § 77k(a) (providing for an exception to Section 11 liability where "it is proved that at the time of such acquisition [the purchaser] knew of [the registration statement's] untruth or omission").  The burden of establishing the knowledge defense is on the defendants.  *See Tsereteli*, 283 F.R.D. at 212 n.106 (citing *In re Initial Pub. Offering Sec. Litig.*, 483 F.3d 70, 73 n.1 (2d Cir. 2007)).  Moreover, the statutory defense requires the defendant to "show the purchaser's actual knowledge of the specific untruth or omission."  *N.J. Carpenters Health Fund v. RALI Series 2006-Q01 Trust*, 477 F. App'x 809, 813 (2d Cir. 2012) (summary order).

Defendants assert that the question whether class members knew of the alleged misstatements in the Offering Documents precludes common issues from predominating.  They contend that purchasers' disparate knowledge will necessitate individual inquiries into what class members knew at the point when they purchased their respective holdings in the Certificates.  (Defs.' Class Cert. Br. at 24-29.)  Defendants make three principal arguments as to how class members' knowledge divides the class.  First, they state that information about financial difficulties among loan originators became publicly available over time, leading to differences among class members who purchased Certificates at different points.  (Defs.' Class Cert. Br. at 24-26.)  Second, Defendants argue that some investors were sophisticated institutional investors who allegedly "had substantial information" about both "mortgage underwriting in general, and the originators' underwriting practices in particular" (*Id.* at 28), which presumably led to their knowledge of the allegedly false statements in the Offering Documents.  Third, Defendants contend that groups of investors who participated in Offerings backed by different types of underlying loans would find different information to be material.  (*Id.* at 26-28.)  Because Defendants' evidence does not demonstrate substantial questions concerning whether individual members of the putative class had knowledge of the falsity of the registration statements, the Court is unconvinced.  Each of Defendants' contentions is addressed in turn.

31

*Purchases over time.*  In a case where the parties opposing certification had demonstrated that "certain class members were extensively involved in the structuring of the offerings at issue, including in the review and selection of the loans that backed the certificates," one court in this district concluded, on a limited record, that individual issues might predominate.  *Pub. Emps. Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc.*, 280 F.R.D. 130, 137 (S.D.N.Y. 2012) (citing *Res. Capital*, 272 F.R.D. at 169) (brackets and internal quotation marks omitted).  As a general matter, "allegations of knowledge or notice appropriately defeat predominance where a district court finds specific statements by certain class members demonstrating specific individual knowledge of the underlying loans and underwriting guidelines set forth in the relevant offering documents."  *IndyMac*, 286 F.R.D. at 238 n.95 (internal quotation marks and ellipsis omitted).

There are no such allegations here.  Rather, Defendants claim that the information available concerning the MBS market changed markedly during the proposed class period from April 2007 to March 2009, citing widely reported "problems" with mortgage originators in 2007 and ratings downgrades affecting the Certificates.  (Defs.' Class Cert. Br. at 24.)  But as Defendants state, this information became public in the context of "market turmoil" (*Id.*), and Defendants cite no information that specifically related to the specific facts at issue here—the Certificates, the Offering Documents, or the disregard of underwriting standards and the falsification of appraisal values and LTV ratios as relevant to this case.  *See Merrill*, 277 F.R.D. at 118 (concluding that a "generic statement" by an executive of a class member's investment advisor "does not come close to suggesting that [the advisor] had any knowledge of appraisal inflation in the Offering Documents at issue here").  The type of generalized information that Defendants reference does not show actual knowledge of the claims at issue in this case by any class member.  *See Tsereteli*, 283 F.R.D. at 214 (concluding that similar indicia were "insufficient to demonstrate that plaintiffs knew . . . of the claims that are central to this case—

that the Offering Documents were materially misleading."); *Merrill*, 277 F.R.D. at 118 ("[T]he evidence in the record that any class member knew of false statements in the Offering before purchase is weak at best."). Accordingly, the Court concludes that differences in public information available over time do not undermine predominance.[11]

     *Sophisticated investors*. The fact that certain investors were more sophisticated usually will not lead to individual inquiries in the absence of any showing that particular members of the class had actual knowledge of the issues specific to the Offering Documents in this case. *See IndyMac*, 286 F.R.D. at 239 ("[W]hile demonstrating that certain class members are sophisticated investors may indicate that these class members were familiar with the MBS market and even understood that there were varying standards for and exceptions to underwriting guidelines used in the industry generally and by IndyMac Bank in particular, it does not establish that any prospective class member likely knew or had notice that the Offering Documents contained misstatements or omissions about IndyMac Bank's adherence to underwriting standards for the Certificates at issue in this case.").

     Where it has not been shown that sophisticated investors had specific knowledge of the alleged falsehoods in the Offering Documents, the courts in this district have rejected a defense specific to such investors. *See, e.g.*, *Tsereteli*, 283 F.R.D. at 213 ("General investment sophistication of certain class members does not show that any of the class members knew anything at all about IndyMac's alleged deviation from its underwriting guidelines."); *N.J. Carpenters Health Fund v. Res. Capital, LLC*, No. 08 Civ. 8781 (HB), 2012 WL 4865174, at *3 (S.D.N.Y. Oct. 15, 2012) ("[E]ven the most sophisticated class members did not have access to

---

[11] Even if Defendants could point to specific facts that gave certain purchasers of the Certificates actual knowledge of the falsity of statements in the Offering Documents—a burden they have not met—the court could consider narrowing the class definition or creating subclasses to eliminate intraclass disparities.

the actual due diligence results and loan files for the certificates at issue and are therefore likely
to be subject to the same knowledge and due diligence defense."), *modified in part*, 288 F.R.D.
290 (S.D.N.Y. 2013); *N.J. Carpenters Health Fund v. DLJ Mortg. Capital*, No. 08 Civ. 5653
(PAC), 2011 WL 3874821, at *6-7 & n.1 (S.D.N.Y. Aug. 16, 2011) (stating that "the fact that
some of the potential class members are sophisticated financial institutions cannot, in itself,
defeat class certification" (citing *Rocco v. Nam Tai Elecs.*, Inc., 245 F.R.D. 131, 136 (S.D.N.Y.
2007))).  Without more, the presence of sophisticated investors in the class does not lead to the
conclusion that some class members had specific knowledge that others did not; thus, their
presence in the class does not affect predominance.

   *Differences in marketing materials and due diligence*.  The nine Offerings in this case
were made up of different sorts of loans—prime, Alt-A, or subprime loans, in declining order of
loan quality.  Investors in different loan categories received differing types of marketing
information and conducted varying due diligence, Defendants say: those investing in riskier
types of loans would often receive more information than those investing in less risky loans.
(Defs.' Class Cert. Br. at 27.)[12]  The Court construes Defendants' papers to argue that some
classes of investors, or perhaps certain investors, possessed loan-level information that permitted
them to develop actual knowledge of alleged untrue statements and omissions in the Offering
Documents.[13]

---

[12] Defendants' contention is a bit shaky in light of the deposition testimony cited, which shows
that various investors in Offerings comprising each type of loan collateral could well have
requested all of the same types of documentation available, depending on each investor's
preferences.  (*See* McLaughlin Decl. Exs. Q at 140-41, R at 263-64.)

[13] Oddly, Defendants never explicitly make this contention, or any other direct argument as to
how differences in marketing documents would lead to actual knowledge, in this section of their
briefing.  Nor do they cite any case that considers whether (much less concludes that) a
difference in marketing materials provided with MBS offerings could prevent common issues
from predominating.

None of the information that Defendants cite, however, shows that the loan-level information that was available to any investor in the Certificates would have revealed that underwriting guidelines were abandoned, appraisal values were inflated, or LTV values were tampered with.  The fact that purchasers of different types of loans received different materials does not give rise to individualized questions as to whether certain class members knew of the allegedly false statements at the time of acquisition.

### c.  Negative Loss Causation

The defendant in a Section 11 action can avoid any portion of the damages suffered by the plaintiff that "represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(e).  "The burden of demonstrating this is entirely on the defendant, as the 'risk of uncertainty' in such instances is placed on the defendant, not on the plaintiff."  *Tsereteli*, 283 F.R.D. at 211 n.95 (quoting *Akerman v. Oryx Commc'ns, Inc.*, 810 F.2d 336, 341 (2d Cir. 1987)).  Even if Defendants raise a defense of negative loss causation, however, it will not require individualized inquiries.  "If the decline in the value of the securities was caused by something other than the alleged misrepresentations or omissions, say, for example, by the general decline in the U.S. securities market, Defendants will be required to rely on generalized proof to support this assertion."  *Merrill*, 277 F.R.D. at 119.  Therefore, negative loss causation does not undermine the predominance of common issues.

### d.  Calculation of Damages

Damages in a Section 11 action are calculated pursuant to a provision of the statute providing for three methods of measuring damages.  That provision provides that Section 11 damages

> shall represent the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought . . . .

15 U.S.C. § 77k(e).

### i.  The Aftermath of *Comcast*

Several years ago, it was clear in this circuit that "the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification."  *Seijas v. Republic of Arg.*, 606 F.3d 53, 58 (2d Cir. 2010).  But this rule, or at least its breadth, is in doubt after the Supreme Court's recent emphasis on the importance of damages calculations to the analysis of predominance at the class certification stage in *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013).  There, the Supreme Court reversed a class certification decision, holding that Rule 23(b)(3) had not been satisfied where the plaintiffs' damages model fell "far short of establishing that damages are capable of measurement on a classwide basis."  *Id.* at 1433.  The decision came in the context of an antitrust class action in which the plaintiffs presented a model for calculating damages that "failed to measure damages resulting from the particular antitrust injury on which petitioners' liability in this action is premised" as opposed to other theories of antitrust impact that were rejected by the district court.  *Id.* at 1433-34.  The Court made clear that damages

calculations "need not be exact" on the basis of the model presented at the class certification

stage.  However, it also stated that the party seeking certification must show that "damages are

capable of measurement on a classwide basis."  *Id.* at 1433.

  "In the wake of *Comcast*, district and circuit courts alike have grappled with the scope,

effect, and application of [its] holding, and in particular, its interaction with non-antitrust class

actions."  *Jacob v. Duane Reade*, 293 F.R.D. 578, 581 (S.D.N.Y. 2013) (discussing state of post-

*Comcast* case law).  The Second Circuit has not yet made a definitive assessment of *Comcast*'s

effects.  However, a recent court of appeals decision prescribed a two-part analysis in order to

ascertain whether damages predominate: "courts should examine the proposed damages

methodology at the certification stage to ensure that it is consistent with the classwide theory of

liability and capable of measurement on a classwide basis."  *Foodservice*, 729 F.3d at 123 n.8

(citing *Comcast*, 133 S. Ct. at 1433-35).  The "linkage between [the] theory of liability and [the]

theory of damages" must be examined "at the class certification stage, even where the inquiry

overlaps with, or is pertinent to, the merits determination."  *Jacob*, 293 F.R.D. at 588 (citing

*Comcast*, 133 S. Ct. at 1432-33) (internal quotation marks and brackets omitted).  As to the

second step, a proposed damages calculation does not need to be purely mechanical, and can

survive "notwithstanding the feasibility-related issue of the potential need for manual input of

certain limited information."  *Megason v. Starjem Rest. Corp.*, No. 12 Civ. 1299 (NRB), 2014

WL 113711, at *6 (S.D.N.Y. Jan. 13, 2014) (quoting *Foodservice*, 729 F.3d at 130) (internal

quotation marks omitted).

### ii.  Application

  Here, at the first step, it appears that any of the securities valuation methods that

Plaintiffs' expert proposes in his report may be sufficiently linked with the theory of liability.  As

long as such methods provide a reliable calculation of value at different points in time, they will

be "consistent with [the Plaintiffs'] liability case," *Comcast*, 133 S. Ct. at 1433, and thus can likely be used for purposes of the statutory Section 11 damages calculation.  However, a more precise specification of the damages calculation method is necessary to assure that the model is in fact linked with the theory of liability.

Moreover, at the second step required by *Comcast*, Plaintiffs have failed to meet their burden of showing that damages can be calculated on a classwide basis.  Their expert, Dr. Joseph Mason, states in his principal report that "[t]here are several ways in which the securities that make up these Offerings can be valued at different points in time," and mentions three methods.  (Mason Report ¶¶ 103-05.)  He concludes by stating that it is his opinion "that class-wide damages can be calculated in a formulaic manner."  (*Id.* ¶ 106.)

Without more specificity as to the methodology that will be used, however, the Court cannot be certain that this is so.  One of Mason's proposals for valuation is to "observe prices paid in market transactions, particularly those driven by indicative bids in the marketplace."  (*Id.* ¶ 103.)   Another proposal relies on prices tracked by third parties like the Interactive Data Corporation.  (*Id.* ¶ 105.)

Mason reiterated at his deposition that he was "confident" in his ability to apply a model "that's applicable, systematically, for all members of the class" and stated that he believed the application of each model would result in similar results.  (Mason Deposition at 131-32.)  However, he has not created such a model to date.  When asked if he would perform both an "observation of prices and market transactions and a model of expected cash flows," he said that he "probably wouldn't take both," and would use "valid market transactions," if there were any.  (*Id.* at 132-33.)

The market for the Certificates was, at times, not particularly liquid.  Moreover, at times during the class period, the market price of the Certificates may have been below the underlying

securities' true value.  Of course, this does not preclude valuation: the "value of a security is not unascertainable simply because it trades in an illiquid market and therefore has no 'actual market price.'"  *NECA*, 693 F.3d at 167.  But it is unclear at this stage how Plaintiffs plan to engage in the difficult process of valuing the complex asset-backed securities that underlie the Certificates.

As a result, Plaintiffs' submissions at this stage do not demonstrate that there is a damages calculation method that will be usable for all class members' claims.  Of course, no actual calculation needs to be performed at this stage.  But without assurance beyond Mason's say-so, the Court cannot conclude that there is a damages model that will permit the calculation of damages on a classwide basis.

### e.  Certification for Liability Purposes Only

For the reasons stated above, the Court finds that the current record establishes that the proposed class meets the predominance requirement for liability purposes, but not for ascertaining classwide damages.  The Court's inability to certify the class as to damages does not preclude certification altogether, however.  Rule 23 permits a suit to be "maintained as a class action with respect to particular issues."  Fed. R. Civ. P. 23(c)(4).  The Second Circuit has held that "a court may employ Rule 23(c)(4)[] to certify a class on a particular issue even if the action as a whole does not satisfy Rule 23(b)(3)'s predominance requirement."  *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 225 (2d Cir. 2006).  The court of appeals came to this conclusion based on the "plain language and structure of Rule 23," as well as the advisory committee's notes, which state that "in a fraud or similar case the action may retain its 'class' character *only* through the adjudication of liability to the class; the members of the class may thereafter be required to come in individually and prove the amounts of their respective claims."  *Id.* at 226 (quoting Fed. R. Civ. P. 23 advisory committee's note to subsection (c)(4)) (emphasis in *Nassau Cnty.*).  *Comcast* does not preclude this approach.  *See Jacob*, 293 F.R.D. at 588

("*Comcast* does not . . . establish a rule that prohibits certification of solely a liability class in the face of individualized proof of damages."); *see also Comcast*, 133 S. Ct. at 1437 n.* (Ginsburg and Breyer, JJ., dissenting) ("[A] class may be certified for liability purposes only, leaving individual damages calculations to subsequent proceedings." (citing 2 William B. Rubenstein, Newberg on Class Actions § 4:54, at 206-08 (5th ed. 2012))).

At this stage, the Plaintiffs have shown that liability may be proven on a classwide basis. Further, to certify a class as to Defendants' liability will "materially advance the disposition of the litigation of the whole." *Jacob*, 293 F.R.D. at 589 (internal quotation marks omitted). Plaintiffs have not made the same showing as to damages in their moving papers. The Court therefore considers the class properly certifiable only as to liability at this time.

### 2.  Superiority

The superiority element requires that the class action be "superior to other methods" for resolving the dispute in question. *In re Initial Pub. Offering*, 471 F.3d at 32 (citing Fed. R. Civ. P. 23(b)(3)). In this analysis, as noted above, the rule directs courts to consider:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). Courts in this district have regularly held that securities class actions are presumed to be superior to individual suits. *See, e.g.*, *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 187 (S.D.N.Y. 2008) ("This is a lawsuit arising under the securities laws, and as is the case in most securities suits, multiple lawsuits would be inefficient and costly. Here, the number of potential plaintiffs is high, but the amount of potential recovery per plaintiff is not so high as to ensure that each plaintiff could or would bring an action individually.").

Defendants have submitted an exhibit reflecting that fifteen members of the proposed class have opted out by filing individual actions or by entering tolling agreements. (McLaughlin Decl. Ex. PP.) Defendants assert that the opt-out litigation accounts for "nearly 25% of the original principal balance of the Certificates."[14] (Defs.' Class Cert. Br. at 39.) Further, they say, "many of the members of the Proposed Class are sophisticated institutional investors and/or are advised by professional investment managers, and thus are fully capable and experienced in vindicating their own rights." (*Id.* at 40.)

Defendants' superiority argument is meritless. First, the fact that some class members have opted out does not preclude a superiority determination; if it did, "few class actions would ever reach the trial room." *Res. Capital*, 2013 WL 6839093, at *5; *see also Dodona*, 296 F.R.D. at 271 ("[T]he mere fact that claims *could* be asserted independently is not a reason to defeat class certification."). The loss of fifteen members leaves well over a thousand members in the proposed class, and "the fact that so many investors remain in these lawsuits militates in favor of adjudicating the issues as [a] class action[]." *Res. Capital*, 2013 WL 6839093, at *5. Nor does the fact that the class includes "sophisticated institutional investors" with "large individual claims" defeat superiority when "the advantages of unitary adjudication exist to determine the defendant's liability." *Merrill*, 277 F.R.D. at 120 (internal quotation marks omitted).

Moreover, the fact that some of the *larger* stakeholders have opted out is of little moment: a significant advantage of the class action form is that it permits recovery by *smaller* stakeholders, for whom it may not be sensible to maintain an individual action. *See, e.g.*, *In re*

---

[14] Defendants' support for their assertion that opt-outs comprise 25% of the value of the Certificates is unclear. Their memorandum in opposition to class certification cites a declaration, which itself cites an exhibit which does not demonstrate the proportional holdings of each opt-out investor. (*See* McLaughlin Decl. Ex. PP.) However, the Court reaches the same result even assuming the truth of Defendants' assertion.

*Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124, 132 (S.D.N.Y. 2008) (noting that where a case involves a "large number of potential claimants" and a "relatively small damage [amount] suffered by each claimant," it is "unlikely that individual plaintiffs would endure the expense of litigation in order to bring their claims"); *Dodona*, 296 F.R.D. at 271 (stating that "there is a risk that absent [a] class action, certain investors would be unable to adjudicate their claims" where some class members' investments are smaller).

The Plaintiffs have shown that the superiority requirement is satisfied.

### 3.   Ascertainability

A final requirement of Rule 23(b)(3) is that the proposed class be ascertainable—that is, "readily identifiable, such that the court can determine who is in the class and, thus, bound by the ruling." *Charron v. Pinnacle Grp. N.Y. LLC*, 269 F.R.D. 221, 229 (S.D.N.Y. 2010) (internal quotation marks omitted).  Defendants argue that the class is not ascertainable because Plaintiffs' proposed formulation of the class definition excludes those purchasers of Certificates who were not "damaged thereby."  (Defs.' Class Cert. Br. at 19.)

The Court disagrees that there is any difficulty with ascertainability.  The parties whose interests are at stake in this litigation due to the securities violations alleged in the SAC are all those who held ownership interests in the nine Trusts during the class period, information that is or will become available through appropriate discovery.  (*See* Ptfs.' Class Cert. Br. at 5 n.8.)  The phrase "and were damaged thereby" appears regularly in class definitions even though the ultimate question of damages may not be settled until later in the litigation.  *See, e.g.*, *Dodona*, 296 F.R.D. at 264, 268 (approving class definition consisting of those investing in financial instruments who were "damaged thereby," despite defendants' argument that lead plaintiffs are unable to demonstrate damages); *In re Bear Stearns Cos. Sec. Litig.*, 909 F. Supp. 2d 259, 262

n.2, 268 (S.D.N.Y. 2012) (approving settlement class definition including phrase "and were damaged thereby" while recognizing the possibility that a jury might award no damages).

Furthermore, because the class is currently certified for liability purposes, this phase of litigation will focus on the issue of whether Defendants made material false statements or omissions in the Offering Documents that affected the value of the Certificates owned by the plaintiff class members.  Defendants make no argument that Plaintiffs are not ascertainable on the issue of *liability*, the only issue as to which the class is certified by this order, and accordingly Defendants' ascertainability objection is inapplicable.

The Court is satisfied that the class certified for liability purposes is sufficiently ascertainable.

## IV.   Conclusion

For the foregoing reasons, Plaintiffs' motion for class certification is GRANTED in part and DENIED in part, and Defendants' motion in limine is DENIED.  A class composed of "all persons or entities who, prior to March 23, 2009, purchased or otherwise acquired any Certificates in any of the Offerings" set out above in note 4 is certified for purposes of liability only.  Laborers Pension Trust Fund for Northern California and Construction Laborers Pension Trust for Southern California are appointed class representatives, and Robbins Geller is appointed class counsel.

Pursuant to Rule 23(c)(1)(C), this class certification order "may be altered or amended before final judgment."  In that regard, the denial of Plaintiffs' motion as to damages is without prejudice to a renewed certification motion providing additional evidence regarding whether damages can be proven on a classwide basis.

The Clerk of the Court is directed to terminate the motions at docket numbers 222 and

294.

SO ORDERED.

Dated: September 30, 2014
       New York, New York

_____
            J. PAUL OETKEN
        United States District Judge